# In The Matter Of:

*TARYN N. DUIS v.*

*FRANCISCAN ALLIANCE INC., et al.*

---

*LINDA STEINHILBER*

*May 7, 2021*

*Cause No. 2:20-cv-00078-PPS-APR*

---

*BOSS REPORTERS*

*Gary * Merrillville * Valparaiso, Indiana*

*3893 East Lincoln Highway (Rt. 30)*

*Merrillville, Indiana  46410*

*(219) 769-9090*



Original File 05-07-21 LINDA STEINHILBER.txt

Min-U-Script® with Word Index

**EXHIBIT 8**

LINDA STEINHILBER                              18
Cause No. 2:20-cv-00078-PPS-APR

```
1        A.    Travis Thatcher-Curtis, Dawn Scott and I
2   believe members of the ICU and the progressive care
3   unit.
4        Q.    Okay.  And did you receive that
5   position?
6        A.    Yes.
7        Q.    And then did you become the nursing
8   manager for both the ICU and PC units for
9   Franciscan?
10       A.    Yes.
11       Q.    Do you recall when you over took that
12  position?
13       A.    In March it would have been the next
14  year.  So what is that?  2019, I believe.
15       Q.    And when I say PCU, that stands for
16  progressive care unit?
17       A.    Correct.
18       Q.    And when I say ICU, what does that stand
19  for?
20       A.    Intensive care unit.
21       Q.    Were you the only nursing manager
22  within those two departments at the time you were
23  hired?
24       A.    Yes.
25       Q.    And you held onto that position until at
```

1    their approval?

2         A.    Right.

3         Q.    But that's never happened, correct?

4         A.    No.

5         Q.    So when I say like can you recommend

6    discipline, you obviously in terms of -- if you

7    want to put someone on a final written warning per

8    se, would that be something that you would create

9    first and take to HR for their approval?

10        A.    No, it does not work that way.

11        Q.    How would it work?

12        A.    So an employee must go through all the

13   steps, and if the steps were missed or the steps

14   are changed, that comes from HR, not from me.

15        Q.    What do you mean if the steps are

16   missed?

17        A.    If an employee is given a corrective

18   action, you start with the first step and you go

19   through the steps.

20        Q.    So it is supposed to be progressive?

21        A.    Correct.

22        Q.    Do you know Taryn Duis?

23        A.    Yes.

24        Q.    When did you first meet Ms. Duis?

25        A.    I cannot tell you the date.  I met her

```
 1   one morning after one of her shifts before she was

 2   leaving the hospital.

 3        Q.   Okay.  Would this probably have been

 4   sometime in March or April of 2019?

 5        A.   It was when I first started as I was

 6   meeting all my employees so I would imagine

 7   sometime in March.

 8        Q.   And did Ms. Duis work in the PCU?

 9        A.   Yes.

10        Q.   And what position did she hold?

11        A.   She was an RN and a charge nurse.

12        Q.   Okay.  What is the difference in duties

13   between a charge nurse and a registered nurse?

14        A.   Charge nurse oversees the entire unit,

15   places admissions, assist nurse, just have an

16   overall charge, managing the PCAs, managing the

17   floor.

18        Q.   Are there charge nurses for both day

19   shift and night shift?

20        A.   Yes.

21        Q.   And is there one charge nurse for a day

22   shift and one charge nurse for a night shift?

23        A.   Probably more than one.

24        Q.   But only one per shift?

25        A.   Yes.
```

```
 1        Q.    Okay.  Because there's different days?

 2        A.    Correct.

 3        Q.    A nurse isn't going to work seven days a

 4   week, there's going to be some to cover.

 5              And so was Taryn one of the charge

 6   nurses for the night shift?

 7        A.    Yes.

 8        Q.    And was the other charge nurse at the

 9   time you worked with Taryn, would that have been

10   Jen Moreno?

11        A.    I don't know that Jen Moreno was even

12   part of that unit when I was there.  I don't

13   believe she was.

14        Q.    And do you know who Jen Moreno is?

15        A.    Yes, I do.

16        Q.    And is Jen Moreno still working there?

17        A.    Yes, she's a float floor nurse.

18        Q.    She's a float nurse?

19        A.    Yes.  I don't believe -- she was not in

20   PCU when I took it over.  She was a float floor

21   nurse.

22        Q.    In April of 2019, were you Ms. Duis'

23   direct supervisor?

24        A.    Yes.

25        Q.    And what shift did you normally work in
```

LINDA STEINHILBER                    29
Cause No. 2:20-cv-00078-PPS-APR

1  April of 2019?

2       A.    Usually a 7 to 3, 4 shift.

3       Q.    Okay.  Did you ever during Ms. Duis'

4  employment with Franciscan work the night shift

5  with her?

