**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| **TARYN N. DUIS,** | ) | |
| | ) | |
| **Plaintiff.** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO: 2:20-CV-78-PPS** |
| | ) | |
| **FRANCISCAN ALLIANCE INC., a/k/a** | ) | |
| **FRANCISCAN HEALTH CROWN** | ) | |
| **POINT,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF**</u>
<u>**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

Defendant Franciscan Alliance, Inc, a/k/a Franciscan Health Crown Point, more properly known as Defendant Franciscan Alliance, Inc., d/b/a Franciscan Health Crown Point ("Franciscan"), by counsel, submits this Memorandum of Law in Support of Defendant's Motion for Summary Judgment filed in response to Plaintiff Taryn Duis's ("Duis") Complaint.

## I.      INTRODUCTION AND SUMMARY OF ARGUMENT

Duis worked at Franciscan as a Registered Nurse ("RN") in the Intensive Medical Care Unit ("IMCU"), which is also referred to as the Progressive Care Unit ("PCU"). Linda Steinhilber ("Steinhilber") became Duis's supervisor in March of 2019. Steinhilber was advised upon being assigned to lead the IMCU that the culture of the unit and attitudes of the staff on the unit needed improvement. In May of 2019, Duis was suspended after it was reported to Steinhilber that in response to a patient signaling his call-light and asking for pain medication, Duis stated in the nurses' station, "I don't give a fuck if that patient wants pain meds. He can wait. He should have taken it before." Steinhilber investigated Duis's behavior, and in the process, employees made

additional statements about Duis, including that she had stated she hated being a nurse, other nurses in the hospital did not want to float to the IMCU because of the negativity and behavior of the nurses, particularly Duis, and Duis was loud and argumentative towards staff who were assisting with uniform fittings. Following Duis's suspension, she went to see Dawn Scott ("Scott"), the Chief Nursing Officer, to complain about her suspension and that she felt Steinhilber was targeting her. Scott found Duis's behavior during that meeting to be very toxic and aggressive. Scott also felt Duis was unwilling to accept that her own behaviors might need to change and was "gravely concerned that she was the face of our facility to the patient and their family." The decision was made to terminate Duis's employment for exhibiting behaviors that were unbecoming of the unit and of a nurse, and a desire that she no longer care for Franciscan's patients.

Duis's Complaint incorrectly alleges that her employment was terminated because of her pregnancy and future plans to take maternity leave, in violation of the Pregnancy Discrimination Act ("PDA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), and the Family and Medical Leave Act of 1993 ("FMLA"). Duis also incorrectly asserts that her termination was in retaliation for her refusal to make false statements about another nurse. The undisputed evidence shows that Franciscan decided to terminate Duis's employment due to her unacceptable response to the patient's request for pain medication and her nasty and toxic behavior when meeting with Scott. There are no genuine issues of fact as to any of Duis's claims, and summary judgment in Franciscan's favor is warranted.

## II.     STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Duis began her employment with Franciscan in 2015 as an RN. (Duis Dep., p. 27, l. 3; *id.* at p. 29, ll. 18-22). Duis worked nights in the IMCU, also called the PCU. (Duis Dep., p. 29, ll. 18-25; Wirkus Aff., ¶¶ 7-8). As an RN, Duis was "responsible for providing total comprehensive

nursing to patients and their families through the development of a plan of care, including implementing, reassessing, evaluating and revising the plan of care." (Wirkus Aff., ¶ 9 at Exhibit A). Duis was expected to provide compassionate care to her patients and implement each patient's plan of care, including pain management. (Wirkus Aff., ¶ 9 at Exhibit A). Duis, like all Franciscan employees, was bound by the Franciscan Values, including respect for life, fidelity to Franciscan's mission, compassionate concern, joyful service, and Christian stewardship. (Wirkus Aff., ¶¶ 9-10, 9 at Exhibit A, 11 at Exhibit B). Duis also served as the charge nurse on duty at times. (Duis Dep., p. 41, ll. 8-13). Whomever is assigned as charge nurse on a particular shift serves in a leadership role over the other nurses during that shift. (Wirkus Aff., ¶ 13; Scott Dep., p. 21, ll. 3-14).

### A.   Duis's Relationship with her Direct Supervisor, Linda Steinhilber.

Steinhilber became the Nursing Manager of the Intensive Care Unit ("ICU") and the IMCU in March 2019. (Steinhilber Dep., p. 18, ll. 7-20). When Steinhilber took this role, Franciscan instructed her to work to change the culture of the IMCU. (Steinhilber Aff., ¶ 10). Although Steinhilber was Duis's supervisor, Duis testified that she "didn't really know Linda" and that she only had about five minutes of interaction with her altogether. (Duis Dep., p. 44, l. 24; *id.* at pp. 69, l. 23 – 70, l. 4). This lack of interaction was due to Duis working the night shift and Steinhilber working the day shift. (Steinhilber Dep., pp. 28, l. 25 – 29, l. 10; Steinhilber Aff., ¶ 11).

### B.   Duis's Pregnancy.

When Steinhilber became Duis's direct supervisor, Duis was pregnant. (Duis Dep., pp. 101, l. 24 – 102, l. 5; Steinhilber Dep., pp. 26, l. 24 - 27, l. 9). Steinhilber does not recall when or from whom she learned that Duis was pregnant. (Steinhilber Dep., p. 35, ll. 5–25). Steinhilber also does not recall any mention by Duis or anyone else prior to Duis's termination about Duis planning to take maternity and/or FMLA leave. (Steinhilber Dep., pp. 36, l. 1 – 37, l. 11).

Franciscan has a policy governing FMLA entitled "Employee Leaves of Absence Policy." (Wirkus Aff., ¶ 16 at Exhibit C). Numerous other employees, including RNs reporting to Steinhilber, have taken maternity leave under the FMLA under this policy. (Wirkus Aff., ¶ 18). Duis has similarly acknowledged that "[j]ust about every single employee [she] kn[ew]" at Franciscan had taken maternity leave given that it is "a bunch of women in their 30s." (Duis Dep., p. 106, ll. 6 – 22). Further, Duis took leave under the FMLA for her prior pregnancy in December 2016. (Duis Dep., p. 107, ll. 6 – 13; Wirkus Aff., ¶ 19). Duis was due in October 2019, and there is no evidence that Duis requested maternity leave under the FMLA prior to her termination in May 2019. (Duis Dep., pp. 102, l. 13 – 103, l. 11; *id.* at p. 183, ll. 14-21).

