## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | |
|---|---|
| TARYN N. DUIS, | ) |
| | ) |
| Plaintiff. | ) |
| v. | ) CAUSE NO:  2:20-CV-00078-PPS-APR |
| | ) |
| FRANCISCAN ALLIANCE INC., a/k/a | ) |
| FRANCISCAN HEALTH CROWN | ) |
| POINT | ) |
| Defendant. | ) |
| | ) |
| | ) |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Taryn N. Duis ("Duis" or "Plaintiff"), by counsel, files her Memorandum of Law in Opposition to Defendant's Motion for Summary Judgement.

### I.    Introduction:

Duis brings this action against her former employer, Franciscan Alliance Inc., a/k/a Franciscan Health Crown Point ("Defendant"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended, the Pregnancy Discrimination Act ("PDA") 42 U.S.C. § 2000(e)(k) as set forth in Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000(e) *et seq*., and for violations of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*.  In addition, Plaintiff also asserts a claim for retaliatory discharge under Indiana common law.

Here Defendant uttered numerous statements reflecting bias against Duis because of her pregnancy, maternity / FMLA leave, and/or protected activity.  These statements are admissible under Fed. R. Evid. 801(d)(2) and must be accepted as true on summary judgment.  Further, Defendant's alleged reasons for termination - that Duis demonstrated a negative attitude or

caused an unacceptable delay in pain medication - is undermined by numerous lines of evidence.  First and foremost, Duis and a co-worker dispute the pain medication delay.  Second, Duis disputes making the statements at issue.  Third, even if Defendant believed there was a delay in pain medication or that she made those statements, they do not justify her termination.  Numerous similarly situated comparators show that language of this nature resulted in no discipline.  Fourth, Defendant viewed Duis as a negative or toxic employee precisely because she was complaining of unlawful discrimination.  Fifth, subjective rationales of this nature should be met with high levels of skepticism, as they can be easily used to mask unlawful motives.  The best and most persuasive view of Duis's case, per the Summary Judgment Standard of Review, shows that this case cannot be resolved on summary judgment.  A jury is needed to determine who said what and why certain actions were taken.

## II.     Legal Standard:

Litigants and courts often cite the familiar summary judgment standard of review.  But the correct application of this standard is what is most important.  Recent guidance by Judge Hamilton on the Seventh Circuit explains, in great detail, how this summary judgment process should work in practice:

> The maxims of summary judgment are familiar – no weighing the evidence, no credibility determinations, draw all non-speculative inferences in favor of the non-movant- but they are more easily recited than applied . . . They define the outer limits of Jol's right to 'the commonsense judgment of [her] community . . . and to the generous latitude the court accords it.  We entrust a great deal to the jury's human experience . . . We allow a jury to infer a great deal without mathematical precision . . . In short, trials are stories, not syllogisms . . . Accordingly, the court must try to focus on the most persuasive story possible on the non-movant's behalf when asking whether a verdict in her favor would be reasonable or could result only from irrational speculation.

*Joll v. Valparaiso Comm. Schools*, 953 F.3d 923, 928 (7th Cir. 2020).

Some of Duis's claims fall under the more forgiving motivating factor test of causation.  But even with but-for causation, the Court must ask whether a jury could find for Duis with her best and most persuasive case, acknowledging that her termination can have multiple but-for causes and still result in liability for Defendant. In *Bostock v. Clayton County, Georgia*, 140 S.Ct. 1731 (2020), the Supreme Court explained why events may have multiple but-for causes:

> In other words, a but-for test directs us to change one thing at a time and see if the outcome changes.  If it does, we have found a but-for cause.  This can be a sweeping standard.  *Often, events have multiple but-for causes* . . . When it comes to Title VII, the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision.  So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law.

*Id*. at 1739.  (emphasis added); *see also Malin v. Hospira, Inc.*, 762 F.3d 552, fn 3 (7th Cir. 2014) ("a single event can have multiple but-for causes . . . .").

In addition, the Seventh Circuit no longer distinguishes between "direct" and "indirect" evidence, but instead asks "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).   While courts "may use the familiar burden-shifting approach articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), as 'a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases,' it is 'not the only way to assess circumstantial evidence of discrimination.'" *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) (quoting David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508, 846 F.3d 216, 224 (7th Cir. 2017)).  "Evidence

must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself….Relevant evidence must be considered and irrelevant evidence disregarded." *Johnson v. Advocate Health & Hosps. Corp.,* 892 F.3d 887, 893-94 (7th Cir. 2018). While the *McDonnell Douglas* framework remains useful, the ultimate question remains "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* at 765.  Moreover, the evidence presented may be direct or circumstantial. *McKinney v. Office of Sheriff of Whitley Cty.,* 866 F.3d 803, 807 (7th Cir. 2017). Accordingly, following this standard, Duis will simply lay out all of the evidence she contends will permit a reasonable jury to find in her favor.

### III.  Duis's Pregnancy Discrimination Act Claim:

### A.  Duis Provides Direct Evidence of Discrimination:

Title VII prohibits discrimination on the basis of sex, including discrimination "on the basis of pregnancy, childbirth, or related medical conditions." *42 U.S.C. § 2000e(k.*).  As pointed out in Defendant's Motion for Summary Judgment Duis must present direct or circumstantial evidence that Defendant had a discriminatory motivation for the termination of her employment. [See Defendant's Memorandum of Law p. 12; *Venturelli v. ARC Cmty. Servs., Inc.,* 350 F.3d. 592, 599 (7th Cir. 2003).].  "Direct Evidence 'essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus.'" *Id*. (quoting *Rogers v. City of Chicago,* 320 F.3d 748, 753 (7th Cir. 2003), *overruled on other grounds by Hill v. Tancherlini,* 724 F.3d 965(7th Cir. 2013).  In pregnancy discrimination cases, direct evidence of discriminatory intent "generally is in the form of an admission by a supervisor or decision maker that the employee was suspended because she was pregnant." *Kennedy v. Schoenberg, Fisher &*

*Newman*, 140 F.3d 716, 723 (7th Cir. 1998).  Here, statements by Linda Steinhilber

("Steinhilber"), a supervisor and a decisionmaker in Duis's termination, standing alone, justifies

summary judgment survival.

        **1.**        **Steinhilber's Discriminatory & Biased Comments:**

In March of 2019 Steinhilber had just become Duis's direct supervisor and was aware

that Duis was pregnant and planning to take leave in October of 2019 when her baby was born.

