

EXHIBIT

C

tabbies®

**In the Matter Of:**

*TARYN N. DUIS*

*-v-*

*FRANCISCAN ALLIANCE INC.*

---

**Taryn N. Duis**

*March 22, 2021*

---

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF INDIANA

HAMMOND DIVISION

TARYN N. DUIS,                )
                              )
        Plaintiff,            )
                              )
    -v-                       )  Cause No.
                              )  2:20-CV-78-TLS-APR
                              )
FRANCISCAN ALLIANCE INC.,     )
a/k/a FRANCISCAN HEALTH       )
CROWN POINT,                  )
                              )
        Defendant.            )

        The deposition upon oral examination of
TARYN N. DUIS, a witness produced and sworn before me,
Catherine M. Stefaniak, CSR, Notary Public in and for
the County of Lake, State of Indiana, taken on behalf
of the Defendant at Krieg DeVault, LLP, 8001 Broadway,
Suite 400, Merrillville, Indiana, on Monday,
March 22, 2021, at 9:00 a.m., pursuant to the Federal
Rules of Civil Procedure.

        STEWART RICHARDSON & ASSOCIATES

        Registered Professional Reporters

              (800) 869-0873

---

Page 2

APPEARANCES

1
2   FOR THE PLAINTIFF:
3       MR. RYAN C. FOX, ESQ.
        FOX & SINK, LLC
4       6117 North College Avenue
        Indianapolis, Indiana  46220
5
6   FOR THE DEFENDANT:
7       MS. AMY J. ADOLAY, ESQ.
        KRIEG DeVAULT, LLP
8       12800 North Meridian Street, Suite 300
        Indianapolis, Indiana  46032
9
10  ALSO PRESENT:
11      Linda Steinhilder
        Nita Wirkus
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 3

1              INDEX OF EXAMINATION
2                                           PAGE
   DIRECT EXAMINATION BY MS. ADOLAY:          4
3
4
                INDEX OF DEFENDANT'S EXHIBITS
5
6   NO.        DESCRIPTION                   PAGE
    Exhibit 1  Job description                40
7   Exhibit 2  Employee acknowledge for handbook  43
    Exhibit 3  EEOC Charge of Discrimination  53
8   Exhibit 4  Emails between Taryn Duis and  76
               Unemployment
9   Exhibit 5  Dismissal and Notice of Rights  92
    Exhibit 6  Intake PDI memo and Memorandum  93
10  Exhibit 7  Complaint and Demand for Jury  101
               Trial
11  Exhibit 8  Statement of Anna Basham      111
    Exhibit 9  Statement of Kimberly Buchanan  122
12  Exhibit 10 Response and Objections to     125
               Defendant's First Set of Requests
13             for Production
    Exhibit 11 Handwritten notes             132
14  Exhibit 12 Corrective Action Form and    134
               Co-worker Statement of Facts Form
15  Exhibit 13 Plaintiff's Verified Answers to  145
               Defendant's Interrogatories
16  Exhibit 14 Plaintiff's Supplemental Verified  151
               Answers to Interrogatories
17  Exhibit 15 Text messages                 160
    Exhibit 16 Instagram posts               170
18
19
20
21
22
23
24
25

---

Page 4

1              TARYN N. DUIS,
2   called as a witness by the Defendant, having been
3   first duly sworn, was examined and testified as
4   follows:
5   DIRECT EXAMINATION
6   BY MS. ADOLAY:
7   Q.  My name is Amy Adolay.  I'm the attorney for
8       Franciscan Alliance in this lawsuit.  Also present
9       today are the court reporter as well as you, the
10      plaintiff, Taryn Duis, your legal counsel, Ryan
11      Fox, and two representatives from Franciscan, Nita
12      Wirkus and Linda Steinhilder.
13          We're here for your deposition as it relates
14      to the lawsuit that you filed against Franciscan
15      Alliance, Inc. d/b/a Franciscan Health Crown Point,
16      cause number 2:20-CV-78-TLS-APR.
17          Ms. Duis, have you ever been deposed before?
18  A.  I have.
19  Q.  When was that?
20  A.  It was a very long time ago.  I don't -- I don't
21      remember exactly what year it was, but a long time
22      ago.
23  Q.  Okay.  Would you say 10 years ago, 15 years ago?
24  A.  At least 10 years ago.
25  Q.  And what was the purpose of that deposition?

1      it the same?

2   A.  I don't know.  There was never any like official

3      paperwork or anything.

4   Q.  Okay.  And did your job title change, or were you

5      still RN IMCU?

6   A.  You're still an RN, yes.  I just got charge pay,

7      charge differential.

8   Q.  Okay.  And so explain to me how that would work.

9      Were you always the charge nurse?

10  A.  No.  We did not have a charge nurse on our unit.

11     They made changes and put a charge nurse on our

12     unit.  I had applied for it at the request of Mike

13     Lane.

14  Q.  Okay.  So you applied for a charge nurse position?

15  A.  Correct.  At the request of Mike Lane.

16  Q.  Okay.  And were you selected for that position?

17  A.  He told me in -- they had selected somebody else

18     who had left our unit and came back.  And then she

19     was, a couple months later, being taken out of that

20     position.  And Mike was going to have me be the

21     permanent charge nurse in November when we had

22     spoken.

23  Q.  Okay.  So he said, in November, that you were --

24     November of what year?

25  A.  2018.

1   Q.  Okay.  That you would be the permanent charge

2      nurse?

3   A.  Yes.

4   Q.  And after that, were you always charge nurse on

5      your shift?

6   A.  Either myself or another girl, Jen.  Jen and I

7      didn't usually work together, because we were both

8      charge nurses.

9   Q.  Okay.  So you usually worked different days?

10  A.  Yes.

11  Q.  What's Jen's last name?

12  A.  Moreno.

13  Q.  Did you and Jen ever work the same shift?

14  A.  Yes.

15  Q.  Okay.  How often?

16  A.  Before we were both charge nurses, we worked

17     together almost every shift.

18  Q.  Okay.  Then after you --

19  A.  Then we didn't work together very often anymore.

20  Q.  Okay.  Let me finish the question first.  So after

21     you both became charge nurses, you're saying you

22     didn't work together very often; correct?

23  A.  Correct.

24  Q.  Do you recall how frequently, if ever, after that?

25  A.  Maybe once a week sometimes.

1   Q.  Okay.  So when you were both working the same

2      shift, which one of you would be the charge nurse?

3   A.  It would depend.

4   Q.  Okay.  So sometimes it was her, sometimes it was

5      you?

6   A.  Yes.

7   Q.  Who would decide which of you would be the charge

8      nurse for that shift when you were both working?

9   A.  I believe it was -- I think at that time -- well,

10     to be honest, it was whoever typed up the schedule

11     in the ICU decided who was going to be in charge

12     for that shift when it was between, you know,

13     multiple nurses depending on -- I don't know.

14     Whatever they decided to base it off of.

15  Q.  So you're not sure how they decided?

16  A.  No.  It was just kind of their choice, whatever

17     they decided.

18  Q.  And why was someone in ICU responsible for that

19     schedule?

20  A.  I don't know.

21  Q.  Do you recall, during your employment, receiving a

22     copy of Franciscan's employee handbook?

23  A.  Yes.

24         (Defendant's Exhibit 2 marked for

25     identification.)

1      MS. ADOLAY:

2   Q.  You've been handed what's marked as Defendant's

3      Exhibit 2.  Can you tell me what that document is?

4   A.  Employee acknowledgment for the handbook.

5   Q.  Okay.  Is this the document that you signed when

6      you received the employee handbook at Franciscan?

7   A.  Yes.

8   Q.  Is that your signature there at the bottom?

9   A.  Yes, it is.

10  Q.  Okay.  Were you provided a paper copy of the

11     handbook, or was it on intranet?

12  A.  I know it was on intranet, but I don't know if I

13     was provided a physical copy or not.  I can't

14     remember.

15  Q.  Okay.  You previously stated that Linda Steinhilder

16     became your supervisor sometime in 2019, maybe the

17     first half of the year; is that correct?

18  A.  Yes.

19  Q.  Or the first quarter, do you recall?

20  A.  I'm sure it was the first quarter.  I was only

21     there until May.

22  Q.  Okay.  And what was your relationship like with

23     Linda during your employment?

24  A.  I didn't really know Linda, other than her coming

25     down and yelling at staff when she first -- her

Page 45

1   very first day as manager.
2   Q.   Do you remember what she was yelling at the staff
3        about?
4   A.   Yeah.  She came down and was telling us we were
5        negative, nasty people and that we needed to have
6        Disney smiles, and our problem was our attitude,
7        and we were all nasty and negative.  So that was my
8        first impression of Linda.
9   Q.   Okay.  After that, what was your working
10       relationship like with Linda?
11  A.   She would -- I had seen her a couple times.  Like I
12       said, she was usually just coming down and yelling
13       at everybody, telling everybody how nasty we were.
14  Q.   So how many times do you claim that happened during
15       your employment?
16  A.   I -- like I said, I only seen her a few times, so
17       probably all four or five times that I had seen
18       her.
19  Q.   So you only saw her four or five times during your
20       employment with Franciscan?
21  A.   Probably, yes.
22  Q.   Do you know who made the decision to terminate your
23       employment?
24  A.   I don't know whose -- whose ultimate decision it
25       was, I don't know.

Page 46

1   Q.   Do you know why your employment with Franciscan was
2        terminated?
3   A.   I was told it was because I was excited about my
4        maternity leave, and I was going to take FMLA.
5   Q.   And who told you that?
6   A.   Linda and human resources both reiterated that to
7        me multiple times.
8   Q.   Who specifically in human resources?
9   A.   I don't -- whoever was on the phone.  I don't know
10       who it was.  I can't remember if it was Jessica or
11       Nita.  I don't know.
12  Q.   You were told this on the phone?
13  A.   Yes.
14  Q.   Do you recall what day?
15  A.   That was -- well, they had said it to me on -- was
16       it the 10th, I think?  And then the following
17       Tuesday.  So I think that was like the 12th.  And
18       then the 14th when they fired me.
19  Q.   So you're saying you were told on the 10th.  And
20       we're talking about what month?  May?
21  A.   Of May.
22  Q.   May of 2019?
23  A.   Yes.
24  Q.   Okay.  So you're saying on May 10th, 12th and 14th
25       of 2019, you were told that you were being

Page 47

1   terminated because you were excited about maternity
2   leave and were going to take FMLA?
3   A.   Well, I wasn't told I was being terminated until
4        the 14th, but I was told that there was an issue
5        with me being pregnant and taking FMLA on the days
6        leading up to that when I was under investigation.
7   Q.   Okay.  So you've told me two different things now
8        that were said to you and seem to be changing the
9        dates.  First of all, I asked you why you were
10       terminated.  You said because you were excited
11       about maternity leave and were going to take FMLA.
12       Now you're saying what you were told is because you
13       were pregnant.  What exactly was said to you?
14  A.   Well, you -- I mean, they were talking about my
15       pregnancy.  They said that I was excited about my
16       pregnancy, that it showed that I didn't value my
17       job.  They said that I cared about my family and my
18       pregnancy more than my job, and that didn't
19       coincide with Franciscan's values.
20  Q.   Okay.  Who said those things?
21  A.   Linda did.
22  Q.   Anyone else?
23  A.   Linda was the one mostly speaking.  Human
24       resources, you know, said -- I'm sure they said a
25       few things, but --

Page 48

1   Q.   Do you recall what anyone in HR said?
2   A.   When I said -- I questioned, I said, so you're
3        telling me that you're firing me because I'm
4        pregnant?  Then whoever was in human resources on
5        the phone said, well, no, it's not because you're
6        pregnant, it's because you're taking FMLA.  Which I
7        then explained, you can only take, you know, the
8        FMLA for having a baby -- for having a baby.  Like
9        there was -- that was the only reason I was taking
10       it.  It wasn't for anything else.
11  Q.   Okay.  So you're claiming that someone in HR told
12       you that you were being terminated because you were
13       taking FMLA?
14  A.   Yes, for my pregnancy.
15  Q.   And when did that person say that to you?
16  A.   On the 14th of May.
17  Q.   Okay.  So let's go back to what was said to you
18       then on the 10th and the 12th.  Who did you talk to
19       on the 10th?
20  A.   I had spoken to Linda, and human resources had
21       called me.
22  Q.   And what was the purpose of the call on the 10th?
23  A.   They were telling me why I was being suspended.
24  Q.   Okay.  What did they say in terms of why you were
25       suspended?

