

EXHIBIT
D

## In The Matter Of:

*TARYN N. DUIS v.*

*FRANCISCAN ALLIANCE INC., et al.*

---

*DAWN SCOTT*

*May 7, 2021*

*Cause No. 2:20-cv-00078-PPS-APR*

---

*BOSS REPORTERS*

*Gary * Merrillville * Valparaiso, Indiana*

*3893 East Lincoln Highway (Rt. 30)*

*Merrillville, Indiana  46410*

*(219) 769-9090*



Original File 05-07-21 DAWN SCOTT.txt

Min-U-Script® with Word Index

Page 1

```
 1
 2              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF INDIANA
 3                    HAMMOND DIVISION

 4   TARYN N. DUIS,          )
                             )
 5        Plaintiff,         )
                             )
 6   vs.                     )  No. 2:20-cv-00078-PPS-APR
                             )
 7   FRANCISCAN ALLIANCE     )
     INC., a/k/a             )
 8   FRANCISCAN HEALTH       )
     CROWN POINT,            )
 9                           )
          Defendant.         )
10
11
12        The discovery deposition of DAWN SCOTT,
13   taken before MARI BETH KAWULIA, C.S.R., for the
14   purpose of discovery at commencing at 10:30 a.m. on
15   May 7, 2021.
16
17
18
19
20
21
22
23
24
25
```

Page 2

```
 1   PRESENT:
 2
          FOX & SINK, LLC
 3        MR. RYAN C. FOX
          6177 North College Avenue
 4        Indianapolis, Indiana  46220
          (317) 254-8500
 5        rfox@foxsink-law.com
               Appeared on behalf of Plaintiff;
 6
 7        KRIEG DEVAULT
          MS. ELIZABETH M. ROBERSON
 8        12800 North Meridian Street
          Suite 300
 9        Carmel, Indiana  46032
          (317) 566-1110
10        eroberson@kdlegal.com
               Appeared on behalf of Defendants.
11
12
13   ALSO PRESENT:
14     MS. TARYN DUIS
15
16
17
18
19
20
21
22
23
24   REPORTED BY:  MARI BETH KAWULIA
     LICENSE #:  No. 84-2873
25
```

Page 3

```
 1
 2                    I  N  D  E  X
 3   WITNESS:
 4   DAWN SCOTT
 5     Examination by Mr. Fox......................4
 6
 7   EXHIBIT                                    PAGE
 8     No. 1                                     11
 9     No. 2                                     11
10     No. 3                                     12
11     No. 4                                     31
12     No. 5                                     43
13     No. 6                                     65
14     No. 7                                     68
15     No. 8                                     70
16     No. 9                                     79
17     No. 10                                    80
18     No. 11                                    81
19     No. 12                                    84
20     No. 13                                    85
21
22
23
24
25
```

Page 4

1            (Witness duly sworn.)
2  WHEREUPON:
3            DAWN SCOTT,
4  called as a witness herein, having been first duly
5  sworn, was examined and testified as follows:
6            EXAMINATION
7  BY MR. FOX:
8     Q.   Hi.  My name is Ryan Fox.  We just met.
9  I represent Taryn Duis in an action versus
10 Franciscan Alliance, Inc. also known as Franciscan
11 Health Crown Point.
12           Have you ever had your deposition
13 taken before?
14    A.   Yes.
15    Q.   Okay.  Was that while you were an
16 employee of Franciscan?
17    A.   No.
18    Q.   Okay.  What were the circumstances of
19 that deposition, if you recall?
20    A.   It was a poor outcome in an OB case, and
21 I was a manager of the OB unit.
22    Q.   Now, this might be some refreshening,
23 but the purpose of the court reporter is to take
24 down everything you say and she will not be able to
25 understand uh-huhs or un-uns or nods of the head.

TARYN N. DUIS v.
FRANCISCAN ALLIANCE INC., et al.

USDC IN/ND case 2:20-cv-00078-APR document 32-5 filed 11/01/21 page 3 of 28

Cause No. 2:20-cv-00078-PRS-APR

DAWN SCOTT
May 7, 2021

Page 5

1  In other words, your responses should be verbal.
2       If you don't understand my question
3  at any time in the deposition, please let me know
4  in order that I can restate my question. Is that
5  fair?
6  A.  Yes.
7  Q.  Okay. And what is bound to happen is
8  you'll most likely know the question I'm about to
9  ask. If you can try to wait until I ask my entire
10 question before answering, it's going to make it
11 much easier on the court reporter. Is that fair?
12 A.  Yes.
13 Q.  Are you currently on any medication that
14 would prohibit you from testifying today?
15 A.  No.
16 Q.  Any reason you cannot testify today?
17 A.  No.
18 Q.  Do you understand that your testimony
19 today has the same effect as if it was taken in a
20 court of law?
21 A.  Yes.
22 Q.  Have you done anything to prepare for
23 today's deposition? When I say that, I don't mean
24 if you had any conversations with your attorney,
25 but have you looked over any documents in

Page 6

1  preparation for today's deposition?
2  A.  On Wednesday I read the notes that I had
3  taken after my conversation with Taryn.
4  Q.  Okay. Besides your attorney, have you
5  spoken to anyone about today's deposition?
6  A.  No.
7  Q.  Did you speak with Linda Steinhilber
8  regarding today's deposition?
9  A.  No.
10 Q.  Did you make any notes in preparation
11 for today's deposition?
12 A.  No.
13 Q.  Okay. And can you please give your full
14 name for the record?
15 A.  Leann Dawn Scott.
16 Q.  And what is your current address?
17 A.  6630 West 550 North, Rensselaer.
18 Q.  Did you have the opportunity to review
19 the deposition transcript of Taryn Duis prior to
20 this deposition?
21 A.  No.
22 Q.  Okay. Are you currently employed by
23 Franciscan Health Crown Point?
24 A.  Yes.
25       (Enter Taryn Duis.)

Page 7

1  Q.  What is your current job title?
2  A.  Chief nursing officer, vice president of
3  clinical services.
4  Q.  And how long have you held that
5  position?
6  A.  Since May of 2018.
7  Q.  Do you have a nursing degree?
8  A.  Yes.
9  Q.  Are you a licensed nurse?
10 A.  Yes.
11 Q.  When did your employment begin with
12 Franciscan?
13 A.  2000.
14 Q.  Was that also at Crown Point?
15 A.  No.
16 Q.  Okay. When did you first start working
17 at Crown Point?
18 A.  May of 2018.
19 Q.  Okay. So I'm going to ask you questions
20 primarily regarding your position as chief nursing
21 officer and vice president.
22 A.  Okay.
23 Q.  Since May of 2018, since you've remained
24 in that position, have your job duties changed
25 substantially?

Page 8

1  A.  No.
2  Q.  What are your primary job duties in that
3  position?
4  A.  As the chief nursing officer, I am
5  responsible for the oversight, the functioning of
6  all nursing areas in Crown Point, so quality,
7  safety, how care is rendered, competency of
8  nursing. I also have some financial
9  responsibilities over all of those areas.
10 Q.  Do you have individuals that report
11 directly to you?
12 A.  Yes.
13 Q.  How many individuals approximately
14 report directly to you?
15 A.  Nine.
16 Q.  And what job titles do those hold?
17 A.  So there are nursing directors. There
18 are clinical nurse specialists. There's an
19 educator. There's an admin assist. I believe
20 that's it.
21 Q.  Do you know Linda Steinhilber?
22 A.  Yes.
23 Q.  Did you have any role in the hiring of
24 Ms. Steinhilber?
25 A.  I did interview her and agree that she

Page 9

1   was the appropriate choice for the position.
2     Q.   What was her job title at the time of
3   hire?
4     A.   Meaning before she was hired or after
5   she was hired?
6     Q.   Upon hire, what was her job title?
7     A.   She was a nurse manager then of ICU and
8   PCU.
9     Q.   Do you recall when she was hired?
10    A.   Yes.  Date I don't know.
11    Q.   December of 2018, does that sound about
12  approximately correct?
13    A.   Sure.  It was after I started and
14  obviously before any of this, but I couldn't tell
15  you a date.
16    Q.   So you said -- Is Ms. Steinhilber
17  currently a nursing manager?
18    A.   Yes.
19    Q.   Is that different from a nursing
20  director?
21    A.   Yes.
22    Q.   Okay.  Is that one step below a nursing
23  director?
24    A.   Yes.
25    Q.   All right.  At the time that

Page 10

1   Ms. Steinhilber was hired as a nursing manager, do
2   you know who the nursing director she reported to
3   was?
4     A.   Travis Thatcher-Curtis.
5     Q.   And is Ms. Steinhilber still a nursing
6   manager?
7     A.   Yes.
8     Q.   Okay.  Is Travis still in his same
9   position as the nursing director?
10    A.   Yes.
11    Q.   Okay.  Who did Ms. Steinhilber replace?
12    A.   Mike Lane was his name.
13    Q.   So Ms. Steinhilber is basically two
14  notches down from you currently still in her
15  position?
16    A.   Yes.
17    Q.   Who made the decision to hire
18  Ms. Steinhilber?
19    A.   Ultimately it would have been Travis's
20  decision with input from other managers, from
21  nursing staff and myself.
22    Q.   Can Travis hire someone unilaterally or
23  would he need your permission?
24    A.   He could hire someone unilaterally.
25

Page 11

1             (Document marked as Plaintiff's
2        Exhibit No. 1.)
3     Q.   Do you recognize what's been marked as
4   Exhibit 1, Plaintiff's Exhibit 1?
5     A.   Do I recognize it?  Obviously I've seen
6   it before.
7     Q.   All right.  And do you recall whether
8   or not you reviewed this prior to hiring
9   Ms. Steinhilber?
10    A.   I would have, yes.
11             (Document marked as Plaintiff's
12        Exhibit No. 2.)
13        MS. ROBERSON: This is Plaintiff's 2?
14        MR. FOX: Plaintiff's 2.
15  BY MR. FOX:
16    Q.   Do you recognize what Plaintiff's
17  Exhibit 2 is?
18    A.   No.
19    Q.   Are you aware what the -- what goes
20  through in terms of a job applicant profile, for
21  instance?  Do you know what that is?
22    A.   I know what that is in terms of the
23  hiring process.
24    Q.   What is your understanding of what a job
25  applicant profile print preview is?

Page 12

1     A.   Well, I don't know what a print preview
2   is.  As part of the onboarding process, there's a
3   profile that's completed that identifies that
4   you've met all of the steps necessary to hire
5   somebody.  That's my understanding of it.
6     Q.   Do you --
7     A.   It's not something I fill in.
8     Q.   Do you know who would be in charge of a
9   job applicant profile for a particular individual?
10    A.   It would either be their hiring person
11  or the HR representative, and I'm not sure whose
12  responsibility it is.
13    Q.   Do you recall ever reviewing Plaintiff's
14  Exhibit 2 prior to Ms. Steinhilber's hire?
15    A.   No.
16             (Document marked as Plaintiff's
17        Exhibit No. 3.)
18    Q.   Do you recognize Plaintiff's Exhibit 3?
19    A.   No.
20    Q.   Do you know whether or not applicants
21  for employment such as nursing managers, whether
22  Franciscan routinely does a background report on
23  them?
24    A.   Yes, they do.  What the content of that
25  background report is I don't know.

