**EXHIBIT**

tabbies

E

**In The Matter Of:**

*TARYN N. DUIS v.*

*FRANCISCAN ALLIANCE INC., et al.*

---

*LINDA STEINHILBER*

*May 7, 2021*

*Cause No. 2:20-cv-00078-PPS-APR*

---

*BOSS REPORTERS*

*Gary * Merrillville * Valparaiso, Indiana*

*3893 East Lincoln Highway (Rt. 30)*

*Merrillville, Indiana  46410*

*(219) 769-9090*



Original File 05-07-21 LINDA STEINHILBER.txt

Page 1

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF INDIANA
 2                  HAMMOND DIVISION

 3

 4   TARYN N. DUIS,            )

 5        Plaintiff,           )

 6   vs.                       )  No. 2:20-cv-00078-PPS-APR

 7   FRANCISCAN ALLIANCE       )
     INC., a/k/a               )
 8   FRANCISCAN HEALTH         )
     CROWN POINT,              )
 9                             )
          Defendant.          )
10

11

12          The discovery deposition of LINDA

13   STEINHILBER, taken before MARI BETH KAWULIA,

14   C.S.R., for the purpose of discovery at commencing

15   at 12:48 p.m. on May 7, 2021.

16

17

18

19

20

21

22

23

24

25
```

Page 2

```
 1   PRESENT:

 2

 3        FOX & SINK, LLC
          MR. RYAN C. FOX
 4        6177 North College Avenue
          Indianapolis, Indiana  46220
 5        (317) 254-8500
          rfox@foxsink-law.com
 6             Appeared on behalf of Plaintiff;

 7        KRIEG DEVAULT
          MS. ELIZABETH M. ROBERSON
 8        12800 North Meridian Street
          Suite 300
 9        Carmel, Indiana  46032
          (317) 566-1110
10        eroberson@kdlegal.com
               Appeared on behalf of Defendants.
11

12

13

14

15

16

17

18

19

20

21

22
          REPORTED BY:  MARI BETH KAWULIA
23        LICENSE #:  No. 84-2873

24

25
```

Page 3

```
 1                  I  N  D  E  X

 2   WITNESS:

 3   LINDA STEINHILBER

 4     Examination by Mr. Fox......................4

 5
     EXHIBIT                                    PAGE
 6
       No. 1                                      14
 7     No. 2                                      16
       No. 3                                      17
 8     No. 4                                      37
       No. 5                                      40
 9     No. 6                                      93
       No. 7                                      94
10     No. 8                                     107
       No. 9                                     125
11     No. 10                                    124
       No. 12                                    136
12     No. 14                                     79
       No. 15                                     92
13     No. 16                                    126
       No. 17                                    128
14     No. 18                                    138
       No. 19                                    148
15     No. 20                                    149
       No. 21                                    153
16     No. 22                                    155
       No. 23                                    157
17     No. 24                                    158
       No. 25                                    159
18     No. 26                                    159
       No. 27                                    159
19     No. 28                                    161

