UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| TARYN N. DUIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CAUSE NO. 2:20-CV-78-PPS |
| | ) | |
| FRANCISCAN ALLIANCE, INC., | ) | |
| a/k/a FRANCISCAN CROWN POINT, | ) | |
| | ) | |
| Defendant. | ) | |

# OPINION AND ORDER

Taryn Duis is a registered nurse who was fired by her employer, Franciscan Alliance, Inc.  She was pregnant at the time and now claims in this lawsuit that her pregnancy (and request for family leave) is the reason she was terminated.  For its part, Franciscan says Duis had a lousy attitude and was overheard swearing and refusing to give a patient pain medication, and those were the reasons for her termination. Franciscan now seeks summary judgment.  But with diametrically opposing stories and evidence to support both, a jury is going to have to sort out who's telling the truth.  In other words, there are questions of fact for a jury to decide about whether Duis was fired because she was not meeting the legitimate expectations of her employer, or if that excuse was really a pretext to cover up a discriminatory motive.

**Motion to Strike**

Before diving into the facts, I note that Franciscan filed a motion to strike Duis' statement of additional facts contained in Plaintiff's Appendix in support of Plaintiff's

opposition to summary judgment as well as Exhibit 26 of Exhibit E in Plaintiff's appendix [DE 32-6 at 67]. [DE 33.]  Franciscan argues that the material facts Duis put in her appendix are inappropriate, because, it claims, response briefs cannot exceed 25 pages *including* the material facts the party contends are genuinely disputed. [DE 33 at 2.]  However, as Duis points out, the local rule in effect at the time this motion was filed states that the response brief *or* the brief's appendix must include a statement of material facts the party contends are genuinely disputed, N.D. Ind. L.R. 56-1(b)(2) (effective October 1, 2020-February 24, 2022), and the rules provide that response briefs (excluding appendices) ordinarily must not exceed 25 pages.  L.R. 7-1(e)(1) (effective October 1, 2020-February 24, 2022).  Therefore, it was proper for Duis to put her statement of facts in an appendix, and she did not violate the applicable page limit.

To the extent Franciscan claims the Corrective Action Form of Nancy Georgakis attached within Appendix Exhibit E (Exhibit 26), should be stricken because it was not authenticated during the deposition of Linda Steinhilber [DE 32-6 at 67], this argument is a nonstarter. Courts can consider unauthenticated documents at the summary judgment stage if it appears they are capable of authentication at trial.  *See Boyce v. Wexford Health Sources, Inc.*, No. 15 C 7580, 2017 WL 1436963, at *3 (N.D. Ill. Apr. 24, 2017) ("federal courts routinely consider unauthenticated documents on motions for summary judgment, for example, when it is apparent [] that such documents are capable of reduction to admissible, authenticated form.").  Moreover, because this document was produced by Franciscan in discovery, they don't really have a leg to

2

stand on.  *See, e.g., Michiana Dairy Processors, LLC v. All Star Beverage, Inc.*, 744 F.Supp.2d 790, 795 (N.D. Ind. 2010) ("These documents were produced by Michiana in response to discovery requests.  Therefore, the objection to authentication is overruled.").

For these reasons, the Motion to Strike [DE 33] is DENIED.

## Motion for Summary Judgment

### Undisputed Facts

Frankly, both sides submitted huge statements of material facts allegedly not in dispute.  For the sake of judicial economy, I've tried to distill them down to the most important, and relevant, facts for the purpose of this motion.  As the reader will quickly glean, there are a lot of details that are disputed about the end of Duis' employment with Franciscan.  This is, in a nutshell, why summary judgment isn't warranted in this case.

Duis worked at Franciscan as a Registered Nurse and a Charge Nurse in the Progressive Care Unit ("PCU").   [Duis Dep. at 41-42.]  She began working in the Crown Point Facility in July of 2015. [Answ. ¶ 9.]  A charge nurse oversees the unit, helps solve problems, assists nurses, and manages the floor. [Duis Dep. at 56; Scott Dep. at 21; Steinhilber Dep. at 27.]  In March of 2019, Linda Steinhilber became the nursing manager for PCU, and Duis' direct supervisor.  [Steinhilber Dep. at 18, 44.] It is undisputed that Steinhilber was aware of Duis' pregnancy, although it is unclear how she found it out and whether Duis told Steinhilber she was planning on taking maternity leave in October when the baby was due. [Duis Dep. at 71, 102, 104, Def.'s

Interrog. Resp. To No. 4 at 5; Steinhilber Dep. at 35-36.]

