```
 1                     UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF INDIANA
 2                           HAMMOND DIVISION

 3   TARYN N. DUIS,                  )
                                     )
 4        Plaintiff,                 )
                                     )
 5        vs.                        )  Cause No.
                                     )  2:20-cv-00078-APR
 6   FRANCISCAN ALLIANCE, INC.,      )
     a/k/a FRANCISCAN CROWN POINT    )
 7                                   )
          Defendant.                 )
 8   _____)

 9
                  EXCERPT FROM DAY ONE OF JURY TRIAL
10                    TESTIMONY OF RENEE SALMI
                          MARCH 6, 2023
11          BEFORE THE HONORABLE ANDREW P. RODOVICH
                  UNITED STATES MAGISTRATE JUDGE
12

13   APPEARANCES:

14   FOR THE PLAINTIFF:       RYAN P. SINK and RYAN C. FOX
                              Fox & Sink LLC
15                            6177 North College Avenue
                              Indianapolis, Indiana 46220
16                            317-254-8500
                              Email: rsink@foxsinklaw.com
17                                    rfox@foxsinklaw.com

18
     FOR THE DEFENDANT:       ROBERT A. ANDERSON
19                            Krieg DeVault LLP
                              8001 Broadway, Suite 400
20                            Merrillville, Indiana 46410
                              219-227-6100
21                            Email: randerson@kdlegal.com

22                            ELIZABETH M. ROBERSON
                              AMY J. ADOLAY
23                            Krieg DeVault LLP
                              12800 North Meridian Street, Suite 300
24                            Carmel, Indiana 46032
                              317-238-6342
25                            Email: eroberson@kdlegal.com
                                     aadolay@kdlegal.com
```

Angela Phipps, RMR, CRR, CSR
(219) 852-3616 - Angela_Phipps@innd.uscourts.gov

```
ALSO PRESENT:            Plaintiff, Taryn N. Duis;
                         Sister Marilyn Oliver,
                         Franciscan Representative.


OFFICIAL REPORTER:       Angela Phipps, RMR, CRR
                         5400 Federal Plaza
                         Hammond, Indiana 46320
                         (219) 852-3616
                         angela_phipps@innd.uscourts.gov
```

Proceedings reported by stenotype.  Transcript produced by computer-aided transcription.

```
 1                           Index

 2   RENEE SALMI                                              PAGE
     Direct Examination by Mr. Sink                           04
 3   Cross-Examination by Ms. Adolay                          13

 4


 5


 6   EXHIBITS ADMITTED                                        PAGE

 7   No Exhibits Admitted

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Angela Phipps, RMR, CRR, CSR
(219) 852-3616 - Angela_Phipps@innd.uscourts.gov

1    **THE COURT:** Call your next witness, please.
2    **MR. SINK:** Plaintiff calls Renee Salmi. If you would
3    raise your right hand, the clerk will administer the oath
4    to you.
5       (The oath was duly administered.)
6    **THE WITNESS:** Yes.
7    **COURTROOM DEPUTY:** Thank you. Please be seated.
8         **RENEE SALMI, PLAINTIFF'S WITNESS, SWORN**
9                    **DIRECT EXAMINATION**
10   **BY MR. SINK:**
11   Q.   Good afternoon.
12   A.   **Hi.**
13   Q.   Can you introduce yourself for the jury.
14   A.   **My name is Renee Salmi. I am the mother of Taryn Duis.**
15   Q.   Now, Ms. Salmi, you just took an oath, and you are the
16   mother of Ms. Duis; is that correct?
17   A.   **Yes.**
18   Q.   Do you agree to tell the truth regardless of whether that
19   truth hurts or helps your daughter in this case?