6       A.    I came in and rounded on the shifts.

7       Q.    What time would that have been?

8       A.    3 in the morning, 4 in the morning.  It

9  varied.  Very infrequently.  Maybe three -- two or

10  three times.

11       Q.    Is it fair to say that Ms. Duis -- you

12  and Ms. Duis only worked in a supervisory employee

13  relationship for approximately two months?

14       A.    Correct.

15       Q.    Okay.  So on how many -- how many total

16  occasions did you have a chance to actually speak

17  with Ms. Duis during that time?

18       A.    During her shift?

19       Q.    During her employment.

20       A.    Oh, I can tell you I spoke face-to-face

21  with Ms. Duis two times.

22       Q.    Two times in total during her

23  employment?

24       A.    Yes.

25       Q.    During Ms. Duis' employment, did you

LINDA STEINHILBER                              35
Cause No. 2:20-cv-00078-PPS-APR

```
 1        Q.    Did you ever issue her any final written
 2   warning?
 3        A.    No.
 4        Q.    Prior to Ms. Duis being -- Prior to
 5   Ms. Duis being suspended, had Ms. Duis told you
 6   that she was pregnant?
 7        A.    I can't remember that conversation if
 8   she was pregnant, no.
 9        Q.    Prior to Ms. Duis being suspended, did
10   you have any reason to believe she was pregnant?
11        A.    Say that again.
12        Q.    Prior to Ms. Duis being suspended, did
13   you have any reason to believe she was pregnant?
14        A.    Yes.
15        Q.    And what do you base that belief on?
16        A.    I believe I heard it from one of the
17   other staff.
18        Q.    Do you remember who that was?
19        A.    No.
20        Q.    Did Ms. Duis ever tell you she was
21   pregnant prior to her suspension?
22        A.    I can't recall that conversation.
23        Q.    So it's possible, but you just can't
24   remember?
25        A.    Yes.
```

1      Q.    Prior to Ms. Duis being suspended, did

2  Ms. Duis inform you that she expected to take

3  family medical leave for the birth of her child?

4      A.    No, I don't recall that conversation.

5      Q.    Prior to Ms. Duis being terminated, did

6  Ms. Duis inform you that she expected to take

7  family medical leave for the birth of her child?

8      A.    No.

9      Q.    Prior to her suspension, did Ms. Duis

10  ever inform you that she expected to take maternity

11  leave?

12      A.    No.

13      Q.    Prior to her termination, did Ms. Duis

14  ever inform you that she expected to take maternity

15  leave?

16      A.    No.

17      Q.    Did any other employee tell you that

18  Ms. Duis was expected to take maternity leave for

19  the birth of her child?

20      A.    I can't -- I cannot remember how I found

21  out Ms. Duis was pregnant or that there was nothing

22  specifically mentioned about her taking maternity

23  leave.  It's rather assumed when someone is

24  pregnant that they will take a maternity leave.

25      Q.    But you don't recall anyone ever telling

LINDA STEINHILBER                               37
Cause No. 2:20-cv-00078-PPS-APR

1   you that?

2        A.    I heard it from someone.  I'm not

3   certain who.

4        Q.    You heard it from someone that she was

5   pregnant?

6        A.    Yes.

7        Q.    Did you hear it from someone that she

8   was taking maternity leave or that she was going to

9   take maternity leave?

10        A.    I don't remember those words being

11   said.

12        Q.    Okay.  Does Franciscan have a policy

13   with regards to family medical leave?

14        A.    Yes.

15        Q.    Are you familiar with that policy?

16        A.    Yes.

17        Q.    Do you recognize that policy as

18   Exhibit 4?

19        A.    I realize this is the policy.

20        Q.    You have no reason to dispute that

21   Exhibit 4 is not the family medical leave policy?

22        A.    Correct.

23        Q.    Do you know a nurse by the name of Dawn

24   Smith?

25        A.    Yes.

1   care?