**C.    The Anxiety Attack Incident.**

On April 11, 2019, Duis was working a night shift that was "very chaotic." (Duis Dep., pp. 55, l. 25 – 56, l. 2). Duis was serving as the charge nurse for the shift. (Duis Dep., p. 56, ll. 10-11). At one point during the shift, Duis was evaluated by one of the hospitalist physicians on duty because she "didn't look good" and "[h]e felt like [Duis] was having a pretty bad anxiety attack[.]" (Duis Dep., pp. 56, l. 15 – 57, l. 7). Ultimately, the hospitalist recommended Duis go home for the night, which she did. (Duis Dep., p. 57, ll. 7–16).

The house supervisor, Connie Snow ("Snow"), reported to Steinhilber that Duis and Dawn Smith ("Smith"), another RN, had a conflict on the night of April 11, 2019, that Duis was very anxious as a result of the conflict with Smith, and this caused Duis to be sent home at the recommendation of the hospitalist. (Steinhilber Dep., pp. 44, l. 13 – 46, l. 6; Snow Aff. at ¶ 7). The next morning, Steinhilber called Duis to check on her since she had heard Duis went home the night before due to an anxiety attack. (Steinhilber Dep., p. 43, l. 24 – 44, l. 8; Duis Dep., p. 57, ll. 17-18). During the conversation, Steinhilber advised Duis that if she had concerns about Smith she

should go to Human Resources. (Steinhilber Dep., p. 46, ll. 21-25; Steinhilber Aff., ¶ 13). Thereafter, on April 19, 2019, Duis, Steinhilber, and Travis Thatcher-Curtis ("Thatcher-Curtis"), the Director of Nursing Operations, met to discuss the April 11 incident. (Thatcher-Curtis Aff., ¶ 9; Steinhilber Aff., ¶ 15; Duis Dep., p. 60, ll. 2-4). Prior to this meeting, Steinhilber informed Thatcher-Curtis of the information that Snow had previously shared with her regarding the April 11 night shift, including that Duis was serving as the charge nurse and asked Smith to do something but Smith did not listen to her, which contributed to Duis having an anxiety attack. (Snow Aff., ¶¶ 7-8; Steinhilber Aff., ¶¶ 12-14; Thatcher-Curtis Aff., ¶ 7). Steinhilber shared with Duis what Snow had reported to her. (Steinhilber Aff., ¶ 14; Thatcher-Curtis Aff., ¶ 9). It was both Steinhilber's and Thatcher-Curtis's understanding from their conversations with Duis about Smith at the time that there had in fact been some sort of conflict between the two during the April 11 shift that pushed Duis to have an anxiety attack. (Steinhilber Aff., ¶ 12; Thatcher-Curtis Aff., ¶ 9). Duis alleges that when she, Steinhilber, and Thatcher-Curtis met to discuss the April 11 shift, Steinhilber started personally attacking her, mocked her and yelled in her face, told her she was a rude and nasty person, and said she couldn't handle her job due to her pregnancy." (Duis Dep., p. 62, ll. 1-8). Not only do Steinhilber and Thatcher-Curtis disagree that Steinhilber engaged in this behavior, but according to Thatcher-Curtis, had Steinhilber in fact engaged in such behavior he would have issued corrective action to her. (Steinhilber Aff., ¶ 13; Thatcher-Curtis Aff., ¶¶ 9, 11). Duis admits that the group then discussed how to improve the unit and Steinhilber's desire that Duis would help Steinhilber build a rapport with the rest of the staff. (Duis Dep., pp. 63, l. 10 – 64, l. 3).

### D.    The Patient Call-Light Incident and Duis's Suspension.

On May 9, 2019, it was reported to Steinhilber that during Duis's May 8, 2019 overnight

shift, a patient signaled his call-light and asked for pain medication. (Steinhilber Aff., ¶¶ 16, 18 at Exhibit A). It was reported that Duis's response was "I don't give a fuck if that patient wants pain meds. He can wait. He should have taken it before." (*Id.*). It was further reported to Steinhilber that there was a resulting delay in administering pain medication to the patient. (Steinhilber Dep., pp. 62, l. 8 – 64, l. 24).

Steinhilber immediately began investigating this incident through employee interviews. (Steinhilber Aff., ¶ 18). Steinhilber received written statements from two employees, Jen Justice ("Justice") and Christine Rogalski ("Rogalski"), regarding the patient call-light incident. (Steinhilber Aff., ¶¶ 18 at Exhibit A, 20). Justice reported that when Duis learned that her patient was requesting pain medication, Duis said, "I don't give a fuck if that patient wants s (sic) pain meds. He can wait. He should have taken it before." (*Id.*). Rogalski reported that she recalled hearing Duis state that the patient would have to wait for pain medication but could not recall Duis's exact words. (*Id.*). Rogalski also stated that Duis has stated in the nurse's station that "she hates being a nurse and doesn't know if she's coming back after October." (*Id.*). As Steinhilber was investigating Duis's conduct, employees provided statements relating to other unfavorable interactions with Duis. (Steinhilber Dep., pp. 80, l. 25 – 81, l. 2; *id.* at pp. 95, l. 14 – 106, l. 8). These statements confirmed the culture problem within the IMCU that Steinhilber was tasked to remedy. (Steinhilber Aff., ¶¶ 18 at Exhibit A, 20). For example, Steinhilber received a statement from Heather Wyatt ("Wyatt") regarding float pool staff reporting to Wyatt, as their supervisor, that they did not want to work in the IMCU due to "negativity and the behavior of nurses including Taryn Duis." (*Id.*). Another statement Steinhilber received was from Snow regarding Duis's demeanor, which stated Duis had said she "hates being a nurse and doesn't want to come back after October." (*Id.*; Steinhilber Dep., pp. 65, l. 20 – 66, l. 12). Lastly, Steinhilber received a

statement from Carrie Renchen regarding Duis's behavior during a uniform fitting, describing that Duis was "loud and argumentative with staff assisting with the fitting." (Steinhilber Aff., ¶¶ 18 at Exhibit A, 20).