[See Defendant's Memorandum of Law p. 3; Ex. C, Duis Dep. p. 71, ll. 11-13; *id* at p. 102, ll.

13-18; *id* at p. 103, ll. 1-7; Ex. G. Defendant's Interrogatory Response No. 4, p. 5].  Shortly

thereafter, on April 19, 2019, in a meeting with Duis, Steinhilber mocked Duis by stating "oh, I

have to call the doctor for myself to the floor.  I can't handle my job because I am pregnant."

[Ex. C, Duis Dep. p. 61, ll. 23-25; *id* at p. 62, ll. 1-8].  At that time, Steinhilber also told Duis

that she couldn't do her job because she was pregnant.  [Tab C, Duis Dep. p. 62, ll. 16-17 / 22-

24; *id* at p. 179, l. 25; *id* at p. 180, ll. 1-3; *id* at p. 181, ll. 9-14].

However, Steinhilber's discriminatory comments were not solely stated directly to Duis.

Steinhilber, in reference to Duis, also angrily confronted a co-worker of Duis, Kim Buchanan,

and while stomping her foot stated "so you're saying we don't hear anyone complaining about

assignments or duties because of their pregnancy or nobody ever said that I'm pregnant and can't

do this or that they're not coming back to work after a child being born." [Ex. F, Buchanan Aff

¶¶ 1, 3, 10, 11, 12, 17].  Shortly, after these comments were made, Steinhilber, on May 9, 2019,

suspended Duis.  [Ex, C, Duis Dep. p. 48, ll. 22-23].  It is undisputed that prior to Duis's

suspension there were no problems or complaints regarding her performance and Duis had not

been disciplined.  [Ex. D, Scott Dep. p. 45, ll. 4-8; *id* at p. 46, ll. 16-19;  *id*  at p. 50; ll. 15-25; *id*

at p. 51, ll. 1-2*, at* p. 55, ll. 4-7; Ex. E. Steinhilber Dep p. 30, ll. 12-25; *id* at p. 34, ll. 18-25; *id* at

p. 35, ll. 1-3; *id* at p. 121, ll. 14-25; Ex. G, Interrogatory Response No. 3, p. 4]. Thus, almost immediately after Duis became pregnant and Steinhilber became her supervisor, she was subjected to comments of a discriminatory nature and disciplined by Steinhilber. An "immediate change in treatment towards [a plaintiff] after learning of her pregnancy" is also evidence of a discriminatory animus. *Hitchcock v. Angels Corps, Inc.,* 718 F.3d, 733, 741-42 (7th Cir. 2013).

The discriminatory comments to which Duis was subjected continued into her termination. On May 14, 2019, Steinhilber, by phone, called Duis and informed her that Duis was excited about her pregnancy and it showed that she did not value her job, and that Duis cared more about her family and her pregnancy than her job which did not coincide with Franciscan's values. [Exhibit C, Duis Dep. p. 47, ll. 15-21]. Duis then asked whether she was being fired because she was pregnant and Jessica Smosna (Human Resources) responded no it's not because you are pregnant, it's because you're taking maternity leave and FMLA. [Ex. C. Duis Dep. p. 48, ll. 4-6; *id* at p. 52, ll. 16-19]. Smosna also told Duis told that they did not want her to take leave. [Exhibit C, Duis Dep. p. 108, ll. 14-22]. Duis was also told that they did not believe that she would return to work after having her baby and FMLA which Duis denied. [Ex. C, Duis Dep. p. 52, ll. 19-22]. Furthermore, as noted below, it is evident that Steinhilber had unbridled authority to suspend and eventually terminate Duis. These statements reflect discriminatory animus and bias against Duis because of her pregnancy and protected leave.

## 2. Steinhilber's Authority and Biased Investigation:

Here, Defendant claims that the termination decision was a collaborative conversation where everyone agreed and where Duis's pregnancy, maternity, or future FMLA was never discussed. [See Defendant's Memorandum of Law pp. 13-14].[1]  Defendant's attempt to insulate

---

[1] This is highly disputed in light of the fact that Duis's termination form mentions "maternity leave." [Ex. E. Steinhilber Dep. p. 120, ll. 6-8; *id* at p. 124, ll. 11-16; Ex. 8 (p.1.)].

or lessen Steinhilber's involvement misses the mark.  Steinhilber's authority went unchecked.

Steinhilber had the authority to issue written warnings, corrective action plans, and suspensions

to employees with approval from human resources. [Tab D, Scott Dep. p. 14, ll. 3-25; *id* at p. 15,

ll. 1-11; Ex. E, Steinhilber Dep. p. 22, ll. 2-6; *id* at p. 23, ll. 4-15].  Indeed, every time Steinhilber

sought to discipline an employee it was approved  [Ex. D, Scott Dep. p. 17, ll. 21-25, *id* at p. 18,

ll. 1-3, *id* at p. 19 1l. 1-3; Ex. E, Steinhilber Dep p. 24, ll. 2-15].  Sometimes managers above

Steinhilber such as Dawn Scott ("Scott") were only aware of employees terminated by

Steinhilber after the fact.  [Ex. D, Scott Dep. p. 88, ll. 20-25;  *id*  at p. 89, ll. 1-17].   Steinhilber

was the primary decision maker with regard to Duis's termination under any legally applicable

theory.[2]

Steinhilber was in charge of the alleged investigation into Duis.  [Ex. E, Steinhilber Dep.

p. 88, ll. 14-16].  However, after Duis was suspended, and prior to Duis's termination,

Steinhilber did nothing else with regard to the investigation into Duis, including speaking with

other employees or witnesses, asking Duis whether she had any other witnesses, or reviewing

Duis's past performance evaluations or personnel file.  [Ex. E. Steinhilber Dep. pp. 30, ll. 18-25;

*id* at p. 86, ll. 14-22; *id* at p. 94, ll. 8-11; *id* at p. 106, ll. 19-23; *id* at p. 113, ll. 18-20; *id* at p. 115,

ll. 7-14].  Indeed, Steinhilber, after suspending Duis, only spoke to her at the time she was

terminated.  [Ex. E. Steinhilber, Dep. p. 114, ll. 19-22].   Scott had no role in the investigation

into Duis and the grounds for termination was based on information Scott received from

Steinhilber which Scott always agreed with.  [Ex. D, Scott Dep. p. 40, ll. 9-16; *id* at p. 64, ll. 13-

---

[2] A cat's paw theory requires [the plaintiff] to show that [a biased supervisor] " 'actually harbored discriminatory animus against him.' " *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 370 (7th Cir. 2019) (quoting *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 570 (7th Cir. 2017)) (in turn quoting *Nichols v. Michigan City Plant Planning Dept.*, 755 F.3d 594, 604 (7th Cir. 2014)). "[Plaintiff] must also show that [the biased supervisor's] 'input was a proximate cause' of the adverse actions against him." *Id.* Here, Steinhilber held a discriminatory animus against Duis and was the proximate cause of her suspension and termination.