Page 49

1  A.  Well, actually, Linda would not tell me why I was
2      being suspended.  She refused to tell me.  She also
3      had another nurse on the phone that didn't have
4      anything to do with it when she called me at that
5      point, actually, when she sus -- oh, no.  That was
6      when she suspended me.
7  Q.  Right.  I think that's what we were talking, on the
8      10th -- what's the day that you were suspended?
9  A.  Linda called me on the morning of the 9th and
10     suspended me, I believe.
11 Q.  Okay.  So Linda called on the 9th and told you that
12     you were suspended?
13 A.  Yes.
14 Q.  Was anyone else on that call?
15 A.  Yes.  I can't remember her name from the 4th floor.
16     The manager that was on the 4th floor.  I can't
17     remember her name.
18 Q.  Okay.  What was she the manager of, do you know?
19 A.  The telemetry unit.  Her name is Shannon.
20 Q.  Do you know her last name?
21 A.  I don't.
22 Q.  Okay.  And what did -- what did -- was anyone else
23     on that call?
24 A.  Just Shannon, Linda and myself.
25 Q.  Okay.  And what did Linda say to you on that call?

Page 50

1  A.  She said I was being suspended.
2  Q.  And did she tell you why?
3  A.  No.  I asked her why, and she said they were
4      investigating me.
5  Q.  Okay.  And then what happened on the 10th?  There
6      was another conversation?
7  A.  Yes.  So then the 10th, I had gone up to the
8      hospital, because I didn't understand how I can be
9      suspended without even being told what happened.
10     And so I went up there to speak with Travis, and he
11     wasn't there, so I spoke with Dawn Scott instead.
12     Dawn Scott is Travis's manager.
13 Q.  Do you know what Dawn's position is?
14 A.  I believe she is the vice-president of nursing.
15 Q.  Okay.  Did you also then talk to Linda in HR on the
16     10th?
17 A.  Yes, after I talked to Dawn.
18 Q.  Okay.  And what was your conversation with Linda in
19     HR on the 10th?
20 A.  So they had called me on the 10th to let me know
21     that I was being suspended, because I refused to
22     give a patient pain medicine, and I said cuss
23     words.
24 Q.  Did they say anything else?
25 A.  No.

Page 51

1  Q.  Who was on the phone with Linda?
2  A.  Someone from human resources.
3  Q.  Do you recall who?
4  A.  No.
5  Q.  Okay.  Then you said you had a conversation on the
6      12th.  Who was your conversation with on the 12th?
7  A.  It wasn't the 12th.  I apologize.  It was just the
8      14th.
9  Q.  Okay.  And who was your conversation with on the
10     14th?
11 A.  Then, Linda, somebody from human resource and
12     Travis called me.
13 Q.  Do you know who from human resources?
14 A.  No.
15 Q.  Okay.  And what did they say when they called you?
16 A.  They told me I was being terminated.  They said
17     that I had a -- that being excited about my
18     maternity leave was -- I was being negative,
19     because I was excited, and that showed I didn't
20     value the company, that it was extremely rude and
21     unprofessional for me to be excited about maternity
22     leave and that it was inappropriate.
23 Q.  Did they say anything else?
24 A.  Yes.  That's when I was told that I valued my
25     child's life more than my job and that that proved

Page 52

1      that my values didn't coincide with Franciscan
2      values and that I don't care about my job.
3  Q.  Okay.  Who said these statements to you?
4  A.  That was Linda.
5  Q.  And who said you were being terminated because you
6      were excited about maternity leave?
7  A.  Linda.
8  Q.  So were all of these statements that you just told
9      me about on the 14th?
10 A.  Yes.
11 Q.  Those were all by Linda?
12 A.  Yes.  And then that's when whoever the
13     representative for Fran -- the human resources
14     person for Franciscan said -- because I said, at
15     that point, you're firing me because I'm pregnant?
16     This is not legal.  They said, oh, we're not firing
17     you because you're pregnant.  We're firing you
18     because you're going to take maternity leave and
19     FMLA.  They also said at that time they didn't
20     believe I was going to come back after having the
21     baby after my FMLA, which I told them that I was
22     coming back, but --
23 Q.  Did they say why they believed you weren't coming
24     back?
25 A.  They said I didn't like my job.

Page 53

1   Q.   Did you say anything else?
2   A.   I just asked them -- I mean, I said I didn't
3        understand why I was being terminated when I had
4        never had one issue in four years of employment and
5        never been anything but complimented by patients,
6        you know, co-workers.  I never had an issue.  I
7        didn't understand how four years of my service with
8        no issues, all of a sudden in one month since Linda
9        got there, all of a sudden changed.
10  Q.   Did they say anything else during the call?
11  A.   No.
12  Q.   Did they mention anything during that call about
13       issues with you getting along with your co-workers?
14  A.   No.
15  Q.   Did they mention anything in that call on the 14th
16       about patient care issues?
17  A.   No.
18            MS. ADOLAY:  (Tendering).
19            (Defendant's Exhibit 3 marked for
20       identification.)
21            MS. ADOLAY:
22  Q.   You've been handed what's marked as Defendant's
23       Exhibit 3.  Can you tell me what this document is?
24            MR. FOX:  You can take your time to review
25       that document.

Page 54

1            THE WITNESS:
2   A.   This is the charge I filed with the EEOC.
3   Q.   The charge against Franciscan Alliance?
4   A.   Yes.
5   Q.   Okay.  And it shows at the bottom of the first page
6        on the left side of it, it says, digitally signed
7        by Taryn Duis on 11/21/2019; is that correct?
8   A.   Yes.
9   Q.   Do you recall submitting your electronic signature
10       on that day?
11  A.   Yes.
12  Q.   And does this represent the charge that you filed
13       against Franciscan?
14  A.   Yes, the charge with the EEOC, yes.
15  Q.   Okay.  So in this charge that you filed, you're
16       discussing your termination, and you say you were
17       discharged by Linda Steinhilder, Jessica blank,
18       human resources manager, and Travis Curtis.  Was
19       Jessica the person from HR that was on the phone?
20  A.   I believe that it was Jessica on the phone, but I'm
21       not 100 percent sure.
22  Q.   Okay.  So you think it was her on the phone on the
23       14th?
24  A.   I believe so.
25  Q.   Okay.  And in this charge, you say you were

Page 55

1        advised by Franciscan that you were being
2        terminated because you were excited about maternity
3        leave?
4   A.   That's correct.
5   Q.   Do you know why you didn't mention in this charge
6        that you thought you were -- that they said you
7        were being terminated for taking FMLA leave?
8   A.   It said that I believe I was discharged and
9        retaliated against due to my pregnancy, so it does
10       say that.
11  Q.   But it doesn't say anything about FMLA leave,
12       you'll agree; right?
13  A.   No, the word FMLA is not on this document.
14  Q.   Is there a reason you didn't share with the EEOC
15       that you were allegedly told that you were being
16       terminated because you were taking FMLA leave?
17  A.   I did.  This is just a brief synopsis of the --
18  Q.   Okay.  So you think you did tell --
19  A.   I'm 100 percent certain I told them when I met with
20       them.
21  Q.   Okay.  You also state in this charge that prior to
22       your discharge, Ms. Steinhilder tried involving you
23       in a scheme to terminate Dawn Smith, RN.  Tell me
24       about that.
25  A.   That's correct.  So on April 11th, I was at work.

Page 56

1        I was charge for the night.  We were short staffed,
2        approved by Linda, so it was very chaotic.  We were
3        extremely understaffed.  The patients were very
4        critical.  We were getting slammed with admissions,
5        and it was just extremely chaotic.  We were already
6        over our numbers.
7            And I think they called a code in the
8        emergency room, and then we had two patients coming
9        to the floor that were getting blood, and it was
10       just extremely chaotic.  And I was in charge, and
11       so I was responsible for the entire floor.  So I
12       was trying to help with the one admission that we
13       were getting while they were bringing up another
14       admission, and things were becoming very hectic.
15           And I had actually paged the doctor.  One of
16       my patient's blood pressures was low, so I had
17       paged the hospitalist.  And when the hospitalist
18       had come to the floor, he asked if I -- if I was
19       okay, and I had told him about my patient.  And he
20       said that I needed to sit down, I didn't look good,
21       and he wanted me to go to the emergency room.  They
22       checked my blood pressure.  I don't -- I don't
23       remember what it was or anything.
24           I did not want to go to the emergency room.  I
25       didn't want to leave my nurses.  I didn't want to

Page 57

1    leave them even shorter.  I didn't want it to be a
2    worse night for them, basically.  So the
3    hospitalist had talked me into being assessed on
4    the floor instead of going down to the emergency
5    room.
6        So he assessed me.  He felt like I was having
7    a pretty bad anxiety attack with everything going
8    on, and he felt that it would be best for me to go
9    home for the night.  I had had a miscarriage
10   earlier that year, and I was pregnant, and he felt
11   like it would be best for me to go home.  I didn't
12   want to leave, because I didn't want to leave my
13   floor.  But the hospitalist actually spoke with the
14   shift director and the ICU charge nurse and my
15   nurses and had arranged for me to leave so I could
16   go home.
17       I went home.  And then the next morning, Linda
18   had called me.  And I thought she was calling
19   because she was concerned, but she wasn't.  She was
20   calling to tell me how I was going to participate
21   in getting Dawn Smith fired, so --
22   Q.  Okay.  What exactly did she say to you?
23   A.  So Linda had called me, and she said, oh, I heard
24       you had a panic attack last night at work.  I said,
25       yes, I did.  And she told me, well, you know that

Page 58

1    Dawn is a bad seed, and I worked with her at
2    Porter, and I already spoke with human resources,
3    and you're going to go down to human resources and
4    you're going to tell them that Dawn caused this
5    confrontation, and it caused your panic attack, and
6    Dawn attacked you in the nurses station, and that's
7    why this happened.  And she told me at that time,
8    obviously, that she had worked with Dawn at Porter,
9    and it wouldn't look very good if she told that
10   stuff to human resources, so she asked me to say it
11   to them.
12       I did not respond to her at that time.  I
13   didn't tell her I wasn't going to do that, but I
14   would not lie about one of my co-workers.  That's
15   wrong, so I did not do that.  Then a couple days
16   later, there was a note taped up -- I have a
17   mailbox for privacy.  Linda decided to tape the
18   note up in the nurses station so everybody could
19   see it instead of using my mailbox and wrote a note
20   in there about how I was meeting with her at the
21   end of my shift on Friday the 19th with Travis and
22   Dawn.
23       At that point, I had emailed Travis, and I
24   believe Linda was copied in on the email, too.  And
25   I said that I didn't feel comfortable talking, for

Page 59

1    one, in front of Dawn after Linda was trying to
2    make me lie about her, and for two, I didn't want
3    to discuss any of my personal medical issues in
4    front of somebody else.  So I told them I did not
5    feel comfortable meeting with Dawn there as well.
6    So they said that they would meet with me
7    separately.
8    Q.  Okay.  Did you and Dawn Smith have any sort of
9        confrontation on April 11th?
10   A.  No.
11   Q.  Do you know whether someone reported to Linda that
12       you did?
13   A.  I don't know why they would, so no.
14   Q.  Do you know whether someone did, though?
15   A.  No, as far as I know.
16   Q.  Okay.  So you don't know whether someone told Linda
17       that there was a confrontation between you and Dawn
18       Smith?
19   A.  No, I don't know if someone lied to her.
20   Q.  Did you have any interaction with Dawn Smith on
21       April 11th?
22   A.  Dawn was one of the nurses working on the floor,
23       and she took over charge when I left.
24   Q.  Okay.  Were there any disputes between you and Dawn
25       that night?