Page 13

```
 1    Q.   Okay.  Do you know who usually does the
 2   background reports customarily?
 3    A.   It's managed through HR.  I don't know
 4   if it's a single person or they contract it out.
 5    Q.   Do you know who Corrine Sikora is?
 6    A.   She's an HR representative.
 7    Q.   Is she still employed there?
 8    A.   I don't know.
 9    Q.   So nursing managers normally report
10   indirectly to you, is that fair to say?
11    A.   Yes.
12    Q.   Okay.  And in terms of -- Do you recall
13   back in let's say January of 2019 how many nursing
14   managers would have reported to Travis Curtis?
15    A.   Four.  I'm still counting in my head.  I
16   believe it's four.
17    Q.   Okay.  Do you remember when
18   Ms. Steinhilber was hired, did she manage a
19   particular nursing unit?
20    A.   She was over two nursing units, ICU and
21   PCU.
22    Q.   And PCU, is that normally referred to as
23   progressive care unit?
24    A.   Yes.
25    Q.   And ICU, what is that normally referred
```

Page 14

```
 1   to as?
 2    A.   Intensive care unit.
 3    Q.   Do nursing managers such as
 4   Ms. Steinhilber have the authority to discipline
 5   employees?
 6    A.   Yes.
 7    Q.   Do they have the authority to -- Do
 8   nursing managers, such as Ms. Steinhilber, have
 9   authority to issues suspensions?
10    A.   Yes.
11    Q.   Do they need -- Do nursing managers such
12   as Ms. Steinhilber have to have approval to issue
13   those suspensions?
14    A.   That's not the word I would use.  They
15   work with HR to issue those suspensions.
16    Q.   So they make -- they can make
17   recommendations for the suspensions but still need
18   to check with HR, is that fair to say?
19    A.   Yes, because HR is involved in
20   suspension problems.
21    Q.   Do nursing managers have the authority
22   to issue written warnings to the employees that
23   they supervise?
24    A.   Yes.
25    Q.   Do they always have to check with HR
```

Page 15

```
 1   before issuing written warnings?
 2    A.   No.
 3    Q.   Do nursing managers have the authority
 4   to issue corrective action plans to employees?
 5    A.   Yes.
 6    Q.   Do they always have to check with HR
 7   before issuing corrective action plans?
 8    A.   No.
 9    Q.   Do nursing managers evaluate the
10   employees they report to?
11    A.   Yes.
12    Q.   So upon the hire of Ms. Steinhilber as a
13   nursing manager, what type of employees or job
14   titles of employees would report directly to her?
15    A.   In those two departments, she would have
16   registered nurses, patient care assistants, monitor
17   techs.
18    Q.   Do nursing managers have the authority
19   to terminate employees?
20    A.   Yes.
21    Q.   But they should check with HR first?
22    A.   In conjunction with HR, yes.
23    Q.   Do nursing managers, are they supposed
24   to perform annual evaluations on employees?
25    A.   Yes.
```

Page 16

```
 1    Q.   And those are done once a year normally?
 2    A.   Yes.
 3    Q.   Can they unilaterally issue those annual
 4   evaluations?
 5    A.   What do you mean by unilaterally?
 6    Q.   Do they have to check with someone
 7   before giving an evaluation?
 8    A.   No.
 9    Q.   Has Ms. Steinhilber's position with
10   Franciscan changed since her hire?  She is still
11   the nursing manager; is that correct?
12    A.   She is still the nursing manager, yes.
13    Q.   Is she still over ICU and PCU?
14    A.   No.  She is now just over ICU, no longer
15   over PCU.
16    Q.   Do you know why she's only over ICU?
17    A.   Yes.
18    Q.   What is the reason for that?
19    A.   So after evaluation of the initial roll
20   out of having Linda over those two units, Travis
21   and I felt it would be better served for PCU, in
22   particular, to give them their own manager, and so
23   we chose to assign Linda to ICU and hire a manager
24   specific to PCU.  We felt the burden of those two
25   units was too high for one manager.
```

TARYN N. DUIS v.
FRANCISCAN ALLIANCE INC., et al.

USDC (IND) case 2:20-cv-00078-APR document 32-5 filed 11/01/21 page 6 of 28

Cause No. 2:20-cv-00078-BPS-APR

DAWN SCOTT
May 7, 2021

Page 17

1    Q.   And do you know when that occurred?
2    A.   Not exactly, no.
3    Q.   Do you know approximately when that
4    occurred?
5    A.   I would say probably late 2019. I'm not
6    sure.
7    Q.   You are not sure?
8    A.   No.
9    Q.   Do you know who then became the nursing
10   manager of PCU?
11   A.   Yes.
12   Q.   Who is that?
13   A.   Mary Beth Bateman.
14   Q.   Is she still the nursing manager of
15   PCU?
16   A.   Yes.
17   Q.   Do you recall whether or not Linda
18   Steinhilber has ever recommended directly to you
19   that nurses under her be disciplined?
20   A.   Recommended to me, no.
21   Q.   Has she informed you that other nurses
22   underneath her that she was disciplining?
23   A.   Yes. I mean, I think that's a fair
24   statement.
25   Q.   All right. Has Linda Steinhilber ever

Page 18

1    recommended discipline for an employee who reported
2    to her and recommended discipline that you did not
3    agree with?
4    A.   No.
5    Q.   Do you know whether or not Linda
6    Steinhilber has ever recommended discipline for a
7    nurse to Travis that he did not agree with?
8    A.   I am not aware of that, no.
9    Q.   If a nurse under the supervision of
10   Linda Steinhilber was to be terminated, would you
11   be aware of that termination prior to it happening?
12   A.   Yes.
13   Q.   That would be a requirement?
14   A.   It's the normal process.
15   Q.   That someone would come to you and tell
16   you?
17   A.   Yes.
18   Q.   Would that normally be Travis?
19   A.   It could be Travis. It could be the
20   manager, but I would expect to be made aware,
21   yes.
22   Q.   Have you ever agreed to any discipline
23   Linda Steinhilber was going to give to a nurse that
24   you did not agree with?
25   A.   I'm sorry, repeat the question.

Page 19

1    Q.   Has Ms. Steinhilber ever come to you
2    requesting to discipline a nurse that you said that
3    you did not agree with?
4    A.   No.
5    Q.   Are you aware of any discipline that
6    Ms. Steinhilber has received while employed with
7    Franciscan?
8    A.   No.
9    Q.   Would you be aware of any discipline
10   that she had received?
11   A.   It would depend on the level of
12   discipline.
13   Q.   What level of discipline would you have
14   to be aware of?
15   A.   So I would -- it would be depending on
16   what the situation was and what level, so, for
17   instance, a verbal warning about some minor thing I
18   would not necessarily be aware of. If it was a
19   written warning, I would be aware of it.
20   Q.   And I take it if it was a final written
21   warning, you would be aware of that as well?
22   A.   Yes, definitely.
23   Q.   Do you know Taryn Duis?
24   A.   I met her once.
25   Q.   And do you recall when you first met

Page 20

1    Taryn?
2    A.   Yes.
3    Q.   And when was that?
4    A.   I'm not sure of the date but in May of
5    2019.
6    Q.   And is that when Taryn had requested a
7    meeting with you?
8    A.   Yes, Taryn and her mom reported to
9    administration.
10   Q.   Do you recall her mom's name?
11   A.   No.
12   Q.   Did Taryn Duis work in the PCU?
13   A.   Yes.
14   Q.   Was she an RN?
15   A.   Yes.
16   Q.   Do you know how long prior to May of
17   2019 Taryn had worked with Franciscan?
18   A.   No.
19   Q.   Do you know whether it was more than two
20   years?
21   A.   No.
22   Q.   Do you know whether or not Taryn was a
23   charge nurse while she was employed with
24   Franciscan?
25   A.   I'm not a hundred percent sure. I

TARYN N. DUIS v.
FRANCISCAN ALLIANCE INC., et al.
Cause No. 2:20-cv-00078-PPS-APR
DAWN SCOTT
May 7, 2021
USDC IN/ND case 2:20-cv-00078-APR document 32-5 filed 11/01/21 page 7 of 28

Page 21

1  believe she had been in the past, but I'm not sure
2  on that.
3      Q.   Are there differences in duties between
4  a charge nurse and a registered nurse?
5      A.   Yes.
6      Q.   What are the difference in duties?
7      A.   The charge nurse is expected to take a
8  leadership role in the unit, help problem solve,
9  help make decisions related to assignments, help
10  facilitate any needs that other nurses in positions
11  and that sort of thing.  They would be expected to
12  assist if there were family issues.  They're a
13  point of contact to help resolve any sort of
14  issues.
15      Q.   Do they have the authority to discipline
16  registered nurses underneath them?
17      A.   No.
18      Q.   Are they expected to recommend
19  discipline to registered nurses if something goes
20  wrong on a shift?
21      A.   No.  They are expected to report
22  concerns but they don't recommend discipline.
23      Q.   Okay.  So they report any infractions by
24  a nurse or anything of that nature, correct?
25      A.   Yes.

Page 22

1      Q.   And during Ms. Duis' employment, did you
2  ever review her personnel file?
3      A.   No.
4      Q.   Do you provide performance evaluations
5  to the employees that report to you?
6      A.   Yes.
7      Q.   And who would provide performance
8  evaluations to nursing managers?  Would that be the
9  director?
10      A.   Their director, correct.
11      Q.   During Ms. Duis' employment, do you
12  know if any patients ever filed any formal
13  complaints regarding the level of care they
14  received from Ms. Duis?
15      A.   No, I'm not aware of any.
16      Q.   If a registered nurse underneath your
17  organizational supervisory structure was to receive
18  a patient complaint, would that be something you're
19  normally made aware of?
20      A.   Not necessarily.
21      Q.   It depends on how serious it is?
22      A.   Correct.
23      Q.   Do you know a nurse by the name of Jen
24  Justice?
25      A.   I know who she is.

Page 23

1      Q.   Are you aware of any patient complaints
2  made against Jen Justice during her employment with
3  Franciscan?
4      A.   No.
5      Q.   At some point were you made aware that
6  Ms. Duis was suspended by Franciscan?
7      A.   Yes.
8      Q.   And who informed you that she was
9  suspended?
10      A.   I'm not sure whether it was Linda or HR.
11      Q.   And if it would have been HR, do you
12  know what individual that would have been?
13      A.   Likely Jessica Smosna.
14      Q.   Is Jessica still with Franciscan?
15      A.   Yes.
16      Q.   What is her current job title?
17      A.   I don't know.  It is not the same job
18  title, but I don't know what it is.
19      Q.   Back in May of 2019, what was Jessica's
20  job title, if you recall?
21      A.   I don't know her title.  She was a
22  manager in HR, but I don't know the specifics.
23      Q.   Did she have the authority to
24  unilaterally terminate nurses?
25      A.   I suppose she had the authority.  Would

Page 24

1  she?  No.
2      Q.   She would always check with someone?
3      A.   Yes.  Meaning the person that -- Well,
4  I'll let you ask your question.
5      Q.   Who would she have to check with if she
6  wanted to terminate a nurse?
7      A.   It would be a collaborative conversation
8  between whoever was wanting, like creating the --
9  whoever she was having the conversation with,
10  whether it's the nurse manager, whether it's
11  myself, whether it's the director, they would be
12  having a conversation with HR regarding
13  termination.  HR would never just do that without
14  involving the nursing leadership.
15      Q.   So it would be common that if a nursing
16  manager had a problem with a nurse, she would
17  normally make a recommendation either to the
18  director or HR regarding that nurse?
19      A.   And usually, you keep using the word
20  recommendation, normally if you have a problem, you
21  sit down and collaborate and make a decision as a
22  group if it's something -- especially regarding
23  termination.  So I don't know that I would use the
24  word recommendation in there.
25      Q.   Who would normally -- In terms of

USDC IN/ND case 2:20-cv-00078-APR document 132-5 filed 11/01/21 page 8 of 28

TARYN N. DUIS
FRANCISCAN ALLIANCE INC., et al.

Case No. 2:20-cv-00078-JPS-APR

DAWN SCOTT
May 7, 2021

Page 25

1  disciplining a nurse, is it normal that the nursing
2  manager would first raise concerns as the primary
3  supervisor of the nurse?
4      A.   Yes.
5      Q.   That would be the normal course?
6      A.   Yes.
7      Q.   Travis in his role as director obviously
8  doesn't -- Would it be your understanding that
9  Travis as the director of nursing, he does not
10 supervise all those nurses on a day-to-day basis as
11 closely as a nursing manager would?  Is that fair
12 to say?
13     A.   Yes.
14     Q.   Okay.  Did you find out that Ms. Duis
15 was suspended by Franciscan after it happened?
16     A.   Yes.
17     Q.   So you had no role in terms of the
18 initial suspension of Ms. Duis?
19     A.   No.
20     Q.   Do you know who made that decision?
21     A.   No.
22     Q.   And was Ms. Duis later terminated?
23     A.   Yes.
24     Q.   Did you make the decision to terminate
25 her?