20

21

22

23

24

25
```

Page 4

1              (Witness duly sworn.)

2  WHEREUPON:

3        LINDA STEINHILBER,

4  called as a witness herein, having been first duly

5  sworn, was examined and testified as follows:

6              EXAMINATION

7  BY MR. FOX:

8     Q.   Hi, Linda.  My name is Ryan Fox.  I

9  think we met before.

10    A.   Hi, Ryan.

11    Q.   You can call me Ryan.  Do you mind if I

12  call you Linda?

13    A.   That's fine.

14    Q.   Can you please state your name for the

15  record?

16    A.   Linda Steinhilber.

17    Q.   Have you ever had your deposition taken

18  before?

19    A.   No.

20    Q.   You sat in on the deposition of Taryn

21  Duis, correct?

22    A.   Correct.

23    Q.   So some of this may be repetitive, but

24  the purpose of the court reporter is to take down

25  everything that you say.  She will not be able to

TAKEN IN MD, case 2:20-cv-00078-ARR document 82-16 Filed 11/01/21 page 3 of 76 INHILBER
USRG, IN MD. - vs - Cause No. 2:20-cv-00078-JRS - ARR

FRANCISCAN ALLIANCE INC., et al.

May 7, 2021

Page 9

1    A.   It is. It's in association with the
2  department of health.
3    Q.   Okay. And how long did you work at
4  Porter Hospital?
5    A.   At Porter Hospital three months. Less
6  than three months.
7    Q.   Were you terminated from Porter
8  Hospital?
9    A.   Yes, I was.
10   Q.   What was the reason for termination?
11   A.   Not made friends with the other
12  directors.
13   Q.   What was your job title at Porter
14  Hospital?
15   A.   I was a director of the medical/surgical
16  units.
17   Q.   And when you say not made friends with
18  directors, are those people you reported to?
19   A.   No, those were other directors in the
20  hospital.
21   Q.   Same as you?
22   A.   Correct.
23   Q.   Did you receive any progressive
24  discipline prior to your termination?
25   A.   No.

Page 10

1    Q.   And when they said that you were not
2  making friends with the other directors, did they
3  give you any specifics?
4    A.   No.
5    Q.   Did you hold any supervisory authority
6  at Porter Hospital?
7    A.   Yes.
8    Q.   And the last ten years besides Porter
9  Hospital, have you been terminated by any other
10  employers?
11   A.   The last 10 years? 2015, yes, I have.
12   Q.   Okay. Where was that?
13   A.   Kindred Healthcare.
14   Q.   What was your position there?
15   A.   I had several positions. My last
16  position was chief nursing officer.
17   Q.   And were you terminated from Kindred?
18   A.   Yes.
19   Q.   What was the reason they gave you for
20  that?
21   A.   There was a new chief CEO who brought in
22  his own team, so I was terminated with a severance
23  package.
24   Q.   Okay. Any other positions that you have
25  been terminated within the last ten years?

Page 11

1    A.   Porter. University of Texas, yes.
2    Q.   When were you terminated from there?
3    A.   I would have to look exactly the date.
4    Q.   What was your position at the University
5  of Texas?
6    A.   I was a, what do they call it, practice
7  administrator I believe was the title.
8    Q.   Do you recall what your position was
9  there at University of Texas -- excuse me.
10        What was the reason that they gave
11  for your termination?
12   A.   We were -- rather difficult. I was sent
13  to multiple different facilities within I think a
14  year and a half. I actually worked at four
15  different facilities. I was unhappy.
16        It was mutual. It was, what did
17  they say, difficulty with, I don't remember what
18  they said, with the opening position or opening a
19  new facility.
20   Q.   That you were having difficulty opening
21  a new facility?
22   A.   Correct.
23   Q.   Okay. At Kindred, I understand you said
24  that the new CEO came in and you were terminated
25  there. Did you receive any discipline at Kindred

Page 12

1  prior to your termination?
2    A.   Never.
3    Q.   Did you receive any discipline at the
4  University of Texas prior to your termination?
5    A.   Never.
6    Q.   Do you have any nursing degrees?
7    A.   Yes.
8    Q.   Are you a licensed nurse?
9    A.   Yes.
10   Q.   Any other positions you've been
11  terminated within the last ten years?
12   A.   No.
13   Q.   Do you recall any other positions that
14  you've been terminated during your working career
15  outside of ten years?
16   A.   No.
17   Q.   Do you know when you were terminated
18  from the University of Texas?
19   A.   I do not remember the date.
20   Q.   At some point you became employed by
21  Franciscan Crown Point; is that correct?
22   A.   Correct.
23   Q.   Do you recall when that was?
24   A.   Middle of December of '18, I believe,
25  2018.

1    Q.   Who took over the PCU in January of 2020
2  as a nursing manager?
3    A.   Mary Beth Bateman.
4    Q.   Where was she previously?
5    A.   I again do not know her title at that
6  time.  She was in the hospital but I don't know
7  what her title was.
8    Q.   Okay.  In your role as a nursing
9  manager, and you're still a nursing manager today,
10 correct?
11   A.   Correct.
12   Q.   And you already said that your
13 responsibilities do not change a lot except for
14 going from two departments to one department?
15   A.   Correct.
16   Q.   So what I'm going to talk about when I
17 say nursing manager, that means during your
18 employment as a nursing manager at Franciscan,
19 okay?
20   A.   Okay.
21   Q.   As a nursing manager, do you have the
22 authority to discipline employees underneath you?
23   A.   We have the authority to discipline
24 employees with HR collaboration and approval.
25   Q.   They have to approve your discipline?

1    A.   Yes.
2    Q.   Do you have the authority unilaterally
3  to issue a written warning?
4    A.   With HR approval.
5    Q.   Corrective action plans?
6    A.   With approvals from supervisors from HR.
7    Q.   Do you have the ability to evaluate
8  employees?
9    A.   Yes.
10   Q.   Do you have to have HR's approval to
11 fill out the evaluation forms?
12   A.   No.
13   Q.   Is that on a yearly basis?
14   A.   Yes.
15   Q.   So every time that you want to formally
16 issue an employee a written warning, you have to
17 collaborate with HR?
18   A.   Yes.
19   Q.   Seek their approval?
20   A.   Correct.
21   Q.   Do you make a recommendation for a
22 written warning and then they say yes or no?
23   A.   Not a recommendation, a presentation of
24 the facts, the investigation, depending on what
25 that is.  If it's attendance, it's black and white.

1  If it's an investigation, we provide the
2  information, the investigation information and it's
3  a collaboration, and it has to be approved with HR.
4    Q.   So are you saying that when issuing a
5  written warning to an employee, you don't make a
6  recommendation that the employee should receive a
7  written warning?
8    A.   When I make a written warning, it must
9  go through HR, yes.  I will write a written warning
10 and then read it, and it still must be approved
11 with HR.
12   Q.   You can create the document with the
13 written warning, like type it up, get it ready but
14 you have to submit it to HR?
15   A.   Correct.
16   Q.   Is that how you normally do it before
17 issuing discipline to an employee?
18   A.   Absolutely.
19   Q.   Have you ever typed up a written warning
20 and given it to HR and they said no, you can't do
21 that?
22   A.   Yes.
23   Q.   Okay.  When did that occur?
24   A.   At Franciscan?
25   Q.   Yes.  I'm just talking about Franciscan.

1    A.   I'm sorry, not at Franciscan.
2    Q.   So let's go backtrack.  Your previous
3  testimony I am only concerned about your nursing
4  manager position at Franciscan.  So we are only
5  looking from the period of March of 2019 until
6  present day.
7    A.   Okay.
8    Q.   Is it your testimony that every time
9  that you are going to issue a written warning to an
10 employee that you would normally fill out the form
11 and then present it to HR for approval?
12   A.   Correct.
13   Q.   Okay.  And every time that you have done
14 that, has HR approved it?
15   A.   To the best of my knowledge, yes.
16   Q.   At times have you ever placed
17 employees on a corrective action plan that you
18 wanted to place an employee on a corrective action
19 plan -- have you ever placed an employee on a
20 corrective employee plan?
21   A.   At Franciscan, no.
22   Q.   Does Franciscan have corrective action
23 plans?
24   A.   Yes.
25   Q.   Okay.  Have you ever asked an employee

Page 25

1  to be placed on a corrective action plan or
2  recommended it to HR?
3     A.  No.  Wait a minute.  A corrective action
4  plan like an improvement plan?
5     Q.  Yes.
6     A.  No, I have not.
7     Q.  Do they have those though?
8     A.  Yes, they do.
9     Q.  And in terms of your evaluations with
10  Franciscan, when you do the evaluations do you have
11  to seek HR's approval or supervisor's approval
12  before giving that evaluation to the employee?
13     A.  No.
14     Q.  So an employee evaluation is at your
15  complete discretion, correct?
16     A.  Well, I think, I cannot say a hundred
17  percent, I believe if an employee has a poor
18  evaluation and needs to be put on an action plan
19  for improvement, I believe that goes through HR as
20  well.  I have not had to do that there.
21     Q.  You have never had to do it?
22     A.  No.
23     Q.  So unless something was serious enough
24  that -- Well, it's never happened, but if something
25  was serious enough, you would normally go to HR for

Page 26

1  their approval?
2     A.  Right.
3     Q.  But that's never happened, correct?
4     A.  No.
5     Q.  So when I say like can you recommend
6  discipline, you obviously in terms of -- if you
7  want to put someone on a final written warning per
8  se, would that be something that you would create
9  first and take to HR for their approval?
10     A.  No, it does not work that way.
11     Q.  How would it work?
12     A.  So an employee must go through all the
13  steps, and if the steps were missed or the steps
14  are changed, that comes from HR, not from me.
15     Q.  What do you mean if the steps are
16  missed?
17     A.  If an employee is given a corrective
18  action, you start with the first step and you go
19  through the steps.
20     Q.  So it is supposed to be progressive?
21     A.  Correct.
22     Q.  Do you know Taryn Duis?
23     A.  Yes.
24     Q.  When did you first meet Ms. Duis?
25     A.  I cannot tell you the date.  I met her

Page 27

1  one morning after one of her shifts before she was
2  leaving the hospital.
3     Q.  Okay.  Would this probably have been
4  sometime in March or April of 2019?
5     A.  It was when I first started as I was
6  meeting all my employees so I would imagine
7  sometime in March.
8     Q.  And did Ms. Duis work in the PCU?
9     A.  Yes.
10     Q.  And what position did she hold?
11     A.  She was an RN and a charge nurse.
12     Q.  Okay.  What is the difference in duties
13  between a charge nurse and a registered nurse?
14     A.  Charge nurse oversees the entire unit,
15  places admissions, assist nurse, just have an
16  overall charge, managing the PCAs, managing the
17  floor.
18     Q.  Are there charge nurses for both day
19  shift and night shift?
20     A.  Yes.
21     Q.  And is there one charge nurse for a day
22  shift and one charge nurse for a night shift?
23     A.  Probably more than one.
24     Q.  But only one per shift?
25     A.  Yes.

Page 28

1     Q.  Okay.  Because there's different days?
2     A.  Correct.
3     Q.  A nurse isn't going to work seven days a
4  week, there's going to be some to cover.
5     And so was Taryn one of the charge
6  nurses for the night shift?
7     A.  Yes.
8     Q.  And was the other charge nurse at the
9  time you worked with Taryn, would that have been
10  Jen Moreno?
11     A.  I don't know that Jen Moreno was even
12  part of that unit when I was there.  I don't
13  believe she was.
14     Q.  And do you know who Jen Moreno is?
15     A.  Yes, I do.
16     Q.  And is Jen Moreno still working there?
17     A.  Yes, she's a float floor nurse.
18     Q.  She's a float nurse?
19     A.  Yes.  I don't believe -- she was not in
20  PCU when I took it over.  She was a float floor
21  nurse.
22     Q.  In April of 2019, were you Ms. Duis'
23  direct supervisor?
24     A.  Yes.
25     Q.  And what shift did you normally work in

Page 29

April of 2019?
 A.   Usually a 7 to 3, 4 shift.
 Q.   Okay.  Did you ever during Ms. Duis'
employment with Franciscan work the night shift
with her?
 A.   I came in and rounded on the shifts.
 Q.   What time would that have been?
 A.   3 in the morning, 4 in the morning.  It
varied.  Very infrequently.  Maybe three -- two or
three times.
 Q.   Is it fair to say that Ms. Duis -- you
and Ms. Duis only worked in a supervisory employee
relationship for approximately two months?
 A.   Correct.
 Q.   Okay.  So on how many -- how many total
occasions did you have a chance to actually speak
with Ms. Duis during that time?
 A.   During her shift?
 Q.   During her employment.
 A.   Oh, I can tell you I spoke face-to-face
with Ms. Duis two times.
 Q.   Two times in total during her
employment?
 A.   Yes.
 Q.   During Ms. Duis' employment, did you

Page 30

ever review her personnel file?
 A.   No.
 Q.   Do employees of Franciscan receive
performance evaluations?
 A.   Yes.
 Q.   And how often do employees receive those
performance evaluations?
 A.   Every year.
 Q.   Did you ever provide performance
evaluation for Ms. Duis?
 A.   No.
 Q.   During Ms. Duis' employment, do you know
if any patients ever filed any formal complaints
regarding the level of care they received from
Ms. Duis?
 A.   Please describe what you mean by filed a
formal complaint.
 Q.   Did they file something in writing about
a patient care issue with regard to Ms. Duis?
 A.   No.
 Q.   Are you aware of any patient complaints
during the time that you supervised Ms. Duis?  Are
you aware of any patient complaints regarding
Ms. Duis?
 A.   No.

Page 31

 Q.   Are you aware of any family members
complaining of patients complaining about Ms. Duis?
 A.   No.
 Q.   Is Jen Justice a nurse who reported to
you in April of 2019?
 A.   Reported to me did you say?
 Q.   Yes.
 A.   No.
 Q.   Do you know what position Jen Justice
held in April of 2019?
 A.   She was a registered nurse in the float
pool.
 Q.   When you say float pool, what does that
mean?
 A.   The float pool is a unit or is a group
of nurses that can go to any unit.  They float
throughout the hospital and they have a different
supervisor.
 Q.   So they are not necessarily working one
day -- one shift on the PCU, the ICU, they could be
working on any of these shifts?
 A.   They don't work -- they usually work any
unit.  They can work any unit that they're needed
at.
 Q.   And how many units are in the hospital?

Page 32

 A.   At that time?  I believe five nursing
units at that time.
 Q.   Okay.  Do you recall how often Jen
Justice worked in the PCU in April or May of 2019?
 A.   I do not.
 Q.   Did you ever discipline Jen Justice --
Strike that.
         Is a float nurse, do they still --
do you still have supervisory authority over float
nurses?
 A.   No.
 Q.   So if a float nurse does something wrong
in the ICU or PCU, who is the nursing manager that
would be involved in their discipline?
 A.   That would be Heather Wyatt.
 Q.   And back in April of 2019, what was
Heather Wyatt's position?
 A.   I believe she is a house supervisor and
she is also over the float pool.
 Q.   And you believe that in May of 2019
Heather Wyatt was the house supervisor over the
float pool; is that correct?
 A.   Over the float pool staff, yes.
 Q.   So have you ever disciplined Jen
Justice?

1  A.  No.
2  Q.  And approximately, I think we said this,
3  you supervised Ms. Duis for approximately two
4  months?
5  A.  Correct.
6  Q.  During the time period that you
7  supervise Ms. Duis, I understand you said you only
8  spoke to her two times, how many times did you
9  actually view her working?
10  A.  I can't remember.  I'm sorry.  I was
11  only on the night shift maybe three times and only
12  for a few hours, and I cannot even remember if
13  Ms. Duis was there.
14  Q.  So that means three times within those
15  two months you were on night shift?
16  A.  Right.
17  Q.  And she might not have even been working
18  during that time?
19  A.  Correct.
20  Q.  At some point was Ms. Duis suspended by
21  Franciscan?
22  A.  Yes.
23  Q.  And was Ms. Duis later terminated?
24  A.  Yes.
25  Q.  Prior to Ms. Duis being terminated, had

1  you ever been involved in issuing any written
2  counseling to Ms. Duis?
3  A.  I did write the reports up.  I gave them
4  to her with HR, and we reviewed them on the phone.
5  So face-to-face with Ms. Duis?  No.
6  Q.  So prior to terminating Ms. Duis, you
7  never issued her any written counseling, correct?
8  A.  Yes, I did over the phone with HR.
9  Q.  In writing?  You gave her something in
10  writing prior to termination?
11  A.  Okay.  I have to look at the form.  The
12  one we sat down and gave her over the phone, we
13  discussed the issues that we found were over the
14  phone delivered to her with human resources.
15  Q.  That was verbal, correct?  Verbally
16  you're saying?
17  A.  Yes.
18  Q.  Did you ever provide her anything in
19  writing prior to her termination --
20  A.  No.
21  Q.  -- regarding discipline?
22  A.  No.
23  Q.  Did you ever issue her any written
24  warning?
25  A.  No.

1  Q.  Did you ever issue her any final written
2  warning?
3  A.  No.
4  Q.  Prior to Ms. Duis being -- Prior to
5  Ms. Duis being suspended, had Ms. Duis told you
6  that she was pregnant?
7  A.  I can't remember that conversation if
8  she was pregnant, no.
9  Q.  Prior to Ms. Duis being suspended, did
10  you have any reason to believe she was pregnant?
11  A.  Say that again.
12  Q.  Prior to Ms. Duis being suspended, did
13  you have any reason to believe she was pregnant?
14  A.  Yes.
15  Q.  And what do you base that belief on?
16  A.  I believe I heard it from one of the
17  other staff.
18  Q.  Do you remember who that was?
19  A.  No.
20  Q.  Did Ms. Duis ever tell you she was
21  pregnant prior to her suspension?
22  A.  I can't recall that conversation.
23  Q.  So it's possible, but you just can't
24  remember?
25  A.  Yes.

1  Q.  Prior to Ms. Duis being suspended, did
2  Ms. Duis inform you that she expected to take
3  family medical leave for the birth of her child?
4  A.  No, I don't recall that conversation.
5  Q.  Prior to Ms. Duis being terminated, did
6  Ms. Duis inform you that she expected to take
7  family medical leave for the birth of her child?
8  A.  No.
9  Q.  Prior to her suspension, did Ms. Duis
10  ever inform you that she expected to take maternity
11  leave?
12  A.  No.
13  Q.  Prior to her termination, did Ms. Duis
14  ever inform you that she expected to take maternity
15  leave?
16  A.  No.
17  Q.  Did any other employee tell you that
18  Ms. Duis was expected to take maternity leave for
19  the birth of her child?
20  A.  I can't -- I cannot remember how I found
21  out Ms. Duis was pregnant or that there was nothing
22  specifically mentioned about her taking maternity
23  leave.  It's rather assumed when someone is
24  pregnant that they will take a maternity leave.
25  Q.  But you don't recall anyone ever telling

TARYN N. DUIS v.                    Cause No. 2:20-cv-00078-PPS-APR                    LINDA STEINHILBER
FRANCISCAN ALLIANCE, INC., et al.                                                                May 7, 2021
USDC IN/ND case 2:20-cv-00078-APR   document 32-6   filed 11/01/21   page 8 of 76

Page 41

1  patient satisfaction and customer service that is
2  described by you are on stage when you are at work
3  and you are happy and your personal issues are
4  under -- behind the scenes and it's creating a
5  pleasant environment for the patients.
6      Q.   In your time as a nursing manager, how
7  much time do you get to spend on the floor?
8      A.   Now or then?
9      Q.   Back then.
10     A.   Not -- I don't know.  It varied.  I
11 would say maybe two hours a day, maybe 30 minutes a
12 day.  It varied.
13     Q.   Did you ever hear nurses use foul
14 language?
15     A.   Yes, I did.
16     Q.   You have heard nurses use foul language?
17     A.   Yes.
18     Q.   If you hear a nurse under your
19 supervision, are those nurses disciplined for using
20 foul language?
21     A.   Are you asking me now or asking me then?
22     Q.   I'm asking you during your time as a
23 nursing manager at Franciscan.
24     A.   Yes, nurses are -- it is stopped.
25     Q.   Do they receive a written warning?

Page 42

1      A.   No.  Not every time, no.
2      Q.   Sometimes just hey, cut it out?
3      A.   Or inappropriate, yes.  If it's a
4  repeated offense then we take the next steps.
5      Q.   If it's a one-time issue and you are
6  walking by and they may say the F word, are you
7  normally going to give them a written warning for
8  that?
9           Again if they're sitting in a closed
10 area where no patients are hearing them and it's
11 the first time that I hear them, am I going to give
12 them a written warning?
13     A.   No.
14     Q.   Have you ever issued a written warning
15 to an employee underneath you at Franciscan for
16 foul language?
17     A.   No.
18     Q.   Do you have to be licensed to be a
19 registered nurse in the State of Indiana?
20     A.   Yes.
21     Q.   And are you familiar with the licensing
22 process?
23     A.   Pretty familiar, yes.
24     Q.   As part of that licensing, are nurses
25 required to meet certain acceptable standards of

Page 43

1  care?
2      A.   Yes.
3      Q.   As part of being a licensed nurse in the
4  State of Indiana, are nurses prohibited from
5  falsifying documentation of nursing actions?
6      A.   Yes.
7      Q.   As part of being a licensed nurse in the
8  State of Indiana, are nurses required to notify
9  their employer of any unprofessional conduct which
10 may jeopardize patient or client safety?
11     A.   Are they required to?
12     Q.   Yeah.
13     A.   I don't know that answer.  Does the
14 state law require that?  I don't know.
15     Q.   As being part of a licensed nurse, are
16 nurses required to notify their employee of
17 unprofessional conduct which may jeopardize patient
18 or client safety?  Do you know?
19     A.   I do not know.
20     Q.   Okay.  In April of 2019, did you ever
21 approach Ms. Duis and question her about whether or
22 not Ms. Duis had any problems with Dawn Smith?
23     A.   Did I approach her?  No.
24     Q.   Did you question Ms. Duis in April of
25 2019 whether or not she had any problems with

Page 44

1  Ms. Dawn Smith?
2      A.   I spoke to her on the telephone about
3  that.
4      Q.   Okay.  And what did you ask her?
5      A.   I asked her if she was okay after being
6  sent home in the middle of the night with a
7  whatever, anxiety attack.  I called her late in the
8  morning and asked her how she was.
9           I did ask her if she had issues with
10 or concerns about working with Dawn Smith, and if
11 she did, I told her she needed to go to human
12 resources.
13     Q.   Did any employee ever tell you that
14 Ms. Duis and Dawn Smith had a conflict at work that
15 previous evening?
16     A.   Yes.
17     Q.   What employee told you that?
18     A.   It was the night supervisor.
19     Q.   Who was that?
20     A.   I believe it was Connie Smith that
21 night.
22     Q.   So Connie Smith informed you that
23 Ms. Duis and Dawn Smith had a conflict at work?
24     A.   Yes.
25     Q.   And what did she say that conflict was?

TARYN N. DUIS v.
FRANCISCAN ALLIANCE INC., et al.
Cause No. 2:20-cv-00078-PPS-APR

GENA OSTENHILBER
May 7, 2021

Page 49

1    Q.   Okay.  So was this a meeting just
2  between you and Ms. Duis?
3    A.   I believe so.
4    Q.   Was it in a specific room in the
5  hospital?
6    A.   It was in my office.
7    Q.   Okay.
8    A.   It was an introduction meeting.
9    Q.   And were the two of you the only ones in
10 that meeting?
11   A.   I believe so.
12   Q.   So that would have occurred you think
13 sometime in March of 2019?
14   A.   That would have been my first meeting
15 with her so I would imagine sometime in March.
16   Q.   Early on in your tenure as nursing
17 manager?
18   A.   Yes.
19   Q.   Okay.  Did Ms. Duis ever inform you that
20 she would not tell a lie about Dawn Smith?
21   A.   No.
22   Q.   Did you ever tell Ms. Duis to lie about
23 Dawn Smith?
24   A.   No.
25   Q.   Did you ever tell Ms. Duis that she

Page 50

1  could not do her job because she was pregnant?
2    A.   No.
3    Q.   Did you ever meet with Ms. Duis and
4  Travis Curtis together in April of 2019?
5    A.   I cannot remember that meeting.  I'm
6  sorry.  I do not remember that.
7    Q.   Do you remember a meeting on April 19th,
8  2019 with Ms. Duis and Travis?
9    A.   I do not remember that meeting.
10   Q.   Did you ever instruct Ms. Duis to say
11 she had a fight with Dawn Scott [sic]?
12   A.   No.
13        MS. ROBERSON: Counsel, I think you
14 misspoke.  You keep saying Dawn Scott.
15 BY MR. FOX:
16   Q.   Dawn Smith.
17   A.   No.
18   Q.   In April of 2019, did you ever hold a
19 meeting with Ms. Duis to discuss Dawn Scott's
20 performance and/or behavior?
21   A.   Dawn Smith?
22   Q.   Dawn Smith.
23   A.   I'm sorry, I don't -- I'm sorry, I don't
24 remember that meeting.
25   Q.   Okay.

Page 51

1    A.   I do understand it happened, but I do
2  not remember that meeting.  I'm sorry.
3    Q.   Did you ever tell Ms. Duis to lie about
4  Dawn Smith?
5    A.   No.
6    Q.   When you say you don't recall a meeting