There are a few critical moments in time pinpointed by the parties in this case. The first event occurred on April 11, 2019, when Duis was working the night shift as a charge nurse, and the shift was very understaffed and busy with admissions.  [Duis Dep. at 55-56.]  The house supervisor, Connie Snow, reported to Steinhilber that Duis and Dawn Smith (another RN), had a conflict that night. [Steinhilber Dep. at 44-46; Snow Aff. ¶ 7.]  Duis was very anxious as a result of the conflict.  *Id.*  During the shift, a hospitalist assessed Duis and told her to go home for the night since she was pregnant and had a miscarriage earlier that year. [Duis Dep. at 57.]  The next morning, Steinhilber called Duis.  According to Steinhilber, she called to check in on Duis since she heard she went home the night before due to an anxiety attack. [Steinhilber Dep. at 43-44; Duis Dep. at 57.]  Duis tells a different story.  She says that Steinhilber called and told her to go down to Human Resources and tell them Smith caused a confrontation and attacked Duis in the nursing station, which caused Duis' panic attack. [Duis Dep. at 55, 57, 58.] Duis took this as Steinhilber ordering her to lie and defame a fellow nurse, even though Duis claimed Smith did not start a fight with her. [Duis Dep. at 128-29.] Steinhilber's spin on the conversation was that she didn't order Duis to go to HR; she simply told Duis if she had concerns about Smith, she should go to Human Resources. [Steinhilber Dep. at 46; Steinhilber Aff. ¶ 13.]

On April 19, 2019, Duis met with Steinhilber and Thatcher-Curtis (the Director of Nursing Operations) to discuss the April 11th incident. [Thatcher-Curtis Aff. ¶ 9; Duis

4

Dep. at 60.]  According to Duis, Steinhilber got upset with her and mocked Duis stating, "oh, I have to call the doctor for myself to the floor.  I can't handle my job, because I am pregnant." [Duis Dep. at 61-62.]  Duis claims Steinhilber was "personally attacking me and mocking me and getting in my face, yelling at me, telling me I was rude, telling me that I was a nasty person" and telling Duis "I can't handle my job, because I'm pregnant."  [*Id.* at 62.]  Duis claims this was very upsetting to her, and she was crying during the meeting.  *Id.*

However, both Steinhilber and Thatcher-Curtis disagree that Steinhilber mocked Duis.  Steinhilber stated in her affidavit that although she did not recall the substance of the meeting, she was "certain that at no point during the discussion was there any mention or mocking of Duis's pregnancy." [Steinhilber Aff. ¶ 15.]  According to Thatcher-Curtis, it wasn't his impression that Steinhilber was mocking Duis at all or yelling at her, and if Steinhilber had engaged in such behavior, he would have issued corrective action against Steinhilber. [Thatcher-Curtis Aff. ¶¶ 9, 11.]

A second incident occurred during the overnight shift on May 8, 2019.  During Duis' shift, a patient hit his call-light and asked for pain medication. [Steinhilber Aff. ¶¶ 16, 18.]  It was reported to Steinhilber by another nurse (Jen Justice) that Duis' response was "I don't give a fuck if that patient wants pain meds.  He can wait.  He should have taken it before." [*Id.* at ¶ 16.]  Another nurse (Christine Rogalski) told Steinhilber that she heard Duis state that the patient would have to wait for pain medication, but could not recall Duis' exact words. [*Id.* at ¶ 18; DE 29-3 at 9.]  Rogalski also stated that Duis

had said in the nursing station that "she hates being a nurse and doesn't know if she's coming back after October." *Id.*