20   A.   **Absolutely.**
21   Q.   I want to ask you about your employment.
22        What's your current occupation?
23   A.   **I'm a registered nurse.**
24   Q.   Where do you currently work?
25   A.   **I work at Northwest Regional Surgery Center.**

1  Q.  Have you ever worked for the Defendant in this case?
2  A.  **I have.**
3  Q.  What were your dates of employment?
4  A.  **The first time was back in '96 and '97.  I think I was**
5  **there two years.  I left, and then I came back and was there**
6  **12 years up until 2020, I think February of 2020.**
7  Q.  What position did you hold?
8  A.  **I was a registered nurse in the pre-op and PACU area.**
9  Q.  I want to direct your attention to May 10 of 2019.
10     Were you employed with Franciscan at that point?
11 A.  **I was, yes.**
12 Q.  What occurred on May 10th of 2019?
13 A.  **Taryn and I had spoke the day before or evening before,**
14 **and she had told me that she had gotten a call from her**
15 **manager, Linda, and that she told her that she was suspended**
16 **pending an investigation.**
17     **And we were both just flabbergasted.  I was like -- I**
18 **never heard anything like this before.  So I actually even**
19 **called my manager, my personal manager, and said, like, isn't**
20 **there, like, usually, like, a verbal warning or a write-up or**
21 **something if you do something wrong, and she said, yeah, that's**
22 **normally the course.**
23     **So I told her that I was going with Taryn the next day, I**
24 **would be in late because I was supposed to work, to go and see**
25 **her manager there, because he -- she had texted, I think, or**

1 tried calling.
2 　　　So we went to St. Anthony's early in the morning, probably
3 8:00, and we went to see her critical care manager.  Travis is
4 his name and -- because in nursing you're supposed to file a
5 line of succession.  So we went to see him.
6 　　　And he was not in.  And Dawn Scott was in.  She's the head
7 of nursing.  And she agreed to see us and talk to us because
8 she seen us looking for Travis and asked, and we -- so we just
9 needed to talk to someone.
10 Q.　Who all was present during this meeting?
11 A.　**Me, Taryn, and Dawn.**
12 Q.　Did anyone take notes during this meeting?
13 A.　**No.**
14 Q.　Tell the jury what happened.
15 A.　**So Taryn and I went in, and we introduced ourselves, and I**
16 **told her I was Taryn's -- she seen I had a uniform on because I**
17 **was supposed to work, and I told her I was Taryn's mom and I**
18 **was there for moral support because Taryn was, like, very**
19 **upset.  She was beside herself.  She just was crying and just**
20 **very upset.**
21 　　　So I told her I was there for moral support.  And we went
22 in.  And Taryn started explaining to Dawn how she had gotten a
23 call, and she told her that she was suspended pending an
24 investigation.
25 　　　And Taryn asked, "Like, an investigation about what?  Can

1  you tell me what I've done or what I've been accused of doing
2  or anything like that?"
3         And she was told no, you know, that she would -- she would
4  let her know.
5         And so we told Dawn we thought that that was, like, really
6  odd, like we didn't understand this, you know, like, why she
7  wasn't called in and spoken to or, you know, given some type of
8  verbal reprimand.  She had never been in trouble before.  She
9  had never had a patient complaint.  Never a verbal reprimand.
10 Never a written reprimand.  Nothing.  She had actually gotten a
11 promotion -- I don't know if it had quite been a year, but
12 sometime before that.
13        So she explained this to Dawn, you know, that she just --
14 she didn't understand; she was really confused, and, you know,
15 she was upset because she needed to work.  She was the sole
16 provider of the family.  She was pregnant, so she needed to
17 work up and to her pregnancy.  Her husband is a
18 stay-at-home dad.
19        So she's like, "You know, I can't be off work.  I need to
20 work.  I have to pay my bills."
21        And Dawn said that she wasn't familiar with the
22 situation -- the direct situation with Taryn.  She's like, "I
23 don't know anything specific about this," and she's like, "So I
24 can't comment on that."  She said, "I can tell you that I was
25 up on your floor the other day," and she said, "during the day,

1   and those nurses up there have a really bad attitude, and I
2   heard foul language."  And she said, "That, you know,
3   department just really needs to have some adjustments made."
4         And Taryn said, "Well, I work straight midnights, so I
5   would not have been there, you know."  She's like, "I'm not
6   there during the day."