2        A.    Yes.

3        Q.    As part of being a licensed nurse in the

4   State of Indiana, are nurses prohibited from

5   falsifying documentation of nursing actions?

6        A.    Yes.

7        Q.    As part of being a licensed nurse in the

8   State of Indiana, are nurses required to notify

9   their employer of any unprofessional conduct which

10  may jeopardize patient or client safety?

11       A.    Are they required to?

12       Q.    Yeah.

13       A.    I don't know that answer.  Does the

14  state law require that?  I don't know.

15       Q.    As being part of a licensed nurse, are

16  nurses required to notify their employee of

17  unprofessional conduct which may jeopardize patient

18  or client safety?  Do you know?

19       A.    I do not know.

20       Q.    Okay.  In April of 2019, did you ever

21  approach Ms. Duis and question her about whether or

22  not Ms. Duis had any problems with Dawn Smith?

23       A.    Did I approach her?  No.

24       Q.    Did you question Ms. Duis in April of

25  2019 whether or not she had any problems with

LINDA STEINHILBER                              44
Cause No. 2:20-cv-00078-PPS-APR

1  Ms. Dawn Smith?

2      A.    I spoke to her on the telephone about

3  that.

4      Q.    Okay.  And what did you ask her?

5      A.    I asked her if she was okay after being

6  sent home in the middle of the night with a

7  whatever, anxiety attack.  I called her late in the

8  morning and asked her how she was.

9            I did ask her if she had issues with

10 or concerns about working with Dawn Smith, and if

11 she did, I told her she needed to go to human

12 resources.

13     Q.    Did any employee ever tell you that

14 Ms. Duis and Dawn Smith had a conflict at work that

15 previous evening?

16     A.    Yes.

17     Q.    What employee told you that?

18     A.    It was the night supervisor.

19     Q.    Who was that?

20     A.    I believe it was Connie Smith that

21 night.

22     Q.    So Connie Smith informed you that

23 Ms. Duis and Dawn Smith had a conflict at work?

24     A.    Yes.

25     Q.    And what did she say that conflict was?

LINDA STEINHILBER                          45
Cause No. 2:20-cv-00078-PPS-APR

1      A.    I cannot recall the exact information or

2   the exact words, but I remember Ms. Duis was sent

3   home by the physician after being -- all I remember

4   the words saying she was very anxious and needed to

5   go home and the physician sent her home after

6   having an issue with Dawn Smith at work.

7      Q.    Was this issue in terms of Dawn Smith

8   somehow attacking her at work?

9      A.    I have no idea.  I do not know.

10      Q.    Do you know whether or not the issue was

11   her and Dawn Smith having some sort of conflict at

12   work?

13      A.    I was told it was a conflict.  I do not

14   know what it was over.

15      Q.    But you do recall that -- apparently

16   your understanding was Ms. Duis had some sort of

17   anxiety attack and then the physician sent her home

18   early?

19      A.    She needed to be sent home early,

20   correct.

21      Q.    Did anyone ever tell you that Dawn Smith

22   had caused plaintiff to have an anxiety attack at

23   work?

24      A.    I was told there was an issue between

25   Ms. Duis and Dawn Smith that caused Ms. Duis the

```
 1   need to leave work.
 2        Q.    And that was told to you by Connie
 3   Smith?
 4        A.    Yes.
 5        Q.    Was that in writing or verbal?
 6        A.    Verbal.
 7        Q.    During the time that you were Ms. Duis'
 8   direct supervisor, did you ever impersonate
 9   Ms. Duis by stating, "oh, I have to call a doctor
10   to the floor for myself" in reference to Ms. Duis?
11        A.    No.
12        Q.    During the time you were Ms. Duis'
13   supervisor, did you ever impersonate Ms. Duis by
14   stating, "I can't handle my job.  I'm pregnant, I
15   can't do my job."
16        A.    No.
17        Q.    In April of 2019, did you ever instruct
18   Ms. Duis to inform human resources that Dawn Smith
19   had caused a confrontation with Ms. Duis?
20        A.    Please repeat what you said.
21        Q.    In April of 2019, did you ever instruct
22   Ms. Duis to inform human resources that Dawn Smith
23   had caused a confrontation with Ms. Duis?
24        A.    I did not instruct.  I offered her that
25   option if she was concerned about Ms. Smith.
```

LINDA STEINHILBER                       62
Cause No. 2:20-cv-00078-PPS-APR

1  took.