As a result of the information received regarding Duis's behavior the night of May 8, 2019, Duis's employment was suspended pending investigation on May 9, 2019. (Smosna Aff., ¶¶ 10-11). Duis was informed of her suspension during a phone call with Steinhilber and Jessica Smosna ("Smosna"), a Manager in Human Resources, on that same day. (Smosna Aff., ¶ 11). Duis was read each statement that was provided to Steinhilber during the investigation to allow her the opportunity to provide a response. (Steinhilber Aff., ¶¶ 18 at Exhibit A, 21). Duis denied making the statement about the patient's request for pain medication. (Steinhilber Aff., ¶ 22). However, Duis admitted that she had said she hated her job and also admitted that it's possible she said she did not want to come back after October. (Duis Dep., p. 133, ll. 4-9).

### E.    Duis's Meeting with Dawn Scott.

On May 10, 2019, Duis and her mother went to Franciscan and met with Scott. (Duis Dep., pp. 74, l. 20 - 75, l. 4; Scott Aff. ¶ 8 at Exhibit A). During that meeting, Duis questioned the basis for her suspension by Steinhilber, although she acknowledged that she was aware of a patient call-light issue. (Scott Aff. ¶ 8 at Exhibit A; Scott Dep., pp. 33, l. 8 – 34, l. 16). Scott was not aware of the details of the suspension, so she was unable to provide further information to Duis. (Scott Aff. ¶¶ 7-8, 8 at Exhibit A). The discussion evolved into Duis advising that she wanted to file a formal grievance against Steinhilber because she believed she was being targeted; Scott instructed her to do so through Human Resources. (Scott Aff. ¶ 8 at Exhibit A; Scott Dep., pp. 33, l. 8 – 34, l. 16).

Overall, Scott found the 15-minute conversation to be unproductive and filled with nasty, unprofessional comments by Duis about Steinhilber. (Scott Aff., ¶¶ 8-9, 8 at Exhibit A; Scott Dep.,

pp. 33, l. 8 – 34, l. 16). Further, it upset Scott that Duis made excuses for the delay of the patient's pain medication, stating that she was "busy". (Scott Dep., p. 35, ll. 2-3). Scott immediately typed up her notes from this meeting and noted, " . . . I certainly heard nothing that would make me think she would provide compassionate, caring care to patients. As a matter of fact[,] I was quite struck by how toxic her attitude was and that I was gravely concerned that she was the face of our facility to the patient and their family." (Scott Aff., ¶ 8 at Exhibit A; Scott Dep., p. 51, ll. 3-11).

Scott informed Human Resources of Duis's claim that Steinhilber was targeting her. (Scott Dep., p. 38, ll. 1-12). It was Scott's understanding that Duis felt Steinhilber was targeting her because Steinhilber was allegedly trying to get employees to say bad things about Duis during the investigation. (Scott Dep., pp. 38, l. 16 – 39, l. 2). Scott does not recall any statement by Duis during their meeting that Duis felt Steinhilber was targeting her due to her pregnancy or future maternity leave or FMLA leave. (Scott Dep., pp. 35, l. 18 – 36, l. 3; *id.* at p. 37, ll. 3-7; *id.* at pp. 45, l. 22 – 46, l. 9; *id.* at p. 56, ll. 2-6). Further, Duis never went to Human Resources to make any such complaints. (Wirkus Aff., ¶ 23; Smosna Aff., ¶ 13). Following Duis's suspension but prior to her meeting with Scott, Duis also texted Thatcher-Curtis claiming she had been "bullied and harassed" by Steinhilber, but never mentioned anything about her pregnancy, discrimination, maternity leave, or FMLA leave. (Thatcher-Curtis Aff., ¶ 13 at Exhibit A). Duis followed up with another text message that explained that she had staff come to her stating that Steinhilber "has it out for [Duis]" and that Steinhilber was trying to get them to say bad things about her. (Thatcher-Curtis Aff., ¶ 13 at Exhibit A). Franciscan concluded that Steinhilber was not improperly targeting Duis but rather asking questions about Duis as part of her investigation into the patient call-light incident. (Scott Dep., pp. 38, l. 13 – 39, l. 2).

### F.      Duis's Termination of Employment.

After Steinhilber finished her investigation, a meeting was held between Scott, Steinhilber, Smosna, and Nita Wirkus, the Human Resources Director, to discuss the investigation and any necessary action. (Scott Dep., pp. 58, l. 24 – 59, l. 12). The only information considered during the meeting were the results of Steinhilber's investigation and Scott's statements about Duis's unprofessional behavior during the meeting she had with Duis and her mother. (Scott Dep., pp. 59, l. 1 – 60, l. 18). Scott described Duis as "one of the most toxic individuals I had ever met, and [Scott] was very uncomfortable continuing to have [Duis] care for patients." (Scott Dep., p. 60, ll. 6-10).   In Duis's termination paperwork, all of the statements about Duis received during the investigation are described and Duis's responses are noted. (Steinhilber Aff., ¶ 18 at Exhibit A). The termination decision was a collaborative conversation that every person in the meeting agreed was the appropriate course of action. (Scott Dep., p. 24, ll. 5-24; *id.* at p. 26, ll. 3-21). At no time during the meeting was there any discussion of Duis's pregnancy, upcoming medical leave, including under the FMLA, or whether there had or had not been any conflict or incident between Duis and Smith. (Scott Dep., p. 72, ll. 4-9; *id.* at pp. 72, l. 24 – 73, l. 8; Steinhilber Aff., ¶¶ 24-26; Smosna Aff., ¶¶ 14-17; Wirkus Aff., ¶¶ 24-27). Thatcher-Curtis also approved the termination decision, again without any discussion of any incident between Duis and Smith, Duis's pregnancy, or any pregnancy or FMLA leave Duis might take in the future.  (Thatcher-Curtis Aff., ¶ 15).