20; *id* at p. 66, ll. 20-25; *id* at p. 67, l. 1].  According to Steinhilber, she recommended that Duis

be terminated and every employee that she has recommended for termination has been fired.

[Ex. F, Steinhilber Dep. p. 94, ll. 4-7].  In sum, Steinhilber admits that she started the

investigation into Duis, was in charge of the investigation, and her investigation led to the

termination of Duis.  [Ex. E, Steinhilber Dep. p. 66, ll. 13-23].

**B.  Intentional and Indirect Evidence of Pregnancy Discrimination:**

1. **Duis Was Meeting the Legitimate Expectations of Her Job:**

Duis disputes the alleged reasons offered for the decision to terminate her employment.

Put simply, Duis did not refuse to give a patient pain medication nor use profanity, and her

complaints to Scott regarding Steinhilber's treatment of her is statutorily protected conduct. [Ex.

C, Duis Dep. p. 72, ll. 18-24; *id* at p. 73, ll. 1-5; *id* at p. 75, ll. 18-25; *id* at p. 76, ll. 1-3, 12-15

*id* at p. 82, ll. 1-18; *id* at p. 141, ll. 9-13; Ex. F. Buchanan Aff. ¶9].

All of Defendant's alleged performance issues with Duis only occurred after Duis

informed Defendant that she was pregnant.  In fact, Defendant admits that Duis was not issued

any disciplinary action other than her termination and prior to her suspension neither Scott or

Steinhilber were aware of any problems or complaints with Duis's performance. [Ex. D, Scott

Dep. p. 45, ll. 4-8; *id* at p. 46, ll. 16-19;  *id*  at p. 50; ll. 15-25; *id*  at p. 51, ll. 1-2, *at* p. 55, ll. 4-7;

Ex. E. Steinhilber Dep p. 30, ll. 12-25; *id* at p. 34, ll. 18-25; *id* at p. 35, ll. 1-3; *id* t p. 121, ll. 14-

25; Ex. G, Interrogatory Response No. 3, p. 4].  Steinhilber testified that prior to suspending Duis

she did not verbally counsel her with regard to performance issues, did not place her on a

corrective action plan, had not witnessed any performance problems, nor had she had any patient

complaints or families of patients complain about Duis's work performance.  [Ex. E, Steinhilber

Dep. p. 74, ll. 2-19].  Duis was a team player who provided her patients with the highest level of

care. [Ex. F, Buchanan Aff. ¶¶ 8, 16].  In fact, Duis, in her role as a charge nurse, oversaw the entire unit, help problem solve, assists nurses, and manages the floor.  [Ex. C, Duis Dep. p. 56, 11. 10-11; Ex. D, Scott Dep. p. 21, ll. 7-14;  Ex. E, Steinhilber Dep. p. 27, ll. 14-20].   Moreover, as addressed below, Duis did not exhibit a horrific attitude rather she reported discriminatory treatment which she had been subjected to by Steinhilber.  [Ex. C, Duis Dep. p. 75, ll. 18-25; *id* at p. 76, ll. 1-3, 12-15].

### 2.  Defendant's Reasons for Terminating Duis are Pretextual:

According to Defendant, Duis's employment was terminated for unsatisfactory work performance and unsatisfactory work behavior, specifically her response to the patient call light and inappropriate behavior during her meeting with Scott.  [Defendant's Memorandum of Law pp. 9-10].    Moreover, Defendant claims that the only information considered during the termination meeting were the results of Steinhilber's investigation and Scott's statements about Duis's unprofessional behavior during the meeting she had with Duis and her mother. [Id at 9].  According to Scott, the reason that Duis was terminated was due to her refusal to meet the needs of the patient and profanity was only part of that.  [Ex. D, Scott Dep. p. 77, ll. 3-9].  Such reasons offered are pretextual.

Pretext is shown by demonstrating that (1) the proffered reason is factually basis, (2) the proffered reason is not the actual motivation for the adverse employment action, and/or the proffered reason is insufficient to motivate the adverse action.  *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931(7th Cir. 1996).  Thus, evidence that calls the Defendant's truthfulness into question precludes summary judgment.  *Perdoma v. Browner*, 67 F.3d 140, 145 (7th Cir. 1995).  The Court should not abandon common sense and good reason when evaluating Defendant's alleged non-discriminatory reasons.

Defendant specifically contends that it "decided to terminate Duis's employment after it discovered and confirmed via other witness accounts that Duis had used profanity, exhibited a horrible attitude, and failed to promptly care for a patient after the patient requested pain medication." [See Defendant's Memorandum of Law p. 16]. Such reasons are illegitimate. Duis did not refuse to give a patient pain medication nor use profanity. [Ex. C, Duis Dep. p. 72, ll. 18-24; *id* at p. 73, ll. 1-5; *id* at p. 82, ll. 1-18; *id* at p. 141, ll. 9-13; Ex. F. Buchanan Aff. ¶9].