Page 60

1    A.  No.
2    Q.  So tell me what happened then once you met with
3        Linda and Travis.
4    A.  So Linda and Travis had then met with me in the
5        office -- the critical care office.  I don't know
6        whose office it was at that point.  Maybe Linda's.
7        And I had come in, and Linda first says to me, tell
8        me about the confrontation that occurred between
9        you and Dawn.  And I said, there was no
10       confrontation between Dawn and I.  She said, tell
11       me about the altercation that occurred between you
12       and Dawn.  I said, there was no altercation that
13       occurred between Dawn and I.  And Travis was in
14       there, so at this point, Linda was expecting me to
15       go with the lie of Dawn, you know --
16   Q.  This is what you --
17   A.  This is what she told me to say, so yes.
18   Q.  Right.  But she didn't tell you she was asking you
19       to lie?
20   A.  No.  She did.  She asked me to tell them that --
21   Q.  Right.  Well, you're saying you view that as a lie.
22       Did she ask you to lie?
23   A.  Yes, she asked me to lie.
24   Q.  Did she say that, though?  Did she say, I need you
25       to lie, or did she just say, this is what you need

Page 61

1       to tell them?

2  A.  She said, I need you to tell them something that

3       did not happen.

4  Q.  She said, I need you to tell --

5  A.  She said, I need you to say that Dawn started a

6       fight with you.  And considering I was the

7       person -- the first person, I know it was a lie,

8       because Dawn did not start a fight with me.  I also

9       told Linda, that's not true.  And she said, well,

10      you're going to say it anyway.  So yes, she told me

11      to lie.

12  Q.  What I'm asking you is specifically what she said.

13      Right?

14  A.  Did she say the words, I want you to lie?

15  Q.  Right.

16  A.  No.

17  Q.  Okay.  I'm trying to understand exactly what she

18      said to you.  I understand that you're saying that

19      was a lie and that you're saying I was being asked

20      to lie.  I'm just trying to understand exactly what

21      she said to you.  Okay?

22  A.  Okay.

23  Q.  Did anything else happen in that meeting --

24  A.  Yes.

25  Q.  -- with Linda and Travis?

Page 62

1  A.  Yes.  So then after that, Linda got very upset,

2      because I was not going along with what she wanted

3      me to say, and she started personally attacking me

4      and mocking and getting in my face, yelling at

5      me, telling me I was rude, telling me that I was a

6      nasty person.  She mocked me.  She said, oh, I have

7      to call the doctor for myself to the floor.  I

8      can't handle my job, because I am pregnant.

9        I told her to please stop personally attacking

10      me multiple times.  I asked her to please stop

11      yelling at me multiple times.  I was pregnant, and

12      I was getting yelled at in my face.  Finally,

13      Travis -- after I asked him, can you please make

14      this stop?  He finally asked her to stop screaming

15      in my face and mocking me.  And I was very upset.

16      I was crying.  It was very upsetting.  I was also

17      told I couldn't do my job because I was pregnant.

18  Q.  Who told you that?

19  A.  Linda.  She mocked me saying it.  She made fun of

20      me telling me I couldn't handle it and that I was

21      having to call the doctor to the floor for myself.

22  Q.  Did she say because you're pregnant?

23  A.  Yes, she did.  She said, I'm pregnant, I can't do

24      my job, in a very rude, you know, very

25      unprofessional, hateful tone.

Page 63

1  Q.  Anything else in that meeting with Linda and

2      Travis?

3  A.  She then was telling me about how nasty I am and

4      how mean I am.  And I had brought up the text

5      messages that I had sent to Travis, you know,

6      thanking our co-workers and talking about their

7      appreciation.  I said, well, Travis knows I'm not a

8      mean, negative, nasty person.  And Travis agreed

9      that I did say that, and he attested to that fact.

10        Then after that, Linda said, well, I just -- I

11      feel like nobody likes me on the floor, and I

12      really appreciate you taking the time to talk to

13      me.  And I would really appreciate it if you could

14      help me gain rapport with the staff.  And so I then

15      sat and talked to her and Travis after she had

16      apologized to me for being so hateful, and I told

17      her that, yes, I would be more than happy to do

18      that, because I wanted a peaceful work environment.

19      Even though Linda was extremely toxic, I still

20      needed a peaceful work environment for myself and

21      my co-workers.  So I said, of course I will help

22      you try to -- help you with the staff.

23        And I had given her a couple suggestions for

24      different things that was important to staff that

25      we felt was being overlooked, and I told her if

Page 64

1      those things were addressed, then people would

2      greatly appreciate it.  Because she felt like

3      nobody liked her.  But when you come in criticizing

4      everybody the first day you meet them, it is very

5      hard to, you know, build a relationship with

6      somebody after they've criticized you when they

7      don't know you.

8  Q.  And what was the date of this meeting?

9  A.  This was the 19th of April.

10  Q.  Anything else discussed in that meeting?

11  A.  No.

12  Q.  In your charge, you also claim that Ms. Steinhilder

13      was trying to recruit other employees to lie about

14      the patient care I was providing.

15  A.  That's correct.

16  Q.  What do you mean by that?

17  A.  She specifically had contacted Kimberly Buchanan.

18      And she asked her, you know, was there a nurse who

19      is, you know, being rude or not giving medication?

20      And Kim told Linda she had no clue what she was

21      talking about.  Linda kept pressing her, trying to

22      get her to say something about me.  Kim didn't know

23      at the time that she was trying to get her to say

24      something about me.

25  Q.  So how do you know -- first of all, how do you know

1  A.   Yes.
2  Q.   Okay.  Anything else that she allegedly said
3       that -- she meaning Linda allegedly said to Lynette
4       Durham, Kate Laas, Alyssa Denny or Kim Buchanan
5       specifically about you?
6  A.   She also said that night shift was too close.
7  Q.   Okay.  Anything else?
8  A.   No.
9  Q.   At the time that you filed for unemployment, were
10      you represented by counsel?
11 A.   No.
12 Q.   When you were meeting with Linda and Travis on -- I
13      think you said April 19th, did Linda say why she
14      allegedly thought that you were negative and nasty?
15 A.   She just said that about everybody on the floor.
16 Q.   That wasn't just you?
17 A.   No.  She didn't have any, because of this or you,
18      know, any reasons.
19 Q.   Okay.  And I think you said that she was saying
20      that about both you and your co-workers, is that
21      correct?
22 A.   Yes.  She came in insulting everybody.
23 Q.   In a note you submitted to Workforce Development,
24      you said, I told her that in the time since I had
25      known her, I had only had about five minutes of

1       interaction with her altogether; is that correct?
2  A.   Yes.
3  Q.   And that's in reference to Linda?
4  A.   Yes.
5  Q.   Okay.  So do you know why after five minutes of
6       interaction with her, she would be saying you were
7       negative and nasty?
8  A.   Because she was saying that about everybody.  She
9       just came in with a bad attitude from the get-go.
10 Q.   And then at the end of that meeting on April 19th,
11      you said the meeting ended, and at that point,
12      Linda asked me if I would help her gain rapport
13      with the staff, because she felt like no one liked
14      her.  Correct?
15 A.   Correct.
16 Q.   And you said, I told her I would be happy to do
17      that, and I told her some things that I thought
18      would help her to build a relationship with the
19      staff.  Is that correct?
20 A.   That's correct.
21 Q.   Did you feel at that time like she wanted to
22      terminate your employment?
23 A.   No.  I thought at that time that she actually
24      wanted to become a better manager and actually try
25      to address some of the issues on the floor instead

1       of attack everybody.
2  Q.   So what do you think changed then?
3  A.   I didn't lie about Dawn.  So I believe after that,
4       she, you know, definitely decided she didn't like
5       me.  And then she had a real issue with my
6       pregnancy, telling me I was unable to do my job
7       because of it and telling me I didn't like my job
8       and I cared about my baby more.  And that was
9       pretty much all I heard out of her mouth after that
10      was about how I love my daughter more than my job.
11 Q.   But as of this conversation on April 19th, she was
12      already aware of your pregnancy; correct?
13 A.   Yes, yes, she made fun of it.
14 Q.   So if she wanted to terminate you due to your
15      pregnancy, why would she be telling you that she
16      wanted you to help her build a rapport with staff?
17 A.   I don't know why she lied.  She lied a lot.
18 Q.   But siting here, you don't know whether it's true
19      or not that she wanted you to help build a rapport
20      with staff; correct?
21      MR. FOX:  Objection to the extent it's
22      speculation and form.
23      MS. ADOLAY:
24 Q.   You still have to answer the question.
25 A.   Can you repeat?

1       MS. ADOLAY:  Can you please read back the
2       question?
3       (The requested material was read back by the
4       reporter.)
5       MR. FOX:  Same objection.  You can answer the
6       question.
7       THE WITNESS:
8  A.   Of course I don't know what's going on in her mind,
9       no.  I don't know her intentions.
10 Q.   During your call with Linda on May 9th, which I
11      don't remember -- if I remember correctly, that's
12      the day you said she told you you were suspended?
13 A.   That's correct.
14 Q.   And you said earlier that she wouldn't tell you why
15      you were suspended at that time?
16 A.   That's correct.
17 Q.   Okay.  In what you submitted to Workforce
18      Development, you said that on May 9th that during
19      that conversation with Linda that she then asked
20      you if you refused to give a patient pain
21      medication on April 7th.  Is that correct?
22 A.   That's correct.
23 Q.   And you said no?
24 A.   That's correct.
25 Q.   You said:  She then asked if you made anyone wait

Page 73

```
1      for medication, because I didn't feel like giving
2      it to them.  Is that correct?
3   A.    That's correct.
4   Q.    And that you said no.  Is that correct?
5   A.    Correct.
6   Q.    So why did you think that you were being suspended
7      as a result of that call?
8   A.    I had no clue.
9   Q.    Did you think that it could have been because of
10     this patient pain medication issue that she asked
11     you about during the call?
12  A.    Well, I -- I assumed it had to be something like
13     that, so I didn't understand why I was being
14     suspended when she could have just looked at the
15     chart and seen that I gave the pain medication.  So
16     obviously, I don't believe that was the real issue
17     considering it was never actually looked into.
18  Q.    And how do you know that?  Do you know whether it
19     was looked into?
20  A.    Yes.  I asked during my unemployment if it was --
21     if the patient had ever reported anything, and the
22     answer was no, and if anything had ever been
23     brought up about it, and the answer was no.
24  Q.    And who did you ask that of?
25  A.    Jessica -- whatever her name is from human
```

Page 74

```
1      resources.
2   Q.    Okay.  So to her knowledge, the patient hadn't
3      been -- hadn't reported anything; correct?
4   A.    That's correct.
5   Q.    Okay.  But you don't know whether the patient
6      reported anything.  You just know the patient
7      didn't report anything to Jessica.  Is that
8      correct?
9   A.    I know the patient didn't report that I didn't give
10     him pain medication.
11  Q.    And how do you know that?
12  A.    Because I gave him pain medication.
13  Q.    Okay.  But you don't know that the patient didn't
14     report that you didn't, correct?
15  A.    That's correct.
16  Q.    Do you know whether a patient reported that you
17     made them wait for pain medication because you
18     didn't feel like giving it to them?
19  A.    No.
20  Q.    In your report to Workforce Development, you say
21     that on Friday morning, you tried to go speak with
22     human resources and Travis.  But I think you said
23     Travis wasn't available, is that correct?
24  A.    That's correct.
25  Q.    What was the date of that?
```

Pages 73..