Page 26

1      A.   I would have been in agreement with that
2  decision.
3      Q.   And was that upon a recommendation of
4  Ms. Steinhilber?
5      A.   It was a discussion with Ms. Steinhilber
6  and HR and myself, and we agreed that that was --
7  would be the result.
8      Q.   Did Ms. Steinhilber recommend that
9  Ms. Duis be terminated?
10         MS. ROBERSON:  Objection.  I think you're
11 mischaracterizing her testimony.
12 BY MR. FOX:
13     Q.   Was it Ms. Steinhilber's opinion that
14 she made to you that Ms. Duis should be terminated?
15     A.   It was an agreement among us that we
16 would terminate Taryn.  I don't think it's fair to
17 say anyone recommended.  We all agreed after our
18 discussion of everything that this was the path,
19 and we didn't have any disagreement in that path.
20 I have no idea who said it first if that's what
21 you're asking me.
22     Q.   Did Ms. Steinhilber make it clear to you
23 that she believed that Ms. Duis should be
24 terminated?
25     A.   She agreed with that recommendation,

Page 27

1  yes.
2      Q.   But no one specifically, as you sit
3  here, made the recommendation?
4      A.   I have no idea or I don't know the first
5  person to say we should terminate her.  I don't
6  know who that person was, no.
7      Q.   Was there an individual responsible for
8  the investigation into Ms. Duis once she was
9  suspended?
10     A.   So it was Linda and HR.
11     Q.   So Linda Steinhilber would have been the
12 person that would have done the investigation upon
13 Ms. Duis' suspension, is that what happened?
14     A.   In conjunction with HR, yes.
15     Q.   When you say in conjunction with HR, do
16 you know who else was involved in that
17 investigation after suspension?
18     A.   So Jessica Smosna was.  The
19 conversation regarding termination included Nita
20 Wirkus as well.
21     Q.   Who is that?
22     A.   Nita Wirkus.
23     Q.   Who is that?
24     A.   It's the director of HR.
25     Q.   Did she sit in meetings with -- Strike

Page 28

1  that.
2          Did you review any documents
3  regarding Ms. Duis before being involved I guess in
4  the decision to terminate her?
5      A.   No.
6      Q.   As we sit here today, you cannot
7  remember any particular person that recommended
8  that she be terminated?
9      A.   That is correct.
10     Q.   Do you recall whether Ms. Steinhilber
11 relayed the results of her investigation after
12 Ms. Duis was suspended to you?
13     A.   Yes.
14     Q.   Okay.  So she told you what her
15 investigation found?
16     A.   Yes.
17     Q.   And based upon that, she believed that
18 Ms. -- it was your understanding that she believed
19 that Ms. Duis should be terminated?
20     A.   Yes, she agreed with the termination
21 based on that.
22     Q.   Did anyone involved -- So in terms of
23 all the people involved in the decision to
24 terminate, I believe you said it was yourself?
25     A.   Uh-huh.

Page 29

```
 1    Q.   Who else?
 2    A.   Well, Jessica Smosna was involved in the
 3  investigation.  Travis Thatcher-Curtis was aware.
 4  I don't know if he was part of the final
 5  conversation.  But Nita Wirkus was also part of the
 6  final conversation.
 7    Q.   And Linda Steinhilber was part?
 8    A.   And Linda Steinhilber, yes, I'm sorry.
 9    Q.   Was this a meeting in one room or was it
10  over the telephone?
11    A.   No, it was a meeting in one room.
12    Q.   And Nita was in that room also?
13    A.   Yes.
14    Q.   Do you know prior to Ms. Duis being
15  terminated whether she had been issued any written
16  counseling?
17    A.   No.
18    Q.   You don't know or --
19    A.   Correct.  I don't know.
20    Q.   Do you know whether or not prior to
21  Ms. Duis being terminated whether she had been
22  issued any written warning?
23    A.   I don't know.
24    Q.   Do you know prior to Ms. Duis being
25  terminated if she had ever been issued any final
```

Page 30

```
 1  written warning?
 2    A.   No.
 3    Q.   Prior to Ms. Duis being terminated, were
 4  you aware that she was pregnant?
 5    A.   Yes.
 6    Q.   And how did you know that?
 7    A.   She told me.
 8    Q.   And did she tell you that in the meeting
 9  where you met with her and her mother?
10    A.   Yes.
11    Q.   Prior to that, did you know that she was
12  pregnant?
13    A.   No.
14    Q.   And during that meeting, at that time
15  she had not been terminated, correct?
16    A.   Correct.
17    Q.   Did she make you aware during that
18  meeting that she planned on taking maternity
19  leave?
20    A.   No.
21    Q.   She never mentioned during the meeting
22  with you and her mother in early May of 2019 that
23  she was planning on taking maternity leave?
24    A.   No.
25    Q.   Did she make it clear during that
```

Page 31

```
 1  meeting with you and her mother in early May of
 2  2019 that she was going to take leave under the
 3  Family Medical Leave Act?
 4    A.   No.
 5    Q.   Is it normal for nurses who are
 6  otherwise eligible for taking FMLA leave that they
 7  do so for the birth of their child?
 8    A.   Yes.
 9            (Document marked as Plaintiff's
10         Exhibit No. 4.)
11    Q.   Do you recognize Exhibit 4?
12    A.   It's a Franciscan policy.
13    Q.   Is this Franciscan policy regarding
14  FMLA?
15    A.   Yes.
16    Q.   And you are free to review the policy,
17  but is it your understanding that this would be the
18  policy in effect at the time that Ms. Duis was
19  terminated?
20    A.   Yes.
21    Q.   Do you know a nurse by the name of Dawn
22  Smith?
23    A.   I'm aware of a nurse Dawn Smith.
24    Q.   Have you ever spoken with Dawn Smith?
25    A.   Not that I recall.
```

Page 32

```
 1    Q.   Is Ms. Smith still employed by
 2  Franciscan?
 3    A.   I don't believe so.
 4    Q.   Was she terminated?
 5    A.   I believe so.
 6    Q.   Were you involved in her termination?
 7    A.   No.
 8    Q.   Do you know who was involved in her
 9  termination?
10    A.   No.
11    Q.   Is it -- Do you recall whether or not
12  Dawn Smith was a nurse that reported to Linda
13  Steinhilber?
14    A.   I believe she was a PCU nurse so she
15  would have reported.
16    Q.   And in terms of -- So she would have
17  been under your organizational structure chain of
18  command?
19    A.   Yes.
20    Q.   Is there a reason why you weren't
21  involved in her termination?
22    A.   I don't know.
23    Q.   Is that normal?
24    A.   I'm not normally involved in every
25  termination.  I am made aware.  I was involved in
```

Page 33

1    Taryn's but -- so I might have been made aware at
2    the time if Dawn was terminated, but I was not
3    involved in any discussions and I am not
4    necessarily involved in any discussions.
5        Q.   Why were you involved in Taryn's?
6        A.   Because Taryn came to see me and I was
7    part of the decisionmaking process.
8        Q.   When Taryn came to see you, what do you
9    recall her telling you?
10       A.   So we had about a 15-minute
11   conversation. It began with her or her mom making
12   statements about hopefully she wasn't going into
13   pre-term labor which is how I knew she was pregnant
14   and morphed into something about she had -- there
15   had been some incident at work and she had gone
16   home, whether it was an anxiety-related event or
17   something, and that Linda had called her as a
18   followup in my understanding to see when she would
19   be coming back to work, and Taryn felt she was very
20   non-compassionate.
21          Then we morphed into that she had
22   been suspended, and she had a right to know why she
23   was suspended, and I told her I was aware she was
24   suspended. I didn't know the details and that HR
25   and Linda would get back to her on that. And we

Page 34

1    had that conversation several times because she
2    continued to demand to know why.
3           And then that morphed into Taryn
4    telling me she wanted to file a formal grievance
5    against Linda as her manager, and I told her at
6    that time that that was certainly well within her
7    rights but that I would ask her to do that through
8    HR so that we followed all the proper processes.
9           And she went on and made many
10   disparaging remarks about Linda, accused her of
11   lying, of trying to dig up dirt on her, and circled
12   back to the conversation about why she was being
13   suspended, kind of made excuses for -- she knew
14   why she was suspended but excused her behavior.
15   That was the gist of the conversation of
16   15 minutes.
17       Q.   You said she knew why she was
18   suspended?
19       A.   She knew why she was suspended.
20       Q.   And what did she tell you why she was
21   suspended?
22       A.   It had to do with refuting something for
23   a patient, so she told me that she -- at first she
24   said she didn't, but then later in the conversation
25   she said she was sure it was someone complaining

Page 35

1    about her refusing to do something for a patient
2    and that she was busy and she just made excuses for
3    it.
4        Q.   Did she admit that she had done
5    something bad to a patient?
6        A.   She said that she was aware that -- she
7    made a comment that it had to do with this report
8    of something that she refused to do with a patient.
9        Q.   Had a patient filed a report against
10   Taryn Duis?
11       A.   No.
12       Q.   Are you aware of any patient ever filing
13   a report or a complaint against Taryn Duis?
14       A.   No.
15       Q.   Did she inform you that she was being
16   targeted by Ms. Steinhilber?
17       A.   She used those exact words.
18       Q.   Did she inform you that Ms. Steinhilber
19   had made derogatory comments regarding her
20   pregnancy?
21       A.   No. What I recall from that
22   conversation is she thought she was uncaring and
23   unprofessional in her comments.
24       Q.   Did she inform you that Ms. Steinhilber
25   had made comments regarding her pregnancy

Page 36

1    related -- and that related to Ms. Duis not being
2    able to do her job as a nurse?
3        A.   No.
4        Q.   If someone had come to you and said that
5    Ms. Steinhilber had made derogatory comments to
6    them about their pregnancy, what were you supposed
7    to do about that?
8        A.   I would refer that person to HR if they
9    had a grievance with their manager and then we
10   would investigate it fully.
11       Q.   At the end of the conversation that day
12   with Ms. Duis, did you report to HR about what
13   Ms. Duis had said regarding Ms. Steinhilber
14   targeting her?
15       A.   I had a conversation with HR. I don't
16   recall the details of it. I wrote up my summary of
17   the conversation and shared that with HR.
18       Q.   Was Ms. Steinhilber in that
19   conversation?
20       A.   Not my initial conversation with HR,
21   no.
22       Q.   So who did you speak with initially in
23   HR?
24       A.   Jessica Smosna.
25       Q.   Was that the same day of your

TARYN N. DUIS v.                    Cause No. 2:20-cv-00078-PPS-APR                    DAWN SCOTT
USDC IN/ND case 2:20-cv-00078-APR   document 32-5   filed 11/01/21   page 11 of 28
May 7, 2021

Page 37

1   conversation with Ms. Duis?
2       A.   I'm not sure.  That day or the next day.
3       Q.   So do you deny that Ms. Duis had told
4   you that Ms. Steinhilber was treating her
5   differently due to her pregnancy during her
6   conversation with you in May of 2019?
7       A.   Yes.
8       Q.   Because if she would have, you would
9   have reported that to HR?
10      A.   Yes.
11      Q.   And what would HR be expected to do at
12  that point?
13      A.   Investigate her concerns or her claims
14  and investigate -- ask for Linda's side and
15  investigate it.
16      Q.   Did any investigation whether or not
17  Ms. Steinhilber had made derogatory comments
18  regarding Ms. Duis about her pregnancy ever occur?
19      A.   No.
20      Q.   Did Ms. Dawn Smith ever inform you that
21  she was being harassed by Ms. Steinhilber?
22      A.   No.
23      Q.   Have any other employees informed you
24  that they have been harassed by Ms. Steinhilber?
25      A.   No.