7  between Ms. Duis and Travis, are you stating that
8  you -- that it's possible that a meeting was held
9  but you just can't remember it?
10   A.   Yes.
11   Q.   Do you know a nurse by the name of
12 Lynette Durham?
13   A.   She left right when I got there so I
14 don't believe she ever worked for me, no.  I know
15 her face and that was it.
16   Q.   Did you ever speak with Ms. Durham?
17   A.   I think she told me right when I was --
18 right when I hired in that she was leaving.  That
19 was it.
20   Q.   Did you ever ask Ms. Durham questions
21 regarding Ms. Duis' performance or behavior?
22   A.   No.  No.
23   Q.   Do you know a nurse by the name of Kate
24 Lass (phonetic)?
25   A.   Yes.

Page 52

1    Q.   Did you ever ask Ms. Durham questions
2  regarding Ms. Duis' performance or behavior to Kate
3  Lass?
4    A.   I cannot recall exactly.  I might have.
5    Q.   It's possible but you can't remember?
6    A.   Yes.  Yes.
7    Q.   And you can't remember any specifics of
8  what you would have asked her?
9    A.   No.
10   Q.   Do you know a nurse by the name of
11 Allison Denny?
12   A.   Allison?
13   Q.   Alyssa Denny.
14   A.   She's not a nurse.
15   Q.   What is her position?
16   A.   She was a nurse's aide at that point.
17   Q.   Okay.  Did you ever speak with Ms. Denny
18 regarding Ms. Duis' performance or behavior?
19   A.   I can't remember that.  I'm sorry.  I
20 don't remember if I did.  I might have.
21   Q.   Do you know an employee, former employee
22 by the name of Kim Buchanan?
23   A.   Yes.
24   Q.   And what was Ms. Buchanan's position?
25   A.   I believe she was a PCA.

TARSHA DUINS v.
FRANCISCAN ALLIANCE INC., et al.

Case No. 2:20-cv-00078-PPS-APR

Case 2:20-cv-00078-APR document 32-6 filed 11/01/21 page 10 of 76

LINDA STEINHILBER
May 7, 2021

Page 53

1  Q.  Did you ever ask Ms. Buchanan questions
2  regarding Ms. Duis' performance or behavior?
3  A.  I don't remember even meeting
4  Ms. Buchanan so I don't think I ever spoke with
5  her.
6  Q.  You don't remember meeting Ms. Buchanan?
7  A.  No.  She was a night person who worked
8  very little and I don't remember even meeting her.
9  Q.  Did you have -- Did you know the day
10 shift nurses better than the night shift nurses?
11 A.  Yes.  Yes.
12 Q.  Do you know whether Ms. Buchanan was
13 terminated?
14 A.  I don't know if she was terminated or if
15 she was resigned.
16 Q.  If she was terminated, do you remember
17 any role that you had in her termination?
18 A.  She was -- it was reported she was
19 sleeping at night and that was reported also to --
20 I believe this is the right person I'm talking
21 about.  Again, sir, I'm sorry, I don't know these
22 people very well.  I didn't know them well.
23 Q.  As you sit here today, are you --
24 A.  I'm sorry?
25 Q.  Are you stating that there's a chance

Page 54

1  you've never spoken to Kim Buchanan?
2  A.  Face-to-face?
3  Q.  Yes.
4  A.  Yes.
5  Q.  It's also possible that you have spoken
6  to Kim Buchanan face-to-face?
7  A.  It could be.  I wouldn't know her if I
8  saw her today.
9  Q.  But you don't know if you've ever spoken
10 with her or not spoken with her, is that fair to
11 say?
12 A.  That's very fair to say.
13 Q.  And you don't know if she resigned or
14 was terminated?
15 A.  Correct.
16 Q.  And you do know that she was a PCA,
17 correct?
18 A.  Yes.
19 Q.  Did she report to you?
20 A.  Yes.
21 Q.  Was her direct supervisor you?
22 A.  Yes.
23 Q.  And was she your direct supervisee for
24 multiple months?
25 A.  No, not multiple months.  Again I hired

Page 55

1  in in March and I think she worked very little.  I
2  rarely -- I don't know how often she worked.  She
3  was not a full-time employee.
4  Q.  And if she did work, part of the reason
5  you wouldn't know would be because she worked
6  nights?
7  A.  Yes, and their shift was from 6:30 in
8  the evening to 6 in the morning and they would
9  leave by 6 in the morning before I was ever there.
10 Q.  Was Ms. Duis also a night shift?
11 A.  Yes, but they did not have the same
12 hours.
13 Q.  What was Ms. Duis' hours?
14 A.  They stayed until 7:30.
15 Q.  So you might have seen -- the other
16 nurses, when they stayed until 7:30, you would see
17 them sometimes in the morning?
18 A.  Correct.
19 Q.  And what time would you arrive at work?
20 A.  Around 7, quarter to 7.
21 Q.  You might see them for a half an hour?
22 A.  Correct.
23 Q.  And back in April and May of 2019, were
24 you working Monday through Friday?
25 A.  Yes.

Page 56

1  Q.  Okay.  Did you work Saturday and
2  Sundays?
3  A.  No.
4  Q.  And you would arrive at work you said at
5  approximately 7 o'clock?
6  A.  Correct.
7  Q.  How late would you normally work until?
8  A.  4, 5.
9  Q.  In May of 2019 are you aware that
10 Ms. Duis was suspended?
11 A.  Say that again.
12 Q.  In May of 2019, are you aware that
13 Ms. Duis was suspended by Franciscan?
14 A.  Yes.
15 Q.  Did you participate in the decision to
16 suspend Ms. Duis?
17 A.  Yes.
18 Q.  Did you inform Ms. Duis that she was
19 suspended?
20 A.  I believe I did.
21 Q.  Was that on a phone call?
22 A.  Yes.
23 Q.  Were you the only one on that call?
24 A.  No.
25 Q.  Who else was on that call?

Page 61

1  Jessica Smosna where you tell Ms. Duis that she's
2  pregnant, had you had any conversations with Dawn
3  Scott about Ms. Duis?
4     A.   Dawn Scott?
5     Q.   Yes.
6     A.   Or Dawn Smith?
7     Q.   Dawn Scott.
8     A.   Had I had any conversations with Dawn
9  Scott?
10    Q.   Yes.
11    A.   Say that again.
12    Q.   Who is Dawn Scott?
13    A.   The chief nursing officer.
14    Q.   Prior to suspending and informing
15 Ms. Duis that she was suspended, did you have any
16 conversations with Dawn Scott about suspending
17 Ms. Duis?
18    A.   I don't remember.
19    Q.   It's possible you didn't?
20    A.   Yes.
21    Q.   Do you have any recollection of you
22 having a conversation with Dawn Scott prior to
23 suspending Ms. Duis?
24    A.   I don't remember. I just know there
25 are steps that I can't remember all the steps I

Page 62

1  took.
2     Q.   Okay. And in terms of the reason for
3  Ms. Duis being suspended, why was she suspended at
4  that time?
5     A.   Finishing our investigation, which is
6  why we suspended her, and then pending the
7  statements we had received from staff.
8     Q.   Okay. Do you recall what specific
9  reasons why she was suspended?
10    A.   Withholding pain medication, the words
11 "I hate being a fucking nurse" stick in my mind. I
12 can't remember anything more at this point.
13    Q.   Okay. So in terms of you said with
14 regards to pain medication, what specifically was
15 wrong with pain medication?
16    A.   It was reported she stated to a
17 patient when a patient asked for pain medication,
18 that that patient "would fucking have to wait. He
19 should have taken it before when I offered it."
20    Q.   Did a patient -- Are you aware of any
21 patient complaining that they did not receive their
22 pain medication?
23    A.   I don't know. I don't know that. I
24 remember talking to the patient -- I'm incorrect,
25 not that patient. I looked in the patient's chart

Page 63

1  and there was a delay in receiving the medication,
2  but I did not speak to that patient.
3     Q.   How long was the delay?
4     A.   I can't remember, sir.
5     Q.   Did the patient complain?
6     A.   I don't know, sir.
7     Q.   Are sometimes patient's -- pain
8  medications for patients delayed because nurses are
9  busy with other patients?
10    A.   That could be. That could be true, yes.
11    Q.   Was it true in this case?
12    A.   Sitting at a computer? I don't know.
13    Q.   Who was sitting --
14    A.   I understand she was sitting at the
15 computer when that comment was made.
16    Q.   Okay. So sitting at a computer when the
17 comment was made, who told you this?
18    A.   That was one of the witness's statement.
19    Q.   Okay. Who was that witness?
20    A.   I would have to look at the --
21    Q.   You don't recall?
22    A.   No.
23    Q.   Okay. So exactly what is your
24 understanding as to the reasons, the best that you
25 can recall, that there was a delay -- There was a

Page 64

1  delay in a patient receiving a medication, correct?
2     A.   A delay or withholding.
3     Q.   You think she withheld purposely?
4     A.   Delay. I'm sorry, delay. Correct,
5  delay. The patient did receive the pain medicine.
6     Q.   And you don't know how much time went
7  by?
8     A.   No.
9     Q.   Was it ever reported to you that you
10 know how much time went by?
11    A.   Yes, when we looked at it in the
12 beginning I did remember. I don't know. I did
13 know. I don't know now.
14    Q.   Would that be an important fact to mark
15 down in any investigation?
16    A.   It might be. I just don't remember now.
17    Q.   So you believe there was a delay in pain
18 medication and then there was some statement made
19 by Ms. Duis?
20    A.   Yes.
21    Q.   What was that statement again?
22    A.   Something to the extent of he can
23 fucking wait for his medication. He should have
24 taken it when I offered it before.
25    Q.   Was that made in front of the patient?

Page 65

1    A.  No.
2    Q.  Who was it made in front of you?
3    A.  The nursing staff.
4    Q.  The nursing staff.  Do you know which
5  nurse in particular reported the statements to
6  you?
7    A.  I would have to look at the statements.
8    Q.  In terms of what lead to Ms. Duis'
9  suspension, how did this all start?  Did someone
10  come to you and say I witnessed this with Ms. Duis
11  or how did it begin?
12    A.  The investigation started because of the
13  reported incidents between Dawn Smith and Taryn
14  Duis.
15    Q.  Which Ms. Duis said didn't happen?
16    A.  Correct.  So that is the only thing that
17  started me even asking questions about Ms. Duis
18  from what I remember.  You know, I don't remember
19  the exact date.
20        One comment that started the
21  investigation to talk to all the nurses who were
22  there that night was the comment -- oh, and it was
23  Jen Justice, I'm sorry, I do remember who said the
24  patient -- her response to a patient wanting pain
25  medication was "he can fucking wait," as I said.

Page 66

1  That's what started me asking all of the nurses
2  what they saw and what they heard that evening.
3    Q.  So the investigation started because Jen
4  Justice came to you and told you that this
5  statement was made?
6    A.  Yes.
7    Q.  When did she tell you that?
8    A.  I can't give you that date.  I don't
9  recall.
10    Q.  Based upon what Jen Justice told you,
11  you decided to start an investigation?
12    A.  Correct.
13    Q.  Are you the one that started the
14  investigation into Ms. Duis?
15    A.  Yes.
16    Q.  Were you the one in charge of the
17  investigation into Ms. Duis as her nursing manager?
18    A.  Yes.
19    Q.  Okay.  And that investigation into
20  Ms. Duis that you were responsible for, that
21  investigation eventually lead to Ms. Duis'
22  termination?
23    A.  Yes.
24    Q.  And have you told me all the facts that
25  you recall that would give rise to the termination

Page 67

1  in terms of this incident with the pain medication
2  and this use of profanity and the nurses?  Was this
3  at the nurse's station I think you said?
4    A.  Yes.  The nurse's station is an enclosed
5  area where all the nurses sit so they are all
6  sitting there together.
7    Q.  So the patients weren't around there
8  when Ms. Duis made the statement, only the nurses
9  are?
10    A.  Correct.  Well, the patients are out in
11  the hallways, yes.
12    Q.  But no patient complained that Ms. Duis
13  was using profanity?
14    A.  No.
15    Q.  No patient ever complained that
16  Ms. Duis was using profanity to your knowledge,
17  correct?
18    A.  Correct.
19    Q.  And prior to Ms. Duis being suspended,
20  did you check with Travis Curtis about the
21  suspension?
22    A.  Yes.
23    Q.  And did you tell him what was relayed to
24  you at that time?
25    A.  What was relayed to me?

Page 68

1    Q.  By these witnesses.
2    A.  Yes, we went over all the documentation
3  together.
4    Q.  Prior to you calling her up with
5  Jessica Smosna and telling Ms. Duis that she was
6  suspended, how many witnesses had you talked to at
7  that point?
8    A.  I believe there was four, five,
9  whatever.  I can't tell you exactly.
10    Q.  Were those night nurses, night shift
11  nurses?
12    A.  Yes.
13    Q.  Which ones worked on the night of those
14  four or five?
15    A.  That night you would have to look at
16  them.  I would have to look at the dates.  I don't
17  know, sir.  Sir, I don't even know the exact date
18  that this happened.
19    Q.  In terms of you calling her to tell her
20  she's suspended?
21    A.  No.
22    Q.  But prior to the suspension -- I'm
23  trying to get -- all I'm trying to know -- It's
24  very simple.  All I'm trying to know is you
25  actually called her up with Jessica and suspended

Page 69

1    Ms. Duis, correct?
2        A.   Correct.
3        Q.   At that time what I want to know is what
4    information you had to suspend her and what you
5    just said was that you had talked to four or five
6    nurses prior to suspended her; is that correct?
7        A.   Correct.
8        Q.   Okay.  Who were these nurses?
9        A.   We can look at the witness statements
10   and those were the nurses.
11       Q.   Were those the only nurses you spoke
12   with?
13       A.   No.  I tried to talk to every nurse that
14   was on the evening of the alleged incident and
15   nurses that work with her.
16       Q.   Okay.  So besides the nurses that you
17   got statements from, you talked to other nurses,
18   correct?
19       A.   I would say yes, I usually do a wide
20   investigation.
21       Q.   I'm talking about this investigation
22   with regard to Ms. Duis.
23       A.   I can't remember, sir, exactly who I --
24       Q.   Is it possible you only talked to those
25   four or five nurses?

Page 70

1        A.   No, it is not.
2        Q.   What other nurses did you talk to?
3        A.   I can't remember, sir.
4        Q.   Would they have been the nurses on the
5    night shift?
6        A.   Yes.
7        Q.   Did you talk to Kim Buchanan?
8        A.   I don't remember ever talking to Kim
9    Buchanan.
10       Q.   Well, if she was on the night shift,
11   would you have talked to her during that shift?
12       A.   I guess I would have, but I don't ever
13   remember a conversation with Kim Buchanan.
14       Q.   Did you talk to any nurses that did not
15   provide a statement?
16       A.   Yes.
17       Q.   Who were they?
18       A.   I can't remember.
19       Q.   And why did they -- Did they refuse to
20   provide a statement?
21       A.   No.  They may not have heard the
22   situation.  They may not have witnessed the
23   situation.
24       Q.   Did any nurse that you talked to not
25   corroborate that Ms. -- Did any nurse that you

Page 71

1    spoke to with regards to this meaning, the
2    suspension into the termination, tell you that
3    Taryn was a good nurse?
4        A.   I don't remember.  I don't remember
5    nurses saying she was a good nurse.
6        Q.   Okay.  Did any of the nurses that you
7    talked to not corroborate the allegations that you
8    had against her from these other nurses?
9        A.   I would say -- Sir, I can't give you
10   names.  I do know that I talked to more nurses than
11   there were statements.
12       Q.   And those other nurses, did they have
13   any information to give?
14       A.   No.  About that incident, no.
15       Q.   And why not?
16       A.   Perhaps they didn't witness it or
17   perhaps they weren't in the nurse's station.  I
18   don't know.
19       Q.   So if I talked to one of these other
20   nurses that you have talked to outside of the ones
21   that gave you statements and said -- and that they
22   told you that these incidents did not occur, would
23   those nurses be lying?
24       A.   No.  If they said they did not witness
25   it, they did not witness it.

Page 72

1        Q.   But is it your testimony that you talked
2    to every nurse that could have possibly been a
3    witness?
4        A.   Not every nurse.  I'm sure I talked to a
5    group of nurses.  I don't know if I talked to every
6    nurse.
7        Q.   Can you name me one you talked to that
8    you did not get a statement from beside the ones
9    that actually gave you a statement?
10       A.   I would have to look at the assignment
11   sheet and look at the dates or look at the names of
12   who was there that night.
13       Q.   Did you speak with Yolanda LaTulip?
14       A.   Yes.
15       Q.   What did she tell you?
16       A.   She must not have given me a statement
17   because there's no statement from her.
18       Q.   Did you ask her to give you a statement?
19       A.   I'm sure I did.
20       Q.   Did she refuse?
21       A.   No.  She probably said she did not see
22   anything.
23       Q.   Is that what she said?  You said
24   probably.
25       A.   Sir, I don't know.

USDC IN/ND case 2:20-cv-00078-ARR document 132-6-5 filed 11/01/21 page 14 of 76 GINHILBER
May 7, 2021
FRANCISCAN ALLIANCE INC., et al.

Page 73

1   Q.  If you don't know --
2   A.  I do not know.
3   Q.  If you know, please answer.  If you
4 don't know, you can say you don't know, please.
5   A.  I don't know.
6   Q.  But you're positive you did talk to
7 Yolanda LaTulip about the allegations against
8 Ms. Duis?
9   A.  I am positive that everyone I talked to
10 who gave me a statement I wrote down that was a
11 statement that I needed to include.  If they did
12 not witness anything, I did not write a statement.
13   Q.  My question is:  Did you speak with
14 Yolanda LaTulip?
15   A.  Yes.
16   Q.  Did you speak with Dawn Smith regarding
17 the allegations against Ms. Duis?
18   A.  I can't remember discussing this with
19 Dawn Smith.
20   Q.  Did you speak with Kim Buchanan
21 regarding the allegations against Ms. Duis?
22   A.  Sir, I can't remember speaking to Kim
23 Buchanan.
24   Q.  Do you know what shift Christine
25 Rogalski worked on in April?

Page 74

1   A.  She works nights.
2   Q.  Prior to suspending Ms. Duis, did you
3 review her personnel file?
4   A.  No.
5   Q.  Prior to suspending Ms. Duis, had you
6 verbally counseled her with regard to any
7 performance issues?
8   A.  No.
9   Q.  Prior to her suspension, had you placed
10 Ms. Duis on any corrective action plan?
11   A.  No.
12   Q.  Prior to suspending Ms. Duis, had you
13 personally witnessed any performance problems of
14 Ms. Duis?
15   A.  No.
16   Q.  Prior to suspending Ms. Duis, had any
17 patients or families of patients complained about
18 Ms. Duis' work performance?
19   A.  No.
20   Q.  When you interviewed these individuals
21 with regards to their statement regarding Ms. Duis,
22 did you take notes?
23   A.  Yes.
24   Q.  Where are those notes?
25   A.  I no longer have them.  They were turned

Page 75

1 into HR.
2   Q.  Who in HR did you give the notes to?
3   A.  They were a complete folder when
4 Ms. Duis was terminated.  I don't know who took
5 them.
6   Q.  Who in HR?  Jessica?
7   A.  Probably.  Whoever is there when you
8 hand in a folder.  I don't know if it was Jessica.
9 I don't know if it was Nita.  I don't know.
10   Q.  Were these notes taken just of the
11 individuals that actually gave you a statement or
12 were there also notes in there of people that you
13 talked to but didn't provide a statement?
14   A.  I cannot remember.
15   Q.  Is it possible that you took notes of
16 people you talked to but didn't actually give you a
17 formal statement?  Is that possible?
18   A.  It's possible.
19   Q.  And did you physically deliver these
20 notes to HR?
21   A.  Yes, I believe so.
22   Q.  Are these notes handwritten?
23   A.  My notes?
24   Q.  Yes.
25   A.  There was very little -- There were very

Page 76

1 little handwritten notes.  They were written
2 statements by the staff.  Who had completed those
3 statements and signed them is what was taken down
4 to HR.  I had very few notes.
5   Q.  But you provided those notes to HR?
6   A.  Yes.
7   Q.  And those notes may or may not include
8 people that you talked to that did not provide
9 formal statements?
10   A.  Yes.
11   Q.  Prior to suspending Ms. Duis, had you
12 given her any written warning?
13   A.  No.
14   Q.  Prior to suspending Ms. Duis, had she
15 informed you that she was looking forward to
16 maternity leave?
17   A.  No.
18   Q.  Prior to suspending Ms. Duis, had she
19 told you -- prior to suspending Ms. Duis, had she
20 told you that she hated her job?
21   A.  No.
22   Q.  Prior to suspending Ms. Duis, had you
23 heard her use any foul language?
24   A.  Yes.
25   Q.  Prior to suspending her, you heard her

Page 77

1   use foul language?
2     A.   Yes.
3     Q.   What foul language was that?
4     A.   I can't remember the exact words, but I
5   did walk into the nursing station and we discussed
6   it as a group, it was not directed at Ms. Duis,
7   that she was one of the nurses on that shift who
8   did use foul language in there and we discussed
9   it --
10    Q.   Okay.  Would this be --
11    A.   -- as a group to them?
12    Q.   Do you know how soon before her
13  suspension that was?
14    A.   No.
15    Q.   There was multiple nurses using foul
16  language?
17    A.   Correct.
18    Q.   Do you recall the other nurses that used
19  foul language?
20    A.   No.
21    Q.   Did you actually hear Ms. Duis use foul
22  language?
23    A.   Yes.
24    Q.   Did you actually hear some of the other
25  nurses use foul language?

Page 78

1     A.   I cannot remember who it was.  I cannot
2   remember besides Ms. Duis, but I did talk to them
3   as a group.
4     Q.   Did any employee ever report to you
5   that they had witnessed Jen Justice sleeping on the
6   job?
7     A.   No.
8          MR. FOX: Let's take a short break.  Is
9   that okay?
10         (Whereupon, a short break in
11         the proceedings was taken.)
12         MS. ROBERSON: I think Linda wants to
13  correct one thing.
14         THE WITNESS: There was a Connie, the
15  supervisor's name is Connie Snow, not Connie Smith
16  that we referred to.  I think I might have
17  misspoke.
18  BY MR. FOX:
19    Q.   Do you recall in April of 2019 that you
20  and Travis met with Ms. Duis?
21    A.   I cannot remember that meeting.
22    Q.   Do you remember anything about that
23  meeting whatsoever?
24    A.   I cannot remember that meeting.
25    Q.   So do you claim the meeting never

Page 79

1   happened or that you have no memory of it?
2     A.   I cannot remember it.
3     Q.   Is there anything that would refresh
4   your memory as to that meeting?
5     A.   Perhaps the content of the meeting.  I
6   do not remember that meeting.
7     Q.   Do you remember a meeting where you
8   talked with Travis Curtis and Taryn where you
9   talked about whether Dawn Smith had attacked Taryn
10  or anything of that nature?  Does that refresh your
11  recollection?
12    A.   Again, sir, I'm sorry, I do not remember
13  that meeting.
14    Q.   This is going to be marked as
15  Exhibit 14.
16         (Document marked as Plaintiff's
17         Exhibit No. 14.)
18         Do you recognize what has been
19  marked as Exhibit 14?
20    A.   Yes.
21    Q.   What is Exhibit 14?
22    A.   These are the notes that we took in
23  during our conversation with Ms. Duis when we
24  suspended her, I believe.
25    Q.   Okay.  And so you called Ms. Duis and is

Page 80

1   this -- was Jessica also on the phone?
2     A.   Yes, Jessica and I were together.
3     Q.   And you called Ms. Duis?
4     A.   Yes.
5     Q.   And at that point you had made the
6   decision to suspend her?
7     A.   Yes.
8     Q.   That was based upon the conversations
9   you had with the employees?
10    A.   Yes, their statements.
11    Q.   Okay.  Do you know whether or not prior
12  to this -- This is May 9th, 2019.  Is that the time
13  that you suspended Ms. Duis?
14    A.   I would have to look at the date.  I
15  don't know.
16    Q.   If you look at Exhibit 14, it has a
17  date.  These are your notes.  It says called Taryn
18  Duis on --
19    A.   Correct.  Yes.
20    Q.   You called her on May 9, 2019?
21    A.   Yes.
22    Q.   At this point had you talked to the
23  witnesses?
24    A.   Yes.
25    Q.   Had you received statements from the

USDC IN/ND case 2:20-cv-00078-ARR document 78-16 filed 11/01/21 page 16 of 76

TARYN N. DUIS, .....                                                    JODY STEENHILBER
FRANCISCAN ALLIANCE INC., et al.                                          May 7, 2021

Page 81

1  witnesses?
2      A.  Yes.
3      Q.  And it says here in these notes, it says
4  "I feel I'm being targeted." Who said that?
5      A.  I believe Ms. Duis did.
6      Q.  Did she say why she felt she was being
7  targeted?
8      A.  I can't remember, sir.
9      Q.  It says, "I said I can't wait until
10  October." Do you see that?
11     A.  Yes.
12     Q.  Did you write that?
13     A.  This I don't believe was my handwriting.
14     Q.  Have you seen this before?
15     A.  Yes.
16     Q.  You don't know whether or not you wrote
17  this?
18     A.  This is not my handwriting. I believe
19  we decided this was Ms. Jessica's handwriting.
20     Q.  Okay. But does this refresh your memory
21  when she says, "I can't wait until October," what
22  that is in reference to?
23     A.  Yes.
24     Q.  What is it in reference to?
25     A.  I can't wait until October. We never

Page 82

1  discussed anything else.
2      Q.  She didn't discuss what was happening in
3  October?