Not surprisingly, Duis has another version of the "pain medication" story, and her account is backed by a co-worker. First, Duis denies ever making that statement. [Duis Dep. at 141.] Second, Kim Buchanan, also a nurse, was working with Duis that night when a new patient got assigned to them. [Buchanan Dec. ¶ 4.] Buchanan said in her declaration that she told Duis that the patient had requested pain medication through a family member. *Id.* Duis explained to Buchanan that the patient would have to wait a moment until Duis received the medication order from the doctor since the patient had just come up as a new patient from the emergency room. *Id.* As Buchanan was providing an update to the patient, Duis entered the room with the pain medication, and apologized to the patient, explaining why there was a wait for the medication. *Id.* According to Buchanan, after the family notified her of the request for pain medication, the patient received the medication within approximately ten minutes. [*Id.* at 5.]

On May 9, 2019, Steinhilber and Jessica Smosna (a manager in Human Resources) called Duis to inform that she was being suspended for what happened the night before, pending an investigation. [Smosna Aff. ¶¶ 10-11.] During the call, Duis denied that she made the statement about the patient's request for pain medication. [Steinhilber Aff. ¶ 22.] However, she admitted that she said she hated her job and conceded it was possible that she said she did not want to come back after October. [*Id.*, Duis Dep. at

6

133.]

The next day, May 10, 2019, Duis and her mother went to Franciscan and met with Dawn Scott, Chief Nursing officer. [Duis Dep. at 74-75; Scott Aff. ¶¶ 3, 8.]  During the meeting, Duis informed Scott she was pregnant, and she also told her that Steinhilber was retaliating against her for refusing to lie to Human Resources about Smith, and Duis claims she told Scott about comments Steinhilber made to her regarding her pregnancy and how Steinhilber had mocked her pregnancy. [Duis Dep. at 75-76.] Scott admits that Duis told her she was being targeted and harassed by Steinhilber. [Scott Dep. at 35, 38.]  Duis told her that she wanted to file a formal grievance against Steinhilber, and Scott told Duis she should go through Human Resources. [Scott Aff. ¶ 8; Scott Dep. at 33-34.] Overall, Scott believed the meeting "was unproductive and filled with nasty, unprofessional comments made by Duis about Steinhilber." [Scott Aff. ¶ 11.] Following the meeting, Scott informed Human Resources of Duis' claim that Steinhilber was targeting her. [Scott Dep. at 38.]

A few days later, there was a termination meeting held to discuss Steinhilber's investigation into Duis' conduct on May 8th involving the patient's request for pain medication.  Several Franciscan employees were present, including Steinhilber and Scott. [Scott Aff. ¶ 14.]  According to Steinhilber, she was later involved in a meeting on May 14, 2019, to discuss her investigation into Duis' conduct involving the patient call-light, and everyone at the meeting agreed that Duis' behavior that night "was directly contrary to Franciscan's values and mission and warranted termination."  [Steinhilber

Aff. ¶¶ 24-25.]  Both Scott and Steinhilber claim there was no mention of pregnancy, maternity leave, or FMLA made during the termination meeting. [Scott Aff. ¶17; Steinhilber Aff. ¶ 7.]

On May 14, 2019, Duis was informed via telephone by Steinhilber and Smosna that she was being terminated. [Duis Dep. at 46-48; Smosna Aff. ¶ 19.] Smosna claims she did not consider Duis' pregnancy or future maternity leave in deciding to support the termination of her employment, and that when Duis asked on the call if she was being terminated because of her pregnancy, she confirmed she was not being fired because she was pregnant. [Smosna Aff. ¶ 19.]  Duis claims that when she spoke with a person in Human Resources that same day, they told her she wasn't being fired because she was pregnant, but because she was taking FMLA leave. [Duis Dep. at 46-48.]  When Steinhilber typed up Duis' termination form, she wrote that "Taryn stated she said she couldn't wait until October to be on maternity leave." [Ex. E; Steinhilber Dep. at 120, 124.]

Duis was not given any progressive disciplinary action other than the termination.  [Ex. G, Interrog. Resp. No. 3, at 4.]  Prior to her suspension, Scott and Steinhilber were not aware of any problems or complaints with Duis' performance. [Scott Dep. at 45-46, 50-51, 55; Steinhilber Dep. at 30, 34-35, 121.]