7         So Taryn told her that she also had had some issues with
8   Linda already, that Linda had called her on a couple occasions
9   and was asking her to do something that wasn't true and that
10  Taryn was not comfortable with doing.
11        And she said -- You know, she said, "I just kind of hoped
12  that it would just, like -- you know, she would like forget
13  about it and, you know, would kind of leave me alone about it,"
14  she said, "but then she called me into a meeting," and that her
15  and Linda and Travis were in this meeting.
16        And Taryn said Linda proceeded to keep asking her
17  questions and questioning her about another nurse, and Taryn
18  kind of got, you know, real uncomfortable about it.  She was
19  like, "I just -- I didn't want to be there."  She said, "And
20  Linda, I wouldn't give her the answer that she wanted, and then
21  she started yelling at me."  And she said, "Once she started
22  yelling at me, I started crying."  "After I started crying,"
23  she goes, "she started mocking me and being like, 'Ah, what's
24  the matter?  You can't handle it?  You can't handle your job
25  because you're pregnant and you're all emotional and

1   hormonal?'"
2       And Taryn said she finally looked at Travis, and she said,
3   "Please make her stop."  And he said that was enough.  And she
4   said, "I want to go.  I don't want to be here anymore."  So
5   Taryn left the meeting.
6       She told Dawn -- She said, "I just" -- She said, "I don't
7   find that to be very professional at all," and she said and --
8   she said, "I thought about saying something," she said, "but,
9   you know, she's new, and I didn't want to make waves."  And she
10  said, "But at this point in time," she said, "I really feel
11  like she's singling me out and that she is bullying me, and I'd
12  like to make -- I'd like to make a complaint about that and
13  I'm, you know, not sure what I need to do."
14  Q.   What did Ms. Scott say in response to that?
15  A.   Dawn Scott said, "You need to go to human resources to
16  make that complaint," and so Taryn and I said that that's what
17  we would do.
18      And we left her office after that.  That was the end of
19  the thing.  And we went down to human resources.
20      And there were some other people in there.  And there was
21  a girl -- like, the front desk girl.  And she asked why we're
22  there, and we told her that -- Taryn told her she needed to
23  file a complaint about her manager, and she said, "Okay.  Hold
24  on a second."
25      And she went in the back in one of the offices.  There's,

1   you know, offices back there.  And she came out, and she said,
2   "What's your name?"
3          And she said Taryn Duis.
4          And she said, "I'm sorry.  We can't talk to you."
5          And Taryn said, "But Dawn Scott told me to come down
6   here," and she said, "This is where I need to go, you know, to
7   file this complaint."
8          And she said, "Well, we're not going to speak to you at
9   this time."  She said, "We'll be in touch with you."
10         And Taryn and I left there, and then she, I think -- so --
11  had gone home.
12  Q.   Okay.  Let's go back to the May 10th meeting.
13       During that meeting, did Ms. Duis curse?
14  A.   **No.**
15  Q.   Did she ever yell?
16  A.   **She was -- I wouldn't say -- she was -- She was upset.**
17  **She was definitely upset, and she was crying, and, you know,**
18  **she was looking for help.  So she was like, "I don't**
19  **understand," you know.**
20  Q.   Was she sitting down during the meeting?
21  A.   **Yeah.  We were all sitting in chairs.**
22  Q.   At any point, did Dawn Scott tell Ms. Duis to calm down?
23  A.   **She may have told her to calm down.  Taryn was upset.**
24  Q.   Was Ms. Duis aggressive during the meeting?
25  A.   **No.**

1  Q.   Was she unprofessional in your opinion?
2  A.   **No.**
3  Q.   How often do you see Ms. Duis?
4  A.   **Every day, every day.**
5  Q.   How often do you talk to her?
6  A.   **Every day.**
7  Q.   Would that be consistent in May of 2019?
8  A.   **In May of 2019?  Yeah.  I'm sure I would have talked**
9  **to her.**
10 Q.   So based on your observation and experience, how did this
11 termination impact Ms. Duis?