2      Q.    Okay.  And in terms of the reason for

3  Ms. Duis being suspended, why was she suspended at

4  that time?

5      A.    Finishing our investigation, which is

6  why we suspended her, and then pending the

7  statements we had received from staff.

8      Q.    Okay.  Do you recall what specific

9  reasons why she was suspended?

10     A.    Withholding pain medication, the words

11 "I hate being a fucking nurse" stick in my mind.  I

12 can't remember anything more at this point.

13     Q.    Okay.  So in terms of you said with

14 regards to pain medication, what specifically was

15 wrong with pain medication?

16     A.    It was reported she stated to a

17 patient when a patient asked for pain medication,

18 that that patient "would fucking have to wait.  He

19 should have taken it before when I offered it."

20     Q.    Did a patient -- Are you aware of any

21 patient complaining that they did not receive their

22 pain medication?

23     A.    I don't know.  I don't know that.  I

24 remember talking to the patient -- I'm incorrect,

25 not that patient.  I looked in the patient's chart

BOSS REPORTERS
(219) 769-9090

1   and there was a delay in receiving the medication,

2   but I did not speak to that patient.

3        Q.    How long was the delay?

4        A.    I can't remember, sir.

5        Q.    Did the patient complain?

6        A.    I don't know, sir.

7        Q.    Are sometimes patient's -- pain

8   medications for patients delayed because nurses are

9   busy with other patients?

10       A.    That could be.  That could be true, yes.

11       Q.    Was it true in this case?

12       A.    Sitting at a computer?  I don't know.

13       Q.    Who was sitting --

14       A.    I understand she was sitting at the

15   computer when that comment was made.

16       Q.    Okay.  So sitting at a computer when the

17   comment was made, who told you this?

18       A.    That was one of the witness's statement.

19       Q.    Okay.  Who was that witness?

20       A.    I would have to look at the --

21       Q.    You don't recall?

22       A.    No.

23       Q.    Okay.  So exactly what is your

24   understanding as to the reasons, the best that you

25   can recall, that there was a delay -- There was a

LINDA STEINHILBER                          64
Cause No. 2:20-cv-00078-PPS-APR

1  delay in a patient receiving a medication, correct?

2       A.    A delay or withholding.

3       Q.    You think she withheld purposely?

4       A.    Delay.  I'm sorry, delay.  Correct,

5  delay.  The patient did receive the pain medicine.

6       Q.    And you don't know how much time went

7  by?

8       A.    No.

9       Q.    Was it ever reported to you that you

10 know how much time went by?

11      A.    Yes, when we looked at it in the

12 beginning I did remember.  I don't know.  I did

13 know.  I don't know now.

14      Q.    Would that be an important fact to mark

15 down in any investigation?

16      A.    It might be.  I just don't remember now.

17      Q.    So you believe there was a delay in pain

18 medication and then there was some statement made

19 by Ms. Duis?

20      A.    Yes.

21      Q.    What was that statement again?

22      A.    Something to the extent of he can

23 fucking wait for his medication.  He should have

24 taken it when I offered it before.

25      Q.    Was that made in front of the patient?

**BOSS REPORTERS**
**(219) 769-9090**

1      A.    No.

2      Q.    Who was it made in front of you?

3      A.    The nursing staff.

4      Q.    The nursing staff.  Do you know which

5  nurse in particular reported the statements to

6  you?

7      A.    I would have to look at the statements.

8      Q.    In terms of what lead to Ms. Duis'

9  suspension, how did this all start?  Did someone

10  come to you and say I witnessed this with Ms. Duis

11  or how did it begin?

12      A.    The investigation started because of the

13  reported incidents between Dawn Smith and Taryn

14  Duis.

15      Q.    Which Ms. Duis said didn't happen?

16      A.    Correct.  So that is the only thing that

17  started me even asking questions about Ms. Duis

18  from what I remember.  You know, I don't remember

19  the exact date.

20             One comment that started the

21  investigation to talk to all the nurses who were

22  there that night was the comment -- oh, and it was

23  Jen Justice, I'm sorry, I do remember who said the

24  patient -- her response to a patient wanting pain

25  medication was "he can fucking wait," as I said.