On May 14, 2019, Duis was informed by telephone of her termination. (Duis Dep., p. 46, l. 9 – 48, l. 10). During this phone call, Duis was informed of the reasons for termination, and it was confirmed that she was not being terminated because she was pregnant. (Duis Dep., pp. 47, l. 3 – 48, l. 10; Smosna Aff., ¶¶ 19-20). Duis's employment was terminated for unsatisfactory work performance and unsatisfactory work behavior, specifically her response to the patient call-light

and inappropriate behavior during her meeting with Scott. (Steinhilber Aff., ¶ 18 at Exhibit A; Scott Dep., p. 40, ll. 21-24).

Two other IMCU employees, Smith and Kimberly Buchanan ("Buchanan"), were terminated on the same day as Duis, for various unrelated reasons, and neither was pregnant at the time of their termination. (Duis Dep., p. 83, ll. 1-16). Interestingly, Duis also claims that these two non-pregnant employees were harassed and bullied by Steinhilber. (Duis Dep., p. 163, ll. 19-24). Franciscan also maintains an Equal Employment Opportunity Policy that prohibits discrimination on the basis of sex, including pregnancy. (Wirkus Aff., ¶ 29 at Exhibit D).

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment "is mandated—where there are no disputed issues of material fact and the movant must prevail as a matter of law." *Dempsey v. Atchison, Topeka & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994); Fed. R. Civ. P. 56(c). The initial burden is on the moving party to demonstrate that there are no genuine questions of material fact and that judgment as a matter of law should be granted in its favor. *Green v. Whiteco Indust., Inc.*, 17 F.3d 199, 201 (7th Cir. 1994). Once the moving party has met this burden, the nonmovant must go beyond the pleadings and set forth facts demonstrating the existence of a genuine issue of fact for trial. *Whetstine v. Gates Rubber Co.*, 895 F.2d 388, 392 (7th Cir. 1990).

The Seventh Circuit has recently refined the summary judgment standard of review in employment discrimination cases, explaining:

> On top of the normal lattice of summary judgment demands, we must also apply the constructs of employment discrimination law. For years we have tangled with a "rat's nest of surplus tests" in employment discrimination cases—struggling to pigeon hole evidence into the direct or indirect method with various overlaying requirements of "convincing mosaics" and circumstantial or direct evidence. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764–66 (7th Cir. 2016). Our Circuit has now clarified the singular question that matters in a discrimination case: "[W]hether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race,

ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself . . . . Relevant evidence must be considered and irrelevant evidence disregarded." *Id*.

*Johnson v. Advocate Health and Hospitals Corp.*, 892 F.3d 887, 894 (7th Cir. 2018).

## IV.   ARGUMENT

### A.   Duis's Pregnancy Discrimination and Retaliation Claims are Unsupported by the Evidence.

Duis's claims of pregnancy discrimination and retaliation fail as a matter of law because she cannot prove these claims under either the single pile theory or the burden-shifting standard. Franciscan had a legitimate non-discriminatory reason for terminating Duis's employment and it neither discriminated against her nor retaliated against her on the basis of her pregnancy. Franciscan terminated Duis's employment because her behavior did not align with the Franciscan Values. Duis's behavior in response to a patient's call-light and request for pain medication and related conduct were the reasons for her termination; her pregnancy played no role in this decision.

### 1.   *Pregnancy Discrimination*

Duis's Complaint alleges that Franciscan discriminated against her on the basis of her pregnancy in violation of the PDA and Title VII. (ECF No. 1 at ¶¶ 31-35). Title VII makes it unlawful for an employer to discriminate against any individual on the basis of a protected class, including sex. 42 U.S.C. § 2000e-2(a)(1). "[T]he Pregnancy Discrimination Act . . . amended Title VII to state that discrimination 'because of sex' includes discrimination 'because of or on the basis of pregnancy, childbirth, or related medical conditions.'" *Hall v. Nalco Co.*, 534 F.3d 644, 646 (7th Cir. 2008) (quoting 42 U.S.C. § 2000e(k)).

In line with the Seventh Circuit's opinion in *Ortiz v. Werner Enters., Inc.*, a plaintiff alleging discrimination has two avenues by which to prove the causation element of a

discrimination claim. *See Marzullo v. NLMK Ind., LLC*, 2021 WL 1089796, at *12 (N.D. Ind. March 22, 2021). The first is known as the direct (or "single pile") method, in which Duis would have to prove her case by pointing to evidence showing that Franciscan subjected her to an adverse employment action on an impermissible discriminatory basis. *Id*. Additionally, the Seventh Circuit has "made clear that its holding [in *Ortiz*] did not alter *McDonnell Douglas* or displace the indirect method of establishing a prima facie case of discrimination." *Golla v. Office of Chief Judge of Cook Cty., Illinois*, 875 F.3d 404, 407 (7th Cir. 2017). Accordingly, the well-known *McDonnell Douglas* framework for analyzing discrimination, claims "remains an efficient way to organize, present, and assess evidence in discrimination cases." *Johnson*, 892 F.3d at 894. Duis cannot prove pregnancy discrimination under either the single pile or *McDonnell Douglas* burden-shifting framework.