### a.       There was no Delay in Pain Medication:

The only incident that Steinhilber is aware of regarding patient care involving Duis is the alleged delay in pain medication. [Ex. E, Steinhilber Dep. p. 121, ll. 14-22]. There was no undue delay in pain medication. In fact, Buchanan told Steinhilber that the patient received the medication approximately ten (10) minutes after the family requested since Duis was waiting on the doctors order. [Ex. F. Buchanan Aff. ¶¶ 4, 5, 9]. The patient received the medication and did not voice any displeasure towards Duis or Buchanan which Steinhilber would have known by looking at the patient chart. [Ex. C, Duis Dep. p. 72, ll. 19-25; *id* at p. 73, ll. 1-5; *id* at p. 74, ll. 9-10; *id* at p. 117, ll. 2-11; Ex. F, Buchanan Aff. ¶¶ 3-6, 9]. Here, as relayed to Steinhilber, there was no patient complaint regarding pain medication, no patient suffered a health issue, and Duis cared for the patient the next night per the patients' request. [Ex. C, Duis Dep. p. 118, ll. 13-22; Ex. D. Scott Dep. p. 63, ll. 24-25; *id* at p. 64, ll. 1-9]. Steinhilber admits she never spoke to the patient, does not know how long the delay was, that the patient received the medication, and that medications can be delayed because nurses are busy with other patients although she did not know if that was true in this case. [Ex. E, Steinhilber Dep. p. 63, ll. 3-10; *id* at p. 64, ll. 1-8;]. Notably, even if there was a delay, which there was not, failing to answer a call light untimely is not grounds for immediate termination since sometimes nurses get busy and cannot

answer every call light.  [Ex. D, Scott Dep. p. 51, ll. 20-25; *id* at p. 52, ll. 1-4].

      **b.**      **Profanity is Rarely Grounds for Discipline Let Alone Termination:**

      According to Scott, Duis used profanity on one occasion.  [Ex. D, Scott Dep. p. 41].

Scott admits that employees have used foul language in front of her yet she has never disciplined

an employee for foul language while at Franciscan Crown Point.  [Ex D, Scott Dep. p. 75, ll. 1-

18; *id* at p. 76, ll. 1-25; *id* at p. 77, l. 1].  Steinhilber has also heard nurses use foul language but

has never issued a written warning for foul language.  [Ex. E., Steinhilber Dep. p. 41, ll. 13-25;

*id* at p. 42, ll. 14-17; *id* at p. 77, ll. 15-17].  Steinhilber herself admits using profanity and

possibly the f word in front of co-workers and peers but was not disciplined.  [Ex. E, Steinhilber

Dep. p. 122, ll. 8-10, 18-23; *id*  at p. 123, ll. 1-8].  Furthermore, no patient ever complained about

Duis using profanity.  [Ex. E. Steinhilber Dep. p. 67, ll. 12-14].

      **c.**      **Interaction with Scott Does Not Support a Horrible Attitude:**

      Finally, according to Scott, the conversation between her, Duis, and Duis's mother

standing alone was not grounds for termination.  [Ex D, Scott, Dep. p. 62, ll. 11-14; *id* at p. 64, ll.

13-17].  Grounds for termination would be based on information Scott received from Steinhilber

since Scott had no role in the investigation.  [Ex. D, Scott Dep. p. 40, ll. 9-16; *id*  at p. 64, ll. 13-

20].  Scott relied on what Steinhilber was telling her and agreed that Duis should be terminated

based on what Steinhilber was telling her and her own personal interaction with Duis.  [Exhibit

D, Scott Dep. p. 59, ll. 19-25; *id* at p. 62, ll. 2-10].   According to Scott this interaction included

unprofessional comments by Duis about Steinhilber.  [Defendant's Memorandum of Law p. 7].

However, an employer's reliance on subjective rationales, such as Duis' alleged bad attitude, is

ripe for manipulation to hide discrimination.  *Namenwirth v. Bd. of Regents of Univ. of Wisc.*

*System*, 769 F.2d 1235, 1243 (7th Cir. 1985) (subjective assessments more readily may be used to

"camouflage" discrimination).   Moreover, Scott's personal interaction with Duis was actually Duis's engagement in protected activity under Title VII.

### 3.  Similarly Situated Employees Were Treated More Favorably:

 "An employee is similarly situated to a plaintiff if the two employees deal with the same supervisor, are subject to the same standards, and have engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their employer's treatment of them." *Barbera v. Pierson Education*, Inc F.3d. 621,629 (7th Cir. 2018). "Similarly situated employees must be directly comparable to the plaintiff in all material respects, yet this is a flexible inquiry with no magic formula." *Khowaja v. Sessions*, 893 F.3d 1010, 1015 (7th Cir. 2018). "The similarly-situated inquiry is flexible, common-sense, and factual. It asks essentially, are there enough common features between the individuals to allow a meaningful comparison?" *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 895 (7th Cir. 2018).  In a case involving disparate discipline, to determine "whether two employees have engaged in similar misconduct, the critical question is whether they have engaged in conduct of comparable seriousness." *Coleman v. Donahoe*, 667 F.3d 835, 851 (7th Cir. 2012). "Whether a comparator is similarly situated is usually a question for the fact-finder, and summary judgment is appropriate only when no reasonable fact-finder could find that plaintiffs have met their burden on the issue." *Barbera*, 906 F.3d at 629.

### a.    Defendant's Progressive Discipline Policy:

According to Steinhilber, recommended discipline is supposed to be progressive starting with the first step. [Exhibit E, Steinhilber Dep. p. 26, ll. 12-21].  Defendant's corrective action policy steps may include written counseling, written warning, final written warning with potential suspension, and termination or suspension pending termination.  [Exhibit D, Scott Dep.

p. 80, ll. 5-22; *id* at p. 81, ll. 2-5; Ex. 10; Exhibit E, Steinhilber Dep. pp. 124, 11. 21-25; *id* at p.

125, ll. 1-2]. Here, Duis was not issued any disciplinary action other than her termination and

neither Scott or Steinhilber were aware of any problems or complaints with her performance.

[Ex. D, Scott Dep. p. 45, ll. 4-8; *id* at p. 46, ll. 16-19; *id* at p. 50; ll. 15-25; *id* at p. 51, ll. 1-2, *at*

p. 55, ll. 4-7; Ex. E. Steinhilber Dep p. 30, ll. 12-25; *id* at p. 34, ll. 18-25; *id* at p. 35, ll. 1-3; *id* t

p. 121, ll. 14-25; Ex. G, Interrogatory Response No. 3, p. 4 ].   However, despite these facts,

Duis, unlike other employees was not offered progressive discipline. Similarly situated

employees such as Dawn Smith, Melissa Roberts, Nancy Georgakis, and Daniella Mendoza are

all examples of employees while reporting to Steinhilber were neither pregnant, took FMLA

leave, or reported discrimination. [Ex. E. Steinhibler Dep. p. 127, ll. 8-25; *id* at p. 128, l. 1; *id* at

p. 147, ll. 12-25; *id* at p. 148, ll. 1-16; *id* at p. 149, ll. 24-25; *id* at p. 150, ll. 1-25; *id* at p. 154, ll.