Page 75

```
1   A.    I believe it was the 10th.  It was Friday.
2   Q.    Okay.  So then May 10th, you then went to meet with
3      Dawn Scott; is that correct?
4   A.    That's correct.
5   Q.    And what's Dawn's position?
6   A.    She is vice-president of nursing.
7   Q.    And according to your submission to Workforce
8      Development, you said:  I voiced my concern to Dawn
9      Scott.  I told Dawn how Linda was clearly
10     retaliating against me since I refused to lie to
11     human resources about my fellow co-worker.  Is that
12     correct?
13  A.    That's correct.
14  Q.    You then say that Dawn told me that she was unaware
15     of the exact situation but that she would look into
16     what I had told her.  Is that correct?
17  A.    That's correct.
18  Q.    Based on your submission to Workforce Development
19     and your conversation with Dawn Scott, you didn't
20     mention anything to her about comments about your
21     pregnancy?
22  A.    I did.
23  Q.    Okay.  You just didn't include it to -- in your
24     submission to Workforce Development?
25  A.    It should be in there.  I told Dawn Scott about the
```

Page 76

```
1      conversation with Linda and Travis and how they
2      mocked my pregnancy.  I told Dawn Scott all of
3      that.  It's in there.
4   Q.    Okay.  Is there a reason you didn't include that in
5      your report to Workforce Development?
6         MR. FOX:  Are you going to provide her with
7      that report?
8         MS. ADOLAY:  Yeah.
9   Q.    You can answer the question first.
10  A.    You want me to tell you what's in it without
11     looking at it?
12  Q.    I'm just saying, is there a reason why you wouldn't
13     have included that in your submission?
14  A.    It's included.  I included that I spoke with Dawn
15     about the meeting and what Linda had said.
16        MS. ADOLAY:  (Tendering).
17        (Defendant's Exhibit 4 marked for
18     identification.)
19        MS. ADOLAY:
20  Q.    So if you look at the third page --
21        MR. FOX:  You can take your time -- you can
22     take your time to review the exhibit.
23        THE WITNESS:  Okay.
24        MS. ADOLAY:
25  Q.    If you look at the fourth page, not the third page,
```

Page 77

1  that last paragraph is what I'm asking you about
2  that starts, I went in on Friday morning.  And this
3  is on Defendant's Exhibit 4.  Okay.
4  A.  Yeah, I guess I specifically did not put the FMLA
5  comment into the unemployment.
6  Q.  Okay.  Or anything in your conversation with Dawn
7  Smith -- sorry, not Dawn Smith -- Dawn Scott about
8  any comments made to you about your pregnancy, is
9  that correct?
10  MR. FOX:  I would take that -- I would advise
11  my client to give her time to review the entire
12  document.
13  MS. ADOLAY:  That's fine.
14  MR. FOX:  If we want to take a break, and she
15  can look at it?
16  MS. ADOLAY:  Well, I have a question pending,
17  so we're not going to take a break.  But she can
18  take the time to read through the document.
19  THE WITNESS:
20  A.  It's mentioned in here.  It says, I had explained
21  to her everything that had happened up to that
22  point.
23  Q.  Okay.  But there's nothing specific in this --
24  A.  There is.  Because before that, it states,
25  everything that happened in the conversation

Page 78

1  between Linda and Travis.  And it says that I went
2  to Dawn Scott and told her everything that had
3  happened.
4  Q.  But in this paragraph, it doesn't say anything
5  about you telling Dawn Scott anything about any
6  comments by anyone relating to your pregnancy or
7  FMLA leave; is that correct?
8  A.  No.
9  MR. FOX:  I will object to form.  Can we --
10  which specific paragraph?
11  MS. ADOLAY:  She's looking at the correct
12  paragraph.  It's the final paragraph on page 4 of
13  this exhibit.  It starts, I went in on Friday
14  morning.
15  MR. FOX:  Okay.  Fine.  I just want to be
16  clear.
17  MS. ADOLAY:
18  Q.  Okay.  So what I asked was:  Would you agree that
19  there's nothing in this paragraph in what you
20  submitted to Workforce Development regarding your
21  conversation with Dawn Scott on May 10th where you
22  discuss any comments made to you relating to
23  pregnancy or leave?
24  A.  Linda had not said anything about my FMLA at that
25  point, so I couldn't very well tell her about FMLA.

Page 79

1  Q.  Okay.  Had she made any comments about your
2  pregnancy at that point?
3  A.  Yes, she did.
4  Q.  Okay.  And according to this paragraph, you did not
5  talk to -- there's no mention of you talking to
6  Dawn Scott on May 10th about any comments by Linda
7  about your pregnancy; is that correct?
8  A.  No.
9  Q.  It's not correct, or it is correct?
10  A.  No, it's not correct.  It says that I told her
11  everything that happened.
12  Q.  Okay.  So you're saying --
13  A.  No, I did not repeat myself, the same thing in one
14  sentence later than I did the sentence before.  No,
15  I did not.  When I was writing to unemployment, no,
16  I did not.
17  Q.  Okay.  So there's nothing in this paragraph that
18  says in your meeting with Dawn Scott you told her
19  about comments relating to your pregnancy or leave?
20  MR. FOX:  Objection to form.
21  MS. ADOLAY:
22  Q.  You still have to answer the question.
23  A.  I mean, I don't understand how to answer it,
24  because she's not accepting my answer.
25  MR. FOX:  I'm going to say asked and answered.

Page 80

1  THE WITNESS:  Yeah.  I have answered it
2  several times.
3  MS. ADOLAY:  You still --
4  MR. FOX:  You can restate the question.
5  MS. ADOLAY:  Can you please read back the
6  question?
7  (The requested material was read back by the
8  reporter.)
9  MR. FOX:  Same objection.  I believe it's been
10  asked and answered.  You can answer the question
11  again.
12  THE WITNESS:
13  A.  Again, I stated, yes, I believe that I did by
14  telling -- by saying that I explained everything
15  that happened, so yes.
16  Q.  Okay.  But that's not the question that I asked.
17  Okay?
18  A.  That's the answer that I have for you.  I'm sorry.
19  There's no other way for me to answer it.
20  Q.  Here's what I would like you to do then.  Show me
21  in this paragraph where you tell Workforce
22  Development that in your conversation with Dawn
23  Scott on May 10th you mentioned anything about
24  pregnancy or medical leave.
25  A.  Okay.  I told Dawn how Linda was clearly

Page 81

1   retaliating against me since I refused to lie to
2   human resources about my fellow co-worker.  I
3   explained to her everything that had happened up to
4   that point.  So that includes everything that had
5   happened up until that point that is listed
6   directly above it.
7   Q.  But you don't say in this paragraph specifically
8       that you talked to Dawn Scott about your pregnancy
9       or FMLA leave?
10          MR. FOX:  Same objection.
11          THE WITNESS:
12  A.  I've answered this question multiple times.
13      There's nothing else for me --
14  Q.  You haven't answered the question.
15  A.  No.  I have answered the question.  You don't like
16      my answer.  That's the problem.
17  Q.  Okay.
18  A.  I've answered the question.
19  Q.  Okay.  Can you tell me whether you see the words
20      FMLA or maternity leave in this last paragraph on
21      the fourth page?
22  A.  Nope, I sure don't.
23  Q.  Okay.  On the next page of this document at the --
24      in the first paragraph -- I think we're on page 5
25      of the exhibit.  Yes.  If you look down a few

Page 82

1   sentences, it says:  Human resources and Linda then
2   called, and Linda said that she heard from someone
3   that I had said in the nurses station to the PCA,
4   quote, "I'm not fucking giving fucking pain
5   medication to that fucking patient at all."  End
6   quote.  Do you see that?
7   A.  Yes.
8   Q.  Okay.  And you typed this statement in this
9       submission to Workforce Development?
10  A.  That's correct.
11  Q.  Okay.  So when did Linda allegedly make this
12      statement to you?
13  A.  She said that when they called me on the 10th.
14  Q.  Did she say who had told her that you made that
15      statement?
16  A.  No.
17  Q.  Did you deny making that statement?
18  A.  Of course.
19  Q.  On the final page of this exhibit, if you look to
20      the second to the last paragraph, it starts also.
21  A.  Uh-huh.
22  Q.  It says:  Also, Kim, the nurses aide that was asked
23      about me, who didn't say anything about me was
24      fired on Tuesday along with myself and Dawn.  Who
25      does Kim refer to in that paragraph?

Page 83

1   A.  Kim Buchanan.
2   Q.  So are you saying her employment was terminated the
3       same day as yours?
4   A.  That's correct.
5   Q.  And the Dawn that you reference here, who is that?
6   A.  The one that Linda was trying to get me to lie
7       about.
8   Q.  I'm asking what the employee's last name is.
9   A.  Oh, I'm sorry.  Dawn Smith.
10  Q.  Okay.  And was Dawn Smith's employment with
11      Franciscan terminated the same day as yours?
12  A.  Yes, it was.
13  Q.  Was Dawn Smith pregnant at the time?
14  A.  No.
15  Q.  Was Kimberly Buchanan pregnant at the time?
16  A.  No.
17  Q.  Do you know whether either planned to take any FMLA
18      leave or had requested leave?
19  A.  Kim Buchanan had taken different leaves, but she
20      had already put her two weeks in when Linda fired
21      her.
22  Q.  Do you know why Kim Buchanan's employment was
23      terminated?
24  A.  They said because she was sleeping.  That's not
25      true, but they said because she was sleeping.

Page 84

1   Q.  How do you know that's not true?
2   A.  Because I was her charge nurse, and she wasn't
3       sleeping.  I was sitting right there.
4   Q.  Do you know who reported that she was sleeping --
5   A.  I do.
6   Q.  -- that --
7   A.  I do.
8   Q.  Okay.  Who reported that she was sleeping?
9   A.  That's Jen Justice.
10  Q.  And why did Jen, in your opinion, report that Kim
11      was sleeping?
12  A.  Jen had been getting in a lot of trouble, and so I
13      think she was just trying to basically kind of keep
14      herself from being looked at, so she was -- kind of
15      made friends with Linda.  Well, after Linda had
16      yelled at her and made a big to-do about it, then
17      after that, Linda became buddy-buddy with her.
18  Q.  You're saying Linda yelled at Jen Justice?
19  A.  Yeah, she got in trouble for something.  I think
20      for -- I don't remember what Jen got in trouble
21      for.  Being unprofessional or being rude.  And
22      Linda spoke with Jen's manager Heather and had made
23      Jen apologize to Linda --
24  Q.  Okay.
25  A.  -- for Linda being rude.