Page 38

1       Q.   Was Ms. Duis in her conversation with
2   you in May of 2019, was she making it clear that
3   in her mind she was being harassed by
4   Ms. Steinhilber?
5       A.   Yes, she said she was being targeted.
6       Q.   And if an employee is being targeted by
7   Franciscan, you're supposed to take those concerns
8   to HR?
9       A.   Yes.
10      Q.   And is that what you did?
11      A.   I had a conversation with HR about what
12  Taryn shared with me.
13      Q.   Do you know if HR did any investigation
14  into whether or not Ms. Steinhilber was harassing
15  Ms. Duis?
16      A.   So Taryn's claim for targeting was that
17  Linda was going to employees to get them to lie
18  against her, and in the investigation, Linda was,
19  in fact, going to employees to get the story or get
20  the facts of the complaint that had been made.
21      Q.   What complaint was that?
22      A.   That she had refused to answer this
23  call light with some profanity and was at the
24  nursing station, and so Linda reached out to the
25  witnesses of that to get their -- the facts of the

Page 39

1   situation.  Taryn felt that was her being
2   targeted.
3       Q.   So in terms of the witnesses, do you
4   recall what shift Ms. Duis worked on?
5       A.   I believe she worked nights.
6       Q.   So do you know if -- do you know all of
7   the nurses that Ms. Steinhilber talked to regarding
8   those allegations?
9       A.   No.
10      Q.   Do you know whether she talked to all
11  the night nurses on that shift, that worked the
12  shift of this alleged complaint?
13      A.   I do not.
14      Q.   Do you know whether or not there was any
15  conclusion to the allegation that she was going
16  around trying to dig up dirt or question things
17  about Ms. Duis?
18      A.   So I believe at the end there were
19  several nurses that did make statements that this
20  is indeed what had happened on that night.
21      Q.   Do you know whether or not there were
22  nurses that actually informed Ms. Steinhilber that
23  the events did not take place?
24      A.   No.
25      Q.   Do you know whether or not

Page 40

1   Ms. Steinhilber had conversations with nurses that
2   said -- that basically said no, this was being made
3   up and that it was a lie with regards to any
4   misconduct by Ms. Duis?
5       A.   No.
6       Q.   Would that have been something important
7   in an investigation if that had occurred?
8       A.   Yes.
9       Q.   Did you ever ask who Ms. Steinhilber --
10  who exactly she talked to or didn't talk to with
11  regards to the investigation?
12      A.   No.
13      Q.   What did -- Did you have any role in the
14  investigation into Ms. Duis after Ms. Duis was
15  suspended?
16      A.   No.  That was Linda and HR.
17      Q.   And ultimately what is your
18  understanding of the reason why Ms. Duis was
19  terminated?
20      A.   So at the end of the day, our rationale
21  as a group is she exhibited behaviors that we
22  thought were unbecoming of the unit, of a nurse, of
23  care for patients and we no longer wanted her in
24  our employ.
25      Q.   Do you know specifically what you

TARYN N. DUIS v.
FRANCISCAN ALLIANCE INC. (etc.)
Cause No. 2:20-cv-00078-PPS-APR
DAWN SCOTT
May 7, 2021
USDC IN/ND case 2:20-cv-00078-APR   document 32-5   filed 11/01/21   page 12 of 28

Page 41

1  thought that she did that warranted termination?
2     A.  So the specific thing is her interaction
3  or her refusing to answer the call light for a
4  patient.  There was some profanity and other things
5  involved in that comment.
6     Q.  So what you recall specifically was
7  answering a call light -- she didn't answer it at
8  all or she was answering it late?
9     A.  I understood she refused to answer it
10  making some statement that he could wait, he could
11  do whatever about the patient.
12     Q.  And then the other one was that she used
13  profanity?
14     A.  In that same -- in that same statement,
15  I believe there was profanity in that statement.
16     Q.  Is the use of profanity normally
17  immediate grounds for termination?
18     A.  It could be.
19     Q.  Okay.  And do you know how many times
20  Ms. Duis was alleged to have used profanity?
21     A.  That's the only time I'm aware of.
22     Q.  One time?
23     A.  Correct.
24     Q.  And did she truly refuse to answer the
25  call light?

Page 42

1     A.  That's my understanding.
2     Q.  She never answered the call light?
3     A.  I don't know if she ever answered it.
4     Q.  If someone never answers a call light --
5  what exactly do you recall from that, when you say
6  refused to answer a call light, does that mean she
7  just completely ignored a call light the entire
8  time or she was late or what's your understanding?
9     A.  It was more her speaking out refusing
10  to care -- provide care for that patient again
11  because she -- whatever reason in her mind.  She
12  didn't -- she wasn't going to do it.
13     Q.  Is being excited to go on maternity
14  leave a reason to be disciplined?
15     A.  No.
16     Q.  I'm sorry if I asked this before, but
17  have any other employees informed you that they
18  were harassed by Ms. Steinhilber?
19     A.  No.
20     Q.  Has any other individual come to you
21  saying that other employees were complaining about
22  Ms. Steinhilber?
23     A.  Repeat that question.
24     Q.  Have any other employees come to you
25  stating that they were receiving complaints that

Page 43

1  Ms. Steinhilber was harassing them, like, for
2  example, Travis?
3     A.  No.  Specific to harassing, I've
4  answered that question.
5     Q.  What about discrimination?
6     A.  No.
7     Q.  Are you familiar with Franciscan's
8  policy regarding the discipline of employees?
9     A.  Yes.
10     Q.  Are you familiar with the job
11  description for a registered nurse for Franciscan?
12     A.  Yes.
13              (Document marked as Plaintiff's
14              Exhibit No. 5.)
15     Q.  Do you recognize what has been marked as
16  Plaintiff's Exhibit 5?
17     A.  Job description.
18     Q.  Do you recognize this as the job
19  description for a registered nurse with Franciscan?
20     A.  Yes.
21     Q.  And would this be the job description
22  that Ms. Duis would be under while she was employed
23  with Franciscan?
24     A.  Yes.
25     Q.  Do you have to be licensed to be a

Page 44

1  registered nurse in the State of Indiana?
2     A.  Yes.
3     Q.  As part of the licensing, are nurses
4  required to meet certain acceptable standards of
5  care?
6     A.  Yes.
7     Q.  As part of being a licensed nurse in the
8  State of Indiana, are nurses also prohibited from
9  falsifying documentation of nursing actions?
10     A.  For a patient chart, yes.
11     Q.  During your conversation with Ms. Duis
12  and her mom, did Ms. Duis inform you that
13  Ms. Steinhilber was asking her to lie about another
14  employee?
15     A.  No.
16     Q.  As part of being a nurse in the State of
17  Indiana, are nurses required to notify his or her
18  employer of unprofessional conduct which may
19  jeopardize patient and client safety?
20     A.  Can you repeat that question?
21     Q.  As part of being a licensed nurse in the
22  State of Indiana, are nurses required to notify his
23  or her employer of unprofessional conduct which may
24  jeopardize patient or client safety?
25     A.  Yes.

USDC IN/ND case 2:20-cv-00078-APR document 178-3 filed 11/01/21 page 13 of 28

TARYN INNIS v.                                      DAWN SCOTT
FRANCISCAN ALLIANCE INC., et al.                    May 7, 2021

Page 45

1    Q.   I'm just going to show you. Have you
2  ever seen this Exhibit 58, Defendant's Exhibit 58?
3    A.   Not that I recall.
4    Q.   Prior to meeting with Taryn and her mom,
5  had anyone brought anything to your attention that
6  there was a problem with regards to Taryn's
7  performance at Franciscan?
8    A.   No.
9    Q.   So this was news to you, correct?
10   A.   Taryn, I had never met her, didn't know
11 her before that.
12   Q.   Did you prior to being -- you had one
13 meeting where you determined that Taryn would be
14 terminated, correct?
15   A.   Yes.
16   Q.   Okay. And during the meeting of the
17 termination of Taryn, was the information you were
18 receiving, was that from Ms. Steinhilber's
19 investigation?
20   A.   Yes, and my own interactions with
21 Taryn.
22   Q.   You mean your interaction when she came
23 to talk to you in early May?
24   A.   Yes.
25   Q.   That interaction where you deny that

Page 46

1  she said anything regarding whether or not
2  Ms. Steinhilber was treating her differently based
3  on her pregnancy, correct?
4    A.   Right.
5    Q.   Because if she would have said that,
6  normally the procedure would have been for you to
7  go to HR, for HR to investigate those complaints of
8  discrimination, correct?
9    A.   Correct.
10   Q.   Do you know whether or not
11 Ms. Steinhilber was investigated in any manner
12 based upon Taryn's conversation with you in May of
13 2019?
14   A.   Not that I'm aware of. I'm not quite
15 sure I understand that question.
16   Q.   And prior to Taryn coming into your
17 office in May of 2019, you weren't aware of any
18 performance problems of Taryn's, correct?
19   A.   Correct.
20   Q.   And at the time that you made -- were
21 involved in the decision to terminate Taryn, did
22 you ever go back and look at Taryn's personnel
23 file?
24   A.   No.
25   Q.   Did you ever look -- go back and look at

Page 47

1  her evaluations?
2    A.   No.
3    Q.   Go back and look at whether or not she
4  had ever been terminated?
5    A.   No.
6    Q.   And at the time what position did
7  Mr. Travis Curtis hold? Was that the director of
8  nursing?
9    A.   Correct.
10   Q.   Do you know whether he was -- he was not
11 in charge of the investigation into the suspension
12 of Ms. Duis though, correct?
13   A.   Not that I'm aware of.
14   Q.   It's your understanding that Linda and
15 HR were, correct?
16   A.   Yes.
17   Q.   Prior to Ms. Duis' termination, did
18 Mr. Curtis ever report to you that Ms. Duis had
19 reported to him that she was being bullied and
20 harassed by Linda?
21   A.   No.
22   Q.   If Ms. Duis had informed Mr. Curtis that
23 Ms. Duis was being bullied or harassed by Linda,
24 would Mr. Curtis -- should he have reported that to
25 HR?

Page 48

1    A.   Yes.
2    Q.   Do you know whether he ever did?
3    A.   No.
4    Q.   But he never reported it to you,
5  correct?
6    A.   Correct.
7    Q.   As part of the procedure, could he have
8  reported it to you?
9    A.   Yes.
10   Q.   Would that have been part of the normal
11 procedure that if a nursing manager was harassing
12 or bullying nurses that Travis would have made you
13 aware of that?
14   A.   Yes.
15   Q.   I want you to take a look at Defendant's
16 Exhibit 757 to 759. I just want to know whether or
17 not you have ever seen these text messages.
18   A.   No.
19   Q.   You can take a look at the whole thing.
20   A.   Not that I recall.
21   Q.   You played no role in the decision to
22 suspend Ms. Duis, correct?
23   A.   Correct.
24   Q.   You only knew after the fact, correct?
25   A.   Correct.

Page 49

1    Q.   Do you know who informed Ms. Duis that
2    she was suspended?
3    A.   No.
4    Q.   Do you know what the reason was that
5    Ms. Duis was suspended?
6    A.   Yes.
7    Q.   What was that?
8    A.   It was this complaint that she had
9    refused to answer a call light.
10   Q.   Okay.  And the other reason she was
11   suspended was profanity?
12   A.   Well, it was all in that same one.  I
13   think the reason for it, I'm just telling you that
14   there was profanity I believe involved, but the
15   reason she was suspended was refusing to answer the
16   call light or care for the patient.
17   Q.   Do you know if she ever answered the
18   call light?
19   A.   No.
20   Q.   You don't know whether she did or she
21   didn't?
22   A.   No.
23   Q.   So when you say she refused to answer
24   the call light, what evidence do you have that she
25   refused to answer the call light?

Page 50

1    A.   I personally don't have any.  She was
2    suspended pending investigation of that complaint.
3    Q.   And was it confirmed that she had
4    refused to answer a call light?
5    A.   I don't know.
6    Q.   Who would know?
7    A.   I suppose Linda Steinhilber and Jessica
8    Smosna.
9    Q.   Do you know who suspended Ms. Duis?
10   A.   No.
11   Q.   Is it your understanding that Linda
12   did?
13   A.   I don't know if it was Linda or HR.  I
14   don't know who made the call.
15   Q.   Do you know whether or not prior to her
16   suspension Ms. Duis had been on any corrective
17   action plan?
18   A.   Not that I'm aware of.
19   Q.   Prior to her termination, besides your
20   interaction with Ms. Duis, had you had any
21   interaction with her during her employment with
22   Franciscan?
23   A.   No.
24   Q.   Prior to Ms. Duis' suspension, had
25   anyone come to you and complained about Ms. Duis'

Page 51

1    behavior and other performance?
2    A.   No.
3    Q.   You said you took notes regarding your
4    conversation with Ms. Duis and her mom.  Did you
5    actually take notes while they were talking?
6    A.   I don't know.  I wrote notes afterwards
7    while it was fresh in my mind, but I don't know if
8    I wrote anything down at the time.
9    Q.   Okay.  And then did you type up those
10   notes?
11   A.   Yes.
12   Q.   So you actually handwrote some notes?
13   A.   I don't know.
14   Q.   It's possible but you don't know?
15   A.   Right.  I might have taken notes during
16   the conversation and then I typed -- I may have
17   notes from the conversation that I used to type up
18   my summary, but I didn't handwrite a summary before
19   I typed.
20   Q.   Is failing to answer a call light
21   untimely grounds for immediate termination?
22   A.   No.
23   Q.   Sometimes nurses get busy and they
24   simply can't answer every call light?
25   A.   Correct.