4      A.  No.
5      Q.  She didn't discuss she was having a baby
6  in October?
7      A.  No.
8      Q.  I'm sorry, she didn't discuss that she
9  was having a baby in October?
10     A.  I don't remember her saying the words,
11  "I'm having a baby in October," no.
12     Q.  So prior to May 9th of 2019, is it your
13  testimony that she had never told you that she was
14  expecting a baby in October -- that Ms. Duis never
15  told you that she was expecting a baby in October
16  of 2019?
17     A.  Please repeat that.
18     Q.  Prior to May 9th, 2019, had Ms. Duis
19  ever told you she was expecting on having a baby in
20  October of 2019?
21     A.  I do not remember Ms. Duis telling me
22  she was having a baby in October of 2019.
23     Q.  Did anyone else tell you that Ms. Duis
24  was having --
25     A.  Yes.

Page 83

1      Q.  Who was that?
2      A.  I cannot remember who would have said
3  it.
4      Q.  Did someone say that prior to -- Did
5  someone say that to you prior to May 9th of 2019?
6      A.  Yes.
7      Q.  And you don't know who told you that?
8      A.  No.
9      Q.  Who told you she was suspended during
10  this call? Was that you?
11     A.  I don't remember.
12     Q.  After this call in -- after May 9th of
13  2019, after this call with Ms. Duis, is it your
14  testimony based upon looking at this note that you
15  also went through all the reasons why she was being
16  suspended?
17     A.  Yes.
18     Q.  And did she admit to any wrongdoing,
19  Ms. Duis?
20     A.  These were the responses we received.
21     Q.  One of responses said "I would work with
22  Linda to help move the unit forward." Is that
23  something Ms. Duis said?
24     A.  Yes.
25     Q.  And when she said, "I feel I'm being

Page 84

1  targeted," is that something Ms. Duis said?
2      A.  That's what the notes say, sir.
3      Q.  Is that what Ms. Duis said?
4      A.  That's what the notes reflect.
5      Q.  Do you recall Ms. Duis saying "I feel
6  I'm being targeted?"
7      A.  Sir, I remember very little of that
8  conversation, so I cannot remember her exact
9  words.
10     Q.  Okay. So do you recall anything
11  specifically about that conversation at all?
12     A.  I recall she asked a lot of questions.
13  She felt it was unfair. But I cannot remember the
14  specifics.
15     Q.  So you can't testify to any other
16  specifics on that call besides what you testified
17  today?
18     A.  And what we have in the notes.
19     Q.  Well, I just asked you something on the
20  notes and you said you cannot recall that?
21     A.  No, I said from the notes that is what I
22  recall. Say your question again.
23     Q.  Did she say -- well, for example, I
24  think I previously asked, did Ms. Duis say that she
25  would work with Linda to help move the unit

TARUN DUING
FRANCISCAN ALLIANCE INC., et al.

Cause No. 2:20-cv-00078-PPS-APR

USDC IND case 2:20-cv-00078-APR   document 32-6   filed 11/01/21   page 17 of 76

LINDA STEINHILBER
May 7, 2021

Page 85

1  forward? Did Ms. Duis say that?
2  A.   Yes.
3  Q.   And did Ms. Duis say she felt she was
4  being targeted?
5  A.   Yes, according to our notes. I don't
6  remember hearing those words. If you're asking me
7  right now do I remember her saying that, I don't
8  remember a lot of that conversation. When I look
9  at the notes --
10 Q.   Okay. After looking at the notes to
11 refresh your recollection, what do you remember of
12 this conversation?
13 A.   The notes state this is what --
14 Q.   You got to -- I'm sorry.
15 A.   I can look at these notes and state that
16 those are the replies we got from Ms. Duis.
17 Q.   Okay. But I just asked did she state
18 that Ms. Duis felt she was being targeted and you
19 said you can't remember.
20 A.   According to the notes, that is what
21 Ms. Duis stated.
22 Q.   I'm not asking what the notes say. I'm
23 asking what you remember her saying.
24 A.   I can't remember I'm saying it.
25 Q.   Okay. And all I'm asking is what do you

Page 86

1  recall her saying during this conversation.
2  A.   I recall her saying she would work with
3  Linda to move the unit forward. I recall her
4  saying -- I do recall her making the last comment,
5  "I don't know how me being frustrated at this time
6  can get me suspended." That's about all I can
7  remember from reading these notes.
8  Q.   Do you recall the next time you spoke
9  with Ms. Duis after this phone call?
10 A.   When we terminated her.
11 Q.   There was no intermediate call after
12 this conversation of May 9?
13 A.   No.
14 Q.   After you made this call to Ms. Duis,
15 what is the next thing you did with regards to the
16 investigation?
17 A.   We waited to make a decision and then we
18 informed Ms. Duis of our decision.
19 Q.   When you say "we", who is "we"?
20 A.   Myself and HR and Travis and Jessica.
21 Q.   And did you do any more investigation?
22 A.   No. No.
23 Q.   Did you at some point hold a termination
24 meeting with regard to Ms. Duis?
25 A.   Meaning calling her and terminating her?

Page 87

1  Q.   Meaning before making the final decision
2  to terminate her, did you hold a meeting with a
3  group of people?
4  A.   Yes.
5  Q.   Who was in that meeting?
6  A.   Human resources.
7  Q.   Who from HR?
8  A.   Nita Wirkus. I don't remember if
9  Jessica Smosna was there. And Travis.
10 Q.   Okay.
11 A.   That's all I can remember.
12 Q.   Was Dawn Scott there?
13 A.   I don't remember her being there.
14 Q.   Was that meeting held the same day that
15 Ms. Duis was terminated?
16 A.   I don't remember that.
17 Q.   Had you made the decision to terminate
18 Ms. Duis before that meeting was held?
19 A.   I had not.
20 Q.   Going into that meeting, did you believe
21 that Ms. Duis should be terminated?
22 A.   I don't believe I had any -- I don't
23 make that decision. It wasn't up to me.
24 Q.   Did you think she should be terminated?
25 A.   Yes.

Page 88

1  Q.   Did you tell them that you thought she
2  should be terminated during this meeting?
3  A.   No.
4  Q.   You did not give an opinion?
5  A.   I did give an opinion. I thought her
6  actions were unprofessional, but we talked about it
7  and we agreed, so I guess I would have said I'm
8  fine with it, the decision that she is being
9  terminated. I agree upon that.
10 Q.   Because you were in charge of the
11 investigation, correct?
12 A.   Not the termination, sir, the
13 investigation.
14 Q.   You were in charge of the investigation,
15 correct?
16 A.   Correct.
17 Q.   And then you relayed your findings of
18 the investigation to HR and to Travis?
19 A.   Correct.
20 Q.   Did you ever talk to Dawn Scott about --
21 A.   I cannot remember talking to Dawn Scott
22 about this. I can't. I might have, but I cannot
23 remember that.
24 Q.   Did anyone -- After you informed Taryn
25 Duis that she was suspended, did anyone from HR or

USDC IN/ND Case 2:20-cv-00078-ARR Document 82-6 filed 11/01/21 page 18 of 76
FRANCISCAN ALLIANCE INC., et al.
LINDA STEINHILBER
May 7, 2021

Page 89

1  management come to you and question you about
2  whether or not you were harassing Ms. Duis?
3      A.   No.
4      Q.   Did anyone at any time from HR or
5  management ask you whether or not you were treating
6  Ms. Duis differently because of her pregnancy?
7      A.   No.
8      Q.   Did anyone from HR or management ever
9  come to you and ask whether you had made any
10 discriminatory comments to Ms. Duis regarding her
11 pregnancy?
12     A.   No.
13     Q.   Are you aware of any investigation by
14 management, HR or anyone at Franciscan regarding
15 allegations that Ms. Duis had made against you?
16     A.   No.
17     Q.   No one came to you and said hey, have
18 you been harassing Ms. Duis or bullying her?
19     A.   No.
20     Q.   Did anyone make you aware that Ms. Duis
21 had complained that you were harassing her?
22     A.   No.
23     Q.   Did Dawn Scott ever come to you and say
24 that Ms. Duis had made a complaint about you
25 harassing her?

Page 90

1      A.   Yes.  Not before the day Ms. Duis went
2  to the hospital to meet with Dawn Scott.  She came
3  to my office and told me Dawn -- that Ms. Duis had
4  been there and that she was on her way to HR.  That
5  was the extent of our conversation.
6      Q.   She didn't tell you --
7      A.   No.
8      Q.   Let me finish my question, please.
9      A.   Sorry.
10     Q.   She didn't tell you any of the specifics
11 of her conversation with Ms. Duis?
12     A.   I believe the only thing she said was
13 Ms. Duis was making a complaint against me and she
14 was going to HR.
15     Q.   Did you ever hear anything else about
16 that complaint?
17     A.   No.
18     Q.   Did anyone from HR contact you with
19 regard to Ms. Duis making a complaint about you?
20     A.   I cannot remember if they shared
21 anything with me about it.  I doubt it.  I don't
22 remember that, sir.
23     Q.   Before Ms. Duis was suspended, did you
24 ever speak with Dawn Scott about suspending
25 Ms. Duis?

Page 91

1      A.   I do not remember speaking to Dawn Scott
2  about suspending Ms. Duis.
3      Q.   After Ms. Duis was suspended but before
4  Ms. Duis was terminated, did Ms. Scott ever discuss
5  with you Ms. Duis reporting that you had been
6  targeting her?
7      A.   No.  I don't believe I ever heard that,
8  no.
9      Q.   After suspending Ms. Duis but before
10 Ms. Duis was terminated, did Travis Curtis ever
11 report to you that Ms. Duis believed you were
12 harassing her?
13     A.   Please repeat that.
14     Q.   After suspending -- After Ms. Duis was
15 suspended but before Ms. Duis was terminated, did
16 Travis Curtis ever report to you that Ms. Duis had
17 reported that you had been harassing her?
18     A.   I don't remember anything like that,
19 no.
20     Q.   Or that you had been targeting her?
21     A.   No.
22     Q.   Did anyone ever at the time either
23 before Ms. Duis was suspended or up to Ms. Duis'
24 termination ever discuss you making improper
25 comments to Ms. Duis regarding her pregnancy?

Page 92

1      A.   No.
2      Q.   Prior to her suspension or up to her
3  termination, did anyone at Franciscan discuss with
4  you making improper comments to Ms. Duis regarding
5  her maternity leave?
6      A.   No.
7      Q.   What about with regards to family
8  medical leave?
9      A.   No.
10          (Document marked as Plaintiff's
11          Exhibit No. 15.)
12     Q.   I would like you to review Exhibit 15,
13 please.
14          MS. ROBERSON: Take your time.
15 BY MR. FOX:
16     Q.   Take your time.  My question is going to
17 be whether or not you've ever seen Plaintiff's
18 Exhibit 15.
19     A.   I don't believe I have seen this before,
20 no.
21     Q.   Prior to Ms. Duis being terminated, did
22 anyone at Franciscan ever come to you and tell you
23 that Ms. Duis had made a complaint that she was
24 being bullied or harassed by you?
25     A.   No.

USDC IN/ND   case 2:20-cv-00078-APR   document 32-6   filed 11/01/21   page 19 of 76
TARYN N. DUIS v.                              Cause No. 2:20-CV-00078-PPS-APR                    LINDA STEINHILBER
FRANCISCAN ALLIANCE INC., et al.                                                                May 7, 2021

Page 93

1    Q.   I'm going to ask:  Have you ever seen
2  what's been marked previously as Plaintiff's
3  Exhibit 6?
4    A.   Yes.
5    Q.   You have seen that?
6    A.   Yes.
7    Q.   When did you see it?  Was it after
8  Ms. Duis was terminated?
9    A.   Yes, this was in preparation.
10    Q.   Okay.  Did you review Exhibit 6 in
11  preparation for today's deposition?
12    A.   A few months ago, yes.
13    Q.   And you believe that Ms. Duis should
14  have been terminated?
15    A.   Professionally as a nurse, yes.
16    Q.   Have you made recommendations to
17  terminate other employees at Franciscan?
18    A.   No.  Oh, wait, I'm sorry.  Let me think
19  about that.  It's not a recommendation.  It's
20  following policy for attendance.  So I guess that's
21  not a recommendation.
22    Q.   Have you ever recommended -- Did you
23  recommend Ms. Duis be terminated?
24    A.   Yes.  I was part of the team, yes.
25    Q.   And you did recommend it?

Page 94

1    A.   I agreed with it.
2    Q.   Based on your investigation?
3    A.   Yes.
4    Q.   Has every employee who you recommended
5  termination at Franciscan been terminated?
6    A.   I guess.  I don't know.  I would imagine
7  yes.
8    Q.   After you suspended Ms. Duis during your
9  conversation with Jessica, did you talk to
10  witnesses after that?
11    A.   Not to my recollection, no.
12    Q.   Did you speak to Jen Justice regarding
13  Taryn Duis after her suspension?
14    A.   No.
15    Q.   It was only before?
16    A.   Yes.
17    Q.   What did Jen Justice tell you?
18    A.   Before.  Her statement is there.
19         MS. ROBERSON: I think it's been marked.
20  Is it 7?
21         MR. FOX: Oh, wait.  Maybe it is.  Hold
22  on.  Yeah.  Okay.
23  BY MR. FOX:
24    Q.   Take your time to review what has been
25  previously marked as Plaintiff's Exhibit 7.

Page 95

1         MS. ROBERSON: I do want to interject.  I
2  think you might have misinterpreted something that
3  she said.  I'm not positive, but she said she
4  reviewed this in preparation.  I don't think she
5  was referring to in preparation for the deposition.
6         MR. FOX: That's fine.
7         THE WITNESS: No, that's correct, for the
8  deposition.
9         MS. ROBERSON: Okay.  All right.
10         THE WITNESS: That was the first I had
11  seen that.
12         MS. ROBERSON: All right.
13  BY MR. FOX:
14    Q.   Are these the witness statements that
15  you collected with regards to Ms. Duis?
16    A.   Yes.
17    Q.   Okay.  And if we start off, were these
18  statements -- Who typed this up?  Let's start with
19  Page 31.
20         MS. ROBERSON: He is referring to the
21  Bates number.
22         MR. FOX: Bates stamp No. 31, first page.
23         MS. ROBERSON: The very bottom of the
24  page it says Franciscan 31.
25  BY MR. FOX:

Page 96

1    Q.   Who typed this statement up?
2    A.   I believe I typed these statements up
3  and gave them to -- strictly because I don't
4  believe staff has access to these, to the form.
5    Q.   So you received a statement from Jen --
6  you typed up this statement from Jen Justice?
7    A.   Correct.
8    Q.   The date of this alleged incident, was
9  that May 8 of 2019?
10    A.   That's what that states, yes.
11    Q.   And if you refer back to a previous
12  exhibit, your notes in terms of when Ms. Duis was
13  suspended, you suspended her on May 9th of 2019?
14    A.   Okay.
15    Q.   Is that correct?
16    A.   Yes.
17    Q.   And in this it says that is this Jen
18  Justice -- is this the statement that she provided
19  to you?
20    A.   These are her exact words.
21    Q.   Okay.  And it says at the bottom, it
22  says, "I was a witness to this phone conversation."
23    A.   Right.
24    Q.   Whose writing is that?  Is that Jen
25  Justice?

Page 105

1 employee Ms. Duis was because she was acting out in
2 a uniform fitting and she was reporting to me that
3 the employee was inappropriate in uniform fitting.
4     Q.   How was she inappropriate?
5     A.   She was upset about the fitting of the
6 uniform, she was lewd and argumentative with staff
7 assisting with fitting.
8     Q.   Is that all she told you?
9     A.   Yes.
10     Q.   Did you write a note regarding that?
11     A.   No, I asked her to write the statement.
12     Q.   And then you typed it up?
13     A.   Yes, and she signed it.
14     Q.   Okay.  And then did you speak with her
15 before Ms. Duis was suspended?
16     A.   I can't remember the date of this.  This
17 was brought to me.
18     Q.   Okay.  Did she tell you that Ms. Duis
19 was upset about the fit of the uniforms because
20 Ms. Duis was pregnant?
21     A.   No.
22     Q.   And so is it your testimony that the
23 exhibits here, the statements on Exhibit 7, these
24 were all conversations you had with people prior to
25 Ms. Duis being suspended?

Page 106

1     A.   That's what I believe, yes.
2     Q.   And then you later went back and then
3 had them sign the statements on May 14th of 2019?
4     A.   Yes.
5     Q.   And in terms of all of these interviews
6 the only people present in these interviews were
7 you and the individuals, correct?
8     A.   Correct.
9     Q.   HR wasn't present?
10     A.   Correct.
11     Q.   And was this what you brought with
12 you -- Did you have these at the time you went to
13 the termination meeting with Travis and HR?
14     A.   Yes.
15     Q.   And you provided copies of this to
16 them?
17     A.   They had their -- they saw the forms,
18 yes.
19     Q.   Do you recall anything -- From the time
20 that you suspended Ms. Duis to the time she was
21 terminated, do you recall anything else you did
22 with regards to your investigation?
23     A.   No, I did not do anything else.
24     Q.   So using -- so this is what you took
25 with you to present to the -- and based upon these

Page 107

1 statements, you believe that Ms. Duis should be
2 terminated?
3     A.   Those were not typed up yet when we met
4 about termination.  So we had our notes.  They
5 weren't in that formal --
6     Q.   So you had your notes, your handwritten
7 notes at the termination meeting?
8     A.   Yes.  Yes.
9     Q.   Did you provide Exhibit 7 to anyone
10 prior to terminating Taryn?
11     A.   Yes.
12     Q.   When was that?
13     A.   Before we suspended her, I believe, sir.
14 HR was fully aware of all of those statements
15 before Taryn was suspended.
16     Q.   If you look at what has been marked as
17 Plaintiff's Exhibit 8, do you recognize Plaintiff's
18 Exhibit 8?
19     A.   Yes.
20     Q.   And what is the date on Plaintiff's
21 Exhibit 8?
22     A.   5/14.
23     Q.   Okay.  And was that the date that
24 Ms. Duis was terminated?
25     A.   Again, sir, what was the date Ms. Duis

Page 108

1 was terminated?  I have to look it up.
2     Q.   I'm asking you.  If you turn to Page 3
3 on Exhibit 8, Bates stamp 30, is that your
4 signature?
5     A.   5/14, that was termination.  So let me
6 look, sir.  Again the date of the suspension --
7     Q.   She was terminated May 14th.
8     A.   Correct.
9     Q.   Your note was -- In terms of the
10 handwritten note, that was either written by I
11 think you said Ms. Jessica Smosna is dated May 9th
12 when she was suspended.
13     A.   Okay.
14     Q.   Do you have any reason to dispute that
15 Ms. Duis was terminated on May 14th?
16     A.   No.
17     Q.   Okay.  And in terms of that -- put that
18 aside for a second and look back at Exhibit 7, the
19 statements.
20     A.   Yes.
21     Q.   These statements were also signed on
22 May 14th of 2019, correct?
23     A.   Correct.
24     Q.   The same day that she was terminated,
25 correct?

Page 113

1    statements and signing them that occurred from the
2    time that Ms. Duis was suspended until she was
3    terminated?
4        A.   No.
5        Q.   Besides these statements from these
6    co-workers that are in Plaintiff's Exhibit 7, you
7    may have spoken with other employees to see what
8    they know, but you did not have them give a
9    statement, correct?
10       A.   After the suspension are you saying?
11       Q.   Either before or -- Well, no, before the
12   suspension you talked to other employees I think
13   was your previous testimony, correct?
14       A.   Correct.
15       Q.   But you didn't think that they had
16   information relevant to the investigation?
17       A.   Correct.
18       Q.   After the suspension, did you talk to
19   any employees?
20       A.   No.
21       Q.   Do you know whether or not you spoke
22   with every employee that worked on May 8, 2019 on
23   the night shift with Ms. Duis?
24       A.   Not for certain.  I believe I did but I
25   cannot say for certain.

Page 114

1        Q.   Can you specifically recall any
2    employees you spoke with regarding what they knew
3    or didn't know besides those employees that gave a
4    statement that are within Exhibit 7?
5        A.   Please say that again.
6        Q.   Can you remember the identity -- can you
7    recall the identity of any employees that you spoke
8    with regarding Ms. Duis before you suspended her
9    that aren't one of the employees that signed
10   this --
11       A.   Yes.
12       Q.   Who?
13       A.   Yolanda LaTulip.
14       Q.   Anyone else?
15       A.   No.
16       Q.   And did LaTulip not have any information
17   for you?
18       A.   Correct.
19       Q.   After you suspended Ms. Duis until the
20   time that she was terminated, did you speak with
21   Ms. Duis again that you can recall?
22       A.   No.
23       Q.   Were you on the -- in terms of
24   terminating Ms. Duis, was this in person or on the
25   phone?

Page 115

1        A.   It was on the phone.
2        Q.   Who was a member of that call?
3        A.   Nita Wirkus from HR, Travis Thatcher and
4    myself.
5        Q.   How long was that call?
6        A.   Five minutes.
7        Q.   Okay.  Did you ever ask Ms. Duis whether
8    she had any witnesses that would corroborate that
9    she was a good nurse or had a good attitude?
10       A.   No.
11       Q.   Did you ever ask Ms. Duis whether she
12   had witnesses that would contradict what was said
13   in Exhibit 7?
14       A.   No.
15       Q.   Did Ms. Duis admit the allegations that
16   these -- Did you ever go through specifically each
17   allegation against her in Exhibit 7 with Ms. Duis?
18       A.   That's what this phone call notes were
19   from.
20       Q.   The May 9, 2019?
21       A.   Yes.
22       Q.   And did she deny using profanity,
23   Ms. Duis?
24       A.   I can't remember.
25       Q.   Did she deny that a patient had to wait

Page 116

1    longer for pain medication?
2        A.   I can't remember.
3        Q.   After taking these -- Ms. Duis, before
4    she was terminated, never saw copies of these
5    statements, correct?
6        A.   No.
7        Q.   Did you ever allow Ms. Duis the
8    opportunity to formally reply to those statements?
9        A.   That's what this was.
10       Q.   When you say this, that was the May 9th
11   conversation?
12       A.   That's correct.
13       Q.   At the time she was first informed she
14   was suspended?
15       A.   Correct.
16       Q.   So she was suspended before she had any
17   chance to reply?
18       A.   No, that's -- before we suspended her,
19   that's what the conversation was.  These are her
20   replies to -- it was reported you stated and this
21   was her reply.  We went through all of those
22   statements.
23       Q.   During the May 9th, 2019 conversation
24   with Ms. Duis, did you inform her that she was
25   suspended?

USDC IN/ND case 2:20-cv-00078-APR document 32-6 filed 11/01/21 page 22 of 76

TARYN N. DUIS v.                    Cause No. 2:20-cv-00078-PPS-APR                    KIMBA STEINHILBER
FRANCISCAN ALLIANCE INC., et al.                                                      May 7, 2021

1    A.   Yes.
2    Q.   So in terms of any response that
3  Ms. Duis was able to give was done during that
4  conversation?
5    A.   Correct.
6    Q.   And you never followed up with her
7  beyond that?
8    A.   No.
9    Q.   Do you know who told Ms. Duis she was
10 terminated?
11   A.   I do not remember if it was Jessica or
12 myself.
13   Q.   Was Ms. Duis terminated in part because
14 she was excited about taking maternity leave?
15   A.   No.
16   Q.   During the course of the termination
17 call, did you ever inform Ms. Duis that she was
18 being terminated because she was going to take
19 maternity leave?
20   A.   No.
21   Q.   Did you overhear HR ever tell Ms. Duis
22 that she was being terminated because she was going
23 to take maternity leave?
24   A.   No.
25   Q.   Did you provide a copy of the

1  termination form to Ms. Duis?
2    A.   She wasn't present.
3    Q.   Okay.  So no?
4    A.   No.
5    Q.   But at the time you told Ms. Duis she
6  was terminated, had you already signed the
7  termination form?
8    A.   I don't know that, that it was signed
9  prior to.
10   Q.   You don't know if you had already signed
11 it before you told her?
12   A.   No.
13   Q.   So if we look back -- If you take a look
14 at Plaintiff's Exhibit 8.  Who typed up this form?
15 Was that you?
16   A.   I did, yes.
17   Q.   You typed it up?
18   A.   Yes.
19   Q.   It said here on what happened, it said
20 the PCA.  Who is the PCA, do you know?
21   A.   The statement says KB so I would imagine
22 that's Kim Buchanan.
23   Q.   Okay.  That a patient requested pain
24 medication and that there was delay in the patient
25 care, correct?

1    A.   Yes.
2        MS. ROBERSON: Take your time.
3        THE WITNESS: Yes.
4  BY MR. FOX:
5    Q.   And you say Taryn was consequently given
6  the opportunity to reply.  Is that your May 9
7  conversation?
8    A.   Yes.
9    Q.   And then Taryn stated she did not recall
10 making the statement, correct?
11   A.   Yes.
12   Q.   And then Taryn stated that she had not
13 seen anyone sleeping in the nurse's station.  Do
14 you know what that's in reference to?
15   A.   I would imagine we asked her if she had
16 seen Kim Buchanan sleeping.
17   Q.   And what did she say?
18   A.   She didn't know.
19   Q.   She didn't know?  That's from your
20 conversation on May 9th?
21   A.   Yes.
22   Q.   And it says, "Taryn stated she has said
23 I hate my job."
24   A.   Yes.
25   Q.   Is it against Franciscan policy to have

1  a bad day and say you hate your job?
2    A.   I wouldn't know that, sir.
3    Q.   You wouldn't know?
4    A.   I believe it's not the culture,
5  preferred culture.
6    Q.   Taryn stated she couldn't wait until