Duis has set forth individuals she believes are similarly situated, but were treated differently by Franciscan.  For example, Dawn Smith was an RN who reported to Steinhilber. [Ex. E, DE 32-6; Steinhilber Dep. at 127-28.]  She was never pregnant, and

she did not take FMLA leave or report any discrimination. *Id.* During 2019, Smith

received three complaints against her - alleging she was lazy, she did not assist her co-

workers, she did not meet patient care standards, and her patients were requesting

another nurse. [Ex. E at 36; Steinhilber Dep. at 128, 134.] Additionally, Smith did not go

to the room of a patient or answer an alarm for 45-60 minutes. [*Id.* at 129.] There were

also problems with rooms assigned to Smith (including an IV alarming air line and

overflowing garbage). *Id.* Smith received multiple patient complaints against her.

Although Smith was eventually terminated, unlike Duis, Smith was afforded a chance

to correct her behavior and performance prior to being terminated. [Ex. E; Steinhilber

Dep. at 128-29, 136.]

Nancy Georgakis was a nurse who reported to Steinhilber, but was never

pregnant, she did not take FMLA leave, and she didn't report any discrimination. [Ex.

E; Steinhilber Dep. at 149-51.] She needed improvement with body language and

verbiage, time management, and with appearing gruff.   [Ex. E at 52; Steinhilber Dep. at

149-51.] She was provided a written counseling after stating to a co-worker, "you

freaking snitch.  You narked me out." [Ex. E at 67, Steinhilber Dep. at 159.]

Melissa Roberts was also a nurse who reported to Steinhilber and was never

pregnant, nor did she take leave, or report discrimination.  [Ex. E; Steinhilber Dep. at

154-55.] Steinhilber provided Roberts a written counseling after Roberts accessed

personal medical information in violation of Franciscan's policy.  [Ex. E; Steinhilber

Dep. at 156.]  Later, she was issued another written counseling for incomplete restraint

documentation, incorrect verbiage, no order for restraints, and not answering calls from the charge nurse on two occasions. [Ex. E at 59, 62, 67.]

### Discussion

Duis brings this lawsuit against her former employer, Franciscan, pursuant to Title VII of the Civil Rights Act of 1963, 42 U.S.C. § 2000e, as amended, the Pregnancy Discrimination Act, 42 U.S.C. § 2000e, and for violations of the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.* Additionally, she also asserts a claim for retaliatory discharge under Indiana law. Franciscan seeks summary judgment on all claims.

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). I must take the facts in the light most favorable to the party opposing the motion. *Fulk v. United Transp. Union*, 160 F.3d 405, 407 (7th Cir. 1998).

### A.     Title VII Claims

Title VII prohibits discrimination on the basis of sex, including discrimination "on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). The Pregnancy Discrimination Act (PDA) "amended Title VII to state that discrimination 'because of sex' includes discrimination 'because of or on the basis of pregnancy, childbirth, or related medical conditions.'" *Hall v. Nalco Co.*, 534 F.3d 644,

10

646 (7th Cir. 2008).

The parties have recognized that a plaintiff may structure their argument by using the *McDonnell Douglas* burden-shifting framework, or by using what Franciscan calls the "single pile theory," which was established in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).  Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973), "the plaintiff has the initial burden of producing evidence showing that (1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably." *Simpson v. Franciscan Alliance, Inc.*, 827 F.3d 656, 661 (7th Cir. 2016). "If the plaintiff meets each element of her prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason" for the action.  *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 719 (7th Cir. 2018) (quotation omitted).  And if the defendant does so, "the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual."  *Id.* at 719-20.

The approach taken in *Ortiz* is much less mechanical and more holistic.  It simply requires me to ask whether, taking all of the employee's direct, indirect and circumstantial evidence into account, a "reasonable factfinder (could) conclude that the plaintiff's . . . [pregnancy] caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765.  Courts have recognized that while the *McDonnell Douglas* framework remains useful, the ultimate question remains simply "whether the evidence

11

would permit a reasonable factfinder to conclude that the plaintiff's [pregnancy] caused the discharge or other adverse employment action." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018).