12 A.   **Taryn is very -- She's very Type A.  She does everything**
13 **you know, by the book.  She's -- And when she was fired, it was**
14 **really hard for her, and it was really hard for the fact that**
15 **they said that she had done things that -- that weren't true.**
16 **And she was extremely depressed.**
17      **She was extremely stressed out.  She started having blood**
18 **pressure problems.  She was -- She was very depressed.  She was**
19 **very upset.**
20      **I mean, she was -- It was hard for her to function.  She**
21 **said many times that, if it wasn't for her baby and her son,**
22 **she said, "I just wouldn't even want to live," because she knew**
23 **that it was going to be so hard to, like, try to find a job**
24 **while she's pregnant, who's going to hire somebody who's going**
25 **to take off in two months while she's pregnant.  And, you know,**

1    and then she, you know, wouldn't have any time off.
2         So it was very hard.  It was very upsetting.
3    Q.   Now, after the termination of Ms. Duis, did you still
4    remain employed with Franciscan for a period of time?
5    A.   I did for a period of time.
6    Q.   When did your employment there end?
7    A.   In February, I think, is when I left.
8    Q.   Did you end that relationship voluntarily?
9    A.   I did.
10   Q.   In terms of any kind of reputational damage to Ms. Duis,
11   do you have any knowledge of that?
12   A.   I do feel like -- that the hospital is a place where
13   people talk all the time, and not only that, the fact that they
14   were saying things that weren't true.
15        Taryn had also told Dawn in the meeting that she had
16   gotten text messages and phone calls from people asking them
17   to -- asking them questions about Taryn and asking if she was
18   coming back after her maternity leave and was -- you know, was
19   she planning on leaving and just, you know, had she done things
20   wrong, you know, there and stuff like that.  I think that it
21   has hurt her that people have said things that weren't true.
22             MR. SINK:  Okay.  Thank you.  I have no more.
23             THE COURT:  Any cross?
24             MS. ADOLAY:  Yes, Your Honor.
25             \\\\\\

Angela Phipps, RMR, CRR, CSR
(219) 852-3616 - Angela_Phipps@innd.uscourts.gov

| | |
|---|---|
| 1 | **CROSS-EXAMINATION** |
| 2 | **BY MS. ADOLAY:** |
| 3 | Q. Good afternoon. Ms. Salmi, during the time that you |
| 4 | worked at Franciscan Health Crown Point, you did not work on |
| 5 | the progressive care unit with your daughter, did you? |
| 6 | A. **No.** |
| 7 | Q. Okay. And so you were not present on April 11th when |
| 8 | she seemingly had a panic attack at work; correct? |
| 9 | A. **No.** |
| 10 | Q. And you were not present for that April 19th meeting |
| 11 | between Plaintiff, Travis Thatcher-Curtis, and Linda |
| 12 | Steinhilber; correct? |
| 13 | A. **Correct.** |
| 14 | Q. Okay. And you were also not present on the night of |
| 15 | May 7th, the morning of May 8th, when it was reported that |
| 16 | your daughter said she didn't give a fuck, if a patient wanted |
| 17 | pain medication, he could wait, he should have taken it before; |
| 18 | correct? |
| 19 | A. **Was I present? Is that the question?** |
| 20 | Q. That's the question. |
| 21 | A. **No.** |
| 22 | Q. And you were not on the phone during the phone calls that |
| 23 | Plaintiff had with Franciscan with respect to her suspension or |
| 24 | termination; correct? |
| 25 | A. **No.** |

```
1          MS. ADOLAY:  I have no further questions, Your Honor.
2          THE COURT:  Anything else?
3          MR. SINK:  Nothing, Your Honor.
4          THE COURT:  Okay.  Thank you, ma'am.  You may step
5    down.
6       (Conclusion of excerpt.)
```

### CERTIFICATE OF REPORTER

I, Angela Phipps, RMR, CRR, certify that the foregoing is a true, complete, and accurate excerpt from the record of proceedings in the above-entitled matter before Magistrate Judge Andrew P. Rodovich, on March 6, 2023.

Date:  March 11, 2023

S/Angela Phipps, RMR, CRR

Official Court Reporter
For the U.S. District Court

Angela Phipps, RMR, CRR, CSR
(219) 852-3616 - Angela_Phipps@innd.uscourts.gov