1  That's what started me asking all of the nurses

2  what they saw and what they heard that evening.

3         Q.    So the investigation started because Jen

4  Justice came to you and told you that this

5  statement was made?

6         A.    Yes.

7         Q.    When did she tell you that?

8         A.    I can't give you that date.  I don't

9  recall.

10        Q.    Based upon what Jen Justice told you,

11  you decided to start an investigation?

12        A.    Correct.

13        Q.    Are you the one that started the

14  investigation into Ms. Duis?

15        A.    Yes.

16        Q.    Were you the one in charge of the

17  investigation into Ms. Duis as her nursing manager?

18        A.    Yes.

19        Q.    Okay.  And that investigation into

20  Ms. Duis that you were responsible for, that

21  investigation eventually lead to Ms. Duis'

22  termination?

23        A.    Yes.

24        Q.    And have you told me all the facts that

25  you recall that would give rise to the termination

LINDA STEINHILBER                              80
Cause No. 2:20-cv-00078-PPS-APR

1   this -- was Jessica also on the phone?

2        A.    Yes, Jessica and I were together.

3        Q.    And you called Ms. Duis?

4        A.    Yes.

5        Q.    And at that point you had made the

6   decision to suspend her?

7        A.    Yes.

8        Q.    That was based upon the conversations

9   you had with the employees?

10        A.    Yes, their statements.

11        Q.    Okay.  Do you know whether or not prior

12   to this -- This is May 9th, 2019.  Is that the time

13   that you suspended Ms. Duis?

14        A.    I would have to look at the date.  I

15   don't know.

16        Q.    If you look at Exhibit 14, it has a

17   date.  These are your notes.  It says called Taryn

18   Duis on --

19        A.    Correct.  Yes.

20        Q.    You called her on May 9, 2019?

21        A.    Yes.

22        Q.    At this point had you talked to the

23   witnesses?

24        A.    Yes.

25        Q.    Had you received statements from the

1   witnesses?

2       A.    Yes.

3       Q.    And it says here in these notes, it says

4   "I feel I'm being targeted."  Who said that?

5       A.    I believe Ms. Duis did.

6       Q.    Did she say why she felt she was being

7   targeted?

8       A.    I can't remember, sir.

9       Q.    It says, "I said I can't wait until

10  October."  Do you see that?

11      A.    Yes.

12      Q.    Did you write that?

13      A.    This I don't believe was my handwriting.

14      Q.    Have you seen this before?

15      A.    Yes.

16      Q.    You don't know whether or not you wrote

17  this?

18      A.    This is not my handwriting.  I believe

19  we decided this was Ms. Jessica's handwriting.

20      Q.    Okay.  But does this refresh your memory

21  when she says, "I can't wait until October," what

22  that is in reference to?

23      A.    Yes.

24      Q.    What is it in reference to?

25      A.    I can't wait until October.  We never

```
 1              MS. ROBERSON:  I do want to interject.  I
 2   think you might have misinterpreted something that
 3   she said.  I'm not positive, but she said she
 4   reviewed this in preparation.  I don't think she
 5   was referring to in preparation for the deposition.
 6              MR. FOX:  That's fine.
 7              THE WITNESS:  No, that's correct, for the
 8   deposition.
 9              MS. ROBERSON:  Okay.  All right.
10              THE WITNESS:  That was the first I had
11   seen that.
12              MS. ROBERSON:  All right.
13   BY MR. FOX:
14        Q.   Are these the witness statements that
15   you collected with regards to Ms. Duis?
16        A.   Yes.
17        Q.   Okay.  And if we start off, were these
18   statements -- Who typed this up?  Let's start with
19   Page 31.
20              MS. ROBERSON:  He is referring to the
21   Bates number.
22              MR. FOX:  Bates stamp No. 31, first page.
23              MS. ROBERSON:  The very bottom of the
24   page it says Franciscan 31.
25   BY MR. FOX:
```

1      Q.    Who typed this statement up?

2      A.    I believe I typed these statements up

3  and gave them to -- strictly because I don't

4  believe staff has access to these, to the form.

5      Q.    So you received a statement from Jen --

6  you typed up this statement from Jen Justice?

7      A.    Correct.

8      Q.    The date of this alleged incident, was

9  that May 8 of 2019?