### i.    *Duis Cannot Prove a Causal Link Under the Single Pile Theory.*

Under the single pile or direct method of proof, Duis must present direct or circumstantial evidence that Franciscan had a discriminatory motivation for her termination of employment. *Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 599 (7th Cir. 2003). "Direct evidence 'essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus.'" *Id.* (quoting *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003), *overruled on other grounds by Hill v. Tancherlini*, 724 F.3d 965 (7th Cir. 2013)). Circumstantial evidence can also be used to prove pregnancy discrimination. *Id.*

Here, there is no evidence, direct or circumstantial, that Franciscan had a discriminatory motive when terminating Duis's employment. Duis's Complaint claims that she was terminated "because of her pregnancy" and was "subjected to disparate treatment in the terms, conditions, and privileges of her employment on the basis of her sex/pregnancy." (ECF No. 1 at ¶¶ 32, 34). Duis

alleges that in a meeting with Steinhilber and Thatcher-Curtis when they were discussing whether Duis had an altercation with Smith and Duis allegedly denied that she did, Steinhilber then yelled at her in her face, mocked her, and questioned whether she could do her job due to her pregnancy after she left work due to the anxiety attack. (Duis Dep., p. 62, ll. 1-8; *id.* at pp. 179, l. 24 – 180, l. 9; *id.* at p. 181, ll. 12-14). Not only do both Steinhilber and Thatcher-Curtis deny that Steinhilber engaged in this behavior, but according to Thatcher-Curtis, who is Steinhilber's supervisor, if Steinhilber had engaged in such behavior he would have issued corrective action to her. (Steinhilber Dep., p. 124, ll. 4-6; *id.* at p. 144, ll. 14-25; Steinhilber Aff., ¶ 15; Thatcher-Curtis Aff., ¶¶ 9, 11). Duis also never reported this alleged conduct by Steinhilber to anyone, including Human Resources. (Wirkus Aff., ¶ 23).

Further, Duis does not point to any non-pregnant employees who were treated more favorably than her. In fact, two other IMCU employees, Smith and Buchanan, were terminated on the same day as Duis, for various reasons, and neither was pregnant at the time of their termination. (Duis Dep., p. 83, ll. 1-16).

Duis also admits that nearly every other person she knew while working at Franciscan took maternity leave, as they are mostly women in their 30s. (Duis Dep. p. 106, ll. 6-22). Duis does not allege that any of these other pregnant women were similarly terminated from employment or identify any non-pregnant employee who engaged in similar conduct as her but was not terminated. The reason is that these other employees did not engage in the same inappropriate behavior as Duis.

After her suspension, Duis claimed to Scott that she was being targeted by Steinhilber, but Scott's understanding of that complaint was that Duis felt Steinhilber was trying to get other employees to say negative things about Duis in response to the call-light issue, not that the alleged

targeting had anything to do with Duis's pregnancy (Scott Dep., pp. 35, l. 18 – 36, l. 3; *id.* at p. 37, ll. 3-7; *id.* at pp. 38, l. 16 – 39, l. 2; *id.* at pp. 45, l. 22 – 46, l. 9; *id.* at p. 56, ll. 2-6). Further, Duis never informed anyone from Human Resources or filed a formal complaint against Steinhilber like Scott told her to do if she had concerns. (Scott Aff., ¶ 8 at Exhibit A; Scott Dep., pp. 33, l. 8 – 34, l. 16; Wirkus Aff., ¶ 23; Smosna Aff., ¶ 13).

Finally, Franciscan's decision to terminate Duis's employment was not based upon her pregnancy or anything related to her pregnancy or future maternity and/or FMLA leave. (Steinhilber Aff., ¶ 18 at Exhibit A). At no point during the Franciscan's meeting at which it was decided that Duis's employment would be terminated was Duis's pregnancy any future maternity and/or FMLA leave mentioned. (Scott Dep., p. 72, ll. 4-9; *id.* at pp. 72, l. 24 – 73, l. 8; Steinhilber Aff., ¶¶ 23-26; Smosna Aff., ¶¶ 14-17; Wirkus Aff., ¶¶ 24-27). Duis's unacceptable response to a patient's request for pain medication, including that she did not "give a fuck if that patient wants pain meds" and that he could wait, as well as her continued inappropriate behavior and toxic attitude while meeting with Scott led to the decision to terminate Duis's employment. (Steinhilber Aff., ¶ 18 at Exhibit A; Scott Aff., ¶¶ 8 at Exhibit A, 11-12, 15; Scott Dep., p. 51, ll. 3-11). Indicative of Duis's attitude, she admitted that she said she hated being a nurse. (Duis Dep., p. 133, ll. 4-9). Franciscan similarly concluded that it no longer wanted her caring for its patients. Her employment was properly and lawfully terminated.

### ii. *Duis's Pregnancy Discrimination Claim Fails Under the* McDonnell Douglas *burden-shifting framework.*

Duis's pregnancy discrimination claim fares no better under the *McDonnell Douglas* burden-shifting method. Under *McDonnell Douglas*, a plaintiff must show that: (1) she is a member of a protected class; (2) she performed her job to Franciscan's expectations; (3) she suffered an adverse employment action; and (4) one or more similarly situated individuals outside

her protected class (sex/pregnancy) received better treatment. *Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 629 (7th Cir. 2018). If Duis can make this *prima facie* showing, then the burden shifts to Franciscan to present a legitimate, non-discriminatory reason for the challenged employment action. *Id.* If Franciscan offers such a reason, the burden reverts to Duis to show pretext, "or at least to produce evidence establishing a genuine factual dispute about pretext to defeat summary judgment." *Id.*

Courts "do not sit as a kind of 'super-personnel department' weighing the prudence of employment decisions made by firms charged with employment discrimination." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 984 (7th Cir. 2001). "Federal courts have authority to correct an adverse employment action only where the employer's decision is unlawful, and not merely when the adverse action is unwise or even unfair." *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006). *See also Pitasi v. Gartner Group*, Inc., 184 F.3d 709, 718 (7th Cir. 1999) (to show pretext, it is insufficient for an employee "to show that his employer fired him for incorrect or poorly considered reasons. He must establish that the employer did not honestly believe the reasons it gave for terminating him"). Here, there is no genuine issue of material fact on multiple required elements of the burden shifting test.

### a. Duis Was Not Meeting the Legitimate Expectations of Her Job.

For the reasons discussed in detail above, Duis was not meeting the legitimate expectations of her job as an RN in the IMCU. As an RN, Duis was expected to provide compassionate care to her patients and implement each patient's plan of care, including pain management. (Wirkus Aff. at ¶ 9, Exhibit A). Franciscan's understanding of Duis's language and reaction to the patient's call-light was in direct contrast to those duties. Further, this behavior and Duis's attitude and actions thereafter were not in line with Franciscan's mission and values. Simply put, "she exhibited

15

behaviors that [Franciscan] thought were unbecoming of the unit, of a nurse, of care for patients and we no longer wanted her in our employ." (Scott Dep., p. 40, ll. 21-24). There is no material question of fact that Duis was not meeting Franciscan's legitimate expectations of an RN.