12-18; *id* at p. 155, ll. 1-12]. As noted below they received progressive discipline.

      **b.**      **Steinhilber Treats Others More Favorably:**

            i**.**      **Dawn Smith**

Dawn Smith was an RN who while reporting directly to Steinhilber, was never pregnant,

never took FMLA leave, or reported discrimination. [Ex. E, Steinhilber Dep. p. 127, ll. 8-25; *id*

at p. 128, l. 1]. In 2019 Smith received three (3) complaints against her alleging that she was

lazy, not assisting her co-workers, not meeting patient care standards, and that patients she was

taking care of were requesting another nurse. [Ex. E, Steinhilber Dep. p. 128, ll. 12-23; *id* at p.

134, l. 8-18 (P-17, Bate Stamp #181)]. Travis Thatcher-Curtis (Thatcher-Curtis) summarized

those complaints to Steinhilber on April 12, 2019. [Ex. E, Steinhilber Dep. p. 128, ll. 12-23; *id*

at p. 134, l. 8-18  (P-17, Bate Stamp # 177-178 and 181)]. Thereafter, Smith did not come to the

room of a patient nor answer an alarm for 45-60 minutes. [Ex. E, Steinhilber Dep. p. 129, ll. 20-

23 (P-17, Bate Stamp #177)]. Subsequently, it was reported that Smith yelled at a patient who reported that she was afraid of Smith and did not want her taking care of her again. [Ex. E, Steinhilber Dep. p. 129, ll. 20-23 (P-17, Bate Stamp #177)]. Furthermore, four (4) rooms assigned to Smith were found to have not been attended to adequately by Smith with such complaints ranging from IV alarming air in line, IV bag dry, garbage overflowing, opened supplies on containers, and a soiled patient all while Smith was found to be on her cell phone in the nurses station. [Ex. E, Steinhilber Dep. p. 129, ll. 20-23(P-17, Bate Stamp #177)]. In addition, on April 11, 12, 22, 23, and 26th of 2018 Smith had failed to return calls from her manager. [Ex. E, Steinhilber Dep. p. 129, ll. 20-23(P-17, Bate Stamp #177)]. As a result of all these infractions Steinhilber did not immediately suspend or terminate Smith yet rather chose progressive discipline and issued her a final written warning. [Ex. E, Steinhilber Dep. p. 129, ll. 20-23, *id* at p. 133, ll. 6-21(P-17, Bate Stamp #177-178)]. In sum, prior to Smith being terminated she had received multiple patient complaints against her and a final written warning all under the direct supervision of Steinhilber. [Ex. E, Steinhilber Dep. p. 128, ll. 12-23; *id* at p. 129, ll. 20-23; *id* at p. 136, ll. 1-21 (P-17, Bate Stamp #177-178)]. Such progressive discipline was not offered to Duis.

### ii. Melissa Roberts:

Melissa Roberts an RN who while reporting to Steinhilber was also never pregnant, never took FMLA leave, nor reported discrimination. [Ex. E, Steinhilber Dep. p. 154, ll. 12-18; *id* at p. 155, ll. 1-12]. Steinhilber provided Roberts a written counseling after Roberts accessed personal medical information in violation of Defendant's policy. [Ex. E, Steinhilber Dep. p. 156, ll. 15-22 (P-22, Bate Stamp #583-585)]. Subsequently, Steinhilber issued another written counseling to Roberts for incomplete restraint documentation on two patients, incorrect verbiage, on CABG

consent, no order for restraints, and for not answering calls from the charge nurse on two occasions.  [Ex. E, Steinhilber Dep. p. 156, ll. 13-25; *id* at p. 157, ll. 1-11(P-22, Bate Stamp #586-588)].

### iii.  Nancy Georgakis:

Nancy Georgakis a registered nurse who while reporting directly to Steinhilber was never pregnant, never took FMLA leave, nor reported discrimination was never disciplined by Steinhilber despite needing improvement with body language and verbiage, time management, and appearing gruff.  [Ex. E, Steinhilber Dep. p. 149, ll. 24-25; *id* at p. 150, ll. 1-25; *id* at p. 151, ll. 1-22; *id* at p. 152, ll. 1-10(P-20, Bate Stamp #148)].  Subsequently, Georgakis was eventually provided a written counseling after stating to a co-worker "you freaking snitch.  You narked me out." [Ex. E, Steinhilber Dep. p. 159, ll. 9-10 (P-26, Bate Stamp #613-615)].

### iv.  Danielle Mendoza:

Daniella Mendoza an RN who while reporting directly to Steinhilber was never pregnant, never took FMLA leave, nor reported discrimination was never disciplined by Steinhilber despite needing improvement on closing the loop when identifying patient needs, change in status or abnormal clinical findings.  [Ex. E, Steinhilber Dep. p. 147, ll. 12-25; *id* at p. 148, ll. 1-25; *id* at p. 149, ll. 1-5(P-19, Bate Stamp #144)].

### v.  Celeste Reed:

Celeste Reed another nurse under Steinhilber's supervision was provided progressive discipline when she was issued two written warnings.  [Ex. E, Steinhilber Dep. p. 159, ll. 19-25; *id* at p. 160, ll. 24-25; *id* at p. 161, ll. 1-6(P-27, Bate Stamp #616-622)].

## IV.  Retaliation Under Title VII and PDA:

Protected conduct under Title VII is not a harsh requirement.  Indeed, informal verbal

complaints about such improper stereotyping can be protected under Title VII.  *Davis v. Time Warner Cable*, 651 F.3d 664, 674 (7th Cir. 2011).  No magic words must be uttered to place an employer on notice of a protected activity under Title VII.  *Clifford v. Patterson Co.*, 2009 WL 3852447, *15 (N.D. Ill. Nov. 18, 2009), *citing Sitar v. Indiana Dept. of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003).  Opposing unlawful discrimination has been granted a liberal interpretation by the Supreme Court that includes not only actively and consistently opposing such behavior, but also by taking any stance that is antagonistic to such behavior.  *Crawford v. Metropolitan Govt. of Nashville and Davidson County, Tennessee*, 555 U.S. 271, 276-77 (2009).