Page 101

1   that the facts reflect that she was discharged for
2   not participating in Ms. Steinhilder's scheme to
3   get Dawn discharged.
4       Do you recall Mr. Norvanis from the EEOC
5   telling you that?
6   A.  No.
7   Q.  Do you recall him explaining why your charge was
8   being dismissed?
9   A.  He said it didn't fit the specific criteria that
10  the EEOC has.
11      MS. ADOLAY:  Okay.  (Tendering).
12      (Defendant's Exhibit 7 marked for
13  identification.)
14      MS. ADOLAY:
15  Q.  Ms. Duis, you've been handed a copy of what's
16  marked as Defendant's Exhibit 7.  Can you tell me
17  what this document is?
18  A.  Complaint and demand for jury trial.
19  Q.  Okay.  Is this the complaint that you filed in this
20  lawsuit against Franciscan?
21  A.  Yes.
22  Q.  Did you review this complaint before it was filed?
23  A.  Yes.
24  Q.  In paragraph 11 of the complaint on page 2, it
25  says:  In February of 2019, plaintiff informed

Page 102

1   defendant that she was pregnant.  Who did you
2   inform in February of 2019?
3   A.  The entire floor.
4   Q.  So how did you announce that to the floor?
5   A.  Just told them I was pregnant.
6   Q.  Did you tell them as a group or individually, do
7   you recall?
8   A.  I'm sure it was some people individually and some
9   people as a group.
10  Q.  Okay.  So it was not all one announcement like at a
11  meeting or something?
12  A.  No.
13  Q.  Okay.  In paragraph 12 on the next page, it says:
14  Thereafter, plaintiff informed defendant, including
15  her supervisors, that she planned on taking a
16  maternity/FMLA leave in October of 2019.  Do you
17  know who you informed of that?
18  A.  Travis and Linda.
19  Q.  Do you recall when you informed them?
20  A.  No.  Sometime in February.  I told them when I was
21  due.
22  Q.  Okay.  But Linda hadn't started yet in February.
23  A.  Linda was at the hospital in February.
24  Q.  Okay.  What was her position in February?
25  A.  She was a rapid response nurse.

Page 103

1   Q.  Okay.  And so you think that you told Linda in
2   February, is that correct?
3   A.  I don't know if I told Linda in February, but she
4   was aware of it when she started as our manager.
5   Q.  Okay.  When you say she was aware of it, she was
6   aware of your pregnancy?
7   A.  Yes.
8   Q.  Do you know whether Linda was aware of your due
9   date?
10  A.  I'm assuming she was.  She brought it up several
11  times.
12  Q.  Okay.  What did she say about your due date?
13  A.  That I kept telling everybody I was going on leave
14  in October of 2019, and I was rude that I was
15  excited about maternity leave.  She was so offended
16  that I was talking about my maternity leave and my
17  children.
18  Q.  Did she say that?
19  A.  She let me know by constantly commenting on it,
20  yes.
21  Q.  Okay.  How many times did she comment on you going
22  on leave in October of 2019?
23  A.  In the -- every -- I mean, every time I spoke to
24  her.  She only spoke to me a couple times.
25  Q.  In paragraph 19, you state:  Ms. Steinhilder was

Page 104

1   actively soliciting false statements from
2   co-workers about plaintiff.  What do you mean by
3   that?
4   A.  She was going around trying to get people to talk
5   negatively about me.
6   Q.  And how do you know that?
7   A.  Because different people told me.
8   Q.  And is this what we've --
9   A.  Yes.
10  Q.  -- already talked about earlier?  Yes?
11  A.  Yes.
12  Q.  In paragraph 25 of the complaint, it says:  Since
13  her termination, defendant has provided different
14  reasons as to why plaintiff was terminated.  What
15  do you mean by that?
16  A.  They change -- they keep changing their story.
17  Like for example, at the unemployment hearing, they
18  tried to claim it was all over the not giving pain
19  medication, but that was never mentioned at all
20  when I was terminated.  It was only mentioned the
21  one time they asked me if it happened.  I said no.
22  And it was never brought up again.
23  Q.  And then when did they give a different reason,
24  other than the reason given at unemployment
25  hearing?

Page 105

1   A.   When they terminated me and every -- I mean, they
2        just keep kind of changing what they're saying.
3   Q.   So you're saying a different reason was given at
4        the unemployment hearing from what was said to you
5        when you were terminated?
6   A.   Uh-huh.
7   Q.   Yes?
8   A.   Yes.  And what I was terminated for, yes.  They've
9        changed it.
10  Q.   Okay.  Any other time when that explanation of your
11       termination has changed?
12  A.   No.  Just multiple times during the unemployment
13       thing.
14  Q.   What do you mean multiple times during the
15       unemployment thing?
16  A.   Just every time we had a case, they would have a
17       different reason for -- you know, like they -- oh,
18       she was -- she was taking poor care of patients.
19       And then, oh, she was swearing in the nurses
20       station.  And then, you know, they were -- I'm
21       assuming because I told them it was illegal to fire
22       me because I was pregnant, they were trying to find
23       something else to say to unemployment.  But all
24       their evidence pointed toward the fact that they
25       terminated me for my pregnancy.  All their evidence

Page 106

1        was me talking about maternity leave.  So there
2        was, you know --
3   Q.   Do you know how many employees at Franciscan Health
4        Crown Point have taken maternity leave?
5   A.   No, I have no idea.
6   Q.   Was anyone -- did anyone else take maternity leave
7        while you were employed at Franciscan?
8   A.   Yes, people took maternity leave while I was
9        employed there.
10  Q.   Okay.  Who took maternity leave that you recall?
11  A.   I mean, there's a lot of people, so I don't -- you
12       want every person that I know of?
13  Q.   If you can recall.
14  A.   Anna Basham, Lea Tan -- it's going to be a long
15       list.  Just about every single employee I know.
16  Q.   Okay.
17  A.   Carla Sierra.
18  Q.   If the answer is almost every single employee you
19       know --
20  A.   It is.
21  Q.   Okay.
22  A.   A bunch of women in their 30s.
23  Q.   In paragraph 26 of the complaint, it says:
24       Plaintiff was terminated due to her pregnancy.
25       This is your belief that you're terminated due to

Page 107

1        your pregnancy, is that correct?
2   A.   No.  I was told that I was being terminated because
3        I was happy about being pregnant, that I valued my
4        unborn child over my job, so I was told that
5        specifically.
6   Q.   Did you ever apply for FMLA leave during your
7        employment?
8   A.   I had FMLA when I had my son.
9   Q.   Okay.  When was that?
10  A.   In 2000 -- he was born December 22nd, 2016.
11  Q.   Okay.  Did you take -- how much time did you take
12       off at that time?
13  A.   12 weeks.
14  Q.   Okay.  Did you apply for FMLA leave at any other
15       time during your employment with Franciscan?
16  A.   No.
17  Q.   Do you know whether Linda Steinhilder has
18       supervised other employees who have been pregnant
19       and taken FMLA leave?
20  A.   I -- I have no idea.
21  Q.   Were you aware of other employees who took FMLA
22       leave?
23  A.   I only worked with Linda for a short period of
24       time.
25  Q.   Right.

Page 108

1   A.   So --
2   Q.   Sorry?
3   A.   So no, nobody went on maternity leave in the month
4        or two.
5   Q.   Okay.  In the month or two that she was your
6        supervisor, correct?
7   A.   Correct.
8   Q.   Okay.  In paragraph 42 of the complaint, it says:
9        Defendant interfered with plaintiff's substantive
10       legal rights under the FMLA to use medical leave
11       for the birth of her daughter.  Why do you believe
12       that Franciscan interfered with your right to take
13       FMLA leave?
14  A.   Because they told me they didn't want me to take
15       leave, so they terminated me, so that took away my
16       leave.
17  Q.   And you're saying that someone in HR told you that
18       they didn't want you to take leave, is that
19       correct?
20  A.   Human resources -- everybody was having an issue
21       with me taking maternity leave.  I don't know why
22       it was an issue, but apparently, it was.
23  Q.   And why do you say everyone was having an issue
24       with me taking maternity leave?
25  A.   Because they kept telling me that I was going to go

Page 117

1  your opinion, what should Linda have done?
2  A.  Well, nothing.  I mean, there's nothing to do.  If
3  I don't give a patient pain medication, there's
4  nothing to do.
5  Q.  Right.  But what should she do if she receives a
6  report like that from a nurse?
7  A.  I guess I would ask the nurse what happened.
8  That's what I would do.  I mean, that's the only
9  thing to do.
10  Q.  Okay.
11  A.  Or look in the chart.
12  Q.  Okay.  And do you know what Linda did in response
13  to that statement from Jen Justice?
14  A.  Nothing, as far as I know.
15  Q.  Okay.  Except you do admit she asked you about it,
16  right, in one of those phone calls you had after
17  you were suspended; right?
18  A.  She asked me if I refused to give a patient pain
19  medication, yes.
20  Q.  Okay.  You denied that.  But you don't know what
21  else she may have done to investigate what
22  happened, is that right?
23  A.  Well, she talked to people after she -- after she
24  had suspended me, then she started talking to
25  people.  So she heard one thing from one person

Page 118

1  that she kind of pushed for, and it wasn't true.
2  And then she never told me about it, never asked me
3  about it.  She asked me if I refused to give a
4  patient pain medication.  I said no.  But then she
5  listened to what somebody else said that was a lie,
6  disregarded what I said, and had me suspended over
7  nothing.
8  Q.  Okay.  Right.  But how was she supposed to know --
9  A.  She asked me.
10  Q.  Right.  Just a second.  How was she supposed to
11  know whether to believe what Jen Justice was saying
12  or whether to believe what you were saying?
13  A.  Well, there was no patient complaint.  The patient
14  had requested to have me back.  And I worked the
15  day after it happened.  So you can't say the
16  patient didn't request to have me back, because he
17  did.  So I took care of him two nights in a row.
18  He liked me.  He wanted me.  He appreciated me.  So
19  I know the patient didn't complain about me.  He
20  thanked me.  He told me he hoped that he got to go
21  home, but if he didn't, he sure hoped I was his
22  nurse, so, you know --
23  Q.  Did you share that information with Linda?
24  A.  Yes, I did.
25  Q.  And what was her response?

Page 119

1  A.  She didn't -- I don't know.  She was nasty to me.
2  I don't know.  I'm sure it was something that had
3  nothing to do with anything.  They tried to get off
4  of that subject very quickly, because it didn't
5  happen.  It wasn't real.  It was made up.  So they
6  tried to -- that's why it was never brought up in
7  the termination.  The whole situation was a made-up
8  lie to try to get me in trouble.
9  Q.  Well, it -- okay.  I understand you're saying it's
10  made up.  But you're not saying that Jen Justice
11  didn't say that it happened?
12  A.  Oh, I know she said it happened.
13  Q.  Okay.
14  A.  Yeah.  She was trying to deflect --
15  Q.  Okay.
16  A.  -- because she had gotten in trouble.
17  Q.  Okay.
18  A.  Actually, been in trouble more than any nurse I
19  know there.
20       MR. FOX:  No question.
21       MS. ADOLAY:
22  Q.  Did Anna Basham work nights as well?
23  A.  Yes.
24  Q.  You also provided a statement that Jennifer Moreno
25  it appears wrote.  Did she work nights as well?

Page 120

1  A.  Yes.
2  Q.  Did you ask Jen Moreno to prepare -- or provide you
3  with a statement?
4  A.  Like I said, my friends asked me if there was
5  anything they could do to help.  I said they could
6  write statements about me.  They just wanted to do
7  something, because they felt awful.
8  Q.  Do you remember who reached out to you to ask like
9  what your friends could do, or did multiple people
10  reach out?
11  A.  Oh, yeah.  A lot of people that I worked with
12  reached out to me.
13  Q.  Okay.
14  A.  Of course.  A lot of people were concerned.  I was
15  friends with everybody on the floor.
16  Q.  Okay.  Do you remember if Jennifer Moreno reached
17  out to you to ask what she could do?
18  A.  Yes.
19  Q.  Do you recall if Anna Basham reached out to you?
20  A.  Yes.
21  Q.  What about Dawn Smith?
22  A.  Yes.
23  Q.  Did Kimberly Buchanan reach out to you?
24  A.  Yes.
25  Q.  Did you suggest to her that she could provide you

Page 121

1    with a statement?