Page 52

1    Q.   Sometimes patients have call lights that
2    they constantly want the nurse's attention when
3    they don't really need attention?
4    A.   Correct.
5    Q.   If a patient has received some level of
6    care that causes concern, is there a form that one
7    is to fill out with regards to that patient care at
8    Franciscan?
9    A.   I'm not sure -- I don't understand the
10   question.
11   Q.   Well, is there a patient complaint form
12   that a patient can fill out if he or she believes
13   they are not getting proper care?
14   A.   They can call.  They can file a
15   grievance.  They can call and complain.  They can
16   ask to speak to a manager.  There's a number of
17   managers if they have a complaint, yes.
18   Q.   Do you know if -- this call light with
19   regard to Ms. Duis, was it your understanding that
20   it was one patient?
21   A.   Yes.
22   Q.   Do you know whether or not that patient
23   complained?
24   A.   No.
25   Q.   Do you know if anyone complained on

TARYN DUIS vs.
FRANCISCAN ALLIANCE INC., et al.

USDC NND IN case 2:20-cv-00078-APR document 32-3 filed 11/01/21 page 15 of 28

Cause No. 2:20-cv-00078-PPS-APR

DAWN SCOTT
May 7, 2021

Page 53

1  behalf of that patient?
2    A.  No.
3    Q.  I think you said you did know a nurse by
4  the name of Jen Justice?
5    A.  I know her, know of her.
6    Q.  Have you spoken to her ever?
7    A.  In passing in the nursing station.
8    Q.  Has anyone ever reported to you problems
9  with Jen Justice's performance?
10    A.  Not that I can recall.
11    Q.  Did anyone ever report to you that they
12  witnessed Jen Justice sleeping on the job?
13    A.  There was a report of someone sleeping.
14  I don't believe it was Jen Justice though.
15    Q.  And prior to Ms. Duis being suspended,
16  you never spoke with Linda Steinhilber regarding
17  the suspension of Ms. Duis?
18    A.  Correct.
19    Q.  Prior to Taryn coming into your office
20  that day, had Ms. Steinhilber ever discussed
21  anything with regards to Taryn Duis with you?
22    A.  Somebody, whether it was Linda or HR,
23  advised me she was suspended.  I was aware of that
24  when she came into my office.  I don't know who
25  told me.

Page 54

1    Q.  But that was after she had already been
2  suspended, correct?
3    A.  Correct.
4    Q.  Do you recall whether or not a
5  registered nurse under the supervision of
6  Ms. Steinhilber had been suspended by
7  Ms. Steinhilber but was later returned to work?
8    A.  I don't recall anything specific.
9    Q.  Prior to Ms. Duis' termination, did
10  Ms. Duis ever report to you that Ms. Steinhilber
11  had told Ms. Duis that Ms. Duis could not do her
12  job because she was pregnant?
13    A.  Restart your question.  I'm sorry.
14    Q.  Prior to Ms. Duis's termination, did
15  Ms. Duis or her mother ever report to you that
16  Ms. Steinhilber had told Ms. Duis that Ms. Duis
17  could not do her job because she was pregnant?
18    A.  No.
19    Q.  Prior to Ms. Duis being terminated, did
20  Ms. Duis or her mother ever report to you that
21  Linda Steinhilber had asked her to lie about a
22  co-worker?
23    A.  No.
24    Q.  Prior to Ms. Duis being terminated, did
25  Ms. Duis or her mother ever report to you that

Page 55

1  Linda Steinhilber was retaliating against Ms. Duis
2  for refusing to lie about a co-worker?
3    A.  No.
4    Q.  Prior to Linda Steinhilber becoming
5  Ms. Duis' supervisor, were you aware of any
6  complaints regarding Ms. Duis' job performance?
7    A.  No.
8    Q.  At the time that Taryn and her mother
9  came in to talk to you in May of 2019, at that time
10  had you already been aware that Taryn was
11  suspended?
12    A.  Yes.
13    Q.  Do you recall who told you?
14    A.  No.
15    Q.  Were you aware at the time that Taryn
16  and her mom came in to talk to you prior to that,
17  were you aware of the details as to why Ms. Duis
18  had been suspended?
19    A.  Vague details.
20    Q.  Vague details after the fact of
21  suspension, correct?
22    A.  Yes.
23    Q.  When Ms. Duis met with you, did she tell
24  you as to comments Ms. Steinhilber made to her
25  regarding Ms. Duis being pregnant?

Page 56

1    A.  No.
2    Q.  When Ms. Duis met with you in May of
3  2019, did she relate to you comments
4  Ms. Steinhilber made to her regarding Ms. Duis
5  taking maternity leave?
6    A.  No.
7    Q.  Did Ms. Duis report to you in May of
8  2019 that Ms. Steinhilber was trying to get dirt on
9  her?
10    A.  She used the word, I said it before, but
11  a general sense of that, that she was targeting
12  her.
13    Q.  And I believe you said that your
14  conversation with Ms. Duis and her mother was
15  15 minutes?
16    A.  Approximately.
17    Q.  Just to be clear, it's your testimony
18  that during this meeting with Ms. Duis and her
19  mother that there was no mention at all that
20  Ms. Steinhilber was treating Ms. Duis differently
21  because she was pregnant?
22    A.  Correct.
23    Q.  And you typed up a note regarding your
24  conversation with Ms. Duis and her mother,
25  correct?

Page 57

1   A.   Correct.
2   Q.   Did someone instruct you to type up the
3   note?
4   A.   No.
5   Q.   When did you type up the note?
6   A.   After my meeting with Taryn and her
7   mother.
8   Q.   Immediately after?
9   A.   Yes.
10  Q.   And everything you typed up in the note
11  was truthful?
12  A.   Yes.
13  Q.   And accurate?
14  A.   Yes.
15  Q.   And after meeting with Ms. Duis, what
16  was the extent of your involvement regarding any of
17  the allegations against Ms. Duis?
18  A.   Meaning?
19  Q.   After you met with Ms. Duis and her
20  mother, the next thing you did I believe you said
21  was you contacted HR?
22  A.   Uh-huh.  Yes.
23  Q.   Who did you speak with?
24  A.   Jessica Smosna.
25  Q.   Was that over the phone?

Page 58

1   A.   Yes.
2   Q.   Okay.  And how long was that
3   conversation?
4   A.   I have no idea.
5   Q.   Do you take -- Was that just reiterating
6   what was in your note?
7   A.   Yes.
8   Q.   And did you provide a copy of that note
9   to Ms. Smosna?
10  A.   I don't know.
11  Q.   Did you provide a copy of that note to
12  anybody at that time?
13  A.   I don't know.
14  Q.   It's possible?  You can't remember?
15  A.   Correct.
16  Q.   And did you give any instructions to
17  Ms. Smosna based upon your conversations with Taryn
18  and her mom?
19  A.   Did I give her any instructions?
20  Q.   Yes.
21  A.   No.
22  Q.   You just relayed the conversation?
23  A.   Yes.
24  Q.   And what was your next involvement in
25  terms of Ms. Duis, do you recall?

Page 59

1   A.   That I recall it was sitting down having
2   a conversation of once things had been
3   investigated, my interaction with her and HR, Linda
4   and making a decision on how to proceed.
5   Q.   So that would have been your
6   conversation in a face-to-face meeting with Linda
7   and Travis?
8   A.   I don't believe Travis was there.  I
9   don't recall.
10  Q.   So that would be Linda and Jessica and
11  the HR director?
12  A.   Yes.
13  Q.   And that was at that meeting that it was
14  confirmed that you were going -- that Franciscan
15  was going to proceed with termination?
16  A.   Correct.
17  Q.   And how long was that meeting?
18  A.   I don't know.
19  Q.   And were you relaying -- were you
20  relying in terms of agreeing with them, were you
21  relying on the results of the investigation?
22  A.   Not completely.
23  Q.   What else were you relying on?
24  A.   My personal interaction with Taryn in
25  the office.

Page 60

1   Q.   You mean your conversation that you had
2   with Taryn and mom?
3   A.   Yes.
4   Q.   Why was that a factor in your
5   determination?
6   A.   Because I believed that at the end of
7   the conversation that Taryn was probably one of the
8   most toxic individuals I had ever met, and I was
9   very uncomfortable continuing to have her care for
10  patients.
11  Q.   Based upon a conversation where she told
12  you that she believed, that Taryn believed she was
13  being targeted by Linda?
14  A.   And the other pieces of that
15  conversation.  It was a very aggressive
16  conversation.
17  Q.   Did she use profanity?
18  A.   No.
19  Q.   Do you know whether or not her
20  allegations that she was being targeted were
21  investigated?
22  A.   To the sense that her accusation was
23  that Linda was going to employees to get them to
24  collaborate or corroborate this complaint, and yes,
25  Linda was going to employees and those employees

---

Page 61

1  did corroborate the complaint, the event that
2  happened.
3      Q.  Do you know if some employees -- sitting
4  here today, you don't know if some employees did
5  not corroborate that, correct?
6      A.  Correct.
7      Q.  And you don't know what employees she
8  talked to and didn't talk to, correct?
9      A.  No.  I know the ones she talked to.
10  Well, I don't today, but I saw the ones she talked
11  to, but I don't know who she didn't talk to.
12     Q.  Are you saying that every employee she
13  talked to regarding the allegations gave a
14  statement?
15     A.  No.  I saw the ones who gave a
16  statement, correct.
17     Q.  You saw the statements that Linda chose
18  to show you, correct?
19     A.  I suppose.
20     Q.  So if Linda talked to somebody and
21  didn't get a statement, did she relay the
22  information that those individuals had told her?
23     A.  No.
24     Q.  Because you don't know who all she
25  talked to, correct?

---

Page 62

1      A.  Correct.
2      Q.  Were you relying on what Linda was
3  telling you was true?
4      A.  Yes.
5      Q.  Is it fair to say that based upon what
6  Linda was telling you, you agreed that Taryn should
7  be terminated?
8      A.  I agreed Taryn should be terminated
9  based on what Linda was telling me and my own
10  personal interactions.
11     Q.  So if -- so your conversation with Taryn
12  and her mom coming to you, was that conversation
13  alone grounds for termination?
14     A.  No, but in context of the rest of the
15  conversation, I felt at that time it was not
16  somebody who had any -- took any accountability for
17  her own actions, that played into whatever the
18  scenario was.
19         She was nasty and toxic in that
20  conversation.  She was very derogatory towards her
21  manager, to probably other people.  I don't know
22  who else she was talking about, but I felt that
23  this wasn't a person who -- if a person did refuse
24  to answer a call light and owned it and said, you
25  know what, I shouldn't have said that, I should

---

Page 63

1  have -- you know, apologetic, take some
2  accountability for it, you have a different
3  conversation.
4          Taryn took absolutely no
5  accountability for her role in anything, and so I
6  did not believe that continuing the employment was
7  to our benefit.
8      Q.  Well, what if it didn't happen?
9      A.  Well, the conversation --
10     Q.  What if the call light wasn't delayed or
11  didn't happen?
12     A.  Taryn herself told me that she was
13  basically aware that the complaint revolved around
14  this call light so something obviously happened.
15     Q.  Did Taryn admit to you that she didn't
16  answer a call light?
17     A.  Taryn brought up she knew what the
18  complaint was.
19     Q.  I understand that.  Did she --
20     A.  Well, because I read these notes a day
21  ago, she made excuses for not answering them, so I
22  guess a person could say she admitted it because
23  she told me she was too busy.
24     Q.  But no patient complaint regarding the
25  call light?