7  October to be on maternity leave, do you see that?
8    A.   Yes.
9    Q.   Is that something she said to you on the
10 May 9th conversation?
11   A.   I believe so.
12   Q.   And this is the -- in terms of the
13 action taken, this is the termination paperwork,
14 correct?
15   A.   This is when Taryn was suspended?
16   Q.   Action taken, it's marked termination,
17 correct?
18   A.   Yes.
19   Q.   You filled out -- this entire page on 28
20 was filled out by you, correct?
21   A.   Yes.
22   Q.   On May 14th of 2019?
23   A.   Yes.
24   Q.   Is it against Franciscan policy to be
25 excited for maternity leave, if you know?

Page 121

1    A.    I wouldn't know.
2    Q.    Do you admit that you interviewed staff
3    that did not provide a statement to you?
4    A.    Yes.
5    Q.    Okay.  You just don't know -- besides
6    Yolanda, that's the only one you can remember,
7    correct?
8    A.    I would have to look at the staffing
9    sheet.
10   Q.    Do you know if Kim Buchanan was
11   interviewed by you?
12   A.    I don't remember speaking to Kim
13   Buchanan.
14   Q.    Besides the incident on Exhibit 8, do
15   you know of Ms. Duis being poor in her work
16   performance in her role as a charge nurse?
17   A.    No.
18   Q.    With regards to patient care while you
19   were Ms. Duis' supervisor, is the only thing that
20   you are aware of with regards to patient care this
21   delay in pain medication?
22   A.    Yes.
23   Q.    Did you ever personally witness Ms. Duis
24   form nursing duties in an unsafe manner?
25   A.    No.

Page 122

1    Q.    I believe you testified previously that
2    you did not look back at her past evaluations
3    before terminating?
4    A.    No.
5    Q.    Did you ever tell her it was rude of her
6    to be excited for her maternity leave?
7    A.    No.
8    Q.    Have you ever used foul language while
9    at work at Franciscan?
10   A.    Yes.
11   Q.    Okay.  Have you used foul language in
12   front of co-workers at Franciscan?
13   A.    In a restricted area.
14   Q.    Have you used foul language in front of
15   employees that are under your supervision at
16   Franciscan in terms of profanity?
17   A.    No, not that I can recall.
18   Q.    You've only used foul language in front
19   of people that you report to or your peers?
20   A.    Peers.
21   Q.    Okay.  Have you ever been disciplined
22   for that?
23   A.    No.
24   Q.    In terms of profanity, have you ever
25   used with your peers the word fuck?

Page 123

1    A.    I don't know.
2    Q.    Maybe?
3    A.    Perhaps.
4    Q.    It's possible?
5    A.    Perhaps, yes.
6    Q.    Were you disciplined in any way if you
7    did?
8    A.    No.
9    Q.    Did you remember telling Ms. Duis that
10   she valued her unborn child over her job?
11   A.    No.
12   Q.    Can lying to a supervisor be grounds for
13   discipline at Franciscan?
14   A.    I would imagine.  I don't know.
15   Q.    Could it be grounds for termination?
16   A.    I don't know exactly.  I would imagine.
17   Q.    Are you -- Do you know whether or not
18   Christine Rogalski and Jen Justice are close
19   friends?
20   A.    I do not know that.
21   Q.    Did Ms. Duis ever inform you that she
22   would not be returning to work following maternity
23   leave?
24   A.    No.
25   Q.    Did any other employees inform you that

Page 124

1    Ms. Duis would not be returning to work following
2    maternity leave?
3    A.    No.
4    Q.    Did you ever mock Ms. Duis for being
5    pregnant?
6    A.    No.
7    Q.    Was Ms. Duis terminated in part because
8    she couldn't wait to be on maternity leave in
9    October?
10   A.    No.
11   Q.    Do you know why you said that Taryn --
12   Did you type Taryn stated she said she couldn't
13   wait until October to be on maternity leave?
14   A.    I see that.
15   Q.    You typed that?
16   A.    Yes.
17   Q.    Do you know whether or not Ms. Duis'
18   final performance evaluation met Franciscan
19   expectations?
20   A.    I do not know.
21   Q.    We'll turn to -- Do you recognize what
22   has been marked previously as Plaintiff's
23   Exhibit 10?  Have you ever seen Exhibit --
24   A.    Yes.
25   Q.    And is that the corrective action policy

USDC IN/ND case 2:20-cv-00078-APR document 32-6 filed 11/01/21 page 24 of 76
TARPY N. DUIS v.                    Cause No. 2:20-CV-00078-PPS-APR                    LINDA STEINHILBER
FRANCISCAN ALLIANCE INC., et al.                                                      May 7, 2021

| Page 125 | Page 127 |
|---|---|

Page 125

1 for Franciscan?
2    A.  Yes.
3       MR. FOX: Okay. Let's take a break:
4         (Whereupon, a short break in
5         the proceedings was taken.)
6       Back on the record.
7 BY MR. FOX:
8    Q.  This has been previously marked as
9 Plaintiff's Exhibit 9. Have you ever seen that
10 document?
11    A.  No.
12    Q.  Okay. At some point you believe Dawn
13 Smith was terminated?
14    A.  Pardon me?
15    Q.  Dawn Smith, was she terminated by
16 Franciscan at some point?
17    A.  Yes.
18    Q.  Do you recall what your role in that
19 termination was?
20    A.  I did the investigation after a patient
21 complaint.
22    Q.  Okay. And what was the reason that Dawn
23 was terminated?
24    A.  I would have to look at the
25 documentation, but I believe it was poor work

Page 127

1       MR. FOX: Yeah. Okay.
2 BY MR. FOX:
3    Q.  Had you worked with Dawn Smith prior to
4 being employed at Franciscan?
5    A.  Yes.
6    Q.  Was that at Porter?
7    A.  Yes.
8    Q.  At the time that Dawn Smith was
9 terminated, to your knowledge had Dawn Smith ever
10 reported that she was being discriminated against?
11    A.  No.
12    Q.  Do you know whether or not at the time
13 that Dawn Smith was terminated whether or not she
14 was pregnant?
15    A.  No.
16    Q.  Prior to Dawn Smith being terminated,
17 were you aware as to whether or not Dawn Smith had
18 ever complained about you?
19    A.  No.
20    Q.  Had anyone ever come to you and said
21 that Dawn Smith had complained about you?
22    A.  No.
23    Q.  During your time at Franciscan, had Dawn
24 Smith requested or taken leave under the Family
25 Medical Leave Act?

| Page 126 | Page 128 |
|---|---|

Page 126

1 performance.
2       (Document marked as Plaintiff's
3       Exhibit No. 16.)
4    Q.  If you take a look at what has been
5 marked as Plaintiff's Exhibit 16.
6    A.  Okay.
7    Q.  You never reviewed -- I think you
8 already testified that you never reviewed Ms. Duis'
9 past performance evaluations, correct?
10    A.  Correct.
11    Q.  Would you agree in terms of the format
12 of the performance evaluation, this is the
13 Franciscan Health --
14    A.  No, this is nothing I've seen. This is
15 not what I use.
16    Q.  This is not what you use in terms of the
17 evaluation, just the form?
18    A.  You have to remember, I've done two
19 years. The first year was not like this one at
20 all.
21    Q.  But regardless you've never seen
22 Plaintiff's Exhibit 16, correct?
23    A.  No.
24    Q.  In terms of Exhibit 11 --
25       MS. ROBERSON: No, that's --

Page 128

1    A.  No.
2    Q.  Prior to Dawn Smith's termination, had
3 you provided her with a written -- final written
4 warning?
5    A.  Yes, I believe I did.
6    Q.  Had you offered her written counseling
7 prior to her termination?
8    A.  I would have to look but I -- Can I look
9 at those corrective actions for Dawn?
10       (Document marked as Plaintiff's
11       Exhibit No. 17.)
12    Q.  If you turn to -- I'll go through these
13 real quick. If you turn to Bates stamp 181, on 181
14 on April 12th, did you receive this email from
15 Travis Curtis regarding Dawn Smith?
16    A.  Yes.
17    Q.  Okay. And he was letting you know that
18 she had received three complaints in the last two
19 weeks?
20    A.  Correct.
21    Q.  Okay. Do you dispute anything that was
22 said on Bates stamp Page 181?
23    A.  No.
24    Q.  Okay. And do you know whether or not
25 you confronted Dawn about these complaints that

Page 129

1  were brought to your attention?
2     A.   I can't remember.
3     Q.   Okay.  If you turn to Pages 182 and 183,
4  is this a statement -- take your time to read it if
5  you like.  Was this a statement that you received
6  from Dawn Smith?
7     A.   Yes.
8     Q.   Do you know why Dawn Smith provided you
9  that statement?
10    A.   Yes.
11    Q.   Was it in response to some discipline
12  she received?
13    A.   Discipline or complaints by a patient.
14    Q.   And did she provide you this statement
15  in --
16    A.   Yes.
17    Q.   That was a statement to rebut the
18  accusations against her?
19    A.   Yes, sir.
20    Q.   If you turn to the first page, Page 177,
21  first page of Exhibit 17, did you type this up?
22    A.   I would say yes.  Not a hundred percent
23  sure but I say yes.
24    Q.   If you turn to Page 179, it has your
25  signature?

Page 130

1     A.   Yes.
2     Q.   It's dated April -- your signature is
3  dated April 30th, 2019, do you see that?
4     A.   Yes.
5     Q.   It looks like on the first page, back to
6  177, the date the corrective action was issued it
7  states 4/26/2019.  Is that when you think you gave
8  Dawn Smith this?
9     A.   No, I think we gave her the corrective
10  action on the date 4/26 but that this was typed and
11  signed on the 30th.
12    Q.   Okay.  And this is not a termination,
13  correct?
14    A.   This is a final written.
15    Q.   And you gave het the final written
16  based upon the statement of facts that are written
17  here?
18    A.   Yes, that's correct.
19    Q.   Did you issue her the final written
20  warning?
21    A.   Yes.
22    Q.   And you believe she should have gotten
23  her final written warning?
24    A.   I believe I was in agreement that she
25  should have gotten the final written warning, yes.

Page 131

1     Q.   Did you do the investigation before this
2  final written warning was issued?
3     A.   Not all of this.  I don't believe all of
4  this was when I was there.  Yes, I did an
5  investigation about the patient complaint on 4/22.
6  That's what this is about, yes.
7     Q.   Well, it says like, for example, "on
8  4/11/2019 Dawn was called from the facility to
9  discuss an issue on the unit.  Dawn did not answer.
10  Voice mail left."  Were you involved in that?
11    A.   Yes.
12    Q.   And right above that on 4/19/2019,
13  "rounds were made by the manager in the PCU at
14  600."  Is that you?
15    A.   Yes.
16    Q.   Okay.  And then it looks like patient
17  and family -- is there anything on the statement of
18  facts that doesn't involve you?
19    A.   No.  You are correct, these are all
20  mine.
21    Q.   So you did this investigation?
22    A.   Yes.
23    Q.   And you believe that based upon your
24  investigation that a final written warning was
25  justified?

Page 132

1     A.   I did not make that decision.  I believe
2  on whatever they had prior to me and this because
3  she had complaints prior to me being there.
4     Q.   Who else made the decision to issue her
5  a final written warning?
6     A.   That would have been HR.  I don't make
7  those decisions, sir.
8     Q.   No, but you gave them -- Did you provide
9  HR with the statement of facts here?
10    A.   The information, yes.
11    Q.   And then who in HR made a decision for
12  the final written warning?
13    A.   That would be either Jessica -- probably
14  Nita or the VP.
15    Q.   Okay.  Did you believe -- Did you meet
16  with the VP about all the things you typed up?
17    A.   I don't remember if it was Jessica, the
18  manager or the VP at that point.
19    Q.   Is it your testimony you did not make
20  any recommendation for discipline?
21    A.   I believed a written warning was
22  sufficient -- was sufficient, but if they want to
23  do a final, that is their decision.
24    Q.   Okay.  So I guess my question to you is
25  this final written warning that the box is marked,

Page 133

1  okay, that has -- is that your initials?
2     A.   That it was changed?  Yes.
3     Q.   So originally were you thinking
4  suspension because that's marked out?
5     A.   I think it was in error.
6     Q.   Oh, okay.  But you agree that -- you
7  agree that she should be -- like that it should be
8  a final written warning, so like that was an error
9  on the suspension?
10    A.   Correct.
11    Q.   And that's why you initialed it?
12    A.   Correct.
13    Q.   Is it your understanding that you typed
14  all this up and in conjunction with HR believe that
15  a final written warning should be issued?
16    A.   Correct.
17    Q.   That's fair to say?
18    A.   Yes.
19    Q.   You were the one responsible for the
20  investigation, correct?
21    A.   Yes.
22    Q.   At the time that you issued the final
23  written warning, did you go back to Dawn's
24  personnel file?
25    A.   I did.

Page 134

1     Q.   And had she had other incidents of
2  misconduct?
3     A.   I do not remember, sir.  I don't
4  believe -- I can't remember.
5     Q.   Okay.  So these are documents that I
6  received from Franciscan.
7     A.   Okay.
8     Q.   And if you look at -- if you turn to
9  187, it says on summary statement, "Dawn met with
10  Travis Thatcher-Curtis to discuss performance
11  concerns and three patient complaints."  Do you see
12  that?
13    A.   Yes.
14    Q.   At the time that the decision to give
15  her the final written warning, you were aware of
16  that because he had emailed you about those,
17  correct?
18    A.   Yes.  Correct.
19    Q.   And then if you turn to Page 186, she's
20  on a final written warning but unfortunately for
21  Dawn, she is later terminated after another
22  incident, correct?
23    A.   I don't have a Page 186.
24    Q.   Bates stamp 186.
25         MS. ROBERSON:  No, there's not a 186.  I

Page 135

1  was trying to find out where that page was.
2         MR. FOX:  Hold on.
3         MS. ROBERSON:  I was thinking it was my
4  mistake.
5         MR. FOX:  No, here.  I need to change
6  that out.  Off the record.
7              (WHEREUPON, discussion was had
8              off the record.)
9  BY MR. FOX:
10    Q.   So turning to 186.
11         MS. ROBERSON:  It's just located after
12  189.
13  BY MR. FOX:
14    Q.   Do you see 186?
15    A.   Yes.
16    Q.   All right.  Now, you also typed up 186,
17  correct?
18    A.   Pardon me.
19    Q.   Did you type up 186 in terms of --
20    A.   Yes.
21    Q.   -- the facts?
22         So after she was given a final
23  written warning, she eventually was suspended after
24  something else came to light?
25    A.   Correct.

Page 136

1     Q.   And in terms of looking through
2  Plaintiff's Exhibit 17, do you recall anything else
3  with regard -- were you responsible for the
4  investigation into Dawn Smith that lead to the
5  final written warning and then eventually she
6  was -- the termination?
7     A.   Yes.
8     Q.   Okay.  And are these all the documents
9  that you recall regarding that investigation?
10    A.   Yes.
11    Q.   Okay.  And prior to Dawn Smith's
12  termination, you would agree that she had
13  previously had multiple patient complaints against
14  her that Travis brought to your attention?
15    A.   Correct.
16    Q.   And she had also had a previous
17  corrective action of a final written warning, is
18  that fair to say?
19    A.   Before her termination?
20    Q.   Yes.
21    A.   Yes.
22    Q.   Did you terminate Kimberly Buchanan?
23    A.   I don't know if she was terminated or if
24  she was resigned.
25    Q.   If you take a look at Plaintiff's

---

Page 145

1    Q.   With regards to Ms. Buchanan, do you
2  recall ever speaking to Ms. Duis and asking her
3  whether Ms. Duis had seen Ms. Buchanan sleeping
4  during that shift?
5    A.   I can't remember speaking to Ms. Duis
6  about that.
7    Q.   Have you ever asked an employee of
8  Franciscan who reported directly to you to lie
9  about another employee?
10   A.   No.
11   Q.   Do you know an employee by the name of
12  Megan Dexter?
13   A.   Megan Dexter?
14   Q.   Yes.
15   A.   Yes.
16   Q.   Is she an RN?
17   A.   Yes.
18   Q.   Is she within the PCU?
19   A.   Yes.
20   Q.   Did she report directly to you?
21   A.   Yes.
22   Q.   Okay.  So that would be the same as
23  Ms. Duis was?
24   A.   I don't think she worked very much.  I
25  probably only had maybe five interactions with her.

---

Page 146

1    Q.   Is Ms. Dexter still employed?
2    A.   I am not certain.
3    Q.   But at some point she did report
4  directly to you?
5    A.   Yes.
6    Q.   Do you know whether or not Ms. Dexter
7  was pregnant when she was reporting to you?
8    A.   Yes.
9    Q.   Did she take FMLA leave while she was
10  reporting to you?
11   A.   Yes.
12   Q.   Did you ever --
13   A.   Excuse me.  I don't know if it was when
14  I was still her manager.
15   Q.   Do you know whether you were still her
16  manager when she was pregnant?
17   A.   I think I was but I don't remember --
18   Q.   You are not sure?
19   A.   No, I was her manager.  I don't know if
20  I was her manager when she was on FMLA.
21   Q.   Had she ever reported that she or a
22  co-worker had been discriminated against?
23   A.   Ms. Dexter?
24   Q.   Yes.
25   A.   No.

---

Page 147

1    Q.   Did you ever formally discipline her?
2    A.   No.
3    Q.   Did she have any performance problems?
4    A.   No.
5    Q.   Did she have any problems with her
6  communication with her supervisors that you're
7  aware of?
8    A.   No.
9    Q.   Do you know whether or not you did a
10  performance appraisal for Ms. Dexter?
11   A.   I believe I did.
12   Q.   Do you know an employee by the name of
13  Daniela Mendoza?
14   A.   Yes.
15   Q.   Is she still an RN nurse within PCU?
16   A.   Yes.
17   Q.   Is she still employed?
18   A.   Yes.
19   Q.   Did she at some point report directly to
20  you?
21   A.   Yes.
22   Q.   Does she still report directly to you?
23   A.   No.
24   Q.   Has she ever been pregnant while she
25  reported to you?

---

Page 148

1    A.   No.
2    Q.   Has she ever reported that she or
3  co-workers had been discriminated against?
4    A.   No.
5    Q.   During your time reporting to you, she
6  has taken any FMLA leave time?
7    A.   No.
8    Q.   Have you ever formally disciplined her?
9    A.   No.
10   Q.   Has she had any performance problems
11  while she's been an employee under your
12  supervision?
13   A.   No.  I would say no.
14   Q.   Have you ever counseled her with regards
15  to any performance problems?
16   A.   No.
17            (Document marked as Plaintiff's
18        Exhibit No. 19.)
19   Q.   Do you recognize what has been marked as
20  Exhibit 19?
21   A.   Yes.
22   Q.   And is this a performance review that
23  you did for Daniela Mendoza?
24   A.   Yes.
25   Q.   And if you turn to page Bates stamp 144,

---

Page 149

1  it says here that Daniela could improve closing the
2  loop when identifying patient needs, change the
3  status or abnormal clinical findings. Is that
4  something that you printed up?
5      A.   Yes.
6      Q.   Okay. And what was wrong with Daniela
7  with regards to those?
8      A.   She just was a little -- I would say
9  missing a few details.
10     Q.   Had she had any patient complaints made
11 against her?
12     A.   No.
13     Q.   How do you know she was missing a few
14 details?
15     A.   Because I would listen to her during our
16 morning patient conferences, interdisciplinary
17 conferences, and this was one area that she could
18 improve on.
19     Q.   Did you ever formerly discipline her
20 because of this?
21     A.   No.
22              (Document marked as Plaintiff's
23              Exhibit No. 20.)
24     Q.   Do you know an employee by the name of
25 Nancy Georgakis?

Page 150

1      A.   Yes.
2      Q.   Is she an RN nurse within PCU?
3      A.   She was.
4      Q.   Did she report to you?
5      A.   Yes.
6      Q.   Okay. And is she still employed?
7      A.   No.
8      Q.   Did she resign?
9      A.   I don't know. She was there when I left
10 that unit.
11     Q.   Was she ever pregnant while she reported
12 to you?
13     A.   No.
14     Q.   Did she ever report that she or a
15 co-worker had been discriminated against while she
16 reported to you?
17     A.   No.
18     Q.   During her time as your direct
19 supervisor, did she take any FMLA leave?
20     A.   No.
21     Q.   Did you ever ask Ms. Georgakis -- I
22 think I asked this. Have you ever asked a nurse to
23 lie about another nurse or another employee of
24 Franciscan?
25     A.   No.

Page 151

1      Q.   Okay. Have you ever formerly
2  disciplined -- Did you ever formerly discipline
3  Ms. Georgakis?
4      A.   No.
5      Q.   Had she had any issues with performance
6  while you were a supervisor?
7      A.   She struggled with some of her body
8  language and time management. It was a very
9  challenging unit.
10     Q.   If you turn to Page 148. When you
11 say -- it says, "Nancy is improving with body
12 language and verbiage, having worked with peers to
13 improve outward presence." What is verbiage? What
14 do you mean by verbiage?
15     A.   Verbage [sic].
16     Q.   Yeah, verbage.
17     A.   She can sometimes sound curt. Instead
18 of saying things -- it was just the way she
19 presented herself, she sounded a bit rough instead
20 of kind or warm. She could just -- She could come
21 off a little gruff.
22     Q.   And that was with her communications
23 with patients?
24     A.   Mostly staff.
25     Q.   She was being rude?

Page 152

1      A.   Not rude. She just came across as
2  gruff.
3      Q.   Did you ever discipline her for that?
4      A.   No.
5      Q.   And with regards to the body language,
6  what did you mean when there was issues in terms of
7  improving her body language?
8      A.   She would sit very closed, very --
9  appear mad, facial expressions, those types of
10 things.
11         MS. ROBERSON: We're getting close again.
12         MR. FOX: I have 15 or 20 minutes. Do
13 you want to take a break?
14         MS. ROBERSON: If it's only 15 or 20
15 minutes, that's fine.
16 BY MR. FOX:
17     Q.   Do you know an employee by the name of
18 Samantha Sarna?
19     A.   Yes.
20     Q.   And is she an RN nurse within PCU?
21     A.   Yes.
22     Q.   And she reported to you at some point?
23     A.   Yes.
24     Q.   Is she still employed?
25     A.   Yes.

USDC IN/ND Case 2:20-cv-00078-APR Document 82-6 filed 11/01/21 page 29 of 76
FRANCISCAN ALLIANCE INC., et al.
LINDA STEINHILBER
May 7, 2021

1   Q.   And while she reported to you, was she
2 ever pregnant?
3   A.   No.
4   Q.   While she reported to you, did she ever
5 report that she and her co-worker had been
6 discriminated against?
7   A.   No.
8   Q.   During her time reporting to you, had
9 she ever taken FMLA leave?
10   A.   No.
11   Q.   Do you know whether you ever issued
12 discipline to Ms. Sarna?
13   A.   No.
14   Q.   Did Ms. Sarna ever have issues with
15 regards to attending meetings?
16   A.   I don't remember.
17   Q.   You don't recall?
18   A.   No, I don't remember.
19         (Document marked as Plaintiff's
20         Exhibit No. 21.)
21   Q.   Is this the evaluation you did for
22 Ms. Sarna?
23   A.   Yes.
24   Q.   It says maintain mandatory requirements
25 for nursing at meetings set by Franciscan Health

1   Q.   Okay. When she reported to you, was she
2 pregnant, if you know?
3   A.   No.
4   Q.   Had she ever reported that she or a
5 co-worker had been discriminated against?
6   A.   No.
7   Q.   Had she ever taken FMLA leave while she
8 reported to you?
9   A.   No.
10   Q.   Do you recall ever formerly being
11 involved in any form of discipline of her?
12   A.   Yes.
13         (Document marked as Plaintiff's
14         Exhibit No. 22.)
15   Q.   If you take a look at what has been
16 marked as Plaintiff's Exhibit 22 on Page 583, the
17 first page, is that your typed up statement?
18   A.   Yes, it is.
19   Q.   Did you provide her a written warning
20 based upon the statement of facts in this
21 statement?
22   A.   Yes.
23   Q.   And she received written counseling for
24 that?
25   A.   Yes.

1 Care, do you see that?
2   A.   Yes.
3   Q.   Did she have trouble attending some
4 meetings?
5   A.   They all had trouble attending some
6 meetings.
7   Q.   Were any of them disciplined?
8   A.   They were not disciplined.
9   Q.   Were these weekly meetings, monthly
10 meetings?
11   A.   Monthly meetings.
12   Q.   Do you know an employee by the name of
13 Melissa Roberts?
14   A.   Yes.
15   Q.   Is she an RN?
16   A.   Yes.
17   Q.   And did you supervise Melissa?
18   A.   Yes.
19   Q.   And is she still employed?
20   A.   No.
21   Q.   Was she terminated?
22   A.   No.
23   Q.   When she reported -- Did she voluntarily
24 resign?
25   A.   Yes.

1   Q.   Were you responsible for the
2 investigation into that statement?
3   A.   No.
4   Q.   That was investigated by a privacy
5 officer?
6   A.   Yes.
7   Q.   To the best of your knowledge,
8 everything in this first page is accurate?
9   A.   Correct.
10   Q.   And that was issued to her -- that's
11 your signature on Page 585?
12   A.   Yes.
13   Q.   And if we turn to Bates stamp 586, is
14 this also a corrective action form for Melissa
15 Roberts?
16   A.   Yes.
17   Q.   And did you type up this corrective
18 action statement?
19   A.   Yes.
20   Q.   And you believe that she made some
21 violations of Franciscan policy that's within the
22 statement of facts; is that correct?
23   A.   Yes.
24   Q.   And for this she was given a written
25 counseling?

TARYN N. DUIS v.
FRANCISCAN ALLIANCE INC., et al.
USDC (N.D. Ind.) Case 2:20-cv-00078-APR Document 82-6 filed 11/01/21   page 30 of 76
LINDA STEINHILBER