Following this standard, Duis has laid out all of the evidence she contends would permit a reasonable jury to find in her favor. [DE 32 at 4.]  I will do the same, going through the analysis once, in an effort to determine whether the evidence as a whole would permit a reasonable factfinder to conclude that Duis' pregnancy, rather than her job performance and attitude, is what led to her being sacked. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 574 (7th Cir. 2021); *Ortiz*, 834 F.3d at 765.  For the reasons articulated below, I believe the evidence is sufficient for a reasonable factfinder to determine that Duis was fired due to her being pregnant.

First, Duis has pointed to evidence that, if credited by a jury, is evidence of a discriminatory intent.  This comes in the form of statements made by her manager as things started to unravel for her on the job.  For example, Duis claims Steinhilber (her supervisor) mocked her after a health incident, stating, "oh, I have to call the doctor for myself to the floor.  I can't handle my job because I am pregnant." [Duis Dep. at 61-62.] Franciscan disputes that Steinhilber made this statement, but if the jury believes Duis and therefore disbelieves Steinhilber, this is strong evidence of discriminatory intent. What's more, according to a co-worker, Kim Buchanan, Steinhilber also angrily confronted her, and said while stomping her foot, "so you're saying we don't hear anyone complaining about assignments or duties because of their pregnancy or nobody

ever said that I'm pregnant and can't do this or that they're not coming back to work after a child being born." [Buchanan Aff. ¶¶ 1, 3, 10-12.]

There are other comments that could be ascribed discriminatory intent, too, like Duis' claim that the human resources officer told her she was being fired because Duis was taking maternity leave. [Duis Dep. at 48, 52.] Franciscan tells me that it's farfetched to believe that a human resources professional would say such a thing. [DE 30 at 21.] Maybe yes, maybe no. But in either event, the argument misses the point at the summary judgment stage of the case. I must assume she did in fact make this incriminating statement. Any arguments about the ridiculousness of an HR manager making such a comment have to be left to a jury.

In sum, while not overwhelming, put together, I do think this litany of comments are enough for a fact finder to determine that the real reason Franciscan fired Duis was because of her pregnancy. *See, e.g., Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 824 (7th Cir. 2011) (reversing district court's grant of summary judgment on pregnancy discrimination claim, finding those "statements alone [were] direct evidence of a discriminatory intent.").

For its part, Franciscan claims that Duis was fired because she was not meeting the legitimate expectations of her job. [DE 30 at 15.] Specifically, they point to Duis' language and reaction to the patient pushing a call-button for pain medication, which they claim was "not in line with Franciscan's mission and values." *Id.* But disputes of fact regarding this incident abound. On the one hand, it was reported to Steinhilber by

Nurse Justice that Duis' response was "I don't give a fuck if that patient wants pain meds. He can wait. He should have taken it before." [Steinhilber Aff. ¶ 16.] But Nurse Rogalski told Steinhilber that she heard Duis state that the patient would have to wait for pain medication, but could not recall Duis' exact words. [*Id.* at ¶ 18.] And on the other hand, Duis denies having made this statement [Duis Dep. at 141], and Nurse Buchanan said Duis explained to her that the patient would have to wait a moment until Duis received the medication order from the doctor since the patient had just come up as a new patient from the emergency room. [Buchanan Dec. ¶ 4.] According to Buchanan, after the family notified her of the request for pain medication, the patient received the medication within approximately ten minutes. [*Id.* at ¶ 5.] There are clearly two accounts of what is going on here, and the jury is going to have to sort out who it believes. *See, e.g., Eggleston v. South Bend Cmty. Sch. Corp.*, 858 F.Supp. 841, 852 (N.D. Ind. 1994) (denying summary judgement where several issues required credibility determinations).