10     A.    That's what that states, yes.

11     Q.    And if you refer back to a previous

12  exhibit, your notes in terms of when Ms. Duis was

13  suspended, you suspended her on May 9th of 2019?

14     A.    Okay.

15     Q.    Is that correct?

16     A.    Yes.

17     Q.    And in this it says that is this Jen

18  Justice -- is this the statement that she provided

19  to you?

20     A.    These are her exact words.

21     Q.    Okay.  And it says at the bottom, it

22  says, "I was a witness to this phone conversation."

23     A.    Right.

24     Q.    Whose writing is that?  Is that Jen

25  Justice?

LINDA STEINHILBER                           97
Cause No. 2:20-cv-00078-PPS-APR

```
 1        A.    That is Heather.  Sir, I don't remember
 2   if that was Jen Justice who wrote that.  I don't
 3   remember.
 4        Q.    So the name of the person submitting
 5   this statement it says Jen Justice?
 6        A.    Correct.
 7        Q.    And at that time was Jen Justice a
 8   manager for --
 9        A.    No, Jen Justice is a nurse who states
10   this is her statement and signs that this is her
11   statement.
12        Q.    But down at the bottom whose signature
13   is that?
14        A.    This is her manager, Heather Wyatt.  So
15   it was a phone -- a received written -- Let me
16   explain this.
17              It was typed up and read to Jen
18   Justice over the phone and she agreed that this is
19   what it stated, and she signed it and her manager
20   is saying I was a witness to this phone
21   conversation.
22        Q.    Had you previously talked to Jen Justice
23   before this?
24        A.    Yes.
25        Q.    When did you talk to Jen Justice?
```

BOSS REPORTERS
(219) 769-9090

LINDA STEINHILBER                         98
Cause No. 2:20-cv-00078-PPS-APR

1      A.    I can't remember the exact date.

2      Q.    And it says -- Who's PCA KB?  Do you

3   know who that is?

4      A.    I would imagine they are talking about

5   Buchanan.

6      Q.    Who you've never spoken with her?

7      A.    I cannot remember speaking with her,

8   sir.

9      Q.    And is this -- so apparently is this

10  something that Jen Justice -- but you can't

11  remember when you spoke to Jen Justice?

12     A.    No.

13     Q.    You may have notes on that conversation,

14  but you can't remember that either, correct?

15     A.    Correct.

16     Q.    If you did have notes, those would have

17  been turned over to HR, correct?

18     A.    Yes.

19     Q.    So in terms of the top portion of Bates

20  stamp 31, that's something that you typed up?

21     A.    I believe so.  Staff does not have

22  access to these forms.

23     Q.    So Jen Justice did not sign this

24  statement, correct?

25     A.    I believe this is Jen Justice's

1   signature down here next to Heather Wyatt.

2       Q.   Okay.  Her initials?

3       A.   Correct.

4       Q.   And then Heather Wyatt?

5       A.   Correct.

6       Q.   It's your understanding this was a phone

7   conversation?

8       A.   I know I talked to Jen in person, but to

9   get this written down in her words, that was a

10  phone conversation to make sure I had her verbiage

11  correct.

12      Q.   Did Jen work the night shift?

13      A.   Yes.

14      Q.   And if we turn to the second page, now

15  this one is also dated May 14th of 2019.  Is that

16  when you talked to Christine Rogalski?

17      A.   No.  The date that it happened would

18  have been again 5/8.

19      Q.   So you talked to them -- Did you talk to

20  Jen Justice before Ms. Duis was suspended?

21      A.   Yes.

22      Q.   Okay.  Did you talk to Christine

23  Rogalski before Ms. Duis was suspended?

24      A.   Yes.

25      Q.   So you talked to them -- basically if

LINDA STEINHILBER                              100
Cause No. 2:20-cv-00078-PPS-APR

1    the incident happened on May 8th, your testimony is

2    then you spoke to them the next day?

3         A.    Or the same day, yes.

4         Q.    Is that correct?

5         A.    That's what I believe happened, yes.

6         Q.    Okay.  And is Christine Rogalski, is she

7    a night shift nurse?

8         A.    Yes.

9         Q.    So she was working that night?

10        A.    Yes.

11        Q.    Of the incident on May 8, 2019?

12        A.    Yes.

13        Q.    It states here, "Taryn has stated in the

14   nurse's station she hates being a nurse and doesn't

15   know if she is coming back after October."  Is that

16   what Christine told you?