### b. Similarly Situated Employees Were Not Treated More Favorably Than Duis.

Duis has not identified any similarly situated non-pregnant employees who were treated more favorably than her. Her only vague reference is in her complaint: "Similarly situated non-pregnant and/or those who have not engaged in statutorily protected conduct has been treated more favorably with regard to the terms and conditions of their employment[.]" (ECF No. 1 at ¶ 27). *See Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016) (noting record must contain admissible evidence "that a similarly situated employee outside of [plaintiff's] protected class[] was treated more favorably"); *Widmar v. Sun Chemical Corp.*, 772 N.E.3d 457, 463 (7th Cir. 2014) ("A similarly situated employee is one whose performance, qualifications, and conduct are comparable in all material respects."). Throughout the duration of this lawsuit, Duis has failed to identify any employee who was treated more favorably. Further, there is no such evidence. No one else engaged in similar conduct, and Duis's termination was warranted.

### c. Franciscan Can Show a Legitimate Non-Discriminatory Reason for the Actions it Took.

Even assuming for the sake of argument that Duis could establish a *prima facie* case of pregnancy discrimination, which she cannot, Franciscan can easily produce (indeed, has already produced) legitimate, non-discriminatory reasons for the adverse employment action it took. Franciscan decided to terminate Duis's employment after it discovered and confirmed via other witness accounts that Duis had used profanity, exhibited a horrible attitude, and failed to promptly care for a patient after the patient requested pain medication. Given these facts, there is no genuine

issue of material fact on Duis's claims of pregnancy discrimination, and Franciscan is entitled to judgment as a matter of law.

### 2.   *Retaliation under Title VII and PDA*

Duis contends that she was retaliated against for her alleged complaints of pregnancy discrimination. (ECF No. 1 at ¶ 37). It is Franciscan's position, however, that Duis never complained of pregnancy discrimination. Clearly, if Franciscan did not understand Duis to have complained of pregnancy discrimination, it is then impossible that it could have retaliated against her for such complaint. Duis's employment was terminated for unsatisfactory work performance and unsatisfactory work behavior and not in retaliation for any alleged complaints of pregnancy discrimination. Duis's claim of retaliation fails under both the single pile and burden-shifting theory.

### i.    *No Causal Link Exists Under the Single Pile Theory.*

The single pile or direct method of proof requires Duis to show that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two. *Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 703 (7th Cir. 2012); *Davis v. Munster Med. Research Found., Inc.*, 213 F. Supp.3d 1074, 1096 (N.D. Ind. 2016). Duis cannot establish that she engaged in statutorily protected activity, namely that she complained of pregnancy discrimination. And even if she could her claim under the single pile theory fails because there is no causal connection between any alleged complaint and the termination of her employment.

Duis claims to have complained of pregnancy discrimination to Scott when she told her that she was being targeted by Steinhilber. (Scott Dep., p. 38, ll. 1-12). It was Scott's understanding, however, from their discussion, that Duis felt Steinhilber was targeting her because

she was asking people about her for purposes of the call-light investigation, not due to her pregnancy. (Scott Dep., pp. 38, l. 13 – 39, l. 2). Further, Duis sent Thatcher-Curtis a text message after she was suspended claiming to be "bullied and harassed" by Steinhilber, but never mentioned anything about her pregnancy, discrimination, or her maternity leave. (Thatcher-Curtis Aff., ¶ 13 at Exhibit A). In fact, Duis followed up with a text message that explained that she had staff come to her explaining that Steinhilber "has it out for [Duis]" and that Steinhilber was trying to get them to say bad things about her. (Thatcher-Curtis Aff., ¶ 13 at Exhibit A). Again, this was the same complaint made to Scott and it was determined that the questions Steinhilber was asking were regarding the investigation into Duis's conduct regarding the call-light incident. (Scott Dep., pp. 38, l. 13 – 39, l. 2). Finally, Duis never went to Human Resources about these issues, even though it was clear she knew that was the correct place to make this complaint. (Thatcher-Curtis Aff., ¶ 13 at Exhibit A). Accordingly, Duis cannot prove she engaged in the statutorily protected activity of complaining of pregnancy discrimination.

Even if Duis had evidence to prove she complained of pregnancy discrimination, there is no causal connection between any such complaint and the termination of her employment. As previously explained, Duis's employment was terminated for the delay in patient care that resulted from the call-light incident and her behavior surrounding that incident. There was no discussion about her pregnancy or future maternity and/or FMLA leave that would potentially occur five months later during Franciscan's meeting where it decided to terminate her employment. (Scott Dep., p. 72, ll. 4-9; *id.* at pp. 72, l. 24 – 73, l. 8; Steinhilber Aff., ¶ 26; Smosna Aff., ¶ 17; Wirkus Aff., ¶¶ 27). Further, Duis admits that when she questioned during her termination meeting whether she was being terminated due to her pregnancy, she was told that she was not. (Duis Dep., pp. 47, l. 3 – 48, l. 10). There is no causal connection between any alleged complaints of pregnancy

discrimination by Duis and the decision to terminate her employment, and her claim fails.

### ii. *No Causal Link Exists Under the Burden Shifting Theory.*

Similarly, the undisputed evidence shows no genuine issue of material fact on multiple required elements of the familiar *McDonnell Douglas* burden-shifting method as explained in Section IV.A.1.ii., *supra*. Duis was not meeting Franciscan's legitimate expectations, and she has not and cannot identify any similarly situated employees who were treated more favorably than her. She also cannot prove she engaged in statutorily protected activity because she never complained of pregnancy discrimination, as explained in Section IV.A.2.i., *supra*. Finally, Franciscan had a legitimate non-discriminatory reason for Duis's termination of employment, her failure to promptly care for a patient after a call-light for pain medication and behavior regarding that incident.