Here, Duis told Scott that Steinhilber was retaliating against her for refusing to lie to Human Resources about a fellow-coworker, Dawn Smith, and informed Scott about comments Steinhilber had made to her regarding Duis's pregnancy and how Steinhilber had mocked her pregnancy.  [Ex. C, Duis Dep. p. 75, ll. 18-25; *id* at p. 76, ll. 1-3, 12-15].  Duis relayed to Scott everything that was said in her meeting with Steinhilber and Thatcher-Curtis including what Steinhilber had said.  [Ex. C, Duis Dep. Ex. C, Duis Dep. p. 75, ll. 18-25; *id* at p. 76, ll. 1-3; *id* at p. 77, ll. 20-25; *id* at p.78, ll. 1-3; *id* at p.  79, ll. 10-11].  Notifying your employer of discrimination, as Duis did here, is not evidence of a horrible attitude rather it is the appropriate thing to do.  Even Scott admits that if an employee believes they are being discriminated against they can talk to her.  [Ex. D, Scott Dep. p. 83, ll. 16-23].   However, Scott's response to Duis's complaint was not to investigate Duis's' complaint, but rather to view her complaint as a negative factor in justifying an unlawful termination.

Title VII protects persons not just from certain forms of job discrimination, but from retaliation for complaining about the types of discrimination it prohibits."  *Miller v. Am. Family Mut. Ins.Co.,* 203 F.3d 997, 1007 (7th 2000).  To establish a prima facie case of retaliation, a

plaintiff "must show that (1) she engaged in statutorily protected expression by complaining about discrimination that Title VII covers; (2) she suffered an adverse action by her employer; and (3) there is a causal link between the protected expression and the adverse job action." *Id*. "For a reasonable factfinder to find in [Plaintiff's] favor, the evidence would have to establish either a causal connection between [her] protected activity and the adverse action he suffered or else support an inference of retaliatory motive." *Lewis v. Wilkie*, 909 F.3d 858, 871 (7th Cir. 2018).

### A.    Duis Engaged in Protected Activity:

First, Defendant claims that Duis cannot establish that she engaged in statutorily protected activity, namely that she complained of pregnancy of discrimination.  [See Defendant's Memorandum of Law p. 17].  Defendant's assertion is false.  On May 10, 2019, Duis met with Scott and informed her that she was pregnant.  [Exhibit D, Scott Dep. p. 30, ll. 3-10].   Duis relayed to Scott everything that was said in her April 19th meeting with Steinhilber and Thatcher-Curtis including what Steinhilber had said regarding her pregnancy and how she was mocked for it.  [Ex. C, Duis Dep. p. 75, ll. 18-25; *id* at p. 76, ll. 1-3, 12-15; *id* at p. 77, ll. 20-25 *id* at p. 78, ll. 1-3; *id* at p. 79, ll. 10-11].  Such comments included Steinhilber stating to Duis "oh, I have to call the doctor for myself to the floor.  I can't handle my job because I am pregnant" and that Duis couldn't do her job because she was pregnant. [Ex. C, Duis Dep. p. 61, ll. 23-25; *id* at p. 62, ll. 1-8, 16-17, 22-24; *id* at p. 179, l. 25; *id* at p. 180, ll. 1-3; *id* at p. 181, ll. 9-14].

Even Scott admits that Duis told her she was being targeted and harassed by Steinhilber and that Steinhilber was trying to get dirt on Duis.  [Ex. D, Scott Dep. p. 35,  ll. 15-17; *id* at p. 38, ll. 1-5].  Supporting Duis's claim further is the fact that Defendant further admits that Duis texted Thatcher-Curtis claiming she had been "bullied and harassed" by Steinhilber. [See

Defendant's Memorandum of Law p. 8].   Based on Steinhilber's statements and actions toward

Duis it is reasonable to assume Duis's fear of discrimination was occurring.   Notably, "a plaintiff

need not prevail on her Title VII discrimination claim or have opposed an action that in fact

violated Title VII to win a retaliation claim.   All that is required is that "she reasonably believed

in good faith that the practice she opposed violated Title VII."   *Fine v. Ryan Int'l Airlines*, 305

F.3d 746, 752 (7th Cir. 2002) (internal citations omitted) (quoting *Alexander v. Gerhardt Enters.,*

*Inc.,* 40 F.3d 187, 195 (7th Cir. 1994).

      **B.**     **Scott's Response or Lack Thereof to Duis's Complaint:**

In response to Duis's complaint Scott never spoke with Duis again. [Ex. D, Scott Dep. p.

50, ll. 19-23; *id*  at p. 66, ll. 10-12].   Scott did not investigate whether these comments were

made by Steinhilber, but rather went to Steinhilber and told her that Duis had complained and

was going to Human Resources.   [Ex. D, Scott Dep. p. 37, ll. 16-22; *id at* p. 65, l. 25; *id* at p. 66,

ll. 1-5; Ex. E, Steinhilber Dep. p. 89, ll. 24-25; *id* at p. 90, ll. 1-17].   Steinhilber admits that after

Duis was suspended no one from Human Resources or management ever questioned her to see if

she was harassing or bullying Duis, treating Duis differently due to her pregnancy, or if she had

ever made any discriminatory comments regarding Duis's pregnancy, maternity leave, or family

medical leave.   [Ex. E, Steinhilber Dep. p 88, ll. 24-25; *id* at p. 89, ll. 1-22; *id* at p. 91, 11. 1-25;

*id* at p. 92, ll. 1-9].   This is not the proper way to handle a complaint of discrimination.

There should be no dispute that there is a causal link between Duis's protected expression

and the adverse employment action.   Indeed, according to Defendant, Duis's "continued

inappropriate behavior and toxic attitude while meeting with Scott led to the decision to

terminate Duis' employment." [See Defendant's Memorandum of Law p. 14].   Duis

complained of discriminatory conduct during her meeting with Scott and Defendant has used that

as a basis for terminating her employment thus there is not only a causal but a direct link between Duis's protected expression and the adverse job action.  For purposes of summary judgment this is direct evidence of unlawful retaliation.