2  A.  Yes, yes. Kim wanted to do whatever it was that

3      she could to help, because she knew that Linda lied

4      about her and lied about me.

5  Q.  What do you mean that Linda lied about her?

6  A.  Because Linda lied and said she was sleeping when

7      she wasn't.

8  Q.  Right. But did Linda know whether she was sleeping

9      or not?

10 A.  Linda sure takes the word of one person that has

11     been in a lot of trouble over everybody else.

12     Usually you ask that person and you go based off of

13     an honesty code, because we're honest people. You

14     don't try to go behind their back and try to get

15     people to make stuff up. Kim wouldn't lie and say

16     that I made -- that I said all this terrible stuff

17     about a patient, so she got fired too for sleeping.

18 Q.  What do you mean Kim wouldn't lie?

19 A.  Linda wanted Kim to say that I said this terrible

20     stuff about a patient. But Kim wouldn't do that,

21     because like I said, we're good people. We're not

22     going to lie about our co-workers.

23 Q.  What did Kim tell you that Linda had said to her?

24 A.  Linda was trying to get her to say that I refused

25     to give a patient pain medication. And Kim said,

Page 122

1      no, that didn't happen. And then all of a sudden,

2      Kim got fired for sleeping conveniently on the same

3      day as Dawn and I. All three of us got fired all

4      in a row all on the same day, one right after

5      another.

6          MS. ADOLAY:  In Kim's statement, she says --

7      well, here. Let me give you a copy. (Tendering).

8          (Defendant's Exhibit 9 marked for

9      identification.)

10         MS. ADOLAY:

11 Q.  Okay. You've been handed what's marked as

12     Defendant's Exhibit 9. Is this the statement that

13     Kimberly Buchanan provided to you?

14 A.  Yes.

15 Q.  Okay. She says, then that morning before I was

16     leaving -- so this is like the third sentence down.

17     It says:  So then that morning before I was

18     leaving, Linda stops me and asked me to say who or

19     what nurse was being rude to the patient and who

20     was not a team player. I then told her I didn't

21     know who she was talking about. Then Linda got

22     into my personal space and said if I didn't tell

23     her that, I'm also not helping the floor out

24     because I wouldn't or didn't even know who she was

25     talking about. Then Linda gave me a dirty look. I

Page 123

1      told her the only person I could think of was RN

2      Dawn Smith. Is that correct?

3  A.  Yes.

4  Q.  Do you know what the issue was and why Kim was

5      saying Dawn Smith was rude to a patient and not a

6      team player?

7  A.  Because Linda was asking -- Linda would not -- Kim

8      said that Linda, you know, cornered her, and she

9      was trying to get her -- you know, who was being

10     rude last night? Who was doing this? And Kim had

11     no idea what Linda was talking about, and she kept

12     telling Linda, I don't know what you're talking

13     about. And then Linda basically, you know,

14     threatened her like, oh, well, you're being a

15     problem, too, if you're not going to tell me who it

16     was. So Kim, just trying to get Linda to stop

17     harassing her, she said that Dawn was the only

18     person on the floor that she could think of that

19     ever had an attitude. And so she said she said

20     Dawn's name, because Dawn is the only person that

21     she could think of who was working the night before

22     who had an attitude.

23 Q.  Did you think Dawn Smith had an attitude?

24 A.  Me personally? I don't think Dawn has an attitude.

25 Q.  But you knew that Kim Buchanan thought that?

Page 124

1  A.  Some people do. But people have different opinions

2      of people. I get along with just about everybody.

3      So to me, Dawn didn't have an attitude.

4  Q.  What about Lynette Durham, did Lynette reach out to

5      you, and did you tell her it would be helpful --

6  A.  Yes.

7  Q.  -- if she could provide you with a statement?

8  A.  Yes.

9  Q.  Okay. Do you know whether Lynette is still

10     employed by Franciscan?

11 A.  The last time I talked to her, she was working at

12     Franciscan in Michigan City. I don't think she is

13     at Crown Point any longer. I know she was their

14     prn for a while, but I don't believe she is there

15     any longer.

16 Q.  Do you know why she left Crown Point?

17 A.  There was just some issues on the floor. Linda was

18     a big problem. She didn't like that. And then

19     there was issues with Jen Justice that were

20     starting to make her feel uncomfortable, and so she

21     decided that she was going to go to Michigan City.

22 Q.  What were the issues with Jen Justice that were

23     making her uncomfortable?

24 A.  Like I said before, Jen was having an inappropriate

25     relationship with a doctor there. And Jen and

Page 125

1   Lynette had been friends prior. And Jen Justice
2   was disappearing for, you know, hours and stuff
3   during the shift. And Lynette kind of wanted to
4   separate herself from that, because she knew that
5   people associated her with Jen because they were
6   friends. And then there was different things with
7   Linda. She just didn't really think that it was
8   going to be a good fit, and so she decided to
9   leave.
10  Q.  Do you know whether Lynette has taken maternity
11      leave?
12  A.  I don't believe so. She doesn't have any children
13      to my knowledge.
14  Q.  Okay. Was Lynette still at Crown Point when your
15      employment was terminated?
16  A.  I think she was still prn. I know she had started
17      at Michigan City, but I believe she was still prn
18      at Crown Point. I'm not 100 percent certain.
19          MS. ADOLAY:  Okay. (Tendering).
20          (Defendant's Exhibit 10 marked for
21      identification.)
22          MS. ADOLAY:
23  Q.  You've been handed what's been marked as
24      Defendant's Exhibit 10. Have you seen this
25      document before?

Page 126

1           MR. FOX:  Take your time to review.
2           THE WITNESS:
3   A.  Yes.
4   Q.  Did you review this document before it was
5       submitted to Franciscan by your counsel?
6   A.  Yes.
7   Q.  Do you have your tax returns for the past five
8       years?
9   A.  With me?
10  Q.  Not with you. Do you possess them?
11  A.  Some of them.
12  Q.  Okay. What years do you have?
13  A.  I don't know off the top of my head.
14  Q.  Okay. And how do you file your taxes? Do you file
15      them using Turbo Tax?
16  A.  Yes, I do it online with Turbo Tax.
17  Q.  How long have you been using Turbo Tax?
18  A.  I don't know.
19  Q.  More than five years?
20  A.  Probably.
21  Q.  Okay. Do you know whether you're able to access
22      your prior years' tax returns on Turbo Tax?
23  A.  I know -- I don't -- I'm not exactly sure how it
24      comes out. I know that there's a thing -- like a
25      link on there that has like past years that you

Page 127

1   filed, but I've never tried to click on it to see
2   what it pulls up.
3   Q.  Okay. Do you file independent tax returns or joint
4       with your spouse?
5   A.  I file joint with my spouse.
6   Q.  Okay. Do you know why Dawn Smith thought that
7       Linda was out to get her?
8   A.  Probably because she was. I mean, maybe she told
9       more people than me to lie about Dawn. But I
10      certainly told Dawn that Linda asked me to make up
11      lies about her.
12  Q.  Do you think that Linda wanted Dawn fired?
13  A.  She told me she did, so yes.
14  Q.  Do you know why she would?
15  A.  Because they worked together previously, and Linda
16      was terminated from that job where her and Dawn
17      worked together, and she didn't want Dawn talking
18      about it to other people.
19  Q.  Who told you that Linda was terminated in her
20      previous role?
21  A.  Dawn did.
22  Q.  What was that previous role, do you know?
23  A.  She was a manager over one of the floors at Porter.
24  Q.  Did you tell Dawn that Linda was trying to dig up
25      dirt on her?

Page 128

1   A.  I told her what Linda had said, that she wanted me
2       to lie about her and that she felt that Dawn was a
3       bad seed and we needed to get rid of her.
4   Q.  Okay. Just to clarify, going back to this told me
5       she wanted me to lie statement. It wasn't that
6       Linda told you to lie.
7   A.  No. She did.
8   Q.  Well, your testimony earlier was that she didn't
9       tell you to lie but that she told you --
10  A.  To say something untrue.
11  Q.  To say a few statements, correct?
12  A.  That were lies, yes.
13  Q.  That you thought were lies?
14  A.  No. They were lies. They were about something I
15      did. So obviously, if it's something I did, I know
16      for a fact if I did it or not. So it was lies.
17  Q.  Okay. But you don't know what had been reported to
18      Linda in terms of a possible confrontation with
19      Dawn?
20  A.  But she asked me to tell something that was not
21      true, so that's a lie.
22  Q.  Do you know -- do you know who told her that there
23      was a confrontation between you and Dawn Smith?
24  A.  Nobody. She made it up.
25  Q.  How do you know that?

Page 129

1   A.   Because she told me.  She said, you're going to
2        tell human resources that Dawn started a fight with
3        you.  Dawn is a bad seed.  We need to get rid of
4        her.  You know I have a history with her from
5        Porter.  We need to get rid of her.
6   Q.   But --
7   A.   Yes, that's what she said.
8   Q.   Okay.  So she said you're going to tell them this?
9   A.   Yes.
10  Q.   But she didn't say she was making it up, correct?
11  A.   I told her what happened, and she made up her own
12       reality of it.  I told her what happened, and she
13       said, that's not what you're going to say.  You're
14       going to say this.  So she told me to lie.  That's
15       telling someone to lie when you tell them the truth
16       and they say, no, you're saying this.
17  Q.   But what I'm saying is you don't know what had been
18       reported to Linda regarding any confrontation?
19  A.   About myself?
20  Q.   Correct.  I'm saying you don't know what had been
21       reported to Linda about a confrontation between you
22       and Dawn Smith, is that correct?
23  A.   I don't know how anything would be reported,
24       because there wasn't anybody else like to say
25       anything.  So I'm just confused.