---

Page 64

1      A.  Correct.
2      Q.  No notes from the patient or the
3  patient's family regarding the call light?
4      A.  Correct.
5      Q.  Was any patient -- was there any
6  complaint that a patient's -- that the patient
7  somehow suffered some sort of health issue because
8  the call light was not answered?
9      A.  No.
10     Q.  And what did you think about Taryn's
11  mom?  Was she also nasty during this meeting?
12     A.  No, I don't recall her being nasty.
13     Q.  So you believe that just based upon your
14  conversation with Taryn that would have been
15  grounds for termination?
16     A.  No, in context of the rest of the
17  information.
18     Q.  The rest of the information that you got
19  from Linda?
20     A.  Right.
21     Q.  And do you know -- So basically when
22  Taryn told you that she was being targeted, you did
23  not believe her?
24     A.  I don't know if I really -- I don't
25  know -- so in Taryn's mind, Taryn believed she was

---

TARYN N. DUIS v.
FRANCISCAN ALLIANCE INC., et al.

Cause No. 2:20-cv-00078-PPS-APR

DAWN SCOTT
May 7, 2021

USDC IN/ND case 2:20-cv-00078-APR document 32-5 filed 11/01/21 page 18 of 28

1  being targeted because Linda was asking questions.
2  Do I think it was appropriate for Linda to ask
3  questions?  Absolutely.
4      Q.   So you don't believe that Taryn was
5  being targeted?
6      A.   Correct.
7      Q.   But you, yourself, did not investigate
8  that, whether she was?
9      A.   Correct.
10          (Document marked as Plaintiff's
11          Exhibit No. 6.)
12     Q.   And we have been referring to the notes,
13 and I'm going to mark this as Plaintiff's
14 Exhibit 6.  Are these the notes you are referring
15 to regarding your conversation with Taryn and her
16 mom?
17     A.   Yes.
18     Q.   Okay.  And are these the notes that you
19 believe -- Was there more things said during the
20 course of this meeting that are not specifically
21 put on these notes?
22     A.   These are the notes that I wrote after
23 the meeting with the general summary of the
24 encounter.
25     Q.   Okay.  And you, yourself, after meeting

1  with Ms. Duis and her mom, you didn't go and
2  interview any co-workers of Ms. Duis regarding the
3  allegations that Ms. Duis had made against
4  Ms. Steinhilber, correct?
5      A.   Correct.
6      Q.   At the time of the termination meeting,
7  did you review any documents regarding the
8  investigation?
9      A.   I don't know.
10     Q.   And you never spoke again with Ms. Duis
11 and her mother after this meeting, correct?
12     A.   Correct.
13          MR. FOX: Let's take a brief break, if we
14 could, and then we'll hopefully get you done on
15 time.
16          (Whereupon, a short break in
17          the proceedings was taken.)
18          Back on the record.
19 BY MR. FOX:
20     Q.   Has Travis ever recommended discipline
21 to an employee underneath his supervision that you
22 did not agree with?
23     A.   No.
24     Q.   Has Linda ever recommended discipline to
25 an employee under her supervision that you did not

1  agree with?
2      A.   No.
3      Q.   During your conversation with Ms. Duis
4  and her mother, did you inform them that you had
5  actually walked through the PCU day shift unit and
6  had overheard nurses using foul language?
7      A.   Not that I recall.
8      Q.   Is that possible?
9      A.   It seems unlikely.
10     Q.   Do you dispute that?
11     A.   No, I don't recall.
12     Q.   You don't know whether you said that or
13 not?
14     A.   Correct.
15     Q.   Do you recall telling Taryn and her mom
16 that you had recently walked through the PCU day
17 shift and had heard registered nurses uses foul
18 language in front of patients and families?
19     A.   No.
20     Q.   You dispute that?
21     A.   Yes.
22     Q.   But you can't say whether or not you
23 told her that you had heard registered nurses use
24 foul language when you walked through the PCU day
25 shift; is that correct?

1      A.   Correct.
2      Q.   Is a registered nurse solely responsible
3  to answer a call light?
4      A.   Meaning can someone else answer the call
5  light?
6      Q.   Yes.
7      A.   Yes.  So the answer to your question is
8  no, they can.
9      Q.   PCU, what is the PCU?
10     A.   Progressive care unit.
11     Q.   What is -- Besides registered nurses
12 that are working on their shift, what other job
13 titles normally work that shift with them?  It's
14 not just registered nurses.
15     A.   Correct.  There's PCAs.
16     Q.   And that is --
17     A.   Patient care assistants.
18     Q.   Do they have responsibility for
19 answering call lights?
20     A.   Yes.
21          (Document marked as Plaintiff's
22          Exhibit No. 7.)
23     Q.   Have you seen what has been marked as
24 Exhibit 7?
25     A.   Have I seen it?  I don't know if I've

TARRN SCOTT WINNS v.
FRANCISCAN ALLIANCE INC., et al.

USDC NIND, case 2:20-cv-00078-ARR, document 32-5, filed 11/01/21, page 19 of 28

Case No. 2:20-cv-00078-PPS-APR

TARYN SCOTT
May 7, 2021

Page 69

1  seen it before but --
2  Q. Do you know what it is?
3  A. Yes.
4  Q. Did you review Exhibit 7 prior to
5  Ms. Duis termination?
6  A. I had a discussion. I do not know if I
7  physically read what is in front of me.
8  Q. Okay.
9  A. I had a discussion about the content.
10  Q. Do you know if you even had a copy of
11  this at the time the decision to terminate was
12  made?
13  A. No.
14  Q. So you're not sure when the decision was
15  made to terminate Ms. Duis whether you had actually
16  sat down and reviewed what has been marked as
17  Plaintiff's Exhibit 7?
18  A. To read it, no. We had a discussion of
19  the contents.
20  Q. Okay. Do you know who typed up
21  Exhibit 7?
22  A. No.
23  Q. Have you -- you are familiar with the
24  PCU unit?
25  A. Yes.

Page 70

1  Q. And you've been to the nurse's station
2  within the PCU?
3  A. Yes.
4  Q. Is the nursing station within the PCU
5  station, is that in an enclosed area?
6  A. It can be. There are doors on it, yes.
7  Q. Are the doors normally open or closed or
8  do you know?
9  A. They are usually open.
10  (Document marked as Plaintiff's
11  Exhibit No. 8.)
12  Q. Have you seen what's been marked as
13  Plaintiff's Exhibit 8?
14  A. I don't know.
15  Q. Did you fill out anything with regards
16  to Plaintiff's Exhibit 8?
17  A. Not that I recall.
18  Q. Okay. Do you recall ever reviewing
19  Plaintiff's Exhibit 8 prior to Ms. Duis being
20  terminated?
21  A. No.
22  Q. Do you recall reviewing Plaintiff's
23  Exhibit 8 at the time that Ms. Duis was terminated?
24  A. No.
25  Q. Do you recall whether the first time you

Page 71

1  ever -- Have you ever seen Plaintiff's Exhibit 8?
2  A. I don't recall seeing it before.
3  Q. Okay. Do you recognize what Exhibit 8
4  is?
5  A. It is the investigation and the plan for
6  corrective action for Taryn.
7  Q. Is this the corrective action form that
8  shows that Ms. Duis is being terminated? If you
9  look at Bates stamped Page 28, action taken.
10  A. Yes.
11  Q. Do you have any reason to dispute that
12  this was the termination paperwork for Ms. Duis?
13  A. No.
14  Q. Okay. And is it against Franciscan
15  policy to be excited for maternity leave?
16  A. No.
17  Q. It says here -- On Exhibit 8 it says,
18  "Taryn stated she couldn't wait until October to be
19  on maternity leave." Do you see that?
20  A. Okay. Yes, I see that.
21  Q. Do you know why that is on Plaintiff's
22  Exhibit 8?
23  A. No.
24  Q. Was Taryn being excited to be on
25  maternity -- to be excited to go on maternity

Page 72

1  leave, was that part of your discussion with
2  regards to the termination of Ms. Duis?
3  A. No.
4  Q. Was it ever brought up that she was
5  excited to be on maternity leave during your
6  discussion in the termination meeting with
7  Ms. Steinhilber that Taryn was excited to be on
8  maternity leave?
9  A. No.
10  Q. Do you believe that on a disciplinary
11  notice that being excited for being on maternity
12  leave should not be a reason for discipline?
13  A. So if the context of that was that Taryn
14  couldn't wait to no longer be there, reflecting her
15  willingness to be there and care for patients, that
16  would make sense. Simply being excited to be on
17  maternity leave, no.
18  Q. Did someone tell you what you just
19  said?
20  A. No. I'm just reading that and I would
21  read that to say that I don't want to be here, I
22  can't wait to be on maternity leave is how I would
23  read that statement.
24  Q. But that was not -- in your termination,
25  the fact that Taryn was excited or not excited

TARYN N. DUIS v.
FRANCISCAN ALLIANCE INC., et al.

Case No. 2:20-cv-00078-APR
USDC IN/ND Case 2:20-cv-00078-APR   document 62-8   filed 11/01/21   page 20 of 28

DAWN SCOTT
May 7, 2021

---

**Page 73**

```
 1    about maternity leave was never brought up,
 2    correct?
 3       A.   Correct.
 4       Q.   So this allegation that someone being
 5    too excited about being on maternity leave, that
 6    was not part of the decision to terminate Ms. Duis
 7    in your mind, correct?
 8       A.   Correct.
 9       Q.   Do you recall whether or not anyone in
10    the termination meeting recommended that Ms. Duis
11    not be terminated but receive written counseling?
12       A.   Nobody recommended that.
13       Q.   Did anyone recommend that she receive a
14    written warning instead of termination?
15       A.   No.
16       Q.   Did anyone recommend that she receive a
17    final written warning instead of termination?
18       A.   No.
19       Q.   Could those have all been possibilities
20    for Ms. Duis outside of termination?
21       A.   Yes.
22       Q.   But it was never even -- was that
23    subject even broached by anyone?
24       A.   I don't remember the exact content of
25    how we got to we all recommended or all agreed that
```

---

**Page 74**

```
 1    termination was the best option.
 2       Q.   Did you take any notes during this
 3    termination meeting?
 4       A.   No.
 5       Q.   Did anyone else take any notes during
 6    this termination meeting?
 7       A.   I don't know.
 8       Q.   Do you recall anyone taking notes during
 9    the termination meeting?
10       A.   No.
11       Q.   Did you instruct anyone as to how to
12    conduct the investigation into Ms. Duis'
13    suspension?
14       A.   No.
15       Q.   At the time of termination, were you
16    aware whether or not Ms. Duis was a charge nurse?
17       A.   I don't know if I was aware of that or
18    not.
19       Q.   Did you ever personally witness Ms. Duis
20    perform her nursing duties in an unsafe manner?
21       A.   No.
22       Q.   Did you -- Do you work the night shift?
23       A.   No.
24       Q.   Did you ever work a full shift with
25    Ms. Duis?
```

---

**Page 75**

```
 1       A.   No.
 2       Q.   Do employees that you supervise ever use
 3    foul language in front of you?
 4       A.   They have.
 5       Q.   Do you discipline them for that?
 6       A.   It depends on the context of it.
 7       Q.   Have you ever disciplined an employee
 8    for using foul language in front of you?
 9       A.   Yes.
10       Q.   Had you ever given a written warning for
11    an employee using foul language in front of you?
12       A.   Yes.
13       Q.   Who was that?
14       A.   I don't remember the name of the
15    employee, and it wasn't in this facility.
16       Q.   I'm talking about for Franciscan Crown
17    Point.
18       A.   Okay.  Sorry.  No, I have not.
19       Q.   In your role with Franciscan Crown
20    Point, have employees that you supervise ever used
21    foul language in front of you?
22       A.   No.
23       Q.   So your testimony is that walking around
24    Franciscan Crown Point --
25       A.   You asked me specifically employees that
```

---

**Page 76**

```
 1    I supervise.  I'm assuming you meant that direct
 2    report to me.
 3       Q.   Not directly report to you.  I am
 4    talking about anyone directly or indirectly
 5    underneath your chain of command, have you ever had
 6    employees use foul language in front of you?
 7       A.   I have heard foul language.  I'm just
 8    trying to process whether they are the people that
 9    report to me.  I think it's likely I have.  I don't
10    know.
11       Q.   So in that context in terms of people
12    reporting to you, I would say that Ms. Duis
13    reported to you because she was under your chain of
14    command.
15            So those nurses on the floor when
16    you're working around Franciscan Crown Point, do
17    you ever hear them use foul language?
18       A.   Nurses that are on the floor, no.
19       Q.   Or employees under your chain of
20    command, have you ever heard them use foul
21    language?
22       A.   I have heard foul language out of
23    certain employees.
24       Q.   When you heard those employees use foul
25    language, did you give them written discipline?
```

USDC IN/ND case 2:20-cv-00078-ARR document 32-5 filed 11/01/21 page 21 of 28
FRANCISCAN ALLIANCE INC., et al.