May 7, 2021

Page 157

1    A.   Yes, and also recommendation to EAP as
2  she was going through very difficult times with her
3  husband.
4    Q.   Okay.  And did you agree that this
5  should be written counseling?  Is that one of
6  the --
7    A.   This was the first step for me, yes.
8    Q.   Okay.  And based upon what was outlined
9  in the statement of facts, did you recommend that
10  she be given written counseling?
11    A.   Yes.
12    Q.   Okay.  And then HR signed off on that?
13    A.   HR agreed, yes.
14        (Document marked as Plaintiff's
15        Exhibit No. 23.)
16    Q.   Okay.  Take a look at what has been
17  marked as Plaintiff's Exhibit 23.  I think we
18  already talked about Samantha.  You did give her
19  some corrective action, correct?
20    A.   No, this is not mine.
21    Q.   This is not yours?
22    A.   No.
23    Q.   Are you aware of any -- It looks like if
24  we turn to the third page Mary Beth Bateman, do you
25  see that?

Page 158

1    A.   Yes.
2    Q.   You were not involved in this corrective
3  action form, correct?
4    A.   No.
5        (Document marked as Plaintiff's
6        Exhibit No. 24.)
7    Q.   Exhibit 24, were you involved in the
8  corrective action with Michelle Moran?
9    A.   No.
10    Q.   Is it your understanding in terms of
11  Mary Beth Bateman and yourself, that as a nursing
12  manager, one of the things for you is to complete
13  these forms what you believe is going to be the
14  discipline, these corrective action forms, and then
15  basically make sure that HR is aware of the
16  discipline and what happened so they can sign off
17  on that?  Is that fair to say?
18    A.   It's more than aware.  It's approval
19  from HR.  Managers do not recommend a level of
20  corrective action.
21    Q.   When is the box normally marked
22  corrective action form in terms of --
23    A.   When the group sits and meets.  If it's
24  something as simple as an attendance policy, it's
25  start from the beginning and go through.  If it's

Page 159

1  something that is egregious or something that is
2  patient safety, it is a discussion and that is
3  marked at the end of the conversation.
4        (Document marked as Plaintiff's
5        Exhibit No. 25.)
6    Q.   Do you recognize what's been marked as
7  Plaintiff's Exhibit 25?
8    A.   No, that's not mine.
9        (Document marked as Plaintiff's
10        Exhibit No. 26.)
11    Q.   Okay.  This is 26.  Do you recognize
12  what's been marked as Plaintiff's Exhibit 26?
13    A.   No.
14    Q.   That's not yours with regard to Nancy
15  Georgakis?
16    A.   No.
17        (Document marked as Plaintiff's
18        Exhibit No. 27.)
19    Q.   With regards to Plaintiff's Exhibit 27
20  which is Celeste Reed, were you the supervisor of
21  Celeste Reed with regards to the corrective action
22  form on Plaintiff's Exhibit 27?
23    A.   Yes.
24    Q.   You were?
25    A.   Yes.

Page 160

1    Q.   Okay.  And with regards to Celeste, were
2  you -- in terms of the first page, none of this is
3  signed, is it your understanding that a written
4  warning was given to Celeste Reed on or about
5  July 5th of 2019?
6    A.   No, she resigned.
7    Q.   She resigned?
8    A.   Yes.
9    Q.   Did she receive this warning?
10    A.   I couldn't tell you, sir.  She resigned.
11    Q.   Okay.  That is dated -- If you look to
12  Page 620, Celeste Reed, there's another corrective
13  action issue dated 7/11/2019?
14    A.   Uh-huh.
15    Q.   Did you type that up?
16    A.   Yes.
17    Q.   Did you provide both of these corrective
18  actions to Celeste Reed?
19    A.   Sir, from what I remember this day, this
20  lady called off, she worked very little, and if it
21  has her absentee days, she was either not there,
22  called off and resigned before she ever received
23  them.
24    Q.   Do you admit though under your
25  supervision she was issued both a written

Min-U-Script®

TARYN N. DUIS vs.
FRANCISCAN ALLIANCE INC., et al.

Cause No. 2:20-cv-00078-PPS-APR

LINDA STEINHILBER
May 7, 2021

Page 161

1  warning -- two written warnings, one on 7/5/2019
2  and one on 7/1/2019?
3     A.  Yes, but I don't think she ever received
4  them.
5     Q.  But you issued them?
6     A.  Yes, sir.
7     Q.  Okay.  And do you know whether or not
8  Ms. Duis was replaced?
9     A.  Yes, she was replaced with a nurse.
10    Q.  Was that nurse Wendy Polos?
11    A.  No.
12    Q.  Do you know who replaced her?
13    A.  Any nurse who filled the position.  She
14  did not have a charge nurse status.  I believe she
15  was just a regular RN on the floor.
16              (Document marked as Plaintiff's
17              Exhibit No. 28.)
18    Q.  What I have handed you, have you ever
19  seen this resume?
20    A.  Yes.
21    Q.  Do you know who replaced Taryn Duis or
22  whether she was replaced specifically?
23    A.  Her position was replaced, yes.  I can't
24  say it was with Wendy Polos.
25    Q.  Is it possible it was Wendy?

Page 162

1     A.  It could have been.  It could have been
2  any nurse that was hired after Ms. Taryn left.
3        MR. FOX: Let's take a short break.
4              (Whereupon, a short break in
5              the proceedings was taken.)
6        MR. FOX: I have no further questions.
7        MS. ROBERSON: I don't have any
8  questions.
9        THE COURT REPORTER: Do you want the
10 transcript?
11       MR. FOX: I'll call you or you can call
12 me.
13       MS. ROBERSON: We do want signature.
14              (The deposition ended at 3:55
15              p.m.)
16              (Signature reserved.)
17
18
19
20
21
22
23
24
25

Page 163

1
2              REPORTER CERTIFICATE
3     I, MARI BETH KAWULIA, a Certified
  Shorthand Reporter within and for the County of
4 Cook and State of Illinois, do hereby certify:
5     That previous to the commencement of the
  examination of the witness, the witness was duly
6 sworn to testify the whole truth concerning the
  matters herein;
7
8     That the foregoing deposition transcript
  was reported stenographically by me, was thereafter
9 reduced to typewriting under my personal direction
  and constitutes a true record of the testimony
10 given and the proceedings had;
11    That the said deposition was taken
  before me at the time and place specified;
12
    That I am not a relative or employee or
13 attorney or counsel, nor a relative or employee of
  such attorney or counsel for any of the parties
14 hereto, nor interested directly or indirectly in
  the outcome of this action.
15
  IN WITNESS WHEREOF, I do hereunto set my
16 hand this June 2, 2021.
17
18
19    _Mari Beth Kawulia_
   MARI BETH KAWULIA, CSR
20 C.S.R. No. 84-2873
21
22
23
24
25

Page 164

1
2              UNITED STATES DISTRICT COURT
3              NORTHERN DISTRICT OF INDIANA
                   HAMMOND DIVISION
4
  TARYN N. DUIS,              )
5                             )
       Plaintiff,             )
6                             )
  vs.                         )
7                             )  No. 2:20-cv-00078-PPS-APR
  FRANCISCAN ALLIANCE        )
8  INC., a/k/a                )
  FRANCISCAN HEALTH          )
9  CROWN POINT,               )
                             )
10      Defendant.            )
11
12       I hereby certify that I have read the
  foregoing transcript of my deposition given at the
13 time and place aforesaid, and I do again subscribe
  and make oath that the same is a true, correct and
14 complete transcript of my deposition so given as
  aforesaid, and includes changes, if any, so made by
15 me.
16
17              _____
                LINDA STEINHILBER
18
19 SUBSCRIBED AND SWORN TO
  before me this _____ day
20 of _____, A.D. 2020.
21
22    _____
       Notary Public
23
24
25



# Franciscan ALLIANCE

**EXHIBIT** P M S-7-21

# CORRECTIVE ACTION FORM
### Performance & Behavior Violations

| COWORKER NAME | EMPLOYEE ID# | DATE CORRECTIVE ACTION ISSUED |
|---|---|---|
| Dawn Smith | | 4/26/2019 |

| JOB TITLE | | DEPARTMENT # | DEPARTMENT NAME |
|---|---|---|---|
| RN | | | PCU |

## LIST PREVIOUS CORRECTIVE ACTIONS (WITHIN THE PREVIOUS 12 MONTHS)

| Date: NA | Type: | Reason: |
|---|---|---|
| Date: | Type: | Reason: |
| Date: | Type: | Reason: |

## ACTION TAKEN

*Some violations may be of such a serious nature, a level of corrective action may be bypassed, allowing for, up to and including, termination.*

| | | |
|---|---|---|
| ☐ Written Counseling | ☒ Suspension - 5/1/19 | (date) |
| ☐ Written Warning | ☐ Termination | (date) |
| ☒ Final Written Warning | | |

## REASON FOR THIS ACTION

| ☒ Unsatisfactory Work Performance | ☐ Breach of Duty | ☐ Falsification of Records |
|---|---|---|
| ☒ Unsatisfactory Work Behavior | ☐ Unsafe Work Conduct | ☐ Substance Abuse (use/possession/sales) |
| ☐ Policy/Rule Violation | ☐ Willful Damage of Property | ☐ Workplace Violence/Harassment |
| ☐ Insubordination | | |

## STATEMENT OF FACTS

**WHEN did it happen?** – *dates and times*
2019, and ▇ 2019

**WHERE did it happen?** – *specific location and department*
Patient Room

**WHAT happened?** – *be specific*

Patient and family requested to speak with the Manager on ▇ 19.
Patient ▇ stated she did not want Dawn as her nurse, stating she was afraid of her. ▇ stated Dawn had been her nurse on Thursday, ▇ 19, The patient states after she had been transferred to a different bed she told Dawn she did not like the feel or the sound of the bed. The patient stated, "Dawn came close to my face, and was yelling, telling me I had to stay in the bed or I would never walk again." The patient stated "I am afraid of Dawn, and don't want her to take care of me again."
Patients Son ▇ stated he was present on ▇ 19 when he had to go to the nurses station to inform Dawn his mother's BP was ▇ and had been rising over the past hour. ▇ stated Dawn did not come to the room to answer the alarms and after he informed Dawn of the blood pressure, Dawn did not get to his mother's room for 45-60 minutes to check on his mother. ▇ also stated he had informed Dawn his mother's potassium IV was burning her arm. ▇ said, Dawn replied "that's how it is, I can't do much for that." ▇ stated other nurses provided ice packs and decreased the IV rate, but Dawn did not offer any options. ▇ stated when he had encounters with Dawn, "she was short and non-responsive."
On ▇ 2019, rounds were made by the manager in the PCU at 0600. When I entered the nurses station, Dawn was the only nurse present at the nurses station and on her cell phone. Her assignment included rooms ▇ Findings included room ▇ IV alarming air in line, IV bag was dry, garbage on counters and sink area, a graduated cylinder filled with garbage and mucous on the bedside table, room countertops with used nursing supplies. Room ▇ garbage found on the bedside table, melted ice pack and dirty towels in the sink, garbage cans overflowing. Room ▇ garbage on the bedside tables, dirty linen on the sofa, opened supplies on counters. Room ▇ the patient found hypertensive, laying side way in the bed with legs over the side. Patient was soiled. Room dirty with used linen and open nursing supplies on the counter. Dawn remained at the nurse's station.
A written statement has been provided by Dawn. See attached email.
On 4/11/19 Dawn was called from the facility to discuss an issue on the unit. Dawn did not answer, voice mail left to call her manager. Dawn did not return the messages.
4/12/19 Dawn was called from the facility, message left to return call to her manager. No return call.
4/22/19 Dawn was called from manager's phone, message left to return call. No return call.
4/23/19 Dawn was called from manager's phone, message left for a return call and text was sent requesting the same. No return call or text.
4/26/19 Dawn was called via manager's cell phone with Dawn present. Dawn stated the number entered was correct, Dawn holding her phone verified the call was not ringing and had been blocked.
On ▇ 19 Dawn had met with Travis Thatcher- Curtis to discuss performance concerns and three complaints in the past two weeks

Form 1003.06F4

Duis v. Franciscan (2:20-CV-00078-TLS-APR)
Produced August 21, 2020

Franciscan000177
03/21/2019

regarding Dawn. Patients had previously requested Dawn not care for them after receiving care from Dawn, staff reported Dawn was lazy and not assisting her coworkers, and patient care was not being completed to standards. ( See attached email)

**HOW** were patients involved? *use epic ID# only*

Patients did not receive care within appropriate standards or within a timely manner. Patient reported she was afraid of Dawn was non responsive and short when requesting assistance. Patients have repeatedly requested Dawn not provide care for them after receiving care from Dawn.

**WHO** was involved? *names and titles*

## IDENTIFY POLICY/RULE THAT WAS VIOLATED

| Franciscan Mission & Values | Please Indicate Expected Behavior(s) That Were Violated |
|---|---|
| ☐ Respect for Life<br>☒ Fidelity to Our Mission<br>☒ Compassionate Concern<br>☒ Joyful Service<br>☐ Christian Stewardship | Provide compassionate care to all patients. Speak to patients and families with professional and kind words. Offer methods to relieve discomfort or pain. Respond promptly to patients needs and communicate any delays in care. Maintain clean, uncluttered surroundings for patients. Assist team members with patient care. |
| **Policy/Rule Name** | **Please Indicate Applicable Section(s) Directly From Policy/Rule That Was Violated** |
| | |

*This list is not an all-inclusive list of reasons*

## IDENTIFY AND EXPLAIN EXPECTATIONS – *not applicable if Termination*

CONFIDENTIAL
Form 1003.06F4
Duis v. Franciscan (2:20-CV-00078-TLS-APR)
Produced August 21. 2020
2 of 4
Franciscan000178
3/21/2019

Provide kind and compassionate nursing care to all patients and meet patient and family needs timely and with joyful service.
Participate as a team member with all staff and assist with coworkers needs. Dawn is to provide her patients with a clean, clutter free room and assist coworkers in maintaining a clean environment.
Respond to verbal requests and messages from her manager.
Arrange follow up meetings with manager bi-monthly and as directed.

**FOLLOW-UP PLAN** – *not applicable if Termination*

| | | |
|---|---|---|
| Is follow-up required? | ☒ Yes  ☐ No | Additional details for follow-up plan: Dawn will meet with Manager bi-monthly to discuss progress toward expectations.  Initial meeting week of May 13, 2019. Dawn is to initiate the meeting date and time. |
| Type: | | |
| Date: | Time: | |

*Report follow-up on follow-up action form*

**SUMMARY STATEMENT** – *if applicable*

Further reports of poor work performance or substandard work performance  may result in a final corrective action or termination as deemed appropriate.

**COWORKER ACKNOWLEDGEMENT AND COMMENTS**

I understand that any further violations or continued performance issues may result in corrective action, up to and including termination. If termination is being recommended, I understand my action/behavior has been deemed severable.  In signing this corrective action form, I acknowledge the fact that I have read and understand the foregoing statements. It does not necessarily mean that I agree with what is contained in this form.

☐ I agree with the information contained in this Corrective Action.

☒ I disagree with the information contained in this Corrective Action.

*Coworker must → complete this section*

_____ I was provided a <u>copy</u> of the policy/rule (if applicable) which was violated.
*Initials*

**Coworker Comments** – *if additional space is needed, use Coworker Statement of Facts Form*

Coworker Signature: _____  Date: _____

Supervisor Signature: _____  Date: 4/30/19

CONFIDENTIAL

Form 1003 0656

Franciscan000179

3/21/2019

Human Resources Signature: _Rita Wickus_   Date: _4/30/19_   ☐ Present at meeting
☒ Reviewed Document

HUMAN RESOURCES MUST REVIEW AND APPROVE WRITTEN WARNINGS AND ABOVE PRIOR TO THE MEETING
Distribution: One copy to coworker, one copy to supervisor and _original_ to Human Resources

everytime family had questions
I answered them right away.
Never yelled at pt was in room
multiple times addressing IV pump &
pts blood pressure.

I never recieved a phone call from
the facility line on April 11th
or 12th. I have my phone
records to prove that.

**Steinhilber Linda M**

| | |
|---|---|
| **From:** | Thatcher-Curtis Travis N - Franciscan Health Crown Point |
| **Sent:** | Friday, April 12, 2019 3:33 PM |
| **To:** | Steinhilber Linda M |
| **Subject:** | Dawn Smith |

19 – Met with Dawn Smith at the end of her shift to discuss performance concerns. Let her know that I had received three complaints in the last two weeks regarding her. The specifics of the concerns were that she was lazy, not assisting her coworkers, patient care was not being done to expected standards, and that patients she has been taking care of are requesting that she not be their nurse again. Dawn stated that she was shocked by this information and feels as if she is a team player that provides great care. I let Dawn know that I would be following up my interviewing patients following her shifts, and that I would be meeting with her again to share what I have found. No further discussion was had.

On Friday ▇▇▇▇ 2019, the nurses aides Kim Brown and Kim Buchanan moved the pt in ▇▇ onto a specialty sand bed per orders from wound care. Soon after Kim Brown came and told me the pt was complaining of pain and the noise from the bed. I looked on the pts MAR to see what I could give her for pain. I pulled a norco from the pyxis and took it to the pts room. I walked into the pts room and let her know that I brought her something for pain. She immediately got very short with me and stated I didn't ask for anything for pain. I told her that the aide had told me she was having pain and that was why I brought her something. She stated she was having pain but wasn't going to be taking anything for pain. She stated that she didn't like the bed it was too loud and that her hip was hurting. I told her that I had pain medication for her if she wanted it again she refused. She kept saying how she didn't like the bed. I educated pt on importance of the specialty bed due to the large purple wound on her bottom. She said that she wasn't comfortable on the bed and didn't like it and that she didn't care about the wound on her bottom or if it broke open. I told her that she needed to give it a try to save her skin from more break down. I told her if me and the aide couldn't get her repositioned to a comfortable position that we would move her back to the regular bed. She then agreed. I also offered her some Tylenol she agreed to that. She was also dirty so I told her I would get the aide and we would clean her up and reposition her to make her more comfortable in the bed. I got Kim Brown and gave the pt her Tylenol and me and Kim cleaned her up and repositioned her until she was comfortable and able to fall asleep. I rechecked on her 20 min after we repositioned her and she

was fast asleep. She slept for about 3.5 hours until respiratory therapy woke her up to give her a breathing treatment. After the breathing treatment she started complaining about the bed once again and she was dirty. I told her that me and Kim would clean her up again and reposition her again and that if we were unable to get her comfortable a second time we would move her to the other bed. We repositioned her and cleaned her up. I asked her if she was comfortable and she said yes. I told her I was glad that we were able to get her comfortable again. She said thank you and I told her you're welcome and asked her if there was anything else I could do for her she said no. I told her I would be back to check in on her and left the room. I rechecked her in 20 minutes and she was fast asleep. When I gave report to the day shift nurse she was still sleeping, and appeared comfortable.

I didn't once get in her face I stood by her bed each time. I never yelled at her, I just explained the reasons for the specialty bed.

Dawn Smith

PCU

Date: 4/18/19

Shift: 11p - 7a

| Vocera | Room Assignments | RN |
|--------|------------------|-----|
| 1699 | | CHARGE NURSE Taryn Duis |
| 1700 | | Dawn Smith |
| 1701 | | Yolanda LaTulip |
| 1702 | | Leah Coffey |
| 1924 | | |
| 1925 | | |
| 2393 | | |

| Vocera | Room Assignments | PCA |
|--------|------------------|-----|
| 1703 | | Roiff |
| 1704 | | Davids |

| Standby | |
|---------|---|
| Float | Anna Basham - ICU |

| ICU Code Nurse | | |
|----------------|---|---|
| PCU Code Nurse | Taryn Duis | |

CONFIDENTIAL
Duis v. Franciscan (2:20-CV-00078-TLS-APR)
Produced August 21, 2020
Franciscan000184



Cluttered Dirty
Garbage on bedside table

Room sink filled c̄
Towels, old ice pack — Garbage bedside
table
Dirty Laundry
Pt confused Bp 183/90 97
— Air in line

— Garbage in Room.
— Garbage on counters
— Started Bedpan in sink
— Garbage on bedside table

Supplies — Needles on Sink
Counter
Dirt
- OK
- OL

**Franciscan ALLIANCE**

## CORRECTIVE ACTION FORM
Performance & Behavior Violations

| COWORKER NAME | EMPLOYEE ID# | DATE CORRECTIVE ACTION ISSUED |
|---|---|---|
| Dawn Smith | | |

| JOB TITLE | DEPARTMENT # | DEPARTMENT NAME |
|---|---|---|
| RN | 6260 | Progressive Care |

### LIST PREVIOUS CORRECTIVE ACTIONS (WITHIN THE PREVIOUS 12 MONTHS)

Date: 4/26/19    Type: ~~Suspension~~ Final Written Warning Reason: Behavior/Work Performance

Date:    Type: 8/1/19    Reason:

Date:    Type:    Reason:

### ACTION TAKEN

Some violations may be of such a serious nature, a level of corrective action may be bypassed, allowing for, up to and including, termination.

- [ ] Written Counseling
- [ ] Written Warning
- [ ] Final Written Warning
- [ ] Suspension: _____ (date)
- [X] Termination _____ (date)

### REASON FOR THIS ACTION

- [X] Unsatisfactory Work Performance
- [ ] Unsatisfactory Work Behavior
- [ ] Policy/Rule Violation
- [ ] Insubordination
- [ ] Breach of Duty
- [ ] Unsafe Work Conduct
- [ ] Willful Damage of Property
- [ ] Falsification of Records
- [ ] Substance Abuse (use/possession/sales)
- [ ] Workplace Violence/Harassment

### STATEMENT OF FACTS

**WHEN** did it happen? – *dates and times*
10

**WHERE** did it happen? – *specific location and department*
ICU Patient rooms

**WHAT** happened? – *be specific*

Nurse receiving patients and follow Dawn Smith on ▓ 19 brought several patient issues and a patient complaint to the nurse manager.

See coworkers statement attached.

**HOW** were patients involved? *use epic ID# only*

Substandard patient care and not following nursing standards with patient care.

**WHO** was involved? *names and titles*

Dawn Smith
Olivia Brown

CONFIDENTIAL    Duis v. Franciscan (2:20-CV-00078-TLS-APR)    Franciscan000186
Form 1003.06F4    Produced August 21, 2020    03/21/2019

## IDENTIFY POLICY/RULE THAT WAS VIOLATED

| Franciscan Mission & Values | Please Indicate Expected Behavior(s) That Were Violated |
|---|---|
| ☐ Respect for Life<br>☒ Fidelity to Our Mission<br>☒ Compassionate Concern<br>☒ Joyful Service<br>☐ Christian Stewardship | |
| **Policy/Rule Name** | Please Indicate Applicable Section(s) Directly From Policy/Rule That Was Violated |
| | |
| | |
| | |

*This list is not an all-inclusive list of reasons*

## IDENTIFY AND EXPLAIN EXPECTATIONS – *not applicable if Termination*

NA

## FOLLOW-UP PLAN – *not applicable if Termination*

Is follow-up required?   ☐ Yes   ☒ No       Additional details for follow-up plan:

Type:

Date:              Time:

*Report follow-up on follow-up action form*

## SUMMARY STATEMENT – *if applicable*

19 Dawn met with Travis Thatcher Curtis to discuss performance concerns and three patient complaints. (see attached email and previous corrective action)

4/26/19 Suspension for unsatisfactory work performance and professional behavior. Final Written Warning 26/ 85

5/3/19 Suspended for investigation of poor patient care and substandard nursing practice.

5/13/19 Termination related to multiple episodes of poor patient care and substandard nursing practice.

98/ KS

Duis v. Franciscan (2:20-CV-00078-TLS-APR)
Produced August 21. 2020
Franciscan000187

Form 1003.06F4

3/21/2019

## COWORKER ACKNOWLEDGEMENT AND COMMENTS

I understand that any further violations or continued performance issues may result in corrective action, up to and including termination. If termination is being recommended, I understand my action/behavior has been deemed severable. In signing this corrective action form, I acknowledge the fact that I have read and understand the foregoing statements. It does not necessarily mean that I agree with what is contained in this form.

☐ I agree with the information contained in this Corrective Action.

☐ I disagree with the information contained in this Corrective Action.

_____
Initials

I was provided a <u>copy</u> of the policy/rule (if applicable) which was violated.

**Coworker must**

← **complete this section**

**Coworker Comments** – *if additional space is needed, use Coworker Statement of Facts Form*

---

Coworker Signature: _____

Supervisor Signature: _____ Date: 5/14/19

Human Resources Signature: _____ Date: _____

☐ Present at meeting
☐ Reviewed Document

HUMAN RESOURCES MUST REVIEW AND APPROVE WRITTEN WARNINGS AND ABOVE PRIOR TO THE MEETING
*Distribution: One copy to coworker, one copy to supervisor and <u>original</u> to Human Resources*

CONFIDENTIAL

Form 1003.06f4

Duis v. Franciscan (2:20-CV-00078-TLS-APR)
Produced August 21, 2020

Franciscan000188

3/21/2019

# Franciscan
ALLIANCE

**COWORKER STATEMENT OF FACTS FORM**

Please complete statement within 48 hours of incident/occurrence and submit to Human Resources.

| Name of Person Submitting Statement | Employee ID | Department # | Department Name | Phone # |