On top of that, even assuming that Duis did make that statement, would that alone be sufficient to establish she wasn't meeting the legitimate expectations of her job? After all, prior to her termination, she was not issued any other disciplinary action, and there were no other problems or complaints with Duis' performance. [Scott Dep. at 45-46, 50-51, 55; Steinhilber Dep. at 30, 34-35, 121; Ex. G, Interrog. Resp. No. 3 at p. 4.] This begs the question of how did Franciscan treat other nurses who engaged in improper workplace behavior, but were not pregnant. In that regard, Duis has identified

similarly situated non-pregnant employees who were treated more favorably than her. [DE 30 at 16.]  At great length in her memoranda, Duis identified 5 other employees (Dawn Smith, Melissa Roberts, Nancy Georgakis, Danielle Mendoza, and Celeste Reed), who all reported to Steinhilber, were not pregnant, and were arguably treated more leniently after work-related issues, including being given progressive discipline. [DE 32 at 14-15.] Franciscan responds by quibbling over whether these other employees are really similarly situated to Duis. [DE 34 at 11-12.]  But the comparators need to be "similar" to the plaintiff, not identical.  *See Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (finding employees are similarly situated if they are directly comparable in all material respects, "but they need not be identical in every conceivable way.").  "All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination." *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019).  Here, Duis has sufficiently shown, at this stage in the proceedings, similarly situated people treated more favorably.

Finally, in looking at whether Duis has shown that Franciscan's reason was pretext for discrimination, I need to consider whether the stated reason for the termination was really just an effort to cover Franciscan's tracks. *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002).  A plaintiff can avoid summary judgment in a discrimination case if the plaintiff can produce evidence that the defendant's proffered reasons "are factually baseless, did not actually motivate the defendants, or were

15

insufficient to motivate the adverse employment action." *O'Neal v. City of New Albany*, 293 F.3d 998, 1005 (7th Cir. 2002). "Because a fact-finder may infer intentional discrimination from an employer's untruthfulness, evidence that calls truthfulness into question precludes a summary judgment." *Id.* Importantly, "once the employee has cast doubt upon the employer's proffered reasons for the termination, the issue of whether the employer discriminated against the plaintiff is to be determined by the jury - not the court." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 724 (7th Cir. 2005) (citation omitted).

Here, Duis has called into question the reason for her termination. She has done this, first, by putting into doubt whether she actually made the statement about the patient requesting the pain medication and showing that regardless, there was only a short delay before the patient received the pain medication; and second, by showing that foul language did not result in discipline (much less termination) for any other employee. For example, Scott admits that employees have used foul language in front of her, yet she has never disciplined an employee for foul language while at Franciscan Crown Point. [Scott Dep. at 75-77.] Steinhilber has also heard nurses use foul language, but never issued even a written warning for foul language. [Steinhilber Dep. at 41-42, 77.] Although Franciscan argues that it was this statement plus Duis' negativity and attitude in the meeting after the incident that caused her termination [DE 30 at 16-17], again, it is ultimately up to the factfinder to determine if the reason for her firing was a mere pretext.

16

In sum, when I put the evidence in "a single pile" and evaluate "as a whole," I conclude that a reasonable jury could find that Duis' pregnancy led to her termination. *Ortiz*, 834 F.3d at 766.  Duis has produced evidence that her supervisor made derogatory comments about her pregnancy, she had no complaints about her performance prior to the pain medication incident, and that other nurses engaged in similar behavior, but were treated differently (including they were granted progressive discipline instead of immediate termination).  As such, Duis' claim for discrimination based upon her status as a pregnant woman survives summary judgment.

**B.    Retaliation Under Title VII**

Title VII protects not only against forms of job discrimination, but also from retaliation for complaining about the types of discrimination it prohibits.  *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000).  To establish a prima facie case of retaliation, a plaintiff "must show that (1) she engaged in statutorily protected expression by complaining about discrimination that Title VII covers; (2) she suffered an adverse action by her employer; and (3) there is a causal link between the protected expression and the adverse job action."  *Id.*  As the Seventh Circuit has held:

> An employee, of course, need not use the words "pregnancy discrimination" to bring her speech within Title VII's retaliation protections.  But she has to at least say something to indicate her pregnancy is an issue.  An employee can honestly believe she is the object of discrimination, but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints.

*Id.* at 1007-08 (7th Cir. 2000) (citation omitted).