17        A.    Yes.  These are their words.

18        Q.    But you did not ask her why she wasn't

19   coming back in October?

20        A.    No.

21        Q.    Nor did you ask her what the

22   significance of October was, correct?

23        A.    No.

24        Q.    And if we turn to the next page, and it

25   looks like this was a statement signed by Heather

LINDA STEINHILBER                           101
Cause No. 2:20-cv-00078-PPS-APR

```
 1   Wyatt?

 2        A.   Correct.

 3        Q.   And Heather Wyatt is a supervisor?

 4        A.   Correct.

 5        Q.   And did you ask Heather Wyatt to provide

 6   this statement?

 7        A.   To provide a statement?

 8        Q.   Yes.

 9        A.   I asked her if she had any information.

10        Q.   And she talked -- Heather Wyatt talked

11   to you before you had suspended Ms. Duis, correct?

12        A.   I can't remember that, sir.

13        Q.   Did you take notes with regards to

14   Ms. Wyatt's conversation with you?

15        A.   These would have been -- what this would

16   have been when she stated.

17        Q.   Did you have handwritten notes possibly

18   also?

19        A.   I would have before I wrote these, yes.

20        Q.   And would you have also had handwritten

21   notes with regard to Ms. Rogalski?

22        A.   Yes.

23        Q.   And then you took those handwritten

24   notes and then you prepared those statement?

25        A.   Yes.
```

LINDA STEINHILBER                        102
Cause No. 2:20-cv-00078-PPS-APR

1      Q.    And then you submitted them for

2   signature or Ms. Wyatt submitted them for

3   signature, correct?

4      A.    To her staff, yes.

5      Q.    Okay.  And it says here, it says

6   "Heather Wyatt reports that float staff do not want

7   to float to the PCU related to the negativity and

8   the behavior of nurses, including Taryn Duis."

9              Did you ask Ms. Wyatt were there

10  other nurses that were negative on that staff?

11     A.    I did.

12     Q.    And who were they?

13     A.    I cannot remember their names, sir.

14     Q.    Were they disciplined?

15     A.    I don't know who they were anymore.

16     Q.    Did you followup on her saying that it

17  wasn't just Taryn being negative but other nurses?

18  Did you do any followup on that?

19     A.    There was no incident that was brought

20  to my attention to discipline any other staff

21  besides Kim Buchanan sleeping.

22     Q.    When you spoke with Jen Justice before

23  the suspension, was that a conversation just

24  between you and Jen?

25     A.    When I did my investigation?

LINDA STEINHILBER                    103
Cause No. 2:20-cv-00078-PPS-APR

1       Q.    You said you spoke with Jen before

2  Ms. Duis was suspended?

3       A.    Yes.

4       Q.    Was your conversation just between you

5  and Jen?

6       A.    Yes.

7       Q.    Okay.  And you also spoke with Christine

8  Rogalski --

9       A.    Yes.

10       Q.    -- before Ms. Duis was suspended?

11             And was your conversation with

12  Christine Rogalski just you and Christine?

13       A.    Yes.

14       Q.    No one else was present?

15       A.    Correct.

16       Q.    And when you spoke with Heather Wyatt

17  before Ms. Duis was suspended, your conversation

18  was only with Ms. Wyatt and no one else was

19  present?

20       A.    Correct.

21       Q.    And then we also have Connie Snow and

22  Connie Snow is -- does she work night shifts?

23       A.    Yes.

24       Q.    Okay.  And did you speak with Connie

25  Snow before Ms. Duis was suspended?

```
 1        A.    Yes.

 2        Q.    Was that conversation just between you

 3   and Ms. Snow?

 4        A.    Yes.

 5        Q.    Okay.  And it says here, "Taryn was

 6   excited stating she hates being a nurse and doesn't

 7   want to come back after October.  Connie described

 8   Taryn's appearance as elevated and anxious,"

 9   correct?

10        A.    Yes.

11        Q.    Did you ask Connie what's so significant

12   about October?

13        A.    No.

14        Q.    And as we turn to the next page, who is

15   Carrie Renchen?

16        A.    She is a director from a different --

17   she runs the OB admittance.

18        Q.    Okay.  Does she work on the night shift?

19        A.    No.

20        Q.    Did you talk to Carrie before Taryn was

21   suspended?

22        A.    I did not go to Carrie at all.  Carrie

23   came to me.

24        Q.    Why did she come to you?

25        A.    Because she wanted to know whose
```

1   employee Ms. Duis was because she was acting out in

2   a uniform fitting and she was reporting to me that

3   the employee was inappropriate in uniform fitting.