### B. Duis's FMLA Claims are Unsupported by the Evidence.

Duis also asserts FMLA interference and retaliation claims against Franciscan. However, Duis's FMLA claims are equally unsupported by the evidence, and summary judgment should be entered as a matter of law in Franciscan's favor. With regard to her FMLA interference allegations, the uncontroverted facts show that Duis was not denied any FMLA leave. Likewise, there is no evidence whatsoever that the termination of Duis's employment was proximately caused by any future FMLA leave.

### 1. *Franciscan In No Way Interfered With Duis' FMLA Rights.*

Duis asserts an FMLA interference claim stating that "[p]rior to her termination [Duis] notified [Franciscan] of her anticipation of taking FMLA leave in October of 2019" and claims that Franciscan interfered with her "substantive legal rights under the FMLA to use medical leave for the birth of her daughter." (ECF No. 1 at ¶¶ 41-42). Duis's allegations of FMLA interference

are categorically false, as shown by the undisputed facts. In reality, it is uncontroverted that Franciscan never denied Duis any FMLA leave to which she was entitled.

The FMLA makes it an unlawful employment practice for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise" an employee's rights under the FMLA. 29 U.S.C.A. § 2615(a)(1). This is also known as an FMLA interference claim, in which the plaintiff carries the burden of proof. *Goelzer v. Sheboygan Cty., Wis*., 604 F.3d 987, 993 (7th Cir. 2010). To prevail on her FMLA claim, Duis must demonstrate that: "(1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled." *Id*. (citing *Burnett v. LFW, Inc*., 472 F.3d 471, 477 (7th Cir. 2006)). Although a termination to prevent an employee from taking FMLA leave can interfere with that employee's FMLA rights, "'an employee may be fired for poor performance when she would have been fired for such performance even absent her leave.'" *Simpson v. Office of Chief Judge of Cir. Ct. of Will Cnty.*, 559 F.3d 706, 712 (7th Cir. 2009) (quoting *Kohls v. Beverly Enters. Wis., Inc.*, 259 F.3d 799, 805 (7th Cir. 2001)).

Duis's employment was terminated for unsatisfactory work performance and unsatisfactory work behavior. (Steinhilber Aff., ¶ 18 at Exhibit A). Duis did not properly perform her duties as an RN when she delayed patient care during the call-light incident. Further, Duis never verbally requested maternity leave or submitted a request under the Employee Leave of Absence Policy. (Wirkus Aff., ¶¶ 16 at Exhibit C, 20-21). Duis was familiar with this process as she had taken maternity leave in the past under the FMLA. (Duis Dep., p. 107, ll. 6–13). Although Steinhilber was aware of Duis's pregnancy at the time of termination, she and Duis never discussed Duis's plans to take time off, including under the FMLA. (Steinhilber Aff., ¶ 9). Further, as Duis

20

herself acknowledges, this was not an unusual situation. Almost everyone she knew at Franciscan had taken maternity leave at some point. (Duis Dep., p. 106, ll. 6–22).

Duis claims that when she was informed of Franciscan's decision to terminate her employment, she was told by Smosna that she was not being terminated due to being pregnant but rather because she was going to take FMLA leave. (Duis Dep., pp. 47, l. 3 – 48, l. 10). Aside from Smosna's denial and the absurdity of the suggestion that a Human Resources professional would tell an employee that his or her employment is being terminated due to planned FMLA leave, this was not the basis for Duis's termination that was discussed and decided upon by the group of Franciscan employees who did make that decision. (Smosna Aff., ¶¶ 17, 20; Wirkus Aff., at ¶¶ 27-28; Scott Aff., ¶¶ 15-18). The undisputed evidence shows that any FMLA leave Duis may have taken five months later following the birth of her child had nothing to do with the termination of her employment. Duis cannot prove Franciscan denied her entitlements under FMLA, which is required to survive summary judgment of an FMLA interference claim. *Goelzer*, 604 F.3d at 994. (granting summary judgment on employee's FMLA claim holding that an interference theory requires proof that the employer denied the employee her entitlements under FMLA).

## 2. *There is No Evidence of FMLA Retaliation*.

Duis's Complaint alleges an FMLA retaliation claim – specifically, that Franciscan retaliated against Duis for terminating her employment after she allegedly engaged in protected activity under the FMLA. (ECF No. 1 at ¶¶ 46-51). Duis's FMLA retaliation claim fails for the same reasons.

Pursuant to 29 U.S.C. § 2615(a)(2), it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). Thus, the FMLA affords protection to employees who are

retaliated against because they exercise rights protected by FMLA. *Lewis v. Sch. Dist. # 70*, 523 F.3d 730, 741 (7th Cir. 2008). "The difference between a retaliation and interference theory of liability under FMLA is that retaliation requires proof of discriminatory or retaliatory intent while an interference theory requires only proof that the employer denied the employee his or her entitlements under the [FMLA]." *Goelzer*, 604 F.3d at 995 (internal quotations omitted).

As with Duis's pregnancy retaliation claim, there is no evidence showing any causal connection between the employment actions Franciscan took and Duis's future FMLA leave. Whether evaluated under the direct method or the *McDonnell Douglas* burden-shifting there, the uncontroverted evidence shows these actions were based entirely on Duis's own actions related to the call-light incident and related behavior. There are no genuine issues of material fact on the causation element, and summary judgment is warranted in Franciscan's favor as a matter of law.

### i.    No Causal Link Exists Under the Single Pile Method.

A court evaluates a claim of FMLA retaliation the same way it does other employment discrimination statutes. *Pagel v. TIN Inc.*, 695 F.3d 622, 631 (7th Cir. 2012). To prevail on a retaliation claim under the FMLA under the single pile theory, Duis must show that: (1) she engaged in a protected activity; (2) Franciscan took an adverse employment action against her; and (3) there is a causal connection between the two. *Sorah v. New Horizons Home Healthcare Ltd. Liab. Co.*, No. 1:16-CV-291-TLS, 2018 WL 5830753, at *3 (N.D. Ind. Nov. 7, 2018). Even if Duis could establish these points, Franciscan is entitled to summary judgment if it can show it would have taken an adverse employment action against Duis even absent any retaliatory motive. *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 771 (7th Cir. 2008)(citing *Burnett*, 472 F.3d at 481). *See also Cracco v. Vitran Express, Inc*., 559 F.3d 625, 633-34 (7th Cir. 2009) (where employer found performance problems with employee, employee could not establish causal connection

under direct method "because [employer's] actions do not suggest [employer] was acting under a prohibited animus").