**V.      Duis' Claims Under the FMLA:**

**A.      Duis's FMLA Retaliation Claim:**

Duis asserts two FMLA claims: retaliation and interference. "The difference between a retaliation and interference theory is that the first 'requires proof of discriminatory or retaliatory intent while [an interference theory] requires only proof that the employer denied the employee his or her entitlements under the Act.' " *Sorah v. New Horizons Home Healthcare Ltd. Liab. Co.*, 2018 WL 5830753, at *2 (N.D. Ind. Nov. 7, 2018) (quoting *Shaffer v. Am. Medical Ass'n*, 662 F.3d 439, 443 (7th Cir. 2011)). An employer cannot use an employee taking FMLA leave as a negative factor in termination. *See Pagel v. TIN Inc.*, 695 F.3d 622, 629 (7th Cir. 2012) (citing *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 978 (7th Cir. 2008) ); *see also* 29 U.S.C. § 2615(a)(2). "To succeed on a retaliation claim, the plaintiff does not need to prove that 'retaliation was the *only* reason for her termination; she may establish an FMLA retaliation claim by 'showing that the protected conduct was a substantial or motivating factor in the employer's decision.' " *Goelzer*, 604 F.3d at 995 (citing *Lewis v. Sch. Dist. # 70*, 523 F.3d 730, 741–42 (7th Cir. 2008) (emphasis in original) ). As with other employment statutes, to prove that her termination was retaliatory for taking protected leave, the Plaintiff must establish that (1) she engaged in a protected activity, (2) the Defendant took an adverse employment action against her, and (3) there is a causal connection between the two. *See Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 633 (7th Cir. 2009).

Defendant was well aware of Duis's intent to take FMLA / maternity leave upon the birth

of her child.   According to Steinhilber, Duis informed her that she couldn't wait to go on maternity leave.  [Ex. F, Steinhilber Dep. p. 120, ll. 6-11].  Moreover, Steinhilber, in reference to Duis, questioned Buchanan "so you're saying we don't hear anyone complaining about assignments or duties because of their pregnancy or nobody ever said that I'm pregnant and can't do this or that they're not coming back to work after a child being born." [Ex. F, Buchanan Aff ¶¶ 1, 3, 10, 11].   However, there are even more admissions that Defendant was retaliating after Duis expressed her intent to take FMLA leave.  On May 14, 2019, Steinhilber, by phone, called Duis and informed her that Duis was excited about her pregnancy and it showed that she did not value her job, and that Duis cared more about her family and her pregnancy than her job which did not coincide with Franciscan's values.  [Exhibit C, Duis Dep. p. 47, ll. 15-21].   Duis then asked whether she was being fired because she was pregnant and Smosna responded no it's not because you are pregnant, it's because you're taking maternity leave and FMLA.  [Ex. C. Duis Dep. p. 48, ll. 4-6; *id* at p.  52, ll. 16-19].  Smosna told Duis told that they did not want her to take leave.  [Exhibit C, Duis Dep. p. 108, ll. 14-22].  Duis was also told that they did not believe that she would return to work after having her baby and FMLA which Duis denied.  [Ex. C, Duis Dep. p. 52, ll. 19-22].   Moreover, as noted in Section III.(B)(2)(a-c) above, the reasons for terminating Duis are pretextual.  Based on these facts a reasonable factfinder could conclude that the Defendant considered the protected leave to which Plaintiff was entitled at least a substantial factor in terminating Duis's employment.

      **B.**     **Duis Interference Claim:**

To prevail on an FMLA interference claim, Duis must prove that: (1) she was eligible for FMLA protections, (2) Defendant was covered by the FMLA, (3) she was entitled to FMLA leave, (4) she provided sufficient notice of her intent to take leave, and (5) Defendant denied her

FMLA benefits to which she was entitled. *Guzman v. Brown Cnty.*, 884 F.3d 633, 638 (7th Cir. 2018); *Goelzer v. Sheboygan Cnty., Wisconsin*, 604 F.3d 987, 993 (7th Cir. 2010). Employers are prohibited from wrongfully denying leave, but they are also prohibited from "interfering with" FMLA rights by "using the taking of FMLA leave as a negative factor in employment actions and discouraging an employee from using such leave." *Baer v. Wabash Ctr., Inc.*, 2016 WL 1610590, at *2 (N.D. Ind. Apr. 21, 2016) (quoting *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 818 (7th Cir. 2015)).

Defendant claims that Duis's interference claim must only fail as Duis was terminated for unsatisfactory work performance and unsatisfactory work behavior. [See Defendant's Memorandum of Law p. 20]. However, as previously explained, Defendant's reasons for terminating Duis are pretextual, and Defendant's own statements to Duis regarding her upcoming leave clearly show Defendant's attempt to stop her from exercising her rights under the FMLA. *See Simpson v. Office of the Chief Judge of the Cir. Ct. of Will Cty.*, 559 F.3d 706, 712 (7th Cir. 2009) ("Firing an employee to prevent her from exercising her right to return to her prior position can certainly interfere with that employee's FMLA rights.").

Defendant told her that she was being fired because she was taking FMLA leave, that they did not want her to take leave, and that they believed she would not return to work after having her baby. [Ex. C. Duis Dep. p. 48, ll. 4-6; *id* at p. 52, ll. 16-22, *id* at p. 108, ll. 14-22]. Notably, Duis's own termination form notes "Taryn stated she couldn't wait until October to be on maternity leave." [Ex, C. Duis Dep. p. 120, Ex. 8; Ex. E. Steinhilber Dep. p. 120, ll. 6-8; *id* at p. 124, ll. 11-16; Ex. 8 (p.1.)]. Being excited about maternity leave is not a reason for discipline and is not against Defendant's policies. [Ex. D, Scott Dep. p. 42, ll. 13-15; *id* at p. 70, ll. 12-25; *id* at p. 71, ll. 1-16]. As discussed in connection with Duis's FMLA retaliation claim Duis has

overcome Defendant's evidence that Duis would have been fired regardless of her intent to take FMLA leave., and Defendant's Motion for Summary Judgment on both of Duis's FMLA claims should be denied.

## VI.    Duis's Indiana Common Law Claim:

### A.    Basics of a *McClanahan* Claim

Indiana currently recognizes three (3) public policy exceptions to the at-will doctrine: (1) *Frampton v. Central Indiana Gas Co.*, 297 N.E.2d 425 (Ind. 1973)(worker's compensation retaliation); (2) *McClanahan v. Remington Freight Lines, Inc.*, 517 N.E.2d 390 (Ind. 1988)(refusal to breach statutorily imposed duty); and (3) *Jarboe v. Landmark Community Newspapers of IN, Inc.*, 644 N.E.2d 118 (Ind. 1995)(promissory estoppel).  Since 1988, Indiana has recognized a public policy exception to the at-will doctrine where an employer terminates an employee for that employee's refusal to commit an illegal act for which the employee would be personally liable.  *McClanahan v. Remington Freight Lines, Inc*., 517 N.E.2d 390, 393 (Ind. 1988)(employee could not be terminated for refusing to drive an overweight truck).