Page 130

1   Q.   What do you mean there wasn't anyone else to say
2        anything?
3   A.   Well, who would just make that up out of nowhere?
4        Like who was there -- who was there to make up this
5        fake thing to say?  You know what I'm saying?
6        There wasn't -- how would somebody else know about
7        something that happened between Dawn and I?
8   Q.   Well, you talked about other people being around at
9        the nurses station and that you're, you know,
10       walking by and people are there, and you're seeing
11       everything that's going on.  So is it possible that
12       somebody else saw something and reported it to
13       Linda?
14  A.   No, because there was no altercation.
15            MR. FOX:  Objection.  Calls for speculation.
16       Go ahead and answer.
17            MS. ADOLAY:
18  Q.   Pardon?
19  A.   No, no, that is not possible.
20  Q.   Why is it not possible?
21  A.   Because there was no altercation, so it's
22       impossible for somebody to report that there was
23       one.  That's impossible.
24  Q.   Right.  But don't you think that -- even if you're
25       saying there wasn't one, isn't it possible that

Page 131

1        somebody reported to Linda that there was an
2        altercation or confrontation between you and Dawn?
3   A.   Is it possible --
4            MR. FOX:  Same objection.
5            THE WITNESS:
6   A.   -- somebody made something up?  I guess it's
7        possible somebody lied.
8   Q.   Okay.
9   A.   Linda never asked me if there was an -- not until
10       in front of Travis, then she asked me, because she
11       thought I was going to go along with it.  But I
12       said no.
13            MR. FOX:  Can we take a short break?
14            MS. ADOLAY:  Yes.
15            MR. FOX:  Okay.  Thanks.
16            (A brief recess was taken.)
17            MS. ADOLAY:
18  Q.   We are back on the record after a quick break.
19       Going back to May 9th, which I believe is the date
20       that you were told you were suspended.  Is that
21       correct?
22  A.   Yes.
23  Q.   And that was a call to you by Linda Steinhilder and
24       Jessica Smosna, is that correct?
25  A.   No.  A lady named Shannon was on the phone with

Page 132

1        Linda when she called me to tell me that I was
2        being suspended.
3   Q.   Do you know whether Jessica Smosna was also on the
4        phone?
5   A.   No, she wasn't.
6            MS. ADOLAY:  (Tendering).
7            (Defendant's Exhibit 11 marked for
8        identification.)
9            MS. ADOLAY:
10  Q.   You've been handed what's marked as Defendant's
11       Exhibit 11.  I realize that part of whatever these
12       notes are is cut off in the top corner.  But it
13       says:  Call to Taryn Duis on 5/9/19 to discuss
14       all -- something.  Present, Linda Steinhilder,
15       manager.  And then it starts to say -- it says
16       J-e-s, which doesn't seem to indicate Shannon.  I'm
17       not saying she wasn't on the call as well.
18  A.   That's who she said was on the call, her and
19       Shannon, the manager from the 4th floor.
20  Q.   Okay.  And it says:  PCA sleeping, don't know.  Do
21       you recall them asking you whether there was a PCA
22       sleeping?
23  A.   Yeah, there was no PCA.  That was Kim she is
24       talking about.  No.
25  Q.   Do you remember them asking you that, though,

Page 133

1    during that call?
2  A.  During that call?  No, I don't remember that part
3      of it.
4  Q.  Okay.  Do you recall saying during that
5      conversation, I said I can't wait until October?
6  A.  Yep.  That's my maternity leave.
7  Q.  Okay.  Do you recall saying, I suppose I've said I
8      hate my job?
9  A.  Yeah.
10 Q.  Do you recall saying, I feel I'm being targeted?
11 A.  Yes.
12 Q.  Do you recall saying --
13 A.  Well, this didn't happen on this -- on this
14     conversation.  This isn't true, but -- so no, I did
15     not say on 5/9 anything about hating my job, being
16     targeted.
17 Q.  So when do you claim you made those statements?
18 A.  I didn't say that until the 10th when human
19     resources and Linda talked to me on the phone on
20     Friday.
21 Q.  Okay.  So you think this conversation actually
22     happened on the 10th, not the 9th?
23 A.  If it's the one with human resources, then yes.
24 Q.  Okay.  Do you recall saying either on the 9th or
25     the 10th, I said I would work with Linda to help

Page 134

1    move the unit forward?
2  A.  Yeah.  I told that to human resources in referring
3      to the meeting with Travis when I told her that.
4  Q.  Okay.  Do you recall saying on the 9th or the 10th,
5      I don't -- I think that says know.
6  A.  Uh-huh.
7  Q.  Me being frustrated at time I'm getting suspended.
8      Do you know what that refers to?
9  A.  I'm guessing I said I don't know why you're
10     suspending me if I'm frustrated.  That's what it
11     sounds like to me.
12 Q.  Okay.
13 A.  Because they also had an issue if you're at work,
14     you have to apparently be -- love your job 24/7 and
15     you have to want to be there the whole time and be
16     jumping for joy about it --
17 Q.  Okay.
18 A.  -- or you have a bad attitude, in their opinion.
19         MS. ADOLAY:  (Tendering).
20         (Defendant's Exhibit 12 marked for
21     identification.)
22         MS. ADOLAY:
23 Q.  You've been handed what's been marked Defendant's
24     Exhibit 12.  You will see that this exhibit has a
25     corrective action form signed by Linda Steinhilder

Page 135

1    and J. Smosna, which is Jessica Smosna, noting that
2    it's for you and your termination of employment.
3    Have you seen this document before?
4  A.  I don't know.
5  Q.  Take your time.  It's the first three pages of this
6      exhibit.
7  A.  I don't know if I have seen this.  Yeah, I believe
8      I seen this at my unemployment hearing.
9  Q.  Okay.  On the fourth page of this exhibit, it says:
10     Co-worker statement of facts form.  It's a
11     statement that appears to be from a Connie Snow?
12 A.  Yeah.
13 Q.  This says:  Taryn was excited, stating she hates
14     being a nurse and doesn't want to come back after
15     October.  Did you ever make that statement to
16     Connie Snow?
17 A.  That I hate being a nurse?
18 Q.  Yes.
19 A.  It may have come out of my mouth at some point.
20 Q.  What about that you didn't want to come back after
21     October?
22 A.  It's a possibility.  It says, Taryn's appearance
23     was elevated and anxious.  So sometimes people say
24     stuff when they're having a bad day.
25 Q.  Okay.  Was Connie Snow on nights or days?

Page 136

1  A.  Connie Snow is a shift director.
2  Q.  Okay.  So did she work nights or days or --
3  A.  I don't know her schedule.
4  Q.  Okay.
5  A.  I don't know if she worked nights and days, just
6      nights.  I don't know.
7  Q.  Okay.  Did you ever interact with Connie?
8  A.  I have a couple times.  I was a charge nurse, so I
9      had to.
10 Q.  Okay.  The next page of the exhibit appears to be a
11     statement from Heather Wyatt?
12 A.  Uh-huh.
13 Q.  What's Heather Wyatt's position?
14 A.  She is in charge of float pool.
15 Q.  Was she a float nurse?
16 A.  No, she's not a float nurse.
17 Q.  Okay.  Did she work nights?
18 A.  No.
19 Q.  Okay.  Days?
20 A.  I -- I believe so.
21 Q.  Okay.  It says:  Heather Wyatt reports that the
22     float staff do not want to float to the PCU related
23     to the negativity and behavior of nurses, including
24     Taryn Duis.  Do you know whether float staff were
25     making this report?

Page 141

1   Q.   The next page appears to be a written statement
2        from Jen Justice.  And I think you said she was a
3        float pool RN, is that correct?
4   A.   Yes.
5   Q.   It says here:  PCA KB informed Taryn her patient
6        was requesting pain medication.  Do you know who KB
7        is?
8   A.   Kim Buchanan.
9   Q.   And then it says in Jen Justice's statement:  Taryn
10       replied, I don't give a fuck if that patient wants
11       pain meds.  He can wait.  He should have taken it
12       before.  And you deny making that statement?
13  A.   Of course I did not say that at all.
14  Q.   Okay.  The next page of this exhibit --
15  A.   Can I -- is there -- am I allowed to --
16            MR. FOX:  No.
17            MS. ADOLAY:
18  Q.   So this statement says:  Taryn refused to accept
19       the answers she was given during the fitting.  She
20       was confrontational with the volunteers/Franciscan
21       staff working the event.  Do you have any idea who
22       wrote this statement?
23  A.   Nope.
24  Q.   Do you recall being at a fitting, even if you
25       personally were not being fitted?

Page 142

1   A.   I went down there and I asked them if I could order
2        scrubs, and they gave me a card.  Because I told
3        them I don't know what size scrubs to order, so
4        they gave me a card.
5   Q.   Okay.  Do you recall saying anything else when you
6        went down there?
7   A.   No.
8   Q.   Do you know who the volunteers were or the
9        Franciscan staff who was working that fitting
10       event?
11  A.   No.  Like I said, I was only there for about
12       30 seconds.  I went in, asked -- I told them I was
13       halfway through my pregnancy, said I had no idea
14       what scrubs to order.  The guy gave me a card.  And
15       he said, we can email you, talk to your manager,
16       and we'll find it out.  You can order scrubs up to
17       whatever time.
18  Q.   Okay.  Anything else you recall about --
19  A.   No.
20  Q.   -- that meeting?
21  A.   (Nodding).
22  Q.   What is your mother's name?
23  A.   Renee Salmi, R-e-n-e-e, S-a-l-m-i.
24  Q.   And she was previously employed by Franciscan as
25       well, correct?

Page 143

1   A.   Yes.
2   Q.   And is no longer?
3   A.   That's correct.
4   Q.   When did she leave Franciscan?
5   A.   I don't know.  I don't know exactly when it was.
6   Q.   Was it after your termination?
7   A.   Yes.
8   Q.   Do you know how long after your termination?
9   A.   No, I don't.
10  Q.   Do you know why she left Franciscan?
11  A.   Because of how horribly they treated me.
12  Q.   Since leaving Franciscan, have you had health
13       insurance benefits available to you?
14  A.   No, I actually have not.  Well, actually, I did
15       with Fresenius briefly, but no.
16  Q.   Okay.  So you had health insurance when you were at
17       Fresenius, but not any of the other employers?
18  A.   That's correct.
19  Q.   And do you know why?
20  A.   Because they don't have traditional insurance at
21       home health jobs.  It's different.
22  Q.   Okay.  So have you been able to obtain health
23       insurance through other sources since leaving
24       Franciscan?
25  A.   I had Medicaid when I was fired.

Page 144

1   Q.   Is your husband employed?
2   A.   No.
3   Q.   Has he been employed at any time since you left
4        Franciscan?
5   A.   No.
6   Q.   Are you currently still on Medicaid?
7   A.   Yes.
8   Q.   Have you had to pay anything out of pocket for
9        medical care since leaving Franciscan?
10  A.   Yes, different things, but I -- I don't know what.
11  Q.   Do you have records that would show what you had to
12       pay for out of pocket since leaving Franciscan?
13  A.   I'm sure somewhere.
14  Q.   When you were at Fresenius, did you get any other
15       employee benefits?
16  A.   I just had the health insurance.
17  Q.   What about dental or vision?
18  A.   I don't remember if I took dental and vision or
19       not.
20  Q.   Did they offer it?
21  A.   Yes.
22  Q.   What about 401(k) or retirement?
23  A.   I didn't do 401(k).
24  Q.   Did they offer it?
25  A.   Yes.

Page 177

```
1          that your statement?
2    A.    Yes.
3    Q.    And what company were you referring to?
4    A.    Franciscan.
5    Q.    Okay.  And in that next message down, a Christine
6          Gallas, it looks like, responds that God left that
7          place a long time ago.  Is that your heart like
8          next to that post?  Do you see the heart?
9    A.    I don't know.  Yeah, probably.  I don't -- I
10         honestly don't know.  If it's -- if I like it or if
11         anybody likes it, I have no idea.
12   Q.    Do you recall whether you liked her post?
13   A.    No, I don't remember.
14   Q.    Okay.  If you look at the third to the last page of
15         this exhibit, at the top, it appears to be a post
16         from you; is that correct?
17   A.    Yes.
18   Q.    And the last sentence says:  And I strongly believe
19         in karma, too, and she will definitely get what's
20         coming to her.  Is that your statement?
21   A.    Yes.
22   Q.    And who are you referring to?
23   A.    Linda.
24   Q.    Okay.  What did you --
25   A.    I think it was Linda.  Either that or it was Jen.
```

Page 178

```
1          One of the two of them about their lying.
2    Q.    And what did you mean by she will definitely get
3          what's coming to her?
4    A.    When you do -- I mean, I believe in karma.  That's
5          just the law of karma.  What you put out into the
6          world, you get back.  So I just believe that the
7          terrible things that she did to me, I believe she
8          will get hers in time.  That's just --
9    Q.    By she, you're referring to Linda?
10   A.    Yes.  Like I said, I think it was about Linda.  It
11         could have been -- I'm sure it was about Linda.
12   Q.    Okay.  And the next post down from you on that page
13         says:  Thank you.  I got really lucky and got a
14         really great job, but I miss all of you guys like
15         crazy.  What job are you referring to?
16   A.    Fresenius.
17   Q.    So you were hired by Fresenius -- what month was
18         it?
19   A.    I think it was at the end of June.  I know I
20         interviewed June 11th.  I think they hired me at
21         the end of June.  I started July 15.
22   Q.    Okay.  So you know you started July 15th?
23   A.    Uh-huh.
24   Q.    And at that time, you were seven months pregnant;
25         is that right?
```