DAWN SCOTT
May 7, 2021

Page 77

1      A.   No, but Taryn didn't receive written
2   discipline for her foul language either.
3      Q.   I thought that was part of the reason
4   that she was terminated was her profanity.
5      A.   No.  The reason that she was terminated
6   was because of her refusal to meet the needs of the
7   patient.  I commented profanity was a part of that,
8   part of what she said.  Profanity wasn't the basis
9   for her termination.
10     Q.   It was that she used profanity with
11  regards to the call light?
12     A.   No.
13     Q.   What do you specifically recall Taryn
14  saying that -- to the best of your recollection,
15  what do you recall her doing that lead to her
16  termination?  What was your understanding in your
17  own words?
18     A.   There was a situation that was being
19  investigated where Taryn had refused to care for
20  patients in a very unprofessional manner in the
21  nursing station.
22     Q.   You said patients?
23     A.   Patient.  Singular.  My mistake.
24     Q.   Go ahead.
25     A.   Unprofessionally in the nursing station.

Page 78

1   That coupled with my conversation with Taryn where
2   she was very aggressive and personally
3   unaccountable, those two factors were what made up
4   my agreement and decision to support termination.
5      Q.   It was based upon your conversation with
6   Taryn and her mom and then the one incident with
7   the call light where profanity was used, is that
8   what your understanding was?
9      A.   Yes.
10     Q.   Can lying to a supervisor be grounds for
11  discipline at Franciscan?
12     A.   It could be.
13     Q.   Could it be grounds for termination?
14     A.   It could be.
15     Q.   Did Ms. Duis ever inform you that she
16  would not be returning to work following maternity
17  leave?
18     A.   No.
19     Q.   Did Ms. Duis ever discuss her maternity
20  leave with you in any manner?
21     A.   No.
22     Q.   Did anyone else discuss Ms. Duis'
23  maternity leave with you in any manner?
24     A.   Not that I recall.
25     Q.   So when it says here on Exhibit 8 where

Page 79

1   it says, "Taryn stated she couldn't wait until
2   October to be on maternity leave," you don't recall
3   that ever being discussed with you during the
4   termination meeting, correct?
5      A.   Correct.  And if it was, it was the
6   context of she didn't want to be here, not that she
7   was going on maternity leave.
8      Q.   Was it discussed or was it not?
9      A.   Not that I recall.
10     Q.   So you're guessing that that was the
11  context, correct, because you specifically can't
12  remember, correct?
13     A.   Correct.
14     Q.   The different co-workers that the
15  suspension had notes with, did you speak with any
16  of those individuals?
17     A.   No.
18     Q.   Do you know whether or not Ms. Duis'
19  final performance evaluation met Franciscan's
20  expectations?
21     A.   No.
22              (Document marked as Plaintiff's
23              Exhibit No. 9.)
24     Q.   Have you ever seen what has been marked
25  as Plaintiff's Exhibit 9?

Page 80

1      A.   No.
2      Q.   And you have never reviewed any
3   performance evaluations of Ms. Duis, correct?
4      A.   Correct.
5      Q.   Does Franciscan Alliance have a
6   corrective action policy?
7      A.   Yes.
8      Q.   Does that include prerogative
9   discipline?
10     A.   Yes.
11     Q.   Did Ms. Duis receive any progressive
12  discipline?
13     A.   In this instance, no.
14              (Document marked as Plaintiff's
15              Exhibit No. 10.)
16     Q.   Do you recognize what's been marked as
17  Plaintiff's Exhibit 10?
18     A.   Yes.
19     Q.   Is this the corrective action policy in
20  effect for Franciscan at the time that Ms. Duis was
21  terminated?
22     A.   Yes.
23     Q.   Okay.  And it has a last revised, if you
24  look at the top of Page 39, of 3/13/2019; is that
25  correct?

Page 81

1    A.   Yes.
2    Q.   And you do believe that that's the
3  corrective action policy in place at the time that
4  Ms. Duis was terminated?
5    A.   Yes.
6         (Document marked as Plaintiff's
7         Exhibit No. 11.)
8    Q.   And if you look at what's been marked
9  as Plaintiff's Exhibit 11, this is another
10 corrective action policy that was provided to us in
11 discovery.  If you look, it says last revised on
12 2/13/2020.
13        Do you know whether the corrective
14 action policy of Franciscan was updated after
15 Ms. Duis was terminated?
16   A.   I do not.
17   Q.   It says last revised 2/13/2020.  Do you
18 have reason to dispute that the corrective action
19 policy on Plaintiff's Exhibit 11 was only updated
20 after Ms. Duis was terminated?
21   A.   I'm sorry, I didn't understand.
22   Q.   Do you have any reason to dispute that
23 Plaintiff's Exhibit 11 was the updated corrective
24 action policy implemented on or about February 13th
25 of 2020?

Page 82

1    A.   No.
2    Q.   All right.  Besides Ms. Duis' complaint
3  regarding Ms. Steinhilber, are you aware of any
4  other complaints by employees concerning
5  Ms. Steinhilber?
6    A.   So define complaints.
7    Q.   Someone goes to you and says they are
8  having an issue or problem with Ms. Steinhilber?
9    A.   To me personally, no.
10   Q.   Has someone else made you aware of
11 complaints against Ms. Steinhilber?
12   A.   Yes.
13   Q.   Who was that?
14   A.   Travis.
15   Q.   And what did Travis -- Was this on one
16 occasion or more than one occasion?
17   A.   Travis and I have had discussions at
18 that time related to coaching Linda to improve her
19 communication skills because she was struggling
20 to build relationships with some of her team
21 members.
22   Q.   And when you say during this time, was
23 this on or about the time that she first started --
24 that she first became a nursing manager?
25   A.   Not when she first started, and I don't

Page 83

1  know a date, but it wasn't when she exactly first
2  started.  It was when she had been a manager for
3  sometime, and I don't know the timeline.
4    Q.   Was it around the same time that
5  Ms. Duis was terminated?
6    A.   Not that I recall.  I think it's likely
7  it was after that.
8    Q.   Did Travis give you any names of people
9  that had come to him that reported that they were
10 concerned about the way --
11   A.   No, they were just general
12 conversations.
13   Q.   So he didn't identify any employees that
14 had complained?
15   A.   No.
16   Q.   If an employee has a problem with a
17 supervisor, can they come and talk to you about
18 it?
19   A.   Sure.
20   Q.   If an employee has a problem or a belief
21 that they are being discriminated against, can they
22 talk to you about it?
23   A.   Sure.
24   Q.   If an individual believes that they are
25 being discriminated against by their supervisor, do

Page 84

1  you believe it's appropriate to have that
2  supervisor investigate those claims of
3  discrimination?
4    A.   Repeat that again.
5    Q.   If an individual believes they are being
6  discriminated against by their supervisor, is it
7  appropriate to have that supervisor investigate
8  those claims of discrimination?
9    A.   No.
10   Q.   Did you ever speak with Ms. Steinhilber
11 regarding Ms. Duis' complaints against her that she
12 raised with you in that conversation?
13   A.   Not that I recall.
14   Q.   But you did inform human resources --
15 you did inform human resources about your
16 conversation that you had with Ms. Duis and her
17 mom, correct?
18   A.   Correct.
19   Q.   And during that conversation with human
20 resources, did you inform them that Ms. Duis
21 believed she was being targeted by Ms. Steinhilber?
22   A.   I informed them that was her claim,
23 yes.
24        (Document marked as Plaintiff's
25        Exhibit No. 12.)

TARYN N. DUIS v.
Cause No. 2:20-cv-00078-APR
DAWN SCOTT
USDC NDIN case 2:20-cv-00078-APR document 92-5 filed 11/01/21 page 23 of 28
FRANCISCAN ALLIANCE INC., et al.
May 7, 2021

Page 85

1    Q.   Do you recognize what has been marked as
2  Bates stamp Exhibit 317?  Excuse me, Bates stamped
3  317, Plaintiff's Exhibit 12.
4    A.   No.
5    Q.   Are you aware of any complaints that
6  Dawn Smith made about Linda Steinhilber?
7    A.   No.
8    Q.   Do you know who Dawn Smith is?
9    A.   I know the name.  She was a nurse
10 there.
11   Q.   Did you have any involvement in the
12 termination of Dawn Smith?
13   A.   No, not that I recall.
14        (Document marked as Plaintiff's
15        Exhibit No. 13.)
16   Q.   Do you recognize what has been marked as
17 Plaintiff's Exhibit 13?
18   A.   A page out of the employee handbook.
19   Q.   Do you recognize this as certain
20 policies with regards to the Franciscan employee
21 handbook that was in place at the time Ms. Duis was
22 terminated?
23   A.   It looks like the employee handbook.
24 Can I tell you it's the one that -- the version
25 that was in place when she was terminated?  No, I

Page 86

1  can't confirm that.
2    Q.   Do you have any reason to dispute that?
3    A.   No.
4    Q.   Do you know a former employee by the
5  name of Kimberly Buchanan?
6    A.   I know who she is.
7    Q.   Did you have any role in the termination
8  of Kimberly Buchanan?
9    A.   I was aware.
10   Q.   Who made you aware?
11   A.   Travis.
12   Q.   And do you recall what Travis told you?
13   A.   I believe she was sleeping.
14   Q.   And do you know whether or not it was
15 recommended by Linda Steinhilber to Travis that
16 Kimberly Buchanan should be terminated?
17   A.   No.
18   Q.   Do you know what Linda Steinhilber's
19 involvement with Kimberly Buchanan's termination
20 was?
21   A.   No.
22   Q.   Prior to her termination, do you know if
23 Kimberly Buchanan had put in her letter of
24 resignation?
25   A.   I don't know.

Page 87

1    Q.   Was your involvement limited to what
2  Travis told you with regard to Kimberly Buchanan
3  already being terminated or did he bring it up
4  before she was terminated?
5    A.   I don't know.
6    Q.   You don't recall?
7    A.   No.
8    Q.   Do you know an employee by the name of
9  Megan Dexter?
10   A.   No.
11   Q.   Do you know an employee by the name of
12 Daniela Mendoza?
13   A.   Yes, I know that name.
14   Q.   Do you know whether or not Ms. Mendoza
15 has ever been formally disciplined?
16   A.   No, I do not.
17   Q.   Do you know an employee by the name of
18 Nancy Georgakis?
19   A.   Yes.
20   Q.   Is Ms. Georgakis an RN nurse within
21 PCU?
22   A.   Then or -- Not currently she's not.  She
23 was at the time.
24   Q.   Has she been terminated?
25   A.   No, she chose to take another position.