|---|---|---|---|---|
| Olivia Brown | | Progressive Care | | |

**Description of Incident/Occurrence**

| WHEN did it happen? – *dates and times* | WHERE did it happen? – *specific location and department* |
|---|---|
| ▮19 | ICU |

**WHO** was involved? – *names and titles*

Patients in room ▮▮▮ in ICU. Intermediate Care patients

**WHAT** happened?

Dawn Smith had floated to ICU and cared for 3 Intermediate patients.
Olivia followed Dawn Smith on day shift ▮▮ 19. The following was found by Olivia:
Patent in ▮ Oxygen saturation in the low ▮▮ on high flow O2. The patient was in obvious distress according to Olivia. The patient had a NG in her right nare, Dawn told Olivia the patient had pulled it most of the way our that night, so she put it back in and did not check placement. Olivia stated she had placement checked and the NG was in the lung.
There were feces on the bed rail and the floor.
Olivia reported all three rooms were disgusting and all three patients did not receive their baths.
The second patient she received from Dawn was a post CABG, and Olivia states the patient shared Dawn would not help the patient get up to use the commode. The patient was very upset he was unable to get up to the commode.

Did **patients** hear or witness the incident/occurrence? If yes, how were patients involved? – *identify patients using Epic ID # only*

Please provide names of any other **witnesses** to this incident/occurrence

**Signature and Acknowledgement**

I acknowledge that the information provided is true and accurate. I understand that in submitting a false claim or making false statements, I may be subject to corrective action up to and including termination.

Signature: *Olivia Brown RN*                                              Date: 5/14/19

**Received By**

Signature: *Linda Stankey Rn*   Title: 5/14/19 *Manager*   Date Received:

Form 1003.0653

CONFIDENTIAL

14

Upon coming onto my shift I got on my patients Friday morning I recieved [redacted] Am [redacted] from the same Nurse. was found w/o her juice of I put it on & she was sitting in the low on 4 she was sitting had low on high flow NC. She had an NG in her @ role. I was told the patient pulled it MAY of the way out that night So she put it back in & did not chart placement. I had placement Checked 1 the NG was in her [circled] luvs. There was poop all over her bedrail and floor. And the patient was in obvious distress. My second patient

She would not help him get up to the commode. All three patient[s] did not recieve their bath and rooms were disgusting. Km peri area was covered in feces. was also feces on here cath. tubing. The CABG pt was very [redacted] that he was unable to get up to use the bathroom. I was Unable to catch up on everything I had to fix until 1130pm.

CONFIDENTIAL

Franciscan000190



## PERFORMANCE APPRAISAL

**Appraisal Score**

**Overall Score: 2.3 / 3.0**

## EMPLOYEE IDENTIFICATION

Name: Daniela Mendoza

Manager: Linda M Steinhilber

Job Title: P01-501064 Registered Nurse

Department: P01-6260 Progressive Care

Employee ID: 168320

Department ID:

Last Review Date: 7/9/18

Hire Date: 3/3/19

## REVIEW PERIOD: August 1, 2018 to July 31, 2019

Evaluated By: Linda Steinhilber

Job description being evaluated: Registered Nurse (501064)

**EXHIBIT**
P-19
5-7-21

## SECTION I: FRANCISCAN VALUES

Considering each of the Franciscan Values (Respect for Life, Fidelity to our Mission, Compassionate Concern, Joyful Service, and Christian Stewardship), indicate below whether these values were demonstrated and upheld during the course of this evaluation period.

| Competency | |
|---|---|
| Franciscan Alliance Values < Click for scoring definitions | Meets |

Comments/
Opportunities for
Improvement

Duis v. Franciscan (2:20-CV-00078-TLS-APR)          Franciscan000142
Produced August 21, 2020
https://global.hgncloud.com/franciscan/eAppraisal/SignedAppraisal?surv_id=50349&form...   8/17/2020

# SECTION II: JOB SPECIFIC COMPETENCIES

Score: 1.5 / 3.0

| Competency | Comments: | | Score |
|---|---|---|---|
| **Nursing Practice / Standards of Practice** • Practices nursing according to the organization and established nursing philosophies and standards of care set by state board of nursing, state nurse practice act, and other governing agency regulations. Evaluates one's own nursing practice in relation to professional practice standards and guidelines, relevant statutes, rules, and regulations. | | Fully Satisfactory | 2.0 |
| **Compassionate Care** • Establishes a compassionate environment by providing emotional, psychological, and spiritual support to patients, friends, families, and coworkers. | | Fully Satisfactory | 2.0 |
| **Collaboration & Patient Experience** • Collaborates with patients and their families, (and or primary caregiver) as well as members of a multidisciplinary team, to ensure optimal patient outcomes and enhancement of the patient experience. | look at the holistic need of the patient and address needs in rounds. | Needs Improvement | 0.0 |
| **Patient Assessment** • Assesses, collects, and analyzes comprehensive objective, subjective, psychosocial, and cultural data pertinent to patient condition. Plan of care is developed and implemented in collaboration with the patient and family. Ensures the plan of care is continually reviewed and revised as the patient's condition warrants. | | Fully Satisfactory | 2.0 |
| **Plan of Care Implementation** • Prioritizes and implements the identified plan, coordinates care delivery, employs interventions to improve patient outcomes while providing a safe, respectful, and ethical practice environment. | | Fully Satisfactory | 2.0 |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **Patient's Assessment/Ongoing Reassessment Communication** • Communicates timely changes in patient's assessment/ongoing reassessment to providers that warrant consideration and/or a change in the plan of care and maintains and coordinates communication with all members of the multidisciplinary team to facilitate safe transitions and continuity in care delivery. Maintains continuity among nursing teams by documenting the assessment, plan of care, interventions, and responses to care in the electronic medical record in a timely manner. | Daniela could improve closing the loop when identifying patient needs, changes in status, or abnormal clinical findings. . | Needs Improvement | 0.0 |
| **Safe Work Environment** • Maintains a clean and safe work environment by handling and clearing instruments, equipment, and supplies in accordance with infection-control policies and protocols. Administers and stores medication according to controlled substance regulations. | | Fully Satisfactory | 2.0 |
| **Equipment & Supplies Maintenance** • May be required to maintain nursing supplies inventory by checking stock and outdates to determine inventory level, anticipating needed supplies and placing orders for required inventory. | | Fully Satisfactory | 2.0 |

# SECTION III: COMPETENCY CHECKLIST

## Department Specific Core Competencies

Please upload the current year competency checklist specific to the department and position being evaluated to supplement the position specific statements. Select yes if the document has been uploaded, select not applicable if there are no additional competencies required outside of this job description.

- ○ Yes: The department specific core competency document has been uploaded to the evaluation system for the current year evaluation.

- ○ Not Applicable: There are no additional competencies required outside of the current job description reflected above in the current evaluation.

**Comments:**

# SECTION IV: ADDITIONAL MANAGER COMMENTS

## Examples of accomplishments during this review period

**Comments:** Daniela has progressed and adjusted into the PCU.

CONFIDENTIAL Duis v. Franciscan (2:20-CV-00078-TLS-APR) Franciscan000144

**Strengths/Skills**

Comments: Meets mandatory requirements. Is accountable with duties, and expectations in patient care.

**Opportunities for Improvement**

Comments: Address abnormal clinical findings in a timely manner and remain diligent until resolved.
Example, continue calling MD until issue is resolved or addressed. Complete holistic patient
care looking at the comprehensive needs of the patient.
Attend 50% of unit meetings. Read emails weekly. Refrain from phone use in patient care areas.

## NEXT STEP - PERFORMANCE REVIEW DISCUSSION

## EMPLOYEE'S OVERALL COMMENTS (OPTIONAL)

## CONGRATULATIONS - YOU HAVE COMPLETED YOUR REVIEW!

My electronic signature acknowledges my receipt and discussion of this performance review with my manager.



| Employee: | Daniela Mendoza D.M. (electronic signature for the evaluation of Daniela Mendoza) |
| Date (M/d/yy): | 1/3/20 02:29 PM EST |

| Manager: | Linda M Steinhilber L.S. (electronic signature for the evaluation of Daniela Mendoza) |
| Date (M/d/yy): | 1/7/20 09:50 AM EST |

| Manager: | Linda M Steinhilber L.S. (electronic signature for the evaluation of Daniela Mendoza) |
| Date (M/d/yy): | 1/7/20 09:51 AM EST |

Electronic confirmation:      c219e6fa696051c0ec4da98c24c2bc01

Page 1 of 5



## PERFORMANCE APPRAISAL

**Appraisal Score**

**Overall Score: 2.4 / 3.0**

## EMPLOYEE IDENTIFICATION

**Name:** Nancy Georgakis

**Manager:** Linda M Steinhilber

**Job Title:** P01-501064 Registered Nurse

**Department:** P01-6260 Progressive Care

**Employee ID:** 028957

**Department ID:**

**Last Review Date:** 1/22/16

**Hire Date:** 4/1/19

## REVIEW PERIOD: August 1, 2018 to July 31, 2019

**Evaluated By:** Lnda Steinhilber

**Job description being evaluated:** Registered Nurse (501064)

EXHIBIT

P-20

5-7-21

PENGAD 800-631-6989

## SECTION I: FRANCISCAN VALUES

Considering each of the Franciscan Values (Respect for Life, Fidelity to our Mission, Compassionate Concern, Joyful Service, and Christian Stewardship), indicate below whether these values were demonstrated and upheld during the course of this evaluation period.

| Competency | |
| --- | --- |
| Franciscan Alliance Values < Click for scoring definitions | Meets |

**Comments/
Opportunities for
Improvement**

# SECTION II: JOB SPECIFIC COMPETENCIES

**Score: 1.8 / 3.0**

| Competency | Comments: | | Score |
|---|---|---|---|
| **Nursing Practice / Standards of Practice** • Practices nursing according to the organization and established nursing philosophies and standards of care set by state board of nursing, state nurse practice act, and other governing agency regulations. Evaluates one's own nursing practice in relation to professional practice standards and guidelines, relevant statutes, rules, and regulations. | | Fully Satisfactory | 2.0 |
| **Compassionate Care** • Establishes a compassionate environment by providing emotional, psychological, and spiritual support to patients, friends, families, and coworkers. | Nancy is improving with body language and verbiage. Has been working with peers to improve outward presence. | Needs Improvement | 0.0 |
| **Collaboration & Patient Experience** • Collaborates with patients and their families, (and or primary caregiver) as well as members of a multidisciplinary team, to ensure optimal patient outcomes and enhancement of the patient experience. | | Fully Satisfactory | 2.0 |
| **Patient Assessment** • Assesses, collects, and analyzes comprehensive objective, subjective, psychosocial, and cultural data pertinent to patient condition. Plan of care is developed and implemented in collaboration with the patient and family. Ensures the plan of care is continually reviewed and revised as the patient's condition warrants. | | Fully Satisfactory | 2.0 |
| **Plan of Care Implementation** • Prioritizes and implements the identified plan, coordinates care delivery, employs interventions to improve patient outcomes while providing a safe, respectful, and ethical practice environment. | | Fully Satisfactory | 2.0 |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **Patient's Assessment/Ongoing Reassessment Communication**<br>• Communicates timely changes in patient's assessment/ongoing reassessment to providers that warrant consideration and/or a change in the plan of care and maintains and coordinates communication with all members of the multidisciplinary team to facilitate safe transitions and continuity in care delivery. Maintains continuity among nursing teams by documenting the assessment, plan of care, interventions, and responses to care in the electronic medical record in a timely manner. | | Fully Satisfactory | 2.0 |
| **Safe Work Environment**<br>• Maintains a clean and safe work environment by handling and clearing instruments, equipment, and supplies in accordance with infection-control policies and protocols. Administers and stores medication according to controlled substance regulations. | | Fully Satisfactory | 2.0 |
| **Equipment & Supplies Maintenance**<br>• May be required to maintain nursing supplies inventory by checking stock and outdates to determine inventory level, anticipating needed supplies and placing orders for required inventory. | | Fully Satisfactory | 2.0 |

## SECTION III: COMPETENCY CHECKLIST

### Department Specific Core Competencies

Please upload the current year competency checklist specific to the department and position being evaluated to supplement the position specific statements. Select yes if the document has been uploaded, select not applicable if there are no additional competencies required outside of this job description.

⦿ Yes: The department specific core competency document has been uploaded to the evaluation system for the current year evaluation.

◯ Not Applicable: There are no additional competencies required outside of the current job description reflected above in the current evaluation.

**Comments:**

## SECTION IV: ADDITIONAL MANAGER COMMENTS

Examples of accomplishments during this review period

**Comments:**

Nancy has learned to manage patient care in a fast paced unit, and provides quality nursing care to her patients. She has learned time management, and is improving her nursing skills in management of higher acuity patients.

### Strengths/Skills

**Comments:** Nancy has demonstrated improvement in managing patient care incorporating positive body language and purposeful communication. She is able to provide skillful nursing care to her patients, and is learning new skills while on the PCU. Nancy is a kind and compassionate nurse who is working on facial appearance to look less intense. She is a dedicated nurse who focuses on details.

### Opportunities for Improvement

**Comments:** Continue to grow your nursing skills and learn Franciscan processes in documentation. Keep progressing with improvement in displaying positive body language and improving positive communication with patients.
Attend 50 % of unit meetings.
read emails weekly.

## NEXT STEP - PERFORMANCE REVIEW DISCUSSION

## EMPLOYEE'S OVERALL COMMENTS (OPTIONAL)

## CONGRATULATIONS - YOU HAVE COMPLETED YOUR REVIEW!

My electronic signature acknowledges my receipt and discussion of this performance review with my manager.



| Employee: | Nancy M Georgakis N.G. (electronic signature for the evaluation of Nancy M Georgakis) |
|---|---|
| Date (M/d/yy): | 1/6/20 08:36 AM EST |

| Manager: | Linda M Steinhilber L.S. (electronic signature for the evaluation of Nancy M Georgakis) |
|---|---|
| Date (M/d/yy): | 1/9/20 08:35 AM EST |

Electronic confirmation:        d1ceb1e5b092e97210ec1ce3814b35d5


# Franciscan
ALLIANCE

CORRECTIVE ACTION FORM
Performance & Behavior Violations

| COWORKER NAME | EMPLOYEE ID# | DATE CORRECTIVE ACTION ISSUED |
|---|---|---|
| Melissa Roberts | | 5/21/2019 |

| JOB TITLE | DEPARTMENT # | DEPARTMENT NAME |
|---|---|---|
| RN | 6400 | ICU |

## LIST PREVIOUS CORRECTIVE ACTIONS (WITHIN THE PREVIOUS 12 MONTHS)

| Date: NA | Type: | Reason: |
|---|---|---|
| Date: | Type: | Reason: |
| Date: | Type: | Reason: |

## ACTION TAKEN

*Some violations may be of such a serious nature, a level of corrective action may be bypassed, allowing for, up to and including, termination.*

- ☒ Written Counseling
- ☐ Suspension: _____ (date)
- ☐ Written Warning
- ☐ Termination _____ (date)
- ☐ Final Written Warning

## REASON FOR THIS ACTION

- ☐ Unsatisfactory Work Performance
- ☐ Breach of Duty
- ☐ Falsification of Records
- ☐ Unsatisfactory Work Behavior
- ☐ Unsafe Work Conduct
- ☐ Substance Abuse (use/possession/sales)
- ☒ Policy/Rule Violation
- ☐ Willful Damage of Property
- ☐ Workplace Violence/Harassment
- ☐ Insubordination

## STATEMENT OF FACTS

**WHEN** did it happen? – *dates and times*

**WHERE** did it happen? – *specific location and department*

**WHAT** happened? – *be specific*

In ███ 2019 is was noted and investigated by the Privacy Officer you had accessed personal medical information. After investigation and discussions with Privacy and Risk management, it was determined your accessing ████ ████ was a violation in Franciscan policy. Further practice of inappropriate accessing of PHI may result in further disciplinary actions up to and including termination.

I have attached the HIPPA Privacy and Security Policy for your review.

**HOW** were patients involved? *use epic ID# only*

EXHIBIT
P-22
5-7-21

**WHO** was involved? *names and titles*

CONFIDENTIAL
Form 1003.06F4

Duis v. Franciscan (2:20-CV-00078-TLS-APR)
Produced March 24, 2021

Franciscan000583

03/21/2019

## POLICY/RULE THAT WAS VIOLATED

| ...can Mission & Values | Please Indicate Expected Behavior(s) That Were Violated |
|---|---|
| ☐ Respect for Life | |
| ☐ Fidelity to Our Mission | |
| ☐ Compassionate Concern | |
| ☐ Joyful Service | |
| ☐ Christian Stewardship | |

| Policy/Rule Name | Please Indicate Applicable Section(s) Directly From Policy/Rule That Was Violated |
|---|---|
| | HIPPA Privacy and Security Policy |
| | |
| | |

*This list is not an all-inclusive list of reasons*

## IDENTIFY AND EXPLAIN EXPECTATIONS – *not applicable if Termination*

Refrain from accessing your personal information through EPIC.

## FOLLOW-UP PLAN – *not applicable if Termination*

| Is follow-up required? | ☐ Yes  ☒ No | Additional details for follow-up plan: |
|---|---|---|
| Type: | | |
| Date: | Time: | |

*Report follow-up on follow-up action form*

## SUMMARY STATEMENT – *if applicable*

Duis v. Franciscan (2:20-CV-00078-TLS-APR)
Produced March 24, 2021

Franciscan000584

## WORKER ACKNOWLEDGEMENT AND COMMENTS

...understand that any further violations or continued performance issues may result in corrective action, up to and including termination. If termination is being recommended, I understand my action/behavior has been deemed severable. In signing this corrective action form, I acknowledge the fact that I have read and understand the foregoing statements. It does not necessarily mean that I agree with what is contained in this form.

☐ I agree with the information contained in this Corrective Action.

☐ I disagree with the information contained in this Corrective Action.

_____ I was provided a <u>copy</u> of the policy/rule (if applicable) which was violated.
Initials

Coworker must ← complete this section

Coworker Comments – *if additional space is needed, use Coworker Statement of Facts Form*

Coworker Signature: Melissa Roberts RN          Date: _____

Supervisor Signature: _____          Date: 5/21/19

Human Resources Signature: _____          Date: 7/24/19   ☐ Present at meeting  ☒ Reviewed Document

HUMAN RESOURCES MUST REVIEW AND APPROVE WRITTEN WARNINGS AND ABOVE PRIOR TO THE MEETING
*Distribution: One copy to coworker, one copy to supervisor and <u>original</u> to Human Resources*

CONFIDENTIAL          Duis v. Franciscan (2:20-CV-00078-TLS-APR)
Produced March 24, 2021          Franciscan000585

# CORRECTIVE ACTION FORM

Performance & Behavior Violations

**franciscan ALLIANCE**

| COWORKER NAME | | EMPLOYEE ID# | DATE CORRECTIVE ACTION ISSUED |
|---|---|---|---|
| Melissa Roberts | | | 7/2/19 |

| JOB TITLE | | DEPARTMENT # | DEPARTMENT NAME |
|---|---|---|---|
| RN | | 6400 | ICU |

## LIST PREVIOUS CORRECTIVE ACTIONS (WITHIN THE PREVIOUS 12 MONTHS)

| Date: NA | Type: | Reason: |
|---|---|---|
| Date: | Type: | Reason: |
| Date: | Type: | Reason: |

## ACTION TAKEN

*Some violations may be of such a serious nature, a level of corrective action may be bypassed, allowing for, up to and including, termination.*

☒ Written Counseling  ☐ Suspension: _____ (date)

☐ Written Warning  ☐ Termination  _____ (date)

☐ Final Written Warning

## REASON FOR THIS ACTION

☒ Unsatisfactory Work Performance  ☐ Breach of Duty  ☐ Falsification of Records

☐ Unsatisfactory Work Behavior  ☐ Unsafe Work Conduct  ☐ Substance Abuse (use/possession/sales)

☐ Policy/Rule Violation  ☐ Willful Damage of Property  ☐ Workplace Violence/Harassment

☐ Insubordination

## STATEMENT OF FACTS

| WHEN did it happen? – dates and times | WHERE did it happen? – specific location and department |
|---|---|
| See below | ICU patients |

**WHAT happened?** – be specific

| 19 | Incomplete restraint documentation on two patients |
|---|---|
| 19 | Incorrect verbiage on CABG consent |
| 19 | No order for restraints |
| 6/23/19 | Left the ICU on call, did not answer calls from charge nurse 2x. |

Work performance has been below acceptable standards. Restraints are to be ordered immediately upon application. Restraints are to be documented precisely as instructed. ( yearly education provided)
On Call nurse is responsible to answer the phone.

**HOW were patients involved?** *use epic ID# only*

Incomplete documentation for restraint use and missing order for restraints. High risk nursing processes completed incorrectly. Verbiage on consents must be spelled out completely. The consent needed to be completed correctly in OR.

**WHO was involved?** *names and titles*

CONFIDENTIAL
Franciscan000586
03/21/2019

| Franciscan Mission & Values | Please Indicate Expected Behavior(s) That Were Violated |
|---|---|
| ☐ Respect for Life<br>☐ Fidelity to Our Mission<br>☐ Compassionate Concern<br>☐ Joyful Service<br>☐ Christian Stewardship |  |

| Policy/Rule Name | Please Indicate Applicable Section(s) Directly From Policy/Rule That Was Violated |
|---|---|
|  |  |
|  |  |
|  |  |

*This list is not an all-inclusive list of reasons*

## IDENTIFY AND EXPLAIN EXPECTATIONS – *not applicable if Termination*

Complete and accurate documentation of restraints including written orders for initiation. Of restraints.  Verbiage for consents must be spelled out completely.
On call RN is to answer the phone and be available during the entire shift.

## FOLLOW-UP PLAN – *not applicable if Termination*

| Is follow-up required?   ☐ Yes   ☐ No | Additional details for follow-up plan: |
|---|---|
| Type: |  |
| Date:          Time: |  |

*Report follow-up on follow-up action form*

## SUMMARY STATEMENT – *if applicable*

Further episodes of poor work performance may result in further disciplinary actions.

*Recomendation to EAP*

**COWORKER ACKNOWLEDGEMENT AND COMMENTS**

I understand that any further violations or continued performance issues may result in corrective action, up to and including termination. If termination is being recommended, I understand my action/behavior has been deemed severable.  In signing this corrective action form, I acknowledge the fact that I have read and understand the foregoing statements. It does not necessarily mean that I agree with what is contained in this form.

☐     I agree with the information contained in this Corrective Action.
☐     I disagree with the information contained in this Corrective Action.

_____     I was provided a <u>copy</u> of the policy/rule (if applicable) which was violated.
*Initials*

**Coworker must**
⬅
**complete this section**

**Coworker Comments** – *if additional space is needed, use Coworker Statement of Facts Form*

Coworker Signature: _Melissa Ridge_          Date: _7-1-19_

Supervisor Signature: _Linda Sterchele_          Date: _7/2/19_

Human Resources Signature: _SBoch_          Date: _7·2·19_

☐ Present at meeting
☒ Reviewed Document

HUMAN RESOURCES MUST REVIEW AND APPROVE WRITTEN WARNINGS AND ABOVE PRIOR TO THE MEETING
*Distribution: One copy to coworker, one copy to supervisor and <u>original</u> to Human Resources*

CONFIDENTIAL
Form 1003.06F4

Duis v. Franciscan (2:20-CV-00078-TLS-APR)
Produced March 24, 2021

Franciscan000588

3/21/2019

FEEDBACK FOR LEARNING AND IMPROVEMENT

NON-VIOLENT RESTRAINTS

Employee Name: __Roberts__

Date: __4/2/19__

Job Position/Department: __ICU RN__

E number: ████████

Feedback provided by: __Prather__

## PRIMARY OBJECTIVE/CHIEF COMPLAINT(S):

- Restraint charting is incomplete and/or incorrect

## NON-VIOLENT RESTRAINT CHARTING

- ☐ No Nonviolent Restraint Order
- ☐ Vitals not checked 30 min after restraint application
- ☐ Restraint order and applied restraints do not match
- ☐ Renewal order is Late (outside of 24 hours)
- ☐ No restraint education documented
- ☐ No clinical justification/reason for restraints charted
- ☐ No less restrictive alternative charted
- ☐ Under Restraint Type, documenting 4 side rails as a restraint when there is no order (Should be documented under Daily Care and Safety)
- ☐ Q2hour Restraint Monitoring not charted
- ☐ Restraint Care Plan not initiated

## NON-VIOLENT DISCONTINUATION OF RESTRAINT CHARTING

- ☐ Under Restraint Type, Restraint not discontinued
- ☑ Under Discontinuation of Restraints, Discontinuation Criteria not charted
- ☑ Under Discontinuation of Restraints, Physical Condition at Release not charted
- ☑ Under Discontinuation of Restraints, Time Restraint Discontinued not charted
- ☑ Restraint Care Plan not resolved
- ☑ Discontinuation order not completed

| IMPACT: Describe the impact the situation had on patients/coworkers, etc. | • Charting restraint accurately demonstrates the nurse's care and attention towards the patient while their movement is restricted |