17

Franciscan claims that Duis did not engage in any statutorily protected expression because she didn't complain of pregnancy discrimination. And even if she did have evidence of such a complaint, it argues, there is no causal connection between any supposed complaint and her termination. [DE 30 at 17-18.]

On the contrary, Duis does have some evidence that she engaged in protected activity. Duis testified in her deposition that during a meeting with Scott on April 19, 2019, she told her how Steinhilber was retaliating against her since she refused to lie to human resources about her co-worker, and she "told Dawn Scott about the conversation with Linda and Travis and how she mocked my pregnancy. I told Dawn Scott all of that." [Duis Dep. at 75-76.] Scott admits that Duis told her "she was being targeted by Ms. Steinhilber." [Scott Dep. at 35.]  Although Scott claims Duis never told her Steinhilber was treating her differently due to her pregnancy [Scott Dep. at 37], this is another factual dispute that the jury is going to have to decide - whether to believe Duis' version of what happened, or Scott's.  I cannot ignore the basic tenant of summary judgment which is that I "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette, Inc.*, 359 F.3d 925, 928 (7th Cir. 2004).  Here, when I do that, Duis has put forth evidence that she told Scott she was being harassed because of her pregnancy, and she was soon thereafter terminated.  Again, this is sufficient to survive summary judgment on the retaliation claim.

### C.    FMLA Retaliation and Interference Claims

Duis asserts two FMLA claims: retaliation and interference. "The difference between a retaliation and interference theory is that the first requires proof of discriminatory or retaliatory intent while [an interference theory] requires only proof that the employer denied the employee his or her entitlements under the Act." *Sorah v. New Horizons Home Healthcare Ltd. Liab. Co.*, No. 1:16-CV-291-TLS, 2018 WL 5830753, at *2 (N.D. Ind. Nov. 7, 2018) (quotation omitted). An employer cannot use an employee taking FMLA leave as a negative factor in termination. *See Pagel v. TIN Inc.*, 695 F.3d 622, 629 (7th Cir. 2012); *see also* 29 U.S.C. § 2615(a)(2). "To succeed on a retaliation claim, the plaintiff does not need to prove that 'retaliation was the *only* reason for her termination; she may establish an FMLA retaliation claim by 'showing that the protected conduct was a substantial or motivating factor in the employer's decision.'" *Goelzer v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 995 (7th Cir. 2010) (citing *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 741-42 (7th Cir. 2008) (emphasis in original)). As with other employment statutes, to prove that her termination was retaliatory for taking protected leave, Duis must establish that: (1) she engaged in a protected activity; (2) Franciscan took an adverse employment action against her; and (3) there is a causal connection between the two. *See Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 633 (7th Cir. 2009).

Franciscan claims that Duis was not denied any FMLA leave, and that there is no evidence to show that her termination was proximately caused by her intent to take any future FMLA leave. [DE 30 at 19.] Regarding the retaliation claim, there is ample evidence that Franciscan knew about Duis' plan to take FMLA leave when her child

19

was born.  For example, Steinhilber said in her deposition that Duis told her she couldn't wait to go on maternity leave. [Steinhilber Dep. at 120.]  Steinhilber also questioned a fellow nurse, asking "so you're saying we don't hear anyone complaining about assignments or duties or because of their pregnancy or nobody ever said that I'm pregnant and can't do this or that they're not coming back to work after a child being born?" [Buchanan Dec. ¶¶ 1, 3, 10-11.] The strongest piece of evidence Duis has in support of her claim is that a person from human resources told Duis she wasn't being fired because she was pregnant, but because she was taking maternity leave and FMLA. [Duis Dep. at 48, 52.]  Based upon these facts, I believe a reasonable factfinder could determine that Duis' intent to take FMLA leave was a substantial factor in her termination.