4        Q.   How was she inappropriate?

5        A.   She was upset about the fitting of the

6   uniform, she was lewd and argumentative with staff

7   assisting with fitting.

8        Q.   Is that all she told you?

9        A.   Yes.

10       Q.   Did you write a note regarding that?

11       A.   No, I asked her to write the statement.

12       Q.   And then you typed it up?

13       A.   Yes, and she signed it.

14       Q.   Okay.  And then did you speak with her

15   before Ms. Duis was suspended?

16       A.   I can't remember the date of this.  This

17   was brought to me.

18       Q.   Okay.  Did she tell you that Ms. Duis

19   was upset about the fit of the uniforms because

20   Ms. Duis was pregnant?

21       A.   No.

22       Q.   And so is it your testimony that the

23   exhibits here, the statements on Exhibit 7, these

24   were all conversations you had with people prior to

25   Ms. Duis being suspended?

**LINDA STEINHILBER**                                    106
**Cause No. 2:20-cv-00078-PPS-APR**

1         A.    That's what I believe, yes.

2         Q.    And then you later went back and then

3    had them sign the statements on May 14th of 2019?

4         A.    Yes.

5         Q.    And in terms of all of these interviews

6    the only people present in these interviews were

7    you and the individuals, correct?

8         A.    Correct.

9         Q.    HR wasn't present?

10        A.    Correct.

11        Q.    And was this what you brought with

12   you -- Did you have these at the time you went to

13   the termination meeting with Travis and HR?

14        A.    Yes.

15        Q.    And you provided copies of this to

16   them?

17        A.    They had their -- they saw the forms,

18   yes.

19        Q.    Do you recall anything -- From the time

20   that you suspended Ms. Duis to the time she was

21   terminated, do you recall anything else you did

22   with regards to your investigation?

23        A.    No, I did not do anything else.

24        Q.    So using -- so this is what you took

25   with you to present to the -- and based upon these

1   Ms. Duis would not be returning to work following

2   maternity leave?

3        A.    No.

4        Q.    Did you ever mock Ms. Duis for being

5   pregnant?

6        A.    No.

7        Q.    Was Ms. Duis terminated in part because

8   she couldn't wait to be on maternity leave in

9   October?

10        A.    No.

11        Q.    Do you know why you said that Taryn --

12   Did you type Taryn stated she said she couldn't

13   wait until October to be on maternity leave?

14        A.    I see that.

15        Q.    You typed that?

16        A.    Yes.

17        Q.    Do you know whether or not Ms. Duis'

18   final performance evaluation met Franciscan

19   expectations?

20        A.    I do not know.

21        Q.    We'll turn to -- Do you recognize what

22   has been marked previously as Plaintiff's

23   Exhibit 10?  Have you ever seen Exhibit --

24        A.    Yes.

25        Q.    And is that the corrective action policy

1  on the floor with nursing?

2      A.   I cannot remember ever speaking with

3  Ms. Buchanan.

4      Q.   Did you ever speak with Ms. -- Do you

5  recall ever speaking with Ms. Buchanan asking her

6  what about Taryn with regards to her performance?

7      A.   I do not remember ever speaking to

8  Ms. Buchanan.

9      Q.   Did you ever talk with Ms. Buchanan with

10  regard to the issue of Taryn being delayed in pain

11  medications?

12      A.   I can't remember ever speaking to

13  Ms. Buchanan.

14      Q.   So I take it you don't recall ever

15  telling Ms. Buchanan with regards to Ms. Duis so

16  you're saying we don't hear anyone complain about

17  assignments or duties because of their pregnancy or

18  nobody ever said I'm pregnant and can't do this or

19  that they are not coming back to work after a child

20  being born?

21      A.   What are you asking me about that

22  statement?

23      Q.   Did you ever make that statement to

24  Ms. Buchanan?

25      A.   No.