Just as with the single pile analysis for Duis's pregnancy retaliation claim in Section IV.A.1.i., *supra* the undisputed evidence reveals no causal connection between the alleged adverse employment actions and Duis's potential future FMLA leave. Franciscan had a legitimate, non-retaliatory reason for Duis's termination of employment. Duis's behavior, especially in light of her being a charge nurse, in response to the patient's call-light to request pain medication was unacceptable, inappropriate, and most importantly, directly in contrast with Franciscan's mission and values. (Steinhilber Aff., at ¶ 18, at Exhibit A). Duis was terminated for this incident and for the lack of responsibility she took for this situation. At no point was Duis's pregnancy or any planned maternity leave under the FMLA considered by the individuals who recommended, supported, and approved the termination of her employment. (Scott Dep., p. 72, ll. 4-9; *id.* at pp. 72, l. 24 – 73, l. 8; Steinhilber Aff., ¶ 27; Smosna Aff., ¶ 18; Wirkus Aff., ¶ 28). The "single pile" of evidence raises no genuine issue of material fact on the causation element.

### ii.    *No Causal Link Exists Under the Burden-Shifting Method.*

Duis's claim also fails under the burden-shifting method. As discussed in detail in Section IV.A.1.ii., *supra*, there exist no genuine issues of material fact on multiple required elements. Duis was not meeting Franciscan's legitimate expectations. *See* Section IV.A.1.ii.a., *supra*. Even if she had been meeting those expectations, no similarly situated employee exists who was treated more favorably than Duis, as discussed in Section IV.A.1.ii.b., *supra*. And finally, assuming *arguendo* that she could establish a *prima facie* case (which she cannot), there is ample evidence showing that Franciscan had legitimate, non-discriminatory reasons for Duis's termination of employment. *See* Section IV.A.1.ii.c., *supra*. There exist no genuine issues of material facts, and summary

judgment is clearly warranted in Franciscan's favor on Duis's FMLA claims.

      **C.**    **Duis Cannot Prove Retaliatory Discharge under *McClanahan*.**

Indiana Courts have recognized an exception to the employment at will doctrine "'when an employee is discharged solely for exercising a statutorily conferred right[.]'" *McClanahan v. Remington Freight Lines, Inc.*, 517 N.E.2d 390, 392 (Ind. 1988) (quoting *Frampton v. Central Ind. Gas Co.*, 297 N.E.2d 425, 428 (Ind. 1973)). The Indiana Court of Appeals in *McClanahan* opined and the Indiana Supreme Court upheld that "logic and justice compel us to hold that an employee cannot be discharged solely for refusing to breach a statutorily imposed duty." *McClanahan*, 517 N.E.2d at 392-93 (quoting *McClanahan v. Remington Freight Lines, Inc.*, 498 N.E.2d 1336, 1339 (Ind. Ct. App. 1986)).

Duis claims that she was terminated for refusing an alleged order by Steinhilber to make defamatory statements regarding her co-worker, Smith. (ECF No. 1 at ¶¶ 52-61). Specifically, Duis claims that Steinhilber told her to lie about her anxiety attack by claiming that Smith caused it. (Duis Dep., pp. 60, l. 21 – 61, l. 16). However, Steinhilber never told Duis to lie about the incident, which Duis has admitted. (Duis Dep., p. 61, ll. 14-16).  Instead, Steinhilber asked Duis to tell her about a confrontation or altercation that occurred between Smith and Duis that had been reported to Steinhilber by Snow. (Duis Dep., pp. 60, l. 21–61, l. 16; Steinhilber Aff., ¶ 13). Steinhilber further advised Duis that if there was an issue between her and Smith, she could report it to Human Resources. (Steinhilber Dep., p. 46, l. 21-25). Duis has subsequently asserted that there was no confrontation or altercation between her and Smith. (Duis Dep., pp. 60, l. 21 – 61, l. 16). Despite Duis's contention, both Steinhilber and Thatcher-Curtis understood from Snow's statement and their conversation with Duis that there was in fact an incident between Duis and Smith that pushed Duis into having an anxiety attack. (Steinhilber Aff., ¶¶ 12-15; Thatcher Curtis Aff., ¶ 9).

Regardless, nothing relating to the alleged incident between Smith and Duis was considered in determining whether Duis's employment was going to be terminated. (Steinhilber Aff., ¶¶ 24-27; Wirkus Aff., ¶¶ 24-27; Smosna Aff., ¶¶ 15-17; Scott Aff., ¶¶ 15-18). Duis was not terminated for "refusing to breach a statutorily imposed duty." Duis was terminated for the call-light incident and her poor behavior and attitude. Accordingly, her claim of retaliatory discharge fails.

## V.    CONCLUSION

There are no genuine issues of material fact that preclude summary judgment in favor of Franciscan on all counts. The designated, uncontroverted evidence shows that Franciscan did not discriminate against Duis based on her sex or pregnancy, interfere with her right to take FMLA leave, retaliate against her because of her pregnancy or for exercising her FMLA rights, or wrongfully discharge her in violation of Indiana law. Absent any genuine issues of material fact, this Court should grant Franciscan's Motion for Summary Judgment and enter judgment in favor of Franciscan and against Duis.

Respectfully Submitted,

By:    Amy J. Adolay, Atty. No. 23147-49
Elizabeth M. Roberson, Atty. No. 34097-64
KRIEG DEVAULT LLP
12800 N. Meridian Street, Suite 300
Carmel, IN 46032
Telephone: (317) 238-6342
        (317) 238-6330
Facsimile:  (317) 636-1507
Email:  aadolay@kdlegal.com
        eroberson@kdlegal.com

*Counsel for Defendant Franciscan Alliance, Inc.*

KD_13435997_8.docx

25