Broken down, a *McClanahan* claim requires three (3) basic elements: (1) protected activity, i.e. refusal to engage in conduct that could expose an employee to criminal liability, or stated more accurately whether Duis refused to breach a statutorily imposed duty, (2) an adverse employment action, and (3) causation between the first two elements.  *See Stillson v. St. Joseph County Health Dept.*, 22 N.E.3d 671, 679 (Ind. Ct. App. 2014)("And in *McClanahan v. Remington Freight Lines, Inc.*, 517 N.E.2d 390 (Ind. 1988), our supreme court extended the Frampton rule and held than an employee cannot be discharged solely for refusing to breach a statutorily imposed duty.").  In the summary judgment context, the issue is whether Defendant can affirmatively negate Duis's contention that a reasonable jury could find in her favor on each of these elements.

**B.      Duis Refusal to Engage in Defamation:**

On April 11, 2019, Duis was working the night shift as a charge nurse where she suffered an anxiety / panic attack and sent home by the hospitalist.  [Ex. C, Duis Dep. p. 55, l. 25; *id* at p. 56, ll. 1-14; *id* at p. 57, ll. 2-11].  The next day, Steinhilber called Duis and instructed her to go down to Human Resources and tell them that RN Dawn Smith (Smith) caused a confrontation and attacked Duis in the nursing station which caused Duis's panic attack.  [Ex. C, Duis Dep. p. 55, ll. 21-25; *id* at p. 57, ll. 22-25; *id* at p. 58, ll. 1-11].  Steinhilber asked Duis to lie and tell Human Resources that Smith started a fight with Duis despite the fact there was no such confrontation and was not true.  [Ex. C, Duis Dep. p. 60, ll. 16-25; *id* at p. 61, ll. 1-11, *id* at p. 128, ll. 4-24; *id* at p. 129, ll. 1-16].  Steinhilber explained her position to Duis by informing her that since she had previously worked with Smith at Porter Hospital it would not look good if Steinhilber told that stuff to Human Resources. [Ex. C, Duis Dep. p. 58, ll. 7-11; Ex. E, Steinhilber Dep. p. 9, ll. 3-6; *id* at p. 127, ll. 3-7].  Duis told Steinhilber that it was not true that Smith started a fight with her yet Steinhilber told her "well, you're gonna say it anyway."  [Ex. C, Duis Dep. p. 61, ll. 9-11].

On April 19, 2021, Duis met with Steinhilber and Thatcher-Curtis.  Steinhilber asked Duis to tell them about the confrontation with Smith.  [Ex. C, Duis Dep. p. 60, ll. 6-9].  Duis refused to lie and told them there was no confrontation.  [Ex. C, Duis Dep. p. 60, ll. 9-10].  In essence, Steinhilber ordered Duis to lie and defame a fellow employee.  [Ex. C, Duis Dep. p. 60, ll. 16-25; *id* at p. 61, ll. 1-11, *id* at p. 128, ll. 4-24; *id* at p. 129, ll. 1-16].

Per the standard of review on summary judgment, the Court must accept Duis's version of events wherein she was ordered to defame a fellow RN.  The question, then, on this first element is whether a reasonable jury could find that Duis's refusal to defame a co-worker

equated to her refusal to breach a legal duty.  The answer is clearly yes.  Under Indiana law, "[a] defamatory statement is one that 'tends to injure reputation or to diminish esteem, respect, goodwill or confidence in the plaintiff, or to excite derogatory feelings or opinions about the plaintiff.'"  *Cortez v. Jo-Ann Stores, Inc.,* 827 N.E.2d 1223, 1230 (Ind. Ct. App. 2005), citing *Branham v. Celadon Trucking Services, Inc.,* 744 N.E.2d 514, 522 (Ind. Ct. App. 2001), *trans. denied* 753 N.E.2d 16 (Ind. 2001).

Here, if Duis would have followed Steinhilber's order to defame a fellow employee she could have subjected herself to civil liability under Indiana law.  Duis's reasonable and good faith belief that her refusal could result in legal liability is enough to satisfy protected activity. If Duis would have obeyed Steinhilber's order that could have subjected her to civil liability thus violating Indiana Common Law.  Her refusal to do so resulted in Steinhilber terminating her employment.  Similarly, if Duis would have obeyed Steinhilber's order she could have been subjected to professional discipline placing her nursing license in jeopardy, including the revocation or suspension of her nursing license.  According to 848 IAC 2–2–2: "The registered nurse shall ... [f]unction within the legal boundaries of nursing practice based on the knowledge of statutes and rules governing nursing." And 848 IAC 2–2–3 provides in relevant part:

> Nursing behaviors (acts, knowledge, and practices) failing to meet the minimal standards of acceptable and prevailing nursing practice, which could jeopardize the health, safety, and welfare of the public, shall constitute unprofessional conduct. These behaviors shall include, but are not limited to, the following:
>
> (1) Using unsafe judgment, technical skills, or inappropriate interpersonal behaviors in providing nursing care.
>
> (2) Performing any nursing technique or procedure for which the nurse is unprepared by education or experience....

If Duis would have abided by Steinhilber's order it would have caused Duis to participate

in unprofessional conduct including engaging in inappropriate interpersonal behaviors thus breaching a statutorily imposed duty as set out in the Indiana Code thereby placing her nursing license in jeopardy.  Moreover, as noted above, Defendant's reasons for terminating Duis are pretextual.  Viewing all evidence in light most favorable to Duis her claim for unlawful retaliatory discharge should survive summary judgment.

**VI.     Conclusion:**

For the foregoing reasons, Duis respectfully requests the Court deny Defendant's Motion for Summary Judgment in all respects.

Respectfully Submitted,

*/s/ Ryan C. Fox*
Ryan C. Fox
Ryan P. Sink
Attorneys for Plaintiff

Fox & Sink, LLC
6177 North College Avenue
Indianapolis, Indiana 46220
rfox@foxsinklaw.com
rsink@foxsinklaw.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and accurate copy of the foregoing document was served this 1st day of November, 2021, by the Court's electronic filing system to the following counsel of record:

Amy J. Adolay: aadolay@kdlegal.com
Elizabeth M. Roberson: eroberson@kdlegal.com

*/s/ Ryan C. Fox*
Ryan C. Fox

25