Page 179

```
1    A.    Yes.
2    Q.    If Franciscan would offer you your job back, would
3          you take it back?
4    A.    I believe so.
5    Q.    And why is that?
6    A.    I just -- it was a nice regular job that I had in
7          the hospital on the floor.
8    Q.    Would you take your job back being supervised by
9          Linda?
10   A.    Absolutely not.  Of course not.
11   Q.    Okay.
12   A.    But Linda has been -- as far as I know, Linda is no
13         longer over that unit.
14   Q.    Any other reasons that you haven't shared with me
15         today why you believe you were discriminated
16         against based on your sex by Franciscan?
17   A.    I mean --
18         MR. FOX:  Based upon your?
19         MS. ADOLAY:  Sex.
20         THE WITNESS:
21   A.    Being female or pregnancy?
22   Q.    Correct, either.
23   A.    Well, it's mostly females that work there.  But
24         like I said, Linda pointed out -- specifically
25         mocked me for being pregnant.  She said that I
```

Page 180

```
1          could not do -- she said -- she was mocking me
2          pretending to be me.  She said, I can't do my job
3          because I'm pregnant.  Just very nasty, you know.
4          So that specifically.  The other thing, obviously,
5          they kept bringing up that I was going on maternity
6          leave, that, you know, I was going to be taking
7          FMLA.  They tried to say, oh, we don't know if
8          you'll come back, but -- I guess you don't want my
9          comment on that.
10   Q.    No.  Go ahead.  Go ahead.
11   A.    No.  Just for them claiming that they were worried
12         that I wouldn't come back, I just find it funny
13         that they would want somebody to come back that
14         they claimed all this terrible stuff about.  That's
15         all.
16   Q.    So why do you think that they would terminate you
17         for taking maternity leave, but as you said, pretty
18         much everyone else has taken medical leave or --
19         and lots of maternity leave?  So why do you feel
20         like yours was any different?
21   A.    I think Linda -- if you want my honest opinion what
22         I really think?  From what I know of Linda, what
23         I've seen of Linda, what I've heard from people
24         that worked under her, you know, at Porter and
25         stuff, I'm pretty sure that she just thought she
```

Page 181

1    was going to get me to get Dawn in trouble.  And I
2    think she believed because I was pregnant and I was
3    the only income that she could threaten me into
4    doing that or kind of make it so that like you're
5    going to tell human resources this happened, when
6    it didn't really happen.  And then I think she got
7    mad that it didn't go her way, and she didn't want
8    her lies to be exposed and all her -- you know, the
9    stuff that she had done that was awful.  And she
10   really started picking on me about my pregnancy.
11   And she really decided that me being pregnant was a
12   problem.  She referenced more than one time, in her
13   opinion, that I could not do my job, because I was
14   pregnant, even though that's completely untrue.
15      So I worked up until I had my son.  And I was
16   the only person on midnights picking up extra
17   shifts helping the floor out when I was terminated.
18   You know, she doesn't care about the floor.  It
19   was -- it was her attacking me.  I don't know why
20   she has a problem with pregnancy.  I don't know why
21   she has a problem with me having a family and
22   loving my family.
23 Q.  Yeah.  I guess the question, though, is:  Why was
24   it different with you than any other employee who
25   has a pregnancy and takes medical leave?

Page 182

1  A.  Because like I said, it was a combination of the
2     fact that I was pregnant, and I was going to be
3     off, and I wouldn't make up lies for her.  So it's
4     partially retaliation, trying to make me make up
5     lies about another person, putting myself in
6     jeopardy for making up lies.  I can't defame
7     somebody's character or put their nursing license
8     in jeopardy.  That puts my own in jeopardy.
9  Q.  Do you think it defames her character -- Linda's
10    character to call her crazy?
11 A.  No, no.
12 Q.  What about to call her evil?
13 A.  I believe that that's my opinion of her.  So
14    somebody who specifically tries to destroy you
15    while you're pregnant and takes pleasure in it,
16    that's pretty evil.  I've honestly never met
17    anybody so cruel in my entire life.
18 Q.  And when you say takes pleasure in it, that's your
19    opinion again; right?
20 A.  It's -- yes, absolutely.
21 Q.  Any other reason that you believe you've been
22    discriminated against based on your sex or
23    pregnancy that you haven't already told me about
24    today?
25 A.  I'm trying to think.  God, I'm sure.  There were so

Page 183

1    many things.
2  Q.  Any other reason?
3  A.  I said no.
4  Q.  Okay.  Sorry.  I didn't hear you.  Any reason other
5     than what you've told me today as to why you
6     believe that Franciscan retaliated against you
7     under Title VII and the Pregnancy Discrimination
8     Act?
9  A.  You want me to say something different than what I
10    said?
11 Q.  No.  I'm asking if there's anything else other than
12    what you already told me.
13 A.  Additional?  No.
14 Q.  Anything other than what you told me as to why you
15    believe that Franciscan interfered with your
16    ability to take FMLA in October of 2019?
17 A.  They terminated me so that I was unable to take a
18    medical leave.
19 Q.  Okay.  Anything else?
20 A.  No, that's the only way they interfered is
21    terminating me.
22 Q.  Okay.  Anything other than what you've told me
23    today as to why you believe Franciscan retaliated
24    against you in anticipation of you taking FMLA in
25    October of 2019?

Page 184

1  A.  Because they repeatedly told me that they had an
2     issue with me taking maternity leave.  They kept
3     bringing up the fact that I was excited about
4     maternity leave.  They have that written in my
5     termination that I was excited about maternity
6     leave.  They were just -- I mean, they really had a
7     problem with babies.  I don't know.
8  Q.  Any other reason why you believe Franciscan
9     retaliated against you in anticipation of you
10    taking FMLA leave?
11 A.  Just what I just said.
12 Q.  Okay.  I'm just asking if there's anything else?
13 A.  Anything else that they did to me?
14 Q.  Right.  Anything else -- any other reason why
15    you're claiming they retaliated against you in
16    anticipation of you taking FMLA leave?
17 A.  Just because they told me that that's what they
18    were doing.
19 Q.  Anything other than what you've told me today as to
20    why you believe you were terminated in retaliation
21    for allegedly refusing to make statements about
22    Dawn Smith?
23 A.  Can you repeat that?  I'm sorry.
24         MS. ADOLAY:  Could you read back the question,
25    please?

**Franciscan ALLIANCE**

**CORRECTIVE ACTION FORM**
Performance & Behavior Violations

| COWORKER NAME | | EMPLOYEE ID# | DATE CORRECTIVE ACTION ISSUED |
|---|---|---|---|
| Taryn Duis | | | 5/14/19 |

| JOB TITLE | | DEPARTMENT # | DEPARTMENT NAME |
|---|---|---|---|
| RN | | 6260 | Progressive Care |

**LIST PREVIOUS CORRECTIVE ACTIONS (WITHIN THE PREVIOUS 12 MONTHS)**

| Date: | Type: | Reason: |
|---|---|---|
| Date: | Type: | Reason: |
| Date: | Type: | Reason: |

**ACTION TAKEN**

*Some violations may be of such a serious nature, a level of corrective action may be bypassed, allowing for, up to and including, termination*

- ☐ Written Counseling
- ☐ Written Warning
- ☐ Final Written Warning
- ☐ Suspension: _____ (date)
- ☒ Termination _____ (date)

**REASON FOR THIS ACTION**

- ☒ Unsatisfactory Work Performance
- ☒ Unsatisfactory Work Behavior
- ☐ Policy/Rule Violation
- ☐ Insubordination
- ☐ Breach of Duty
- ☐ Unsafe Work Conduct
- ☐ Willful Damage of Property
- ☐ Falsification of Records
- ☐ Substance Abuse (use/possession/sales)
- ☐ Workplace Violence/Harassment

**STATEMENT OF FACTS**

| WHEN did it happen? – *dates and times* | WHERE did it happen? – *specific location and department* |
|---|---|
| 5/8/19 | |

WHAT happened? – *be specific*

The PCA informed Taryn a patient requested pain medication. It was reported Taryn response was inappropriate resulting in delay in patient care and inappropriate and unsatisfactory work behavior. See Coworker statement.

Taryn was contacted and given the opportunity to reply. Taryn stated she did not recall making the statement. Taryn stated she did not see anyone sleeping in the nurse's station. Taryn stated she suppose she has said I hate my job. Taryn stated she didn't understand how being frustrated at times would get her suspended. Taryn stated she said she couldn't wait until October to be on maternity leave.

Taryn was suspended pending complete investigation. All staff present during the shift were interviewed.

See attached documentation.

HOW were patients involved? *use epic ID# only*

Delay in patient care,
Inappropriate behavior and disruption of the work environment.
Poor work performance as the charge nurse.

**EXHIBIT**
P-8
5-7-21

WHO was involved? *names and titles*
See attached documentation

CONFIDENTIAL          Duis v. Franciscan (2:20-CV-00078-TLS-APR)          Franciscan000028
Produced August 21, 2020

## IDENTIFY POLICY/RULE THAT WAS VIOLATED

| Franciscan Mission & Values | Please Indicate Expected Behavior(s) That Were Violated |
|---|---|
| ☐ Respect for Life<br>☒ Fidelity to Our Mission<br>☒ Compassionate Concern<br>☒ Joyful Service<br>☐ Christian Stewardship | |

| Policy/Rule Name | Please Indicate Applicable Section(s) Directly From Policy/Rule That Was Violated |
|---|---|
| | PG 36 Conduct and behavior Standards. |
| | |
| | |

*This list is not an all-inclusive list of reasons*

## IDENTIFY AND EXPLAIN EXPECTATIONS – *not applicable if Termination*

NA

## FOLLOW-UP PLAN – *not applicable if Termination*

| Is follow-up required? ☐ Yes ☒ No | Additional details for follow-up plan: |
|---|---|
| Type: | |
| Date:       Time: | |

*Report follow-up on follow-up action form*

## SUMMARY STATEMENT – *if applicable*

Termination

CONFIDENTIAL

Duis v. Franciscan (2:20-CV-00078-TLS-APR)
Produced August 21, 2020

Franciscan000029

3/21/2019

**COWORKER ACKNOWLEDGEMENT AND COMMENTS**

I understand that any further violations or continued performance issues may result in corrective action, up to and including termination. If termination is being recommended, I understand my action/behavior has been deemed severable.  In signing this corrective action form, I acknowledge the fact that I have read and understand the foregoing statements. It does not necessarily mean that I agree with what is contained in this form.

☐    I agree with the information contained in this Corrective Action.

☐    I disagree with the information contained in this Corrective Action

_____    I was provided a <u>copy</u> of the policy/rule (if applicable) which was violated.
Initials

**Coworker must**
← **complete this section**

**Coworker Comments** – *if additional space is needed, use Coworker Statement of Facts Form*

Coworker Signature: _____   Date: _____

Supervisor Signature: _____   Date: _5/14/19_

Human Resources Signature: _____   Date: _5/14/19_

☐ Present at meeting
☐ Reviewed Document

HUMAN RESOURCES MUST REVIEW AND APPROVE WRITTEN WARNINGS AND ABOVE PRIOR TO THE MEETING
*Distribution: One copy to coworker, one copy to supervisor and <u>original</u> to Human Resources*

CONFIDENTIAL      Duis v. Franciscan (2:20-CV-00078-TLS-APR)      Franciscan000030
Produced August 21, 2020