Page 88

1    Q.   Outside of Franciscan?
2    A.   Yes.
3    Q.   Are you aware of any discipline that
4  was -- that Ms. Georgakis received while she was
5  employed at Franciscan?
6    A.   No.
7    Q.   Are you aware of an employee by the name
8  of Samantha Sarna?
9    A.   No.
10   Q.   And I take it if you don't know who they
11 are, you aren't aware of any discipline they
12 received?
13   A.   Correct.
14   Q.   Do you know an employee by the name of
15 Melissa Roberts?
16   A.   No.
17   Q.   So I take it you are not aware of any
18 discipline that Melissa Roberts received?
19   A.   Correct.
20   Q.   Is it fair to say that if an RN under
21 the supervision of Linda received discipline,
22 you're not always going to be aware of it?
23   A.   Correct.
24   Q.   Is it possible that if an RN under the
25 supervision of Linda Steinhilber is terminated, you

TARYN N. DUIS v.
Cause No. 2:20-cv-00078-PPS-APR
DAWN SCOTT
USDC IN/ND case 2:20-cv-00078-APR document 52-5 filed 11/01/21 page 24 of 28
FRANCISCAN ALLIANCE, INC., et al.
May 7, 2021

Page 89

1  may not be aware of it?
2     A.  I am made aware.  Am I part of the
3  decision?  Not necessarily.
4     Q.  Okay.  So they have -- in terms of
5  Linda, she does have the authority to issue
6  discipline without your knowledge as long as it
7  doesn't go to termination, correct?
8     A.  That's a reasonable statement, yes.
9     Q.  But if it's at termination, they are at
10 least going to tell you it's happening?
11    A.  Yes.
12    Q.  Can they tell you even if it's after the
13 fact of termination?
14    A.  That has happened.
15    Q.  That has happened too.  So you don't
16 have to be involved?
17    A.  Correct.
18    Q.  And do you know whether or not Linda has
19 ever made a recommendation for discipline to Travis
20 where Travis said no, don't do that?
21    A.  No.
22    Q.  Do you know an individual by the name of
23 Michelle Moran?
24    A.  No.
25    Q.  What about Susan Alsdorf?

Page 90

1     A.  No.  Apparently I'm really bad with
2  names.
3     Q.  What about Celeste Reed?
4     A.  No.
5     Q.  Do you know who replaced plaintiff?
6     A.  No.
7     Q.  Do you know if -- Do you know if Taryn
8  was replaced?
9     A.  Her position would have been replaced.
10    Q.  Does Ms. Steinhilber have the ability to
11 hire employees?
12    A.  Yes.
13    Q.  Does she have the ability to
14 unilaterally hire employees?
15    A.  Yes.
16    MR. FOX: Let's take a quick break.  We
17 may be close to being done, okay?
18    THE WITNESS: Okay.
19    (Whereupon, a short break in
20    the proceedings was taken.)
21    MR. FOX: Back on the record.
22 BY MR. FOX:
23    Q.  Was Ms. Steinhilber hired as a nursing
24 manager when she started at Franciscan?
25    A.  No.

Page 91

1     Q.  What was her first position?
2     A.  Rapid response nurse.
3     Q.  And then was she promoted to the
4  position of nursing manager?
5     A.  She interviewed and successfully got
6  that position, yes.
7     Q.  And who made the decision to promote
8  her?
9     A.  So it would have been Travis's ultimate
10 decision, but based on interviews with Travis,
11 with other nursing leadership, with members of ICU
12 and PCU, and I did interview her prior to that as
13 well.
14    Q.  Do you know how many individuals that
15 Ms. Steinhilber has been involved in their
16 termination since she's been with Franciscan?
17    A.  No.
18    Q.  Besides Ms. Duis, could you identify any
19 other individuals that have been terminated?
20    A.  Not offhand, no.
21    Q.  So it's possible she has but you can't
22 recall?
23    A.  Correct.
24    MR. FOX: Okay.  I have no further
25 questions.

Page 92

1     MS. ROBERSON: I don't have any
2  questions.
3     THE COURT REPORTER: Signature?
4     MS. ROBERSON: Yes, please.
5     MR. FOX: Thank you for your time.  Have
6  a good weekend.
7     (The deposition ended at 12:18
8     p.m.)
9     (Signature reserved.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| Current Status: *Active* | | PolicyStat ID: *5957094* |
|---|---|---|



|  |  |
|---|---|
| Original: | *3/13/2019* |
| Last Reviewed: | *3/13/2019* |
| Last Revised: | *3/13/2019* |
| Next Review: | *3/12/2022* |
| Responsible Party: | *Tom Creevey: VP Human Resources System* |
| Policy Area: | *Human Resources* |
| References: | *Policy* |
| Applicability: | *Franciscan Alliance Corporate Board Directed - All* |

## Corrective Action Policy

*9/12/16 Franciscan Alliance hospital facility names were changed. See Hospital Listing document for new name changes and previous names.*

### Policy Number: 1003.06

### Applies to: All Franciscan Alliance Hospitals and all Franciscan Alliance Entities (See Entity Listing)

# Corrective Action Policy:

Franciscan Alliance is committed to providing compassionate, quality health care to its patients. As such, it requires its coworkers to maintain high standards of performance and behavior. This policy describes the process that will generally be taken when a coworker's performance or behavior does not meet organizational expectations.

# Applicable To All Coworkers:

Corrective action may be taken when a coworker has violated an organizational or departmental policy, procedure or when the coworker's conduct or work performance does not meet expectations. The organization is committed to working with coworkers to improve performance and will follow a progressive corrective action process. However, the organization reserves the right to skip any or all steps in progressive corrective action if deemed appropriate. Additionally some violations may result in immediate termination without notice. Law enforcement and/or licensing or regulating agencies will be notified as required.

PENGAD 800-631-8989

5-1-21   P-10   EXHIBIT

# Corrective Action Steps:

Step 1 –Written Counseling: This is a formal corrective action discussion between the coworker and his or her department leader or designee. This conversation will be documented using the designated corrective action template. The coworker will be asked to sign the document. If refused, supervision will indicate so and a third party will also initial. The department leader or designee will deliver the corrective action and provide the coworker a copy of the signed document. The signed original will be forwarded to Human Resources and placed in the coworker's file.

CONFIDENTIAL        Duis v. Franciscan (2:20-CV-00078-TLS-APR)      Franciscan000039
Produced August 21, 2020

**Step 2** –Written Warning: Depending on the nature and severity of the problem, a written warning may be issued upon the first instance of a behavior or performance problem or upon a first violation of any rule, policy or procedure. A written document will be prepared using the designated corrective action template. The department director, senior leadership or Human Resources should be consulted prior to delivery. The coworker will be asked to sign the document. If refused, supervision will indicate so and a third party will also initial. The department leader or designee will deliver the corrective action and provide the coworker a copy of the signed document. The signed original will be forwarded to Human Resources to be placed in the coworker's file.

**Step 3** – Final Written Warning with potential suspension: A single incident may be so severe as to merit immediate final written warning. A written document will be prepared using the designated corrective action template. The department director, senior leadership or Human Resources must be consulted prior to delivery. The coworker will be asked to sign the document. If refused, supervision will indicate so and a third party will also initial. The department leader or designee will deliver the corrective action and provide the coworker a copy of the signed document. The signed original will be forwarded to Human Resources and placed in the coworker's file. If suspension is recommended by the director, enforcement of suspension will be determined after Human Resources review.

**Step 4** – Termination or Suspension pending Termination: A written document will be prepared for review by leadership and Human Resources prior to delivery. Prior corrective actions and severity of the issue will be reviewed. The issue will be discussed with the coworker. After discussion with the coworker, if appropriate, the leader or designee may pursue suspension. If suspension occurs, the coworker must be notified of the next steps and possible outcomes. However, Human Recourses and a member of Senior Leadership must be notified and in agreement with the termination recommendation. The department leader or designee will conduct the termination meeting and provide the coworker a copy of the signed document, including a copy of the applicable policy and procedure. The signed original will be forwarded to Human Resources and placed in the coworker's file. **Violations that may result in immediate suspension or termination**

The organization reserves the right to skip any of the aforementioned steps and move directly to suspension and/or termination. The following list is not exhaustive but the following breaches of good conduct are considered sufficient cause for immediate suspension pending investigation and/or immediate termination.

A. Providing false information to employer;

B. Gambling on the premises;

C. Being insubordinate or disrespectful to manager, coworker, customer, visitor or vendor while in the course of company business. Each coworker is expected to work in a cooperative manner with management.

D. Disclosure or sharing of confidential financial or other non-public proprietary company information, including confidential information regarding, personal health information (PHI) of patient or coworker, business partners, subsidiaries, vendors, physicians, coworkers and customers – refer to **Social Medica Policy 1307.01** and **HIPAA Privacy and Security Policy 1302.05**.

E. Sleeping during work shift;

F. Unauthorized possession of explosives, firearms or other weapons in the buildings;

G. Bringing narcotics, or any controlled substance onto employer's property; reporting for work impaired with a detectable presence of alcohol or drugs in one's system; possessing or using intoxicants, alcoholic beverages, narcotics or controlled substance while on Franciscan Alliance property or while engaged in Franciscan Alliance business unless under some circumstances the coworker has a current, valid prescription for the controlled substance. Disregard of safety and/or security regulations;

CONFIDENTIAL       Duis v. Franciscan (2:20-CV-00078-TLS-APR)       Franciscan000040
Produced August 21, 2020

H. Harassment, sexual or other, as defined by the corporate Equal Opportunity Employment and Anti-harassment Policy 1001.01

I. Threatening, intimidating, coercing or otherwise interfering with the job performance of coworkers or visitors.

J. Obtaining material, money or other property from employer by fraudulent means or misrepresentation;

K. Willful violation of the Corporate Compliance Program Policy 402.02;

L. Falsifying records (including application for employment), work reports, time sheets, official documents, patient records or other hospital records;

M. Improper or fraudulent use of Short or Long Term Disability or Leave of Absence,

N. Fighting, attempting to injure others or disorderly conduct or any other acts of work place violence;

O. Deliberate destruction or abuse of Franciscan Alliance property;

P. Conduct that jeopardizes patient care;

Q. Accepting or soliciting gifts or gratuities in violation of Franciscan Alliance policy;

R. Refusal to cooperate in an investigation, including refusal to submit to an investigative or diagnostic test or refusal to report to employee health;

S. Inappropriate use of company computer systems and internet access per corporate Workstation Use and Security Policy 1307.12 and Corporate Internet Acceptable Use Policy 1307.12;

T. Retaliation of any kind;

U. Working outside the scope of practice;

V. Performance issues during the Introductory Period of employment, defined as the first 90 days for all coworkers.

W. Failure to maintain license, certification or registration as required by practice;

X. Unethical/illegal conduct in the course of employment;

Y. Theft or reported knowledge of theft;

Z. Audio taping or video taping in patient care areas or settings (due to patient privacy and HIPAA obligations) without prior written consent of the Compliance/Risk Officer and Human Resources;

AA. Spending work time on non-work activities such as hobbies, recreational games, school work, work for third parties, or taking additional breaks without authorization.

Corrective Action Document Templates for corrective action can be found on FRANC. Corrective Action documents are kept in the coworker's file in the Human Resources department. Coworkers may provide a written response to the corrective action to their leader and/or Human Resources. Corrective Actions will transfer between wholly owned Franciscan Alliance entities. If you have any questions or concerns regarding this policy please contact your Human Resource Representative.

Employment at Will it is understood that nothing in this policy changes the fact that coworkers' employment is "at will"

# Forms: See Corrective Action Forms

CONFIDENTIAL        Duis v. Franciscan (2:20-CV-00078-TLS-APR)     Franciscan000041
Produced August 21, 2020

*During the transition to PolicyStat, if you do not see any electronic signatures on this policy, the signatures will be found in the PDF archived version.*

# Attachments:

No Attachments

## Approval Signatures

| Step Description | Approver | Date |
|---|---|---|
| Executive Committee of Franciscan Alliance, Inc. | Lethia Marie Sister Leveille: Corporate Secretary | 3/13/2019 |
| Reviewed by: | Joel Hoff: Sr VP Admin Services | 2/9/2019 |
| Reviewed by: | Pat Downes: Chief Legal Counsel [SC] | 2/7/2019 |
| Corporate Sponsor: | Tom Creevey: VP Human Resources System [MS] | 2/7/2019 |

## Applicability

Franciscan Alliance Corporate & System Wide , Franciscan Alliance Information Services, Franciscan Alliance Revenue Cycle, Franciscan Health Crawfordsville, Franciscan Health Crown Point , Franciscan Health Dyer, Franciscan Health Hammond, Franciscan Health Indianapolis, Franciscan Health Indianapolis at Carmel, Franciscan Health Lafayette Central, Franciscan Health Lafayette East, Franciscan Health Michigan City, Franciscan Health Mooresville, Franciscan Health Munster, Franciscan Health Olympia Fields, Franciscan Physician Network, Franciscan WorkingWell

CONFIDENTIAL    Duis v. Franciscan (2:20-CV-00078-TLS-APR)    Franciscan000042
Produced August 21, 2020