|---|---|
| SUGGESTIONS FOR FUTURE: Describe how this situation could have been handled differently to avoid impact previously described | • Complete all restraint charting as per policy |

Employee signature: _____

Date: _____

Manager's signature: _____

Date: _____

_Original to :_ Employee
_Copy to :_ Manager

**Please do not forward a copy to HR. This is not a corrective action.*

c:\users\phxw3\documents\restraint process\ee- feedback for improvement-restraints non violent 04112019.docx

CONFIDENTIAL

Franciscan000589

# FEEDBACK FOR IMPROVEMENT

## NON-VIOLENT RESTRAINTS

Employee Name: **Roberts**

Date: **6/21**

Job Position/Department: **ICU RN**

E number: ▮▮▮▮▮▮

Feedback provided by: **Trathen**

### PRIMARY OBJECTIVE/CHIEF COMPLAINT(S):

* Restraint charting is incomplete and/or incorrect

### NON-VIOLENT RESTRAINT CHARTING

- ☐ No Nonviolent Restraint Order
- ☐ Vitals not checked 30 min after restraint application
- ☐ Restraint order and applied restraints do not match
- ☐ Renewal order is Late (outside of 24 hours)
- ☑ No restraint education documented
- ☐ No clinical justification/reason for restraints charted
- ☐ No less restrictive alternative charted
- ☐ Under Restraint Type, documenting 4 side rails as a restraint when there is no order (Should be documented under Daily Care and Safety)
- ☐ Q2hour Restraint Monitoring not charted
- ☐ Restraint Care Plan not initiated

### NON-VIOLENT DISCONTINUATION OF RESTRAINT CHARTING

- ☐ Under Restraint Type, Restraint not discontinued
- ☑ Under Discontinuation of Restraints, Discontinuation Criteria not charted
- ☑ Under Discontinuation of Restraints, Physical Condition at Release not charted
- ☑ Under Discontinuation of Restraints, Time Restraint Discontinued not charted
- ☑ Restraint Care Plan not resolved
- ☑ Discontinuation order not completed

### IMPACT:

Describe the impact the situation had on patients/coworkers, etc.

* Charting restraint accurately demonstrates the nurse's care and attention towards the patient while their movement is restricted

### SUGGESTIONS FOR FUTURE:

Describe how this situation could have been handled differently to avoid impact previously described

* Complete all restraint charting as per policy

Employee signature: _____

Date: _____

Manager's signature: _____

Date: _____

*Original to :* Employee
*Copy to :* Manager

**Please do not forward a copy to HR. This is not a corrective action.*

c:\users\phxw3\documents\restraint process\ee- feedback for improvement-restraints non violent 04112019.docx

CONFIDENTIAL

Duis v. Franciscan (2.20-CV-00078-TLS-APR)
Produced March 24, 2021

Franciscan000590

Restraints - Management Form - 100242

Logged In as Linda Steinhilber

Add Follow-up

## Table of Contents

Restraints

Restraint Event Details

When and Where Event Occ...

Parties Involved / Notified / W...

Attachments

Incident
Reporting

File State: New
Owner: ▮▮▮

Entered Date ▮▮▮▮C18

### Restraints

## File Notifications

Linked Files (0)

Alerts (14)

Tasks (1)

Summaries

Audits

File Exports

General information about the restraint event

| | |
|---|---|
| Specific Event Type | Other (please specify) |
| Other Specific Event Type | Restraints not ordered. Has been on patient all day |
| Type of Person Affected | Person Not Applicable |
| Event Severity at the Time of Submission | B. An Error Occurred, but the Error Did Not Reach the Patient (an "Error of Omission") |
| Injury Incurred? | No |
| Equipment Involved/Malfunctioned? | No |
| Brief Factual Description | Patient was transferred over from ▮▮▮▮. assess patient, RN noticed Roll belt was on patient. RN went to ▮▮▮ When PCU RN went to no restraints has been document all day. There was also no order in the computer for restraints. RN called attending to ask about restraints. Treating RN will continue to monitor the need for the restraints. |
| Contributing Factors (Reported) | Not Specified Add/Modify |
| Immediate Actions | ⊘ Assessment of Conditions That Led to Restraint<br>⊘ Assessment of Mental Status<br>⊘ Assessment of Physical Condition<br>⊘ Informed Staff<br>Add/Modify |

### Restraint Event Details

Details of the restraint event

| | |
|---|---|
| Restraint Type | Mechanical Restraint |
| Restraint Start Time | ▮▮▮▮ |

More Actions

CONFIDENTIAL
Dujo v. Franciscan (2:20-CV-00078-TLS-APR)
Produced March 24, 2021

Franciscan000591
▮▮▮2019

AUTH...

SURGICAL OPERATIONS, DIAGNOSTIC AND THERAPEUTIC PROCEDURES

1. _____ authorize Dr. ████████ and such assistants and associates as may be selected by him/her to perform the following surgery or other medical procedure(s): _____

   ████████████████████████

2. I understand that some physicians including but not limited to pathologists, anesthesiologists, and radiologists who may be treating me are not employees or agents of Franciscan Health – Crown Point, but are independent medical practitioners who are solely and exclusively responsible for the exercise of their medical judgment

3. It has been explained to me that during the course of the operation/procedure unforeseen conditions may be revealed that necessitate an extension of the original procedure(s) or different procedure(s) than those set forth in Paragraph 1. I authorize additional or different medical or surgical procedures as are deemed appropriate and desirable in the exercise of his/her or their professional judgment.

4. The operation(s), treatment and/or procedure(s) and risks have been explained to me by my physician in terms I understand. I understand the nature and purpose of the operation(s) and/or procedure(s). I have been made aware of the medically significant risks and consequences that are associated with the operation(s), treatment and/or procedure(s) stated above as well as the alternative courses of treatment and the risks and consequences of refusing the operation(s) and/or procedure(s). I acknowledge that no guarantees or assurance has been made to me concerning the results of the procedure(s) stated above.

5. I consent that tissue or parts of my body removed at surgery, body fluids, x-ray films, and other materials, as well as medical information concerning me may be used in research studies, in publication of results, and in teaching.

6. I consent to the disposal by hospital authorities of any tissues or body parts, which may be removed with the exception of _____

7. Providing my identity is not revealed, I consent to the taking and publication of any photographs or televising in the course of this operation, treatment and/or procedure for medical scientific and educational purposes.

8. I have been informed that prior to, or during the procedure, I may also receive intravenous medications for sedation. It has been explained that the primary goal of sedation is to allay fear and anxiety while still being able to cooperate with the procedure. Adverse and/or undesirable effects associated with intravenous sedation may be slurred speech, unarousable sleep, low blood pressure, agitation, combativeness, decreased respiration's, respiratory depression, airway obstruction, and in rare instances cardiac arrest. I understand that all sedative drugs, including anesthetic agents, may slow reaction time, and although my reactions seem normal, they will be affected.

9. If appropriate, I also authorize, permit and consent to the presence of any sales representatives or vendors in the procedure, for technical support only. I understand that the sales representatives or vendor will NOT physically participate in the procedure, but will be present only in an advisory capacity for the responsible physician.



**Franciscan**
HEALTH
Crown Point


!08626398

P.9500.0006
REV. 7/28/17
3LET    CONFIDENTIAL

Page 1 of 2

Duis v. Franciscan (2:20-CV-00078-TLS-APR)
Produced March 24, 2021
CONSENT

Franciscan00268
Consent Acute

10. For the purpose of advancing medical education, I consent to the admittance of observers to the room in which the procedure(s)/treatment is performed. I understand that supervised students in training in the hospital may be involved in the procedure(s)/treatment before, during, and after the procedure(s)/treatment.

11. I hereby consent to have my blood tested if a physician or other staff member is exposed to my blood during my procedure. I understand that this consent will only be in effect during the time I am unable to sign a consent. This is necessitated by the possible risk of employees being exposed to HIV positive blood and by the short period of time after an exposure for a person exposed (to another person's blood) to have preventative medications started. If an exposure occurs after this time, I will be asked to sign an informed consent specific to the occurrence.

My signature below constitutes my acknowledgement: (1) That I have read, or have had read to me, and agreed to all of the above; (2) That the proposed operation(s) or procedure(s) have been satisfactorily explained to me and I have all the information which I desire about them; (3) That I have been given an opportunity to ask questions that I might have concerning the procedure, risks and alternative procedure(s); and (4) That I hereby give my authorization and consent



_Melissa Roberts RN_

Witness

Date and Time ___9___  ___1430___

Patient/Legal Representative ▮▮▮▮▮▮▮▮

Relationship ___Self___

I have personally explained to the patient, or his or her legal representative, the information set forth in the above on _____ at _____.

_____
Physician's Signature

---

**PATIENT WITH "DO NOT RESUSCITATE (DNR)" ORDERS ONLY:**

1. I understand that by consenting to this procedure, I am also consenting to a temporary suspension of the DNR (Do Not Resuscitate) orders until the procedure and/or anesthesia recovery period has ended.

_____/_____
Initials/Date

OR

2. I request not to be resuscitated in case of cardiopulmonary arrest during the procedure

_____/_____
Initials/Date

---

# Franciscan
## HEALTH
### Crown Point



CONFIDENTIAL

Duis v. Franciscan (2:20-CV-00078-TLS-APR)
Produced March 24, 2021
CONSENT

Franciscan000593

 **Franciscan**
ALLIANCE

**CORRECTIVE ACTION FORM**
Performance & Behavior Violations

| COWORKER NAME | | | |
|---|---|---|---|
| Nancy Georgakis | | **EMPLOYEE ID#** | **DATE CORRECTIVE ACTION ISSUED** |
| **JOB TITLE** | | 028957 | |
| RN | | **DEPARTMENT #** | **DEPARTMENT NAME** |
| | | 6260 | PCU |

**LIST PREVIOUS CORRECTIVE ACTIONS (WITHIN THE PREVIOUS 12 MONTHS)**

| Date: | Type: | |
|---|---|---|
| Date: | Type: | Reason: |
| Date: | Type: | Reason: |
| Date: | Type: | Reason: |

**ACTION TAKEN**

*Some violations may be of such a serious nature, a level of corrective action may be bypassed, allowing for, up to and including, termination.*

☒ Written Counseling    ☐ Suspension: _____

☐ Written Warning       ☐ Termination     _____ (date)

☐ Final Written Warning                  _____ (date)

**REASON FOR THIS ACTION**

☐ Unsatisfactory Work Performance    ☐ Breach of Duty          ☐ Falsification of Records
☒ Unsatisfactory Work Behavior        ☐ Unsafe Work Conduct     ☐ Substance Abuse (use/possession/sales)
☐ Policy/Rule Violation               ☐ Willful Damage of Property  ☐ Workplace Violence/Harassment
☐ Insubordination

**STATEMENT OF FACTS**

| WHEN did it happen? – dates and times: | WHERE did it happen? – specific location and department |
|---|---|
| 5/7/20 @ 0700 and 5/7/20 @ 1900 | Breakroom and nurse's station |

**WHAT happened? – be specific**

Emilie Higgins told me that Nancy approached her in the breakroom, wanting to know if Victoria Davis had been talking about her. Emilie told Nancy that she would not participate in conversations about other co-workers. Nancy said, "But you would tell me if she was." Emilie said she would not. I told Emilie that I would talk to Nancy about it.

I confirmed the above with Nancy, and she admitted that it occurred. Nancy said that Victoria seemed irritated with her, and she was wondering if she had said anything about her.

That same evening (5/7), when Emilie returned back to work and entered the nurse's station for huddle, it's reported by Emilie that Nancy got up quickly and went to her and whispered, "You freaking snitch. You narked me out." Emilie spoke in an audible tone and told her that she did what she felt she needed to do and encouraged Nancy to talk to Mary Beth too, if she felt like she was having issues with staff. Other staff who witnessed the interaction said that Nancy "bee-lined" for Emily, got within inches of her face, and talked "at her." They did not hear what Nancy had said, but they heard Emilie's response.

**HOW were patients involved? – do not use patient names**

N/A

EXHIBIT
P-26
5-7-21

**WHO was involved? – names and titles**

Emilie Higgins - Staff Nurse
Kathleen Amsler - Charge Nurse (witness)

Jessica Graykowski - Charge Nurse (witness)
Victoria Davis - Charge Nurse (witness)

Duis v. Franciscan (2:20-CV-00078-TLS-APR)
Produced March 24, 2021

Franciscan000613
03/21/2019

## IDENTIFY POLICY/RULE THAT WAS VIOLATED

| Franciscan Mission & Values | Please Indicate Expected Behavior(s) That Were Violated |
|---|---|
| ☒ Respect for Life <br> ☐ Fidelity to Our Mission <br> ☐ Compassionate Concern <br> ☐ Joyful Service <br> ☐ Christian Stewardship | Talk directly to the staff member that you are in conflict with and do not ask other team members to be an informant for you. <br><br> Do not confront team members in a threatening way. |

| Policy/Rule Name | Please Indicate Applicable Section(s) Directly From Policy/Rule That Was Violated |
|---|---|
| Respectful Workplace Policy | Key Point "1a" |
| Corrective Action Policy | Point "i" |
| | |

*This list is not an all-inclusive list of reasons*

## IDENTIFY AND EXPLAIN EXPECTATIONS – *not applicable if Termination*

It is expected that when you have issues with co-workers, you will talk directly to that person in an attempt to resolve the issue(s).

If the attempt has an unsatisfactory outcome, you will enlist the help of the manager to mediate the conversation.

You will not attempt to intimidate co-workers from discussing concerns with the manager.

## FOLLOW-UP PLAN – *not applicable if Termination*

| Is follow-up required?   ☐ Yes   ☐ No | Additional details for follow-up plan: |
|---|---|
| Type: | |
| Date:          Time: | |

*Report follow-up on follow-up action form*

## SUMMARY STATEMENT – *if applicable*

Duis v. Franciscan (2:20-CV-00078-TLS-APR) <br> Produced March 24, 2021 <br> Franciscan000614 <br> 3/21/2019

## COWORKER ACKNOWLEDGEMENT AND COMMENTS

I understand that any further violations or continued performance issues may result in corrective action, up to and including termination. If termination is being recommended, I understand my action/behavior has been deemed severable.  In signing this corrective action form, I acknowledge the fact that I have read and understand the foregoing statements. It does not necessarily mean that I agree with what is contained in this form.

☐ I agree with the information contained in this Corrective Action.
☐ I disagree with the information contained in this Corrective Action.

_____ I was provided a **copy** of the policy/rule (if applicable) which was violated.
Initials

> **Coworker must**
> **complete this section**

**Coworker Comments** – *If additional space is needed, use Coworker Statement of Facts Form*

Coworker Signature: _____    Date: _____

Supervisor Signature: _____    Date: _____

Human Resources Signature: _____    Date: _____
☐ Present at meeting
☐ Reviewed Document

HUMAN RESOURCES MUST REVIEW AND APPROVE WRITTEN WARNINGS AND ABOVE PRIOR TO THE MEETING
*Distribution: One copy to coworker, one copy to supervisor and __original__ to Human Resources*



**Franciscan**
**ALLIANCE**

**CORRECTIVE ACTION FORM**
Performance & Behavior Violations

| COWORKER NAME | EMPLOYEE ID# | DATE CORRECTIVE ACTION ISSUED |
|---|---|---|
| Celeste Reed | 184820 | 7/5/19 |

| JOB TITLE | DEPARTMENT # | DEPARTMENT NAME |
|---|---|---|
| PCA | 6260 | Progressive Care |

### LIST PREVIOUS CORRECTIVE ACTIONS (WITHIN THE PREVIOUS 12 MONTHS)

| Date: | Type: | Reason: |
|---|---|---|
| Date: | Type: | Reason: |
| Date: | Type: | Reason: |

### ACTION TAKEN

*Some violations may be of such a serious nature, a level of corrective action may be bypassed, allowing for, up to and including, termination.*

☐ Written Counseling    ☐ Suspension: _____
☒ Written Warning    ☐ Termination _____ (date)
☐ Final Written Warning    _____ (date)

### REASON FOR THIS ACTION

☐ Unsatisfactory Work Performance    ☐ Breach of Duty    ☐ Falsification of Records
☐ Unsatisfactory Work Behavior    ☐ Unsafe Work Conduct    ☐ Substance Abuse (use/possession/sales)
☒ Policy/Rule Violation    ☐ Willful Damage of Property    ☐ Workplace Violence/Harassment
☐ Insubordination

### STATEMENT OF FACTS

| WHEN did it happen? – *dates and times* | WHERE did it happen? – *specific location and department* |
|---|---|
| See attached attendance sheet | |

WHAT happened? – *be specific*

Absence and tardy as documented per attendance sheet. 7/5/19 you are at 6.5 points resulting in a Final written warning for a part time employee.

EXHIBIT
P-27
5-7-21

HOW were patients involved? *use epic IDK only*

WHO was involved? *names and titles*

Duis v. Franciscan (2:20-CV-00078-TLS-APR)
Produced March 24, 2021
Franciscan000616
03/21/2019

## IDENTIFY POLICY/RULE THAT WAS VIOLATED

| Franciscan Mission & Values | Please Indicate Expected Behavior(s) That Were Violated |
|---|---|
| ☐ Respect for Life<br>☒ Fidelity to Our Mission<br>☐ Compassionate Concern<br>☐ Joyful Service<br>☐ Christian Stewardship | |

| Policy/Rule Name | Please Indicate Applicable Section(s) Directly From Policy/Rule That Was Violated |
|---|---|
| Attendance Policy 1003.04 | See attached policy |
| | |
| | |

*This list is not an all-inclusive list of reasons*

## IDENTIFY AND EXPLAIN EXPECTATIONS – *not applicable if Termination*

Report to work as scheduled.
Report to work on time.
Clock in and out for each shift.

## FOLLOW-UP PLAN – *not applicable if Termination*

| Is follow-up required?   ☐ Yes   ☐ No | Additional details for follow-up plan: |
|---|---|
| Type: | |
| Date:          Time: | |

*Report follow-up on follow-up action form*

## SUMMARY STATEMENT – *if applicable*

Further episodes of tardiness or absence will result in a final written warning.

Duis v. Franciscan (2.20-CV-00078-TLS-APR)
Produced March 24, 2021

Franciscan000617

3/21/2019

## COWORKER ACKNOWLEDGEMENT AND COMMENTS

I understand that any further violations or continued performance issues may result in corrective action, up to and including termination. If termination is being recommended, I understand my action/behavior has been deemed severable.  In signing this corrective action form, I acknowledge the fact that I have read and understand the foregoing statements. It does not necessarily mean that I agree with what is contained in this form.

☐   I agree with the information contained in this Corrective Action.
☐   I disagree with the information contained in this Corrective Action.

_____   I was provided a <u>copy</u> of the policy/rule (if applicable) which was violated.
Initials

> Coworker must
> ← complete this section

### Coworker Comments – *If additional space is needed, use Coworker Statement of Facts Form*

<br><br><br><br><br>

Coworker Signature: _____   Date: _____

Supervisor Signature: _____   Date: _____

Human Resources Signature: _____   Date: _____   ☐ Present at meeting
☐ Reviewed Document

HUMAN RESOURCES MUST REVIEW AND APPROVE WRITTEN WARNINGS AND ABOVE PRIOR TO THE MEETING
*Distribution: One copy to coworker, one copy to supervisor and <u>original</u> to Human Resources*

Duis v. Franciscan (2 20-CV-00078-TLS-APR)
Produced March 24, 2021

Franciscan000618

3/21/2019

July 9, 2019.

Meeting with Celeste Reed occurred to discuss disciplinary actions for time and attendance.  Celeste was provided with documentation of her attendance record, and recieved detailed information reguarding the attendance policy. Celeste verbalized understanding of the policy, expectations for scheduling conflicts, and process for clock in and clock out expectations.  We discussed further accumulation of points from tardiness or absenteeism will result in a final written warning and the termination.

 Expectations for wearing a name badge were discussed as well as the disciplinary process for not clocking in and out each shift.

The dress code was revisited and discussed  regarding wearing long nails, past the fingertip, and/ or artificial or any unnatural application of wraps or gels.  We discussed covering tatoos, facial piercings. It was discussed the initial request for nail removal was during the last unit meeting June 19, 2019.

Celeste agreed she clearly understands her attendance situation as well as the progression if further episodes occur.

Celeste also verbalized she understands the dress code policy and expectations to comply with policy.

Comments:

# Franciscan
## ALLIANCE

**CORRECTIVE ACTION FORM**
Performance & Behavior Violations

| COWORKER NAME | | EMPLOYEE ID# | DATE CORRECTIVE ACTION ISSUED |
|---|---|---|---|
| Celeste Reed | | | 7/11/2019 |

| JOB TITLE | | DEPARTMENT # | DEPARTMENT NAME |
|---|---|---|---|
| PCA | | 6260 | Progressive Care |

**LIST PREVIOUS CORRECTIVE ACTIONS (WITHIN THE PREVIOUS 12 MONTHS)**

| Date: | Type: | Reason: |
|---|---|---|
| Date: | Type: | Reason: |
| Date: | Type: | Reason: |

## ACTION TAKEN

*Some violations may be of such a serious nature, a level of corrective action may be bypassed, allowing for, up to and including, termination.*

☐ Written Counseling   ☐ Suspension: _____ (date)
☒ Written Warning   ☐ Termination _____ (date)
☐ Final Written Warning

## REASON FOR THIS ACTION

☐ Unsatisfactory Work Performance   ☐ Breach of Duty   ☐ Falsification of Records
☐ Unsatisfactory Work Behavior   ☐ Unsafe Work Conduct   ☐ Substance Abuse (use/possession/sales)
☒ Policy/Rule Violation   ☐ Willful Damage of Property   ☐ Workplace Violence/Harassment
☐ Insubordination

## STATEMENT OF FACTS

| WHEN did it happen? – *dates and times* | WHERE did it happen? – *specific location and department* |
|---|---|
| See attached dress policy | |

**WHAT happened? – *be specific***

On June 19, 2019 you received details regarding the dress code policy, and you were informed by your manager you would need to remove your fingernails, remove facial piercings, and cover your visible tattoos.

On July 9th, 2019 you received specific details for s second time, by your manager, Human resource manager and Director and the regarding the dress policy. You were sent home from work and informed to have your overlay finger nails removed, and your natural nails at an appropriate length. You were also informed to cover your visible tattoos and remove your facial piercings when you returned to work.

July 11, 2019, you reported to work with a nose piercing in place, your finger nails are shorter, but the overlay is still present and you informed your manager you could have it removed due to your cuticles.

**HOW were patients involved?** *use epic ID# only*

Violation of infection control policy.

**WHO was involved?** *names and titles*

Duis v. Franciscan (2 20-CV-00078-TLS-APR)
Produced March 24, 2021
Franciscan000620
03/21/2019

## IDENTIFY POLICY/RULE THAT WAS VIOLATED

| Franciscan Mission & Values | Please Indicate Expected Behavior(s) That Were Violated |
|---|---|
| ☐ Respect for Life<br>☒ Fidelity to Our Mission<br>☐ Compassionate Concern<br>☐ Joyful Service<br>☐ Christian Stewardship | |

| Policy/Rule Name | Please Indicate Applicable Section(s) Directly From Policy/Rule That Was Violated |
|---|---|
| Dress Code and Personal Appearance Policy 1003.02 | Please see attached Policy |
| | |
| | |

*This list is not an all-inclusive list of reasons*

## IDENTIFY AND EXPLAIN EXPECTATIONS – *not applicable if Termination*

## FOLLOW-UP PLAN – *not applicable if Termination*

| Is follow-up required?  ☐ Yes  ☐ No | Additional details for follow-up plan: |
|---|---|
| Type: | |
| Date:          Time: | |

*Report follow-up on follow-up action form*

## SUMMARY STATEMENT – *if applicable*

Please follow dress code policies. Artificial nails, overlays gels are not permitted at any length. Facial piercings are not permitted.

Duis v. Franciscan (2:20-CV-00078-TLS-APR)<br>Produced March 24, 2021

Franciscan000621<br>3/21/2019

## COWORKER ACKNOWLEDGEMENT AND COMMENTS

I understand that any further violations or continued performance issues may result in corrective action, up to and including termination. If termination is being recommended, I understand my action/behavior has been deemed severable. In signing this corrective action form, I acknowledge the fact that I have read and understand the foregoing statements. It does not necessarily mean that I agree with what is contained in this form.

☐ I agree with the information contained in this Corrective Action.
☐ I disagree with the information contained in this Corrective Action.

I was provided a _copy_ of the policy/rule (if applicable) which was violated.

_____
*Initials*

> Coworker must
>
> complete this section

**Coworker Comments** – *If additional space is needed, use Coworker Statement of Facts Form*

Coworker Signature: _____ Date: _____

Supervisor Signature: _____ Date: _____

Human Resources Signature: _____ Date: _____   ☐ Present at meeting
☐ Reviewed Document

HUMAN RESOURCES MUST REVIEW AND APPROVE WRITTEN WARNINGS AND ABOVE PRIOR TO THE MEETING
*Distribution: One copy to coworker, one copy to supervisor and original to Human Resources*

CONFIDENTIAL
Form 1003.06F4

Duis v. Franciscan (2:20-CV-00078-TLS-APR)
Produced March 24, 2021

Franciscan000622

3/21/2019