And, contrary to Franciscan's insinuation, Duis doesn't have to prove that she was actually denied FMLA leave after a formal request. "The notice requirement under the FMLA is not especially strict.  An employee need not mention the FMLA by name; in fact, all that is required is that the employee provide the employer with enough information to put the employer on notice that FMLA-qualifying leave is needed." *Sample v. Rend Lake College*, No. 04-CV-4161-JPG, 2005 WL 2465905, at *9 (S.D. Ill. Oct. 5, 2005) (citing *Stoops v. One Call Commc'ns, Inc.*, 141 F.3d 309, 312 (7th Cir. 1998)).  Plus, employees violate the FMLA "not only when they take adverse action in response to specific requests for leave but also when they discharge an employee in anticipation of the future use of leave." *Zutz v. Froedtert Health*, No. 20-CV-388-JPS, 2022 WL 1488204,

at *6 (E.D. Wis. May 11, 2022). Based upon the evidence Duis has pointed to, a reasonable jury could determine that Duis gave sufficient notice under the FMLA.

Regarding the FMLA interference claim, Duis must prove that: (1) she was eligible for FMLA protection; (2) Franciscan was covered by the FMLA; (3) she was entitled to FMLA leave; (4) Duis provided sufficient notice of her intent to take leave; and (5) Franciscan denied her FMLA benefits to which she was entitled. *Guzman v. Brown Cnty.*, 884 F.3d 633, 638 (7th Cir. 2018). Employers cannot "interfere with" FMLA rights by "'using the taking of FMLA leave as a negative factor in employment actions' and 'discouraging an employee from using such leave.'" *Baer v. Wabash Ctr., Inc.*, No. 4:15-CV-00094-JEM, 2016 WL 1610590, at *2 (N.D. Ind. Apr. 21, 2016) (quoting *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 818 (7th Cir. 2015)). Franciscan argues the "FMLA retaliation claim fails for the same reasons" as the FMLA interference claim. [DE 30 at 21.] But the flipside of this is also true - the retaliation claim survives for the same reasons, and the same disputed material facts, as the interference claim. *See Williams v. Illinois Dep't Of Corrections*, No 05-CV-4227-JPG, 2007 WL 772933, at *8 (S.D. Ill. 2007) (finding the "distinction [between retaliation and interference under the FMLA] does not really make a difference in the end because the crux of [Plaintiff's] claim is that h[er] discharge was wrongfully procured.").

### D.    State Law Claim for Retaliatory Discharge - Under *McClanahan*

Duis also brings a state claim for retaliatory discharge. In a nutshell, she claims she was terminated for refusing an alleged order by Steinhilber to make defamatory

21

statements regarding her co-worker, Smith. [Compl. at 7-8.] Indiana courts have recognized an exception to the employment at will doctrine "when an employee is discharged solely for exercising a statutorily conferred right." *McClanahan v. Remington Freight Lines, Inc.*, 517 N.E.2d 390, 393 (Ind. 1988). A *McClanahan* claim requires three basic elements: (1) protected activity (for example, refusal to engage in conduct that could expose an employee to criminal liability, or, whether Duis refused to breach a statutorily imposed duty); (2) an adverse employment action; and (3) causation between the first two elements. *See Stillson v. St. Joseph Cnty. Health Dep't*, 22 N.E.3d 671, 679 (Ind. Ct. App. 2014).

Here, even assuming Duis could have subjected herself to liability under Indiana law if she followed the alleged order and made those statements about Smith, the last required element simply is not present. Duis has not put forth any evidence whatsoever that she was terminated *because* she refused to obey that alleged order made by Steinhilber. And multiple Franciscan employees have stated that nothing relating to the alleged incident between Smith and Duis was considered in determining whether Duis' employment should be terminated. [Steinhilber Aff. ¶¶ 24-27; Wirkus Aff. ¶¶ 24-27; Smosna Aff. ¶¶ 15-17; Scott Aff. ¶¶ 15-18.] Causation is therefore lacking, and summary judgment is proper on this claim.

## Conclusion

For the aforementioned reasons, Franciscan Alliance Inc.'s Motion to Strike [DE 33] is DENIED. Franciscan Alliance Inc.'s Motion for Summary Judgment [DE 29] is

GRANTED IN PART AND DENIED IN PART.  It is GRANTED as to Count V (the state

law claim for retaliatory discharge), which is DISMISSED WITH PREJUDICE.  The

Motion for Summary Judgment is DENIED as to all the other claims, which REMAIN

PENDING.

ENTERED: July 29, 2022.

 s/   Philip P. Simon_____
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT
