1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF INDIANA
2                        HAMMOND DIVISION

3    TARYN N. DUIS,                    )
                                       )
4         Plaintiff,                   )
                                       )
5         vs.                          )  Cause No.
                                       )  2:20-cv-00078-APR
6    FRANCISCAN ALLIANCE, INC.,        )
     a/k/a FRANCISCAN CROWN POINT      )
7                                      )
          Defendant.                   )
8    _____  )

9

**EXCERPT FROM DAY ONE OF JURY TRIAL**
10             **TESTIMONY OF TARYN N. DUIS**
                    **MARCH 6, 2023**
11       **BEFORE THE HONORABLE ANDREW P. RODOVICH**
               **UNITED STATES MAGISTRATE JUDGE**

12

13   <u>APPEARANCES</u>:

14   FOR THE PLAINTIFF:        RYAN P. SINK and RYAN C. FOX
                               Fox & Sink LLC
15                             6177 North College Avenue
                               Indianapolis, Indiana 46220
16                             317-254-8500
                               Email: rsink@foxsinklaw.com
17                                     rfox@foxsinklaw.com

18
     FOR THE DEFENDANT:        ROBERT A. ANDERSON
19                             Krieg DeVault LLP
                               8001 Broadway, Suite 400
20                             Merrillville, Indiana 46410
                               219-227-6100
21                             Email: randerson@kdlegal.com

22                             ELIZABETH M. ROBERSON
                               AMY J. ADOLAY
23                             Krieg DeVault LLP
                               12800 North Meridian Street, Suite 300
24                             Carmel, Indiana 46032
                               317-238-6342
25                             Email: eroberson@kdlegal.com
                                      aadolay@kdlegal.com

Angela Phipps, RMR, CRR, CSR
(219) 852-3616 - Angela_Phipps@innd.uscourts.gov

```
 1
     ALSO PRESENT:            Plaintiff, Taryn N. Duis;
 2                            Sister Marilyn Oliver,
                              Franciscan Representative.
 3

 4

 5   OFFICIAL REPORTER:       Angela Phipps, RMR, CRR
                              5400 Federal Plaza
 6                            Hammond, Indiana 46320
                              (219) 852-3616
 7                            angela_phipps@innd.uscourts.gov

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Proceedings reported by stenotype.  Transcript produced by

25   computer-aided transcription.
```

1                        <u>**Index**</u>

2    **TARYN DUIS**                              <u>**PAGE**</u>
     Direct Examination by Mr. Fox              <u>04</u>
3    Cross-Examination by Mr. Anderson          49
     Redirect Examination                       83
4    Recross Examination                        83

5    <u>**EXHIBITS ADMITTED**</u>                       <u>**PAGE**</u>

6    No Exhibits Admitted

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1         (Proceedings resumed in open court at 1:13 p.m.)

 2              COURTROOM DEPUTY:  All rise.

 3     Please be seated.

 4     Let's bring our jury in, please.

 5     Who's the first witness for the Plaintiff?

 6              MR. FOX:  Taryn Duis, Your Honor.

 7              THE COURT:  Okay.

 8     (Jury in at 1:13 p.m.)

 9              THE COURT:  Please be seated.  Have a seat.  We will

10     start with the presentation of the Plaintiff's case --

11     Will you call your first witness, please.

12              MR. FOX:  Taryn Duis, Your Honor.

13              THE COURT:  Ma'am, if you would approach the witness

14     stand, the clerk will administer an oath for you.

15     (The oath was duly administered.)

16              THE WITNESS:  Yes.

17              COURTROOM DEPUTY:  Thank you.  Please be seated.

18              THE COURT:  When you are ready to proceed.

19              TARYN NICOLE DUIS, PLAINTIFF, SWORN

20                    DIRECT EXAMINATION

21     BY MR. FOX:

22     Q.   Can you please state your name for the record.

23     A.   Taryn Nicole Duis.

24     Q.   Ms. Duis, where do you live?

25     A.   I live in Crown Point, 1102 Country Club Drive, with my
```

TARYN DUIS - DIRECT

```
 1   husband, my son, and my daughter.
 2   Q.    And what is your occupation?
 3   A.    I'm a registered nurse.
 4   Q.    How long have you been a registered nurse?
 5   A.    Since 2015.
 6   Q.    Why did you choose to be a registered nurse?
 7   A.    I had been working in a physicians' office previously, and
 8   my grandfather had gotten sick with cancer, so I quit my job,
 9   and I took care of him the last year of his life.
10   Q.    How did you go about becoming a registered nurse?
11   A.    After that, I had gone to school for nursing, and I
12   graduated from Breckinridge School of Nursing in 2015.  Oh, and
13   then I did my NCLEX to be certified.
14   Q.    After receiving your nursing degree, what steps, if any,
15   did you take to become a registered nurse?
16   A.    The NCLEX exam, state licensing exam.
17   Q.    How long have you had that license?
18   A.    Since 2015.
19   Q.    Do you have any other licenses regarding nursing?
20   A.    I have certifications of, like, the BCLS, ALS, just
21   different nursing certifications that you receive.
22   Q.    Where are you currently licensed to work as a nurse?
23   A.    I am licensed in the State of Indiana to work as a nurse,
24   and I also have a compact license, which allows me to work
25   in -- I think it's 23 different states.
```

TARYN DUIS - DIRECT

1  Q.   Have you ever worked for the Defendant in this matter,

2  Franciscan Alliance?

3  A.   **Yes.**

4  Q.   When were you hired?

5  A.   **I was hired in July of 2015.**

6  Q.   And what was your position at the time of hire?

7  A.   **A registered nurse in the intermediate care unit for**

8  **midnights.**

9  Q.   And do you recall the individual who hired you?

10 A.   **Yes.  Deb Kingery, my manager.**

11 Q.   Upon being hired by the Defendant, who was your direct

12 supervisor?

13 A.   **Deb was.  Deb Kingery.**

14 Q.   And do you recall what Deb Kingery's job title was?

15 A.   **She was the manager of the ICU and the intermediate care**

16 **unit.**

17 Q.   Upon hire, what department did you work for, for

18 Franciscan?

19 A.   **I was hired for IMCU, the step-down unit.  We were also**

20 **cross-trained to be able to float down to the ICU in case they**

21 **needed us.**

22 Q.   And do you recall how long Ms. Kingery was your

23 supervisor?

24 A.   **About two years.**

25 Q.   And what, if any, medical leave did you take while being

TARYN DUIS - DIRECT

1    supervised by Ms. Kingery?

2    A.   **I had my son in December of 2016, and I took my Family and**

3    **Medical Leave Act at that time.**

4    Q.   After Ms. Kingery was your direct supervisor, who was your

5    next supervisor?

6    A.   **After that, we had an interim manager, Travis**

7    **Thatcher-Curtis.  He was the director of critical care in the**

8    **hospital.  So while we were in between managers, Travis took**

9    **over to be the interim manager.**

10   Q.   And do you recall how long Mr. Curtis was your temporary

11   direct supervisor?

12   A.   **I'm not a hundred percent positive how long.  I know that**

13   **it was less than a year.**

14   Q.   And who was your supervisor after Mr. Curtis?

15   A.   **That would be Michael Lane.**

16   Q.   And what was Mr. Lane's job title?

17   A.   **He was also nursing manager of the ICU or IMCU.**

18   Q.   And how long was Mr. Lane your supervisor?

19   A.   **He was there a little less than a year.  He came, I want**

20   **to say, close to the beginning of 2018, and he had left by**

21   **January of 2019.**

22   Q.   Okay.  And who was your supervisor after Mr. Lane?

23   A.   **After Mr. Lane, we had Travis again very briefly as an**

24   **interim manager.**

25   Q.   And who was your supervisor after Mr. Curtis for the

TARYN DUIS - DIRECT

1  second time?

2  A.  **Then we had Linda Steinhilber.**

3  Q.  What job title did Ms. Steinhilber hold?

4  A.  **When she was originally hired, she was a rapid response**

5  **nurse; and then a couple months later, they put her in the**

6  **position of nurse manager of the ICU and the IMCU.**

7  Q.  Do you recall when Ms. Steinhilber became your direct

8  supervisor?

9  A.  **I believe it was the end of March, beginning of April of**

10  **2019.**

11  Q.  So prior to Ms. Steinhilber becoming your direct

12  supervisor at Defendant, how many supervisors did you have?

13  A.  **Four.**

14  Q.  And that's including Mr. Curtis?

15  A.  **Yes.**

16  Q.  Okay.  What discipline, if any, did you receive prior to

17  Ms. Steinhilber becoming your supervisor?

18  A.  **No discipline.**

19  Q.  Are you aware whether Franciscan has any discipline

20  policies regarding the disciplining of employees?

21  A.  **Yes.**

22  Q.  Do you know whether or not that discipline policy is in

23  writing?

24  A.  **It is.  It was available -- I believe -- I know a hard**

25  **copy at orientation, and then it was also available on the**

1 **internet anytime we needed to pull up or look at policies.**

2 Q.   Is there an exhibit book up with you, Ms. Duis?

3 A.   **I do not see a book, unless they're on the computer.**

4 Q.   (Exhibit book tendered to the witness.)

5 A.   Thank you.

6        **COURTROOM DEPUTY:**  This just goes on the screen.

7        **MR. FOX:**  This is not going to be the first time that

8 that happens.

9 Q.   Would you take a look at what's been marked as Exhibit 6?

10 A.   **Yes.**

11 Q.   And do you recognize this as the Corrective Action Policy

12 for Franciscan?

13 A.   **Yes, I do.**

14 Q.   And were you terminated by Franciscan?

15 A.   **Yes, I was.**

16 Q.   When were you terminated?

17 A.   **On May 14th, 2019.**

18 Q.   And who was your direct supervisor at the time of your

19 termination?

20 A.   **Linda Steinhilber.**

21 Q.   If you look at this policy, there are some dates on the

22 first page?

23 A.   **Yes.**

24 Q.   On the upper corner of page 1 of this policy, what is the

25 date that it was last revised?

TARYN DUIS - DIRECT

1   A.   **It won't let me move it on here, so I can't see it.**

2   Q.   (Computer Display Repositioned.)

3   A.   The date is 3/13/2019.

4   Q.   Do you know whether this Corrective Action Policy was in

5   effect at the time Ms. Steinhilber was your direct supervisor

6   in 2019?

7   A.   **Yes.  As far as I know, it was.**

8   Q.   In March of 2019, what was your understanding of this

9   policy?

10   A.   **That there were progressive action, progressive steps,**

11   **progressive discipline.**

12   Q.   According to page 1 of this policy, do you recall what

13   step one was?

14   A.   **Written counseling.**

15        **I somehow drew that blue line.**

16   Q.   (Said line was cleared.)

17   A.   **Okay.  Good.**

18   Q.   And if you look at the second page of the Corrective

19   Action Policy, what was the second step according to the

20   corrective action steps?

21   A.   **Step two is a written warning.**

22   Q.   And what was step three?

23   A.   **A final written warning with potential suspension.**

24   Q.   And step four?

25   A.   **Termination or suspension pending termination.**

TARYN DUIS - DIRECT

1   Q.   Did the Defendant follow each of these corrective action

2   steps prior to your termination of employment?

3   A.   **No.**

4   Q.   According to this policy, how many corrective action steps

5   are there in the progressive corrective action process?

6   A.   **There are four until you get to termination.**

7   Q.   And how many of these progressive steps did Defendant

8   follow prior to your termination?

9   A.   **Zero.**

10  Q.   At the time Ms. Steinhilber became your direct supervisor,

11  what job titles did you hold?

12  A.   **I was a charge nurse for the midnight shift on the PCU,**

13  **IMCU.  IMCU later changed its name to PCU.  It's the same unit,**

14  **just a new --**

15  Q.   Is there a common name?  Do they call it the PCU?

16  A.   **Yeah.  They just changed the name.  It's pretty common**

17  **around -- All the hospitals are changing it from IMCU to PCU.**

18  Q.   How are the duties of a charge nurse different from that

19  as just a registered nurse?

20  A.   **So as a charge nurse, when I would -- like, when I would**

21  **first arrive to work, I was responsible for getting report --**

22  **reports-- I'm sorry --on the entire floor.  So all the patients**

23  **that were on the floor, I needed to know any pertinent or**

24  **important things about them.**

25       **I was also responsible for being on the code team as well**

TARYN DUIS - DIRECT

 1   as doing staffing.  So I did the assignments for the nurses.

 2       I also did our acuity charts.  So we could do staffing for

 3   day shift, and then we also worked with late shift directors to

 4   arrange staffing or make sure our patients were able to be

 5   where they needed to be.

 6   Q.   Did you primarily work the night shift?

 7   A.   Yes, I did.

 8   Q.   Did you occasionally have to work the day shift, as well?

 9   A.   I had voluntarily picked up some day shifts here and

10   there, very rarely.

11   Q.   In your opinion, were there differences between working

12   the night shift as compared to working the day shift?

13   A.   Yes.

14   Q.   What would those differences be?

15   A.   So during the day, it's very busy in the nurses' station

16   area and in the hallways.  There is physical therapy and

17   occupational therapy, speech therapy.  Dietary is coming around

18   and passing out stuff.

19       There's also a lot of family members, as it's visiting

20   hours during the day.  The physicians are also in and out all

21   day.  That's when they do their roundings, so...

22   Q.   Were there other charge nurses within PCU in March of 2019

23   that were --

24   A.   Yes.

25   Q.   Do you recall who those were that worked the night shift?

1   A.   On the night shift, Jen Moreno was one of our other

2   permanent charge nurses.  And then we worked three -- We worked

3   three days a week, so that left us with six nights between Jen

4   and I.

5        So there was always a fill-in.  It was usually Anna, or

6   whoever was, like, the most experienced on the floor that would

7   take the charge position that one day.

8   Q.   Prior to Ms. Steinhilber becoming your direct supervisor,

9   were you ever issued any performance evaluations?

10  A.   I was given a performance evaluation my first year as a

11  nurse at Franciscan by Deb.

12       And I believe it was either the second year I was there or

13  the third year I was there; I was given a performance

14  evaluation by Travis Thatcher-Curtis, as well.

15  Q.   And how were those evaluations?

16  A.   My evaluation with Deb was fine.  There wasn't anything

17  that had stood out positive or negative.  I was a brand new

18  nurse at that time.

19       And then Travis didn't really have -- Since he was just an

20  interim manager, he didn't really know us all that well by the

21  time evaluations came around.  So he didn't want to leave us

22  with nothing, knowing we had a previous, kind of, no

23  evaluation.  So he just did, like, a generalized,

24  straight-down-the-middle evaluation for everybody.

25  Q.   And how did you know he did that for other nurses?

TARYN DUIS - DIRECT

1   A.   He had told us that he just didn't think it was fair to us

2   when he hadn't spent all that much time with us.

3   Q.   In total in 2019, how long was Ms. Steinhilber your direct

4   supervisor?

5   A.   Sometime towards the end of, I think, maybe the very last

6   week of March until May.  So two-and-a-half months

7   approximately.

8   Q.   And you said you worked the night shift.  What was your

9   normal working hours?

10  A.   I worked 7:00 p.m. to 7:30 a.m. unless there was -- A lot

11  of times with charge, you're there maybe little bit longer so

12  you can get report on the whole floor as well as your own

13  patients.

14  Q.   Prior to Ms. Steinhilber becoming your supervisor, how

15  well did you know her?

16  A.   I didn't.  I had never -- Oh, yeah.  I had just met her

17  really, I think, in the hallway one time when she was

18  introduced.  They went around to the floors and just

19  introduced, "Here are the new rapid response nurses," but I

20  didn't really know her at that time.

21  Q.   In March of 2019, were you pregnant?

22  A.   Yes.

23  Q.   Did you inform anyone at Franciscan in March of 2019 that

24  you were pregnant?

25  A.   Yes, I did.

TARYN DUIS - DIRECT

1   Q.   Do you recall who you informed?

2   A.   **So I had informed everybody.  I first probably started off**

3   **with management and my charge nurse.**

4        **When you're pregnant and you're a nurse, there are certain**

5   **rooms you're not necessarily allowed to go into.  If people are**

6   **getting, like, a chemo or radiation procedure, it can be toxic**

7   **to the fetus.  So it's important that you let them know right**

8   **away so you don't get put in those kind of rooms.**

9   Q.   So they would try to schedule for rooms, as you would not

10  have to go into because --

11  A.   **Correct.  Correct.**

12  Q.   Who specifically in your direct chain of command did you

13  inform that you were pregnant?

14  A.   **I had spoken to -- Well, I had spoken to everyone on my**

15  **floor, and I had also spoken with Travis and Linda**

16  **specifically.**

17  Q.   What plans, if any, did you have maternity-wise in terms

18  of leave at that time?

19  A.   **I had planned when I had had my daughter that I was going**

20  **to take my full weeks of the federal Family and Medical Leave**

21  **Act, my FMLA.**

22  Q.   Do you know whether or not Franciscan has a policy

23  regarding maternity leave?

24  A.   **As far as?**

25  Q.   Family medical leave?

TARYN DUIS - DIRECT

1    A.    **So you just have to be -- There are certain stipulations.**

2    **You have to be employed, either work a certain number of hours**

3    **or be full-time, and I believe you have to be there for a year.**

4    Q.    I'm going to show you what's been previously stipulated to

5    by the parties as Exhibit 7.

6          Do you recognize this first page of Exhibit 7?

7    A.    **Yes.**

8    Q.    And is this the FMLA policy for Franciscan at the time you

9    were under the supervision of Ms. Steinhilber?

10   A.    **Yes.**

11   Q.    And did you plan to take leave under this policy?

12   A.    **Yes, I did.**

13   Q.    When Ms. Steinhilber was your supervisor beginning March

14   of 2019, did she work the night shift with you?

15   A.    **No, she did not.**

16   Q.    Do you know what her normal shift was?

17   A.    **She told us when we first met her that she would be there**

18   **from 8:00 a.m. till 4:00 p.m. and she would not be available at**

19   **any other time, weekends, or evenings.**

20   Q.    I want to direct your attention to a particular date and

21   time, and that would be April 11th, 2019.

22   A.    **Okay.**

23   Q.    Do you recall what happened at work on April 11th, 2019?

24   A.    **I do.  I was having -- I was in charge at work.  We were**

25   **short-staffed.**

TARYN DUIS - DIRECT

1    There had been a code in the emergency room, and we were

2    getting several admissions to the floor, and it was just very

3    chaotic.  We were short -- We were down a nurse already.

4    I had paged the doctor over a patient that I had had in a

5    different room.  He was just having some issues with his

6    breathing.  It didn't look like -- It just didn't look normal.

7    Didn't sound normal.  We set the patient and had done some

8    interventions for him.

9    And I did not expect the doctor necessarily to get to the

10   floor right away since I knew that he had been responding to

11   the code downstairs.

12   When he had come up, I -- you know, I mean, he -- so after

13   we code a patient -- My floor, the IMCU and ICU are connected.

14   There are just a set of double doors in between.  So once the

15   patient was brought up after the code, they're always placed

16   into the ICU.  So since the hospitalist was over in the ICU, he

17   had just come over to check to see what I had needed with my

18   patient.  And he said that the patient appeared to be doing

19   fine; our interventions were working.

20   But he said he noticed I was breathing really hard, and he

21   just wanted to take my vitals.  He actually wanted to send me

22   to the emergency room, but I didn't want to leave my staff, so

23   I told him I would go ahead and agree to let him assess me

24   there in the nurses' station.

25   And then after that, he had suggested my blood pressure

TARYN DUIS - DIRECT

1    was pretty elevated.  I had sat in his office for a little bit,

2    and he said that, with me having a previous miscarriage and

3    being pregnant, he said, he felt safer if I would go home with

4    blood pressure elevated like that.

5    Q.    And did you go home at that time?

6    A.    I did.  I sat for a little bit, and then I did go home.

7    Q.    And what happened next with regard to that incident on

8    April 11th?

9    A.    So I had gone home after that.  The shift supervisor, IC,

10   everybody, had gotten everything arranged so we could find

11   coverage so I wasn't leaving my floor short.

12         Then in the morning, Linda had called me.  Ms. Steinhilber

13   had called me.  And she said, "Oh, I heard you had a panic

14   attack at work last night."

15         And I thought she was calling out of concern or, you know,

16   worried that I had had this panic attack.  And I said, "Yeah."

17   I said, "You know, I'm feeling a lot better now.  I was just --

18   very overwhelming."

19         At that point, she told me, "Well, you're going to go down

20   to human resources, and you're going to let them know that Dawn

21   caused a fight with you in the nurses' station, and, you know,

22   she had attacked you and that's what caused this panic attack."

23         And I said to her, that's not what happened; it was just

24   very chaotic; it didn't have anything to do with Dawn.

25         And she told me that she -- as I knew, she had previously

TARYN DUIS - DIRECT

1  worked with Dawn at Porter and Dawn was a bad seed and we

2  needed to get rid of her.

3       And I said -- You know, I just reiterated that Dawn did

4  not cause my panic attack; it didn't have anything to do with

5  that.

6       And she said, "Well, I already told human resources that

7  you would be calling, so that's what we're going to say."

8  Q.   And did you say anything in response to that comment?

9  A.   I didn't.  I just kind of let it go.  I didn't -- I didn't

10 really feel comfortable saying, like, yeah, I'm not going to do

11 that.

12 Q.   After that conversation with Ms. Steinhilber, what

13 happened next with regard to that incident on April 11th,

14 2019?

15 A.   So everything had gone by a couple days just fine, and

16 then I had gone into work on the 18th of October -- I'm

17 sorry -- April.

18      I had walked in.  We have our nurses' station; and then

19 next to that, we have, like, a break room, where it has our

20 mailboxes and all of our personal information in there.

21      So I had walked in the nurses' station, and I had seen

22 notes taped up, like, just in broad -- you know, right out in

23 the open that Dawn and I were supposed to meet with Linda and

24 Travis in the morning.

25      At that point, I had emailed both Linda and Travis.  I

TARYN DUIS - DIRECT

1    sent kind of like a -- I CC'd them in on it.

2        And I said, for one, I didn't feel comfortable talking

3    about Dawn with Dawn there.  And I also stated that, you know,

4    if they wanted to bring up anything about my pregnancy or

5    having a panic attack, I just didn't really feel comfortable

6    sharing my medical information with my coworkers.

7        And I asked them if we could please separate the meeting.

8    So they did meet with me individually and Dawn individually.

9    Q.   And what happened during that meeting?

10   A.   So I had first walked in the meeting, and Linda had asked

11   me, "Why don't you go ahead and tell Travis about the

12   confrontation that you had with Dawn in the nurses' station."

13       And I said there was no confrontation, you know, with Dawn

14   in the nurses' station.

15       And so she said, "Well, why don't you tell Travis about

16   the altercation that you had with Dawn in the nurses' station."

17       And I said -- Again, I said, "I didn't have any, you know,

18   altercation.  There was no argument."

19       She had tried to reiterate, you know, say the same phrase,

20   just differently.  It was like, "Well, tell me about the fight.

21   Tell me how Dawn was yelling at you."

22       And, you know, I said, "That did not happen, so I'm not

23   going to say that."

24       At that point, Ms. Steinhilber got really angry with me,

25   and she started mocking me.  You know, she had her hands up,

TARYN DUIS - DIRECT

1   and she was using a mocking tone.  And she said, "Oh, I need to

2   call the doctor to the floor for myself.  I can't handle doing

3   my job because I'm pregnant."

4       She started mocking me, just saying how I was unable to do

5   my job and making fun of the fact that the doctor was -- had

6   come and treated me at that point.

7       She just -- She was yelling at me, and she was being very

8   rude to me.  She was telling me I was a nasty person; I was a

9   negative person.  And I had started crying at this point

10  because she was in my face, yelling at me.

11      And I looked over at Travis, and he was just sitting there

12  doing nothing, and she continued to go on about, "Oh, you're

13  nasty, and you have a bad attitude," and, you know, "You can't

14  do your job because you're pregnant, and you need to call the

15  doctor to come to the floor for yourself."

16      At that point, I had asked Travis.  I said, you know, "I

17  am really not any kind of negative or nasty person."  I said

18  just a couple weeks ago I sent Travis a text message, you know,

19  stating that I was so happy with the way that our coworkers

20  work together; I just wanted to give them recognition.  And

21  Travis attested to that.  He agreed that I did send him that

22  message.  He agreed that I had never shown a nasty or negative

23  attitude.

24      So at that point, Linda had somewhat calmed down.  And

25  then she started saying, "Well, nobody here on the floor likes

TARYN DUIS - DIRECT

1   me, and, you know, everybody's just against me."  And she's

2   like, "I just don't know what to do, and I would really like

3   someone to help build rapport with the staff."

4        And, you know, at this point, I really just wanted a

5   peaceful work environment.  And so I had suggested to Linda,

6   since Travis was there too -- I had suggested to Linda just

7   some things that, like, were important to the staff.

8        When Linda had addressed us the first couple times she met

9   us, she came down and was just, "You guys are negative.  You

10  guys are nasty."  And I told her, like, our job is very

11  stressful and we've been in between managers, so, yeah, there's

12  definitely a lot of stress, but we weren't negative people.

13       And, you know, I told her that people were just hurt by

14  that, if she could just try to listen to them and maybe

15  understand where they were coming from.

16       She thanked me for my input, and she said, "Well, you

17  know, I hope that you can help me to continue to build rapport

18  with the staff."

19       And I said that would be great for me; I just wanted to

20  work in a -- you know, a nice environment where everybody got

21  along.

22       So that was -- That was the end of that meeting.

23  Q.   You mentioned that you had referenced a text with

24  Mr. Curtis during that meeting?

25  A.   That's correct.

TARYN DUIS - DIRECT

 1   Q.   If you would turn to page 1 of Exhibit 3.

 2        Is this a copy of the text that you referenced during that

 3   April 19th, 2019, meeting with Mr. Curtis and

 4   Ms. Steinhilber?

 5   A.   **Yes.**

 6   Q.   Could you read that text for us.

 7   A.   **Absolutely.**

 8        **[As read:]  Hi, Travis.  Good morning.  Didn't want to**

 9   **bother you on a Saturday, and I'm sure you hear more bad news**

10   **than good.  But I wanted to take a minute to tell you that last**

11   **night -- that the last night was extremely hectic in PCU.  Our**

12   **nurse, Irena Sori, was floated down to ICU, and her, Eric**

13   **Wright, and Marina Spalla all came down to PCU and helped us**

14   **out while we were in the middle of our chaos.  All three of**

15   **them are absolutely incredible, especially Eric.  He was so**

16   **much help, and we were lucky to have him as charge last night.**

17        **In the ICU, he's an ICU charge.**

18        **[As read:]  We were so lucky to have him.  We never could**

19   **have made it through the night without them.  I just wanted to**

20   **let you know they all went above and beyond to help us, and it**

21   **was so greatly appreciated.**

22   Q.   And if you turn to the next page.

23   A.   **Mm-hmm.**

24   Q.   Did Mr. Curtis respond to your text?

25   A.   **He did.  Oh, it looks like I -- I'm sorry.**

---

1      [As read:]  This is Taryn Duis.  I was charge in PCU last

2 night.

3      I didn't know if he, for sure, had my number saved.

4      Travis had said back to me:  [As read:]  Thanks for

5 letting me know.  It's awesome that everyone pulled together in

6 a difficult time.  Please let me know if there was anything in

7 particular that made the night tough that I could possibly help

8 to fix.  Otherwise, you are always welcome to reach out to me.

9 Hope the rest of your weekend goes better.

10      And then I said:  [As read:]  Thank you.  I will email you

11 and let you know, but I wanted to give credit where credit was

12 due, and they were awesome.

13 Q.   What was your emotional state during this meeting with

14 Mr. Curtis and Ms. Steinhilber?

15 A.   **I was okay when I first got in there; but after Linda was**

16 **yelling at me, I became tearful.  I was crying, and I was**

17 **very -- I was upset.**

18 Q.   What, if anything, do you recall Mr. Curtis saying during

19 this meeting?

20 A.   **So Travis was really quiet until I specifically asked him**

21 **to please make her stop yelling at me and calling me names.**

22 **And at that point, he did speak up and ask her to please stop.**

23 Q.   Had any other supervisors at Franciscan ever talked to you

24 the way Ms. Steinhilber did during this meeting?

25 A.   **No.**

TARYN DUIS - DIRECT

1   Q.   Do you recall how that meeting ended?

2   A.   **Yes.  Linda had asked me -- After we got past the Dawn**

3   **situation, she had just asked me if I could please help build**

4   **rapport with the staff, that she didn't feel like any of the**

5   **staff liked her.**

6       **And I told her I would be -- I would be more than happy**

7   **to, you know, communicate with her to be the one to, you know,**

8   **let her know what staff needs or, you know, help her so that**

9   **she felt more liked by our staff.**

10  Q.   While Ms. Steinhilber was your supervisor, what was your

11  normal nursing role on the night shifts?

12  A.   **It was charge nurse.**

13  Q.   Do you recall some of the names of some of the other

14  employees that would routinely work the night shift with you?

15  A.   **Yes.  There was Daniel Minnix, Jen Moreno, Anna Basham**

16  **Irena Sori, Laia Tann, nurse-wise.  And then we would also have**

17  **some float nurses, which Jen Moreno did become a float nurse at**

18  **one point.  Jen Justice was there, here and there.  And Yolanda**

19  **LaTulip was one of the main women that floated to us.**

20  Q.   Would you work as a charge nurse more than a registered

21  nurse on a regular --

22  A.   **Yes, yes.**

23  Q.   Working on night shift, I know things, as you said, can be

24  chaotic.  But what would a normal, typical night as a charge

25  nurse entail?

TARYN DUIS - DIRECT

1   A.   So when I first come in, I would get report -- just

2   depending on, like, you know, who you're getting report from.

3   I would either get report on -- my assigned patients, I would

4   have four or five of my own patients personally assigned to me.

5        And we had a 16-bed unit, so I would then get report on

6   the rest of the patients on the unit.  So I was responsible for

7   knowing all of their, you know, basics about their care just in

8   case anything had happened so I was able to respond in case of

9   emergency.

10       After that, I would usually -- Day shift usually had the

11  assignments done.  If we were getting transfers or admissions

12  at the beginning of the shift, I would have to assign those to

13  other nurses, assess their skill levels, and see which patients

14  were appropriate for which nurses.

15       They did staffing at 11:00 p.m. and 4:00 a.m. with the

16  house supervisor, shift director.

17       We were also responsible for being on the code team, and I

18  did different audits.  I would go around -- It just changed,

19  basically, based on different evidence.  Like if there was a

20  point that they were having a lot of people maybe getting out

21  of -- getting out of bed without bed alarms.

22       Like, one of our audits was, we had to go make sure -- We

23  had to check their fall risk level and make sure that their bed

24  alarms were set appropriately or that their white boards were

25  filled out, their pumps were cleared; just ensuring that

TARYN DUIS - DIRECT

1   **everybody is doing what they're supposed to do, as well as**

2   **taking any complaints or concerns from patients and/or family**

3   **members.**

4   Q.   As a nurse for Franciscan, what patient complaints, if

5   any, have you ever received?

6   A.   **I haven't received too, too many complaints.  Some people**

7   **are just frustrated if things take a little bit long.  I didn't**

8   **typically have too many complaints.**

9   Q.   Were you ever formally disciplined for any

10  patient complaints prior to --

11  A.   **Oh, me?**

12  Q.   Yes.

13  A.   No, I never had a patient complaint.  I'm saying they very

14  rarely even complain to me about things.

15  Q.   Okay.  What meetings would you have, if any, prior to your

16  night shift with Ms. Steinhilber before --

17  A.   **Linda was usually gone before I got there at 6:45.**

18  Q.   Following your meeting with Mr. Curtis and Ms. Steinhilber

19  on April 19th, 2019, what do you recall happening next

20  concerning your interactions with Ms. Steinhilber?

21  A.   **So I really had not seen Linda or had much interaction**

22  **with her after that until I had worked May -- I have to --**

23  **April and the May are throwing me off.**

24       **I had worked May 7th and 8th, and then my next interaction**

25  **with Linda was on May 9th, when she had called me in the**

TARYN DUIS - DIRECT

1    morning.

2    Q.    And what did she say?

3    A.    **At that point, she told me that she -- that I was being**

4    **suspended.**

5    Q.    Did she tell you why you were being suspended?

6    A.    **She did not.  I asked her why I was being suspended, and**

7    **she responded to me, and she said, "Did you refuse to give a**

8    **patient pain medication?"  And I said no, I did not.  And she**

9    **asked if I delayed it, and I told her no, I didn't.**

10   Q.    What is a call light?

11   A.    **So the patients have call lights in their rooms; and if**

12   **they need something, they hit the call light.  Somebody --**

13   **Basically, it just dings in the hallway.**

14        **And then we have a -- In our nurses' station, we also have**

15   **a big computer screen, and it will show us what light is**

16   **blinking so you can see which room to go into from in the**

17   **station.**

18   Q.    Going back quickly to the May 9th, 2019 phone call with

19   Ms. Steinhilber, how long was that initial call with

20   Ms. Steinhilber?

21   A.    **On the 9th, it was very brief, a couple minutes.**

22   Q.    What is a normal ratio of patients to nurses on the PCU

23   night shift that you worked?

24   A.    **For certain patients, it was supposed to be three to one**

25   **if they had drips.  That wasn't really ever the case.  So**

1    they -- Our ratio was supposed to be for, like, standard

2    patients on our floor, four to one.  We would usually have

3    five to one.

4    Q.   In light of that ratio, what circumstances, if any, could

5    exist where a call light is not immediately answered?

6    A.   So it really just depends.  There's so many different

7    scenarios that can take place in a hospital.

8         So, for example, if we were to have 15 patients, chances

9    are that we would have four total employees.  So that's

10   including the tech and the three nurses to take care of those

11   15 patients.  So if 15 people hit their call light near the

12   same time, which happens a lot at shift change or when patients

13   first get there, there's only -- we're outnumbered.  There's

14   three times as many of them as us.  So it just depends on what

15   you're doing in your patient's room.  It could be two seconds

16   you could get in there.  It could be 20 minutes.  It just

17   really depends on what's --

18   Q.   Are you aware of any definitive rule that Franciscan has

19   on the timing that a call light must be answered?

20   A.   A time?  No.

21   Q.   What do you need from a doctor before administering pain

22   medications?

23   A.   You need an order.  First, a diet order, if the patient is

24   going to be given the medication orally, and then an order for

25   the pain medication.  And you want to know from the doctor or

TARYN DUIS - DIRECT

1    in total everything that you would need.

2    Q.   And is there a set period of time that that's supposed to

3    take?

4    A.   **Not in particular.  It really just matters what the doctor**

5    **is doing.**

6        **When it's a new admission, the doctor has to be paged to**

7    **let them know the patient has arrived to the floor.  Usually,**

8    **they like a brief assessment done so I can kind of give them**

9    **any specific information.  At that point, the doctor -- We**

10   **usually call back, talk to the nurse, give you the order.**

11   **Sometimes the doctor puts them in.  Sometimes the nurse puts**

12   **them in.**

13       **And then all medication orders are verified through the**

14   **pharmacy.  So they're all sent down to pharmacy, and the**

15   **pharmacist has to verify the medication orders, and then the**

16   **order will be loaded into the Pyxis, which is our machine**

17   **that we get our medication from.  You use a fingerprint.  You**

18   **put your fingerprint on there.  You cannot pull anything out**

19   **that is not ordered or listed.  It's all connected to a**

20   **fingerprint, so...**

21   Q.   As an RN charge nurse working on the night shift, could

22   you prescribe pain medication for a patient?

23   A.   **No.**

24   Q.   And do you have any, in your opinion -- Do you have any

25   opinion how long it could take for the process to play out

1   before administering pain medications to a patient?

2   A.   I have had a doctor take multiple hours to call me back

3   before I got any orders at all.  Typically, depending on the

4   night -- it also depends -- some patients are hospitalist

5   patients.

6        Like, a hospitalist patient, their doctor is the

7   hospitalist for -- the doctor for the hospital for that night,

8   basically the on-call physician, in-house physician.  So

9   typically, if it's a hospitalist patient, you are able to get

10  to them a little bit sooner because they are there in the

11  hospital.

12       It also just depends on how many other admissions they

13  have.  And hospitalists are also required to go to rapid

14  responses or codes.  So if they're off doing that, that could

15  also put a delay in getting your orders.

16  Q.   As a result of that conversation with Ms. Steinhilber

17  informing you that you were suspended, what action, if any, did

18  you take after that?

19  A.   So after that, I was really concerned because I knew it

20  was such a simple solution.  Either talk to the patient or open

21  the chart to see if medication had been given, so -- I'm sorry.

22  Can you ask the question one more time?  I didn't --

23  Q.   After you were informed by Ms. Steinhilber you were

24  suspended, what action, if any, did you take after that?

25  A.   So after that, I had sent Travis -- we had been -- we

TARYN DUIS - DIRECT

1    communicated fairly regularly from when he was our interim

2    manager.  He really came in to just try to make the floor more

3    cohesive, make it run a little bit better since we had so many

4    managers off and on.

5         So I had sent Travis a text message.  I was concerned that

6    I was being suspended when I knew I didn't do anything wrong.

7    So I went ahead and let him know that I felt I was, you know,

8    being bullied or singled out, that I've been suspended and

9    haven't done anything wrong and, you know, I'm unable to get an

10   explanation as to why.

11        So I let -- I had waited a little bit for Travis to

12   respond to me.  He was usually pretty quick.  He didn't say

13   anything, so I just went ahead and sent him another message.

14   And I said, you know, "I'll just come to human resources and

15   your office and meet with you tomorrow."

16   Q.   You said you sent Travis a text message?

17   A.   Yes.

18   Q.   I'll turn to -- If you could turn to Exhibit 3, page 3.

19   A.   Yes.

20   Q.   Is this the text message you sent to Mr. Curtis?

21   A.   Yes, it is.

22   Q.   Could you please read it to the jury.

23   A.   [As read:]  Hi, Travis.  This is Taryn Duis, and I have an

24   urgent matter that I need to talk to you about as soon as

25   possible.  If you could please call me, I'd appreciate it.

TARYN DUIS - DIRECT

1      It looks like I waited about an hour-and-a-half, and I

2  didn't hear anything.

3      I said:  [As read:]  I am being bullied and harassed by

4  Linda, my manager, and I have now been suspended.  I have done

5  nothing wrong, and I have never been in any trouble and never

6  have had any complaints.  So I will be speaking with HR

7  tomorrow morning.  I have had several staff members come to me

8  and say that they believe Linda has it out for me and that she

9  has been trying to get them to say bad things about me.

10 Q.   What response, if any, did you receive from Mr. Curtis

11 after you texted him?

12 A.   **Nothing.  He did not respond to me at all.**

13 Q.   What action, if any, did you take after sending out these

14 texts with regards to your suspension?

15 A.   **So the next day, I -- I was just still really confused as**

16 **to why I was being investigated and not told anything and**

17 **they're telling me I can't come to work.  And I -- I just -- I**

18 **didn't understand why.  So I wanted to go in to speak with**

19 **Travis, as I had planned.**

20     **I went in the building.  I went to where Travis' office**

21 **was.  And the woman at the front desk said that Travis had**

22 **called off that day and his immediate supervisor, Dawn Scott,**

23 **was available.**

24     **So she -- She asked me if I would like to speak with Dawn,**

25 **and so, of course, I said, yes, I would like to speak with**

TARYN DUIS - DIRECT

1    **Dawn.**

2    Q.    And did you actually meet with Dawn?

3    A.    **I did.**

4    Q.    And what occurred during that meeting?

5    A.    **So it was very nervous.  I didn't really quite understand**

6    **what was going on.  So I just kind of wanted to talk to Dawn**

7    **and figure out why, understand why, I wasn't being, you know,**

8    **told I was suspended, stuff like that.**

9          **So my mom had been at Franciscan for a long time.  She's a**

10   **nurse there as well.  And so I brought her with me kind of for**

11   **moral support.  I was also really nervous and whatnot.  So she**

12   **came with me.**

13         **And I had gone in.  And I was voicing my concerns to Dawn.**

14   **I had let Dawn know that originally she had asked -- Linda had**

15   **asked me to lie to human resources to try to get Dawn fired.**

16   **And, you know, I explained to her that, like, I didn't do that**

17   **and that it seemed, after that, Linda was just -- she just**

18   **really began attacking me; she began attacking my pregnancy;**

19   **she was saying I was incapable of doing my job.**

20         **I had explained to Dawn everything that had happened in**

21   **the meeting with Travis and Linda.  I let her know verbatim,**

22   **you know, everything that had been said and done as far as --**

23   **as far as her mocking me and, you know, asking me to lie to**

24   **human resources about Dawn.**

25         **At that time, Dawn told my mother and I -- She said,**

1   "Well, I don't know -- you know, I don't know what your

2   situation is about -- you know, I haven't heard anything

3   about it."

4       And then she went on to tell me that she -- She

5   voluntarily told me that, on Monday, she was in the nurses'

6   station on my floor and there were just the most appalling

7   things coming out of the nurses' mouths and that there was

8   family and doctors and physicians everywhere, and she just

9   couldn't believe the way that they were talking and the words

10  that they were using.

11      And I said to her, I said, "Well, I do not" -- "I don't

12  work day shift."

13      And she said, "Oh, no.  I know you don't work day shift.

14  You weren't there."

15      And I said okay.  I'm like, well -- I said, you know,

16  "Nobody's gotten in trouble for anything, and I've been

17  suspended, and I still don't" -- "You know, I still don't know

18  why.  I don't understand."  I said, "So I would like it

19  investigated, you know, that I'm being targeted here because I

20  haven't done anything wrong," I said.  "So I would like to file

21  something official to" -- you know, to state my position as far

22  as what Linda had been doing to me and the way she had been

23  treating me because I was just getting a very uncomfortable

24  feeling knowing I didn't do anything and this was -- I think

25  I've only seen one or two people suspended the whole time I was

1   at Franciscan, so I was completely blown away.

2   Q.   What interactions, if any, had you had with Ms. Scott

3   prior to this meeting?

4   A.   I had never met Ms. Scott prior to that.

5   Q.   You said you talked about mocking with Ms. Scott.  What

6   specifically did you tell her with regards to any mocking?

7   A.   How, after I had told Travis and Linda in the meeting on

8   the 19th that I was not going to say that Dawn caused a panic

9   attack or argument because that didn't happen, I let her know

10  how she was saying that I had to call the doctor to the floor

11  myself, that I'm pregnant and I can't handle my job and...

12  Q.   Do you recall how the meeting ended?

13  A.   So Dawn was actually really nice during the meeting.  I

14  was going to her for help.  I figured I was following the chain

15  of command, and I was really hoping that she was going to

16  listen to me and take seriously what I had said.

17       You know, I followed their policy.  It said that if -- you

18  know, talk to your manager first, talk to above them.  So I

19  tried to go all the alleyways to see.

20       And Dawn told me that I should go down to -- I should walk

21  down to human resources and file the complaint against Linda

22  when I got to human resources.

23  Q.   What was your emotional state during this meeting?

24  A.   I was tearful.  I was upset.  My feelings were hurt

25  because they were -- you know, they were just saying things

TARYN DUIS - DIRECT

 1   that weren't true, and I had been suspended for no reason.  So

 2   I was -- I was upset.  I was, you know -- I was crying and

 3   emotional, but -- but I really believed Dawn was going to

 4   help me.

 5   Q.   What happened next after you left this meeting with

 6   Ms. Scott?

 7   A.   So I had gotten down to human resources.  It's not much of

 8   a walk.  It's kind of on the other side of the administration

 9   hallway, but maybe only a two- to three-minute walk.

10        So I had walked down there.  And I believe it was the

11   secretary for human resources.  There's somebody who sits,

12   like, in a front desk.  Had asked what I was there for.

13        And I said that I was there to speak to -- I believe I

14   asked for either Jessica or Anita by name.  Those were the only

15   two names I had heard in human resources, and I knew I had

16   spoken specifically with Jessica.

17        The lady went back into the office and came back out and

18   told me that no one would be meeting with me; they would not

19   talk to me.

20   Q.   And after going to human resources, what happened next

21   with regards to your suspension?

22   A.   So a couple hours later then, Linda and, I'm pretty sure

23   it was, Jessica Smosna had called me.  And they told me that

24   they were -- that they had brought up, you know, not giving a

25   patient pain medication.

TARYN DUIS - DIRECT

1      And I -- I asked if they had looked in the chart
2  because -- I mean, everything is charted.  You could see plain
3  as day exactly what time the order was given, what time the
4  order was verified by the pharmacy, what time the patient was
5  scanned, and what time the pill was given.
6      And then they were telling me that my -- that they thought
7  it was rude that I was excited about my maternity leave and
8  that staff didn't want to work with me because I was happy that
9  I was going to have a baby.
10 Q.   And do you know how long this call exactly was?
11 A.   It wasn't very -- It wasn't very long.  A couple minutes.
12 Q.   Do you recall anything else from that call as we sit here
13 today?
14 A.   I know they were -- they were saying I was rude.  The
15 rudeness was me being excited.
16      And I believe at that point they had said I didn't give a
17 pain medication or that I had cursed in the nurses' station; I
18 had said a curse word in the nurses' station, I think was all
19 brought up, too, in that specific conversation.
20 Q.   What, if any, instances do you recall of nurses using
21 profanity at work?
22 A.   Every day that I've ever been there.
23 Q.   What discipline are you aware of nurses being given for
24 the use of profanity at work at Franciscan?
25 A.   None.

TARYN DUIS - DIRECT

1   Q.   Have you ever heard profanity be used by RNs in front of
2   supervisors?
3   A.   **Yes.**
4   Q.   At Franciscan?
5   A.   **Yes.**
6   Q.   Have you ever heard profanity being used by nurses in
7   front of Ms. Steinhilber?
8   A.   **Yes.**
9   Q.   Do you recall any specific instances?
10  A.   **I specifically remember the day after Easter.  It was -- I**
11  **worked Easter.  I made gender-reveal cupcakes.  My daughter was**
12  **going to be a girl, so I filled them with pink.**
13       **And Linda came in.  I gave her a cupcake.  Day shift came**
14  **in.  And one of the girls was telling a story.  Megan Cardwell**
15  **was telling a story where she dropped a good four or five**
16  **F-bombs right in front of Linda bright and early in the**
17  **morning, and Linda didn't bat an eye.**
18  Q.   Is there a nursing station in the PCU?
19  A.   **Yes, there is.**
20  Q.   Could you explain what the nurses' station looks like?
21  A.   **Sure.  So our floor is -- It's basically a triangle or two**
22  **U-shapes.  So when you get off, half of it is PCU, half of it**
23  **is ICU.  There's double doors just separating each half.**
24       **And then each half goes down on one side, you know, so it**
25  **does, like, a U-shape.  And then if you connect the two, then**

1    it's, you know, just a full-on rectangle shape.

2         So there's the elevators.  There's, like, a front desk

3    part.  And then there's a little hallway.  And this is all --

4    And that encloses our nurses' station.  We had a med room in

5    there that's enclosed, and then we have a nurses' station.

6    There are sides on each -- I'm sorry -- doors on each side, and

7    then, you know, the patient rooms are surrounding it.

8    Q.   Can you describe any differences between what the nurses'

9    station might look like at night for the night shift compared

10   to what it might look like for the day shift?

11   A.   Sure.  So at night we really try to -- because obviously

12   we're there all night, and lab has to go in and poke them at

13   4:00, and we have to assess them every four hours.  So we try

14   to promote quiet and rest at night.

15        It's also better so people do not get so disoriented in

16   the hospital.  They're used to lights and bells and whistles

17   all the time.  So if we try to keep it dark and quiet in the

18   evening, it kind of helps them realize this is nighttime; this

19   is daytime.

20        So we kept our door shut, our nursing station door shut,

21   and the patient doors were also shut in the evening.  And there

22   were not visitors allowed.

23        Doctors were usually done rounding by then.  PT, OT were

24   not there, and there were no -- There's no food served at that

25   time.

TARYN DUIS - DIRECT

1          So it's just nurses and the patients in their rooms.

2          And then the day, it's -- It's kind of open in there.  It

3    kind of has to be open.  There's several doctors walking in and

4    out.  They have to get the charts.  PT and OT, they're also

5    going to get their charts.  They're doing food delivery.  They

6    have family members.

7          So it's very open and in and out and a chaotic, busy

8    place.  They don't typically keep the doors closed because

9    there are so many people going in and out.

10   Q.   After your last call with Ms. Steinhilber, what was your

11   next interaction with her?

12   A.   So after she had called the -- on the 10th to let me know

13   I was being -- give me my reason why I was being suspended, she

14   then called me on the 14th

15         And on the 14th, they fired me.  Linda and, I believe it

16   was, Jessica Smosna.  I also believe Travis was on the phone

17   call, but I don't believe that he stated anything at all.  And

18   they fired me over the phone.

19   Q.   What was said during that call?

20   A.   So during that call, they told me that -- they said that I

21   was very excited about my maternity leave and that's very rude

22   to be excited about maternity leave.

23         And the -- They were frustrated that I was going to take

24   my FMLA.  I guess it was just an inconvenience for them.  They

25   were -- I was told that, because I loved my daughter, they said

TARYN DUIS - DIRECT

1   I cared more about my daughter than my job and that those

2   values don't coincide with Franciscan values.

3   Q.   Do you recall who did most of the speaking?

4   A.   That was Linda.

5   Q.   Do you recall anything that Ms. Smosna said?

6   A.   So after I had -- I was completely flabbergasted

7   because -- I was just shocked.  And I -- I repeatedly said -- I

8   said, "I don't understand.  You cannot fire me for being

9   pregnant.  I don't understand how you're telling me I'm fired

10  for being pregnant."

11       And Ms. Smosna said that they weren't firing me because I

12  was pregnant; they were firing me because I planned on taking

13  my Family and Medical Leave Act.

14       And at that point, I -- Again, I was confused.  I said I

15  don't know how I would take maternity leave without being

16  pregnant.  It seemed to me that being pregnant and taking your

17  maternity leave are two correlated things.  There's just no

18  other way to get maternity leave without having a baby.

19  Q.   After you had texted Travis on the last text that's up

20  there --

21  A.   Yes.

22  Q.   -- did you have any other interaction with him that you

23  recall?

24  A.   No, I did not.

25  Q.   Do you recall ever speaking with him?

1  A.  **Nope.**

2  Q.  Since that text you sent, have you spoken with him at all?

3  A.  **No.**

4  Q.  At some point, do you recall receiving a document from

5  Franciscan regarding your termination?

6  A.  **I did not receive anything to me personally.  Franciscan**

7  **tried to fight my unemployment.  So the first time I had seen**

8  **my termination paper was during an unemployment trial.  I had**

9  **asked for a copy of my employee file several times, but they**

10  **refused to send it to me.**

11  Q.  Sometime after your termination, you received -- You've

12  seen this document that's in front of you?

13  A.  **Yes.  Yes.  The date of the incident isn't even correct.**

14  Q.  Did you ever receive anything from Franciscan in writing

15  regarding your suspension?

16  A.  **No.**

17  Q.  If you'd look at what's been marked as Exhibit 1 by the

18  parties, up here, it says the PCA informed Taryn a patient

19  requested pain medication.

20  When they say "PCA," do you know what that's referring to?

21  A.  **Patient care assistant.**

22  Q.  And it has a date of May 8th, 2019?

23  A.  **Mm-hmm.**

24  Q.  Do you have any recollection of what occurred on

25  May 8th, 2019 regarding the patient possibly needing pain

TARYN DUIS - DIRECT

1    medication?

2    A.    **That was the second day I took care of the patient.  So**

3    **the whole pain medication incident was actually on April 7th.**

4    **So there's actually nothing that happened on April -- I'm**

5    **sorry -- May 7.**

6         **There was actually nothing happened on May 8th.  I worked**

7    **on May 8th.  I showed up to work.  That patient had requested**

8    **me back, and I took care of him a second evening.**

9    Q.    Are you aware of any formal complaints this patient ever

10   filed against you?

11   A.    **No.  He did not.**

12   Q.    When this document says "PCA," do you know who that's

13   referring to?

14   A.    **Kim.  Kimberly Buchanan.**

15   Q.    Would Kimberly normally work with you on night shift?

16   A.    **Yes.**

17   Q.    And it also says on what's been marked as Exhibit 1 --

18   Could you read the second-to-last sentence in terms of what

19   happened?

20   A.    **"Taryn stated she couldn't wait until October to be on**

21   **maternity leave."**

22   Q.    Do you recall any other discussions besides what you've

23   testified to regarding you being excited to be on maternity

24   leave?

25   A.    **Not, like, specific discussions.  I was just excited to**

TARYN DUIS - DIRECT

1   have another baby, add another cutie to my bunch.

2   Q.   Had you openly discussed your maternity leave and taking

3   maternity leave with your coworkers on the night shift?

4   A.   **Yes.  I'm sure, casually, we did.**

5   Q.   Before being suspended, were you ever written up for delay

6   in patient care?

7   A.   **No.**

8   Q.   Inappropriate behavior?

9   A.   **No.**

10  Q.   Disruption of the work environment?

11  A.   **No.**

12  Q.   After Ms. Steinhilber suspended you and after you talked

13  to her on those occasions, did you talk to her at any time from

14  the time of your second suspension to the time you were

15  terminated?

16  A.   **From the 10th until the 14th, no.**

17  Q.   After you talked with Dawn Scott on the 10th until you

18  were terminated on the 14th, did you talk to Dawn Scott?

19  A.   **No, I did not.**

20  Q.   From May 10th to your last conversation with

21  Ms. Steinhilber to the time you were terminated, did you talk

22  with anyone at Franciscan regarding your suspension?

23  A.   **No.  They wouldn't speak to me.**

24  Q.   Did anyone at Franciscan ever call you and interview you

25  how you felt you were being possibly harassed by

TARYN DUIS - DIRECT

1  Ms. Steinhilber between May 10th and May 14th?

2  A.  **No, they did not.**

3  Q.  How did your termination affect you?

4  A.  **Oh, so I was five-and-a-half months pregnant.  My husband**

5  **is disabled.  It's -- Well, everybody there knew that.  We have**

6  **a group of moms that work and the dads stay home.  I guess**

7  **that's kind of common in nursing.**

8  **So obviously I was our only source of income and the only**

9  **source of insurance for myself and my husband, I was pregnant,**

10  **and my three-year-old son at the time.**

11  **So I instantly -- I started having panic attacks.  I was**

12  **losing weight.  I couldn't eat.  I was terrified.  This was the**

13  **first and only nursing job I had had.  I was so excited to get**

14  **it because I was able to get a critical care position right out**

15  **of school.**

16  **And I was terrified that only having one nursing job in**

17  **my, you know, almost five years of nursing at this point, I**

18  **didn't know how it was going to look being fired.  That**

19  **scared me.**

20  **I was worried that I didn't know anybody who would hire a**

21  **nurse that was six months pregnant.  Nursing orientation is**

22  **three months.  So if you figure starting at six months, by the**

23  **time three months comes, it's pretty much time for maternity**

24  **leave.  So it's very hard to hire a nurse that's, you know,**

25  **more than halfway through their pregnancy.**

TARYN DUIS - DIRECT

1          So I was having a lot of anxiety.  I was -- I couldn't

2     sleep.  I couldn't eat.  My blood pressure was through the

3     roof.

4          I was hospitalized every single weekend in July.  Every

5     single weekend, I had four hospital admissions for multiple

6     days with my blood pressure in the 200s and just --

7               MR. ANDERSON:  Judge, we'll object to this testimony

8     on the basis of foundation.

9               THE COURT:  Okay.  Now there's no question pending,

10     so ask another question, please.

11     BY MR. FOX:

12     Q.   I want to be -- There's two Dawns in this matter.

13     A.   Yes.

14     Q.   And I want to make it clear to the jury.  Who is Dawn

15     Smith?

16     A.   Dawn Smith is a former coworker of mine at Franciscan, a

17     floor nurse.

18     Q.   And Dawn Scott is?

19     A.   Dawn Scott, I believe her title was the vice president of

20     nursing.

21     Q.   On May 7th, did you use profanity with regards to a

22     patient?

23     A.   I may have.  I mean, not about the patient.  It was about

24     the emergency room.

25     Q.   Excuse my language.  But did you say with regard to the

TARYN DUIS - DIRECT

1    patient on May 7th, 2019, "I don't give a fuck if that

2    patient wants pain meds.  He can wait.  He should have taken it

3    before"?

4    A.   **No, I never said that.**

5    Q.   As soon as you got off the phone that day you were

6    terminated, what was your emotional state for the next few

7    hours?

8    A.   **I cried and cried.  I was devastated.  I was heartbroken**

9    **and devastated.**

10   Q.   And how long did that feeling last?

11   A.   **For quite some time.  I would say even -- even when I was**

12   **lucky enough to get a new job, probably a little bit past that,**

13   **because it was very stressful to start a new job six-and-a-half**

14   **months pregnant and -- or six months pregnant and -- It was**

15   **very stressful.**

16              **MR. FOX:**  Thank you, Taryn.

17              **THE COURT:**  I assume you will be a while with cross?

18              **MR. ANDERSON:**  Yes.

19              **THE COURT:**  Why don't we take our afternoon break

20   before we do cross.

21        We'll start at quarter of.  Please do not discuss the case

22   or form any opinions at this time.

23              **COURTROOM DEPUTY:**  All rise.

24        (Recess taken at 2:28 p.m.)

25        (Proceedings resumed in open court at 2:50 p.m.)

```
 1              COURTROOM DEPUTY:  All rise.

 2        Please be seated.

 3              THE COURT:  Bring the jury in, please.

 4        (Jury in at 2:50 p.m.)

 5        Please be seated.

 6        Mr. Anderson, you have some cross-examination?

 7              MR. ANDERSON:  Yes.  Thank you, Judge.

 8                      CROSS-EXAMINATION

 9   BY MR. ANDERSON:

10   Q.   Good afternoon.

11   A.   Good afternoon.

12   Q.   You would agree with me bedside nursing is hard work,

13   isn't it?

14   A.   It can be, yes.

15   Q.   It's especially hard work in a hospital; right?

16   A.   Yes.

17   Q.   In an acute care hospital?  You work 12-hour shifts when

18   you work; right?

19   A.   Twelve-and-a-half, yes.

20   Q.   Twelve-and-a-half?  So what was it, 6:00 p.m. to --

21   A.   7:00 p.m. to 7:30 a.m.

22   Q.   Okay.  7:00 to 7:30 the next day.

23        You're on your feet most of that time, I assume; right?

24   A.   It depends.  Depends on the night.  But, I mean, you're on

25   your feet a lot.
```

1  Q.    On a busy night, you're on your feet most of the night;
2  right?
3  A.    **Yes.**
4  Q.    Sometimes if you're busy, like you said, sometimes you
5  have, instead of four patients, you might have five or might
6  have six patients, even?  You might even give up -- might have
7  to give up breaks, even; right?
8  A.    **It's not legal to do that.**
9  Q.    Have you ever done it?
10 A.    **Have I ever given up breaks?  Yes.**
11 Q.    You've often had at least four patients and, I think you
12 testified, sometimes five patients; right?
13 A.    **Yes.**
14 Q.    When you get a new patient on the unit, that's even more
15 time-consuming, isn't it?
16 A.    **It is -- Sometimes it is.  Yes.  It just --**
17 Q.    You have to do a head-to-toe assessment when you get a new
18 patient?
19 A.    **You have to do a head-to-toe assessment on all patients,**
20 **so yes.**
21 Q.    But when a new one comes in, you have to do it fairly
22 promptly after the patient arrives on the unit; right?
23 A.    **Yes.**
24 Q.    You have to start all the nursing flow sheets that the
25 nurses use to continually document all kinds of things; right?

TARYN DUIS - CROSS

1   A.   **Yes.  But that's not different than any other patient.**

2   Q.   When a new patient comes in, all that has to be, sort of,

3   started for the first time; correct?

4   A.   **I mean, yes.**

5   Q.   Okay.  It's not really true that the night shift is easier

6   than the day shift because the patients are all sleeping,

7   is it?

8   A.   No, definitely not.  I wish, but no.

9   Q.   Exactly.  I bet you probably heard that from day nurses

10  before.

11  A.   **I've heard it from the patients, too.**

12  Q.   But patients still need to be assessed frequently?

13  A.   **Yes.**

14  Q.   Patients still are needy; they're still asking for things

15  in the middle of night?

16  A.   **Yes, correct.**

17  Q.   Sometimes, I bet, it can even be more complicated than the

18  day shift; right?

19  A.   **Absolutely.**

20  Q.   When you have patients in the hospital, they're in the

21  hospital because they're either not feeling well or they're

22  injured; correct?

23  A.   **Yes.**

24  Q.   And usually they're probably worried about their situation

25  or their condition, I bet; right?

TARYN DUIS - CROSS

 1   A.   **I'm sure that they are, yes.**

 2   Q.   They're usually uncomfortable in the hospital, aren't

 3   they?

 4   A.   **Almost always.**

 5   Q.   Almost always.  Oftentimes, especially on your unit,

 6   they're going to -- or on your old unit, they're going to have

 7   at least one IV probably, maybe more; right?

 8   A.   **Yes.**

 9   Q.   In the hand or in the elbow or some place in that area;

10   right?

11   A.   **Wherever -- wherever they get it.**

12   Q.   Right, because sometimes you'll have a couple of them at

13   least?

14   A.   **On our floor the standard is, you have to have two IVs,**

15   **for critical care.**

16   Q.   Patients on the progressive care unit, they would

17   oftentimes be sicker than patients, say, on a general medical

18   unit in the hospital; correct?

19   A.   **Yes, that's correct.**

20   Q.   They might have other things attached to them, as well;

21   right?  Like oxygen or pulse oximetry monitoring, that little

22   thing that goes on the end of your finger?

23   A.   **Yes.**

24   Q.   They're all in a gown, where their rear end is hanging

25   out, and they're not comfortable in that gown typically; right?

TARYN DUIS - CROSS

1    A.    **Mostly, yes.**

2    Q.    And sometimes the patients, even people that would

3    ordinarily be pleasant, might be a little cranky when they're

4    in those circumstances, aren't they?

5    A.    **Yes.**

6    Q.    And they have difficulty sleeping, right, in that

7    environment?

8    A.    **Yes.  It's a difficult place to sleep.**

9    Q.    And they can be irritable sometimes; yeah?

10   A.    **The patients?**

11   Q.    Yeah.

12   A.    **Of course.**

13   Q.    And demanding?

14   A.    **Yes.**

15   Q.    And impatient sometimes; right?

16   A.    **Sometimes.**

17   Q.    Hard to please sometimes?

18   A.    **It depends.  Yeah.**

19   Q.    And even though, you said, you don't have families

20   typically in the middle of the night, you still have families

21   at the beginning of your shift; right?  You'll have some that

22   are over in visiting hours; right?

23   A.    **Visitors hours begin at 8:00 a.m., and I am off at 7:30.**

24   **So, really, the whole time I'm there, they're not -- except for**

25   **until 8:00 p.m.  So we are not supposed to have visiting hours**

TARYN DUIS - CROSS

1    **on night shift.  There is not supposed to be family there.**

2    Q.   And you -- (Indiscernible.)

3         **COURT REPORTER:**  Excuse me.  I'm sorry.  I'm having a

4    little difficulty hearing you.

5         **MR. ANDERSON:**  You're having a problem hearing me?

6    That is not usually a problem.  Thank you.

7         (Brief discussion off the record.)

8    **BY MR. ANDERSON:**

9    Q.   You have patients sometimes that have family members spend

10   the night; right?

11   A.   **Very rarely.  It's against our policy.**

12   Q.   And when that happens, they're pretty concerned usually

13   about the patient, as well; right?

14   A.   **It depends.**

15   Q.   Okay.  And on top of all that stuff, bedside nurses are

16   human beings; right?  So you show up at work with all of the

17   problems that all of the rest of us have, and you have to

18   somehow compartmentalize all of that and make each patient feel

19   like he or she is your only patient; right?

20   A.   **Yeah.  You try to do that.  Of course.**

21   Q.   You try to; right?

22   A.   **Yeah.**

23   Q.   Like we said at the beginning, it's not easy work, is it?

24   Especially when there's things going on at home that are maybe

25   causing you a little stress and you got four or five patients

TARYN DUIS - CROSS

1    that are feeling like the way we just said?  It can be hard

2    work, can't it?

3    A.   **Yeah.  But, I mean, I don't know that it has to deal -- my**

4    **work at my job doesn't --**

5    Q.   I'm just asking --

6    A.   **-- have to deal with home.**

7    Q.   -- you the questions.  If you could just answer my

8    questions, I would appreciate it.

9    A.   **I was.  I'm sorry.**

10   Q.   Okay.  So I want to switch now and talk specifically about

11   the progressive care unit?

12   A.   **Okay.**

13   Q.   So we talk about units, and you've been in the hospital

14   environment.  I represent hospitals.  So you and I are

15   communicating, but I'm not always sure we're communicating to

16   people that don't work in a hospital.

17        So hospitals have a lot of different nursing units;

18   correct?

19   A.   **Yes.**

20   Q.   So there's a med-surg unit typically; right?

21   A.   **Yes.**

22   Q.   And that's sort of -- I don't know -- kind of a baseline

23   hospital unit, where people go that are either not so seriously

24   ill that they have to go to a higher level of care, or they

25   just come back from surgery or whatever; right?  So that's sort

1    of the standard nursing unit, if you will?

2    A.    **Yeah.  It's just basic medical -- basic medical stuff.**

3    Q.    Right.

4    A.    **Nothing really complicated.**

5    Q.    And then some hospitals have an OB unit, or an obstetrics

6    unit; right?

7    A.    **Yes.**

8    Q.    Where moms go to have babies; right?

9    A.    **Yes.**

10   Q.    And an intensive care unit, which is where the sickest

11   patients go; right?

12   A.    **Yes.**

13   Q.    And then your unit, the progressive care unit, falls

14   really between intensive care and that med-surg floor; right?

15   You're in between those two?

16   A.    **There are two levels between us.  So there's intensive**

17   **care.  There's intermediate care, or PCU.  Then there would be**

18   **telemetry, and then there would be medical.**

19   Q.    So telemetry would be patients that are attached to

20   monitors, and there's people in other rooms keeping an eye on

21   those monitors; right?

22   A.    **Yes.  They could be -- they're usually -- They could**

23   **usually have a history of, like, a heart issue or something**

24   **like that, but they're not critical usually, so they're --**

25   Q.    Okay.  So we talk sometimes in terms of acuity levels for

TARYN DUIS - CROSS

1  patients; right?

2  A.   **Yes.**

3  Q.   An acuity level is really a quantitative description of

4  how sick somebody is; right?

5  A.   **Not necessarily of how sick they are.  It's more of, like,**

6  **care required.**

7  Q.   Okay.

8  A.   **How much time it's going to take you to care for somebody.**

9  Q.   How much resources they're going to use?

10 A.   **Yes.**

11 Q.   So somebody that is just coming back from open heart

12 surgery, for example, would have a higher acuity level than

13 somebody that's maybe coming back from a knee replacement

14 surgery; right?

15 A.   **Yes.  They would have to go to a specialized place.**

16 Q.   In fact, that open heart surgery patient would probably go

17 to intensive care first and then may end up in progressive care

18 after intensive care; right?

19 A.   **Yes.  They always go to ICU first.**

20 Q.   The whole point of all of that is:  You would have sicker

21 patients in the progressive care unit than a nurse might have

22 on the med-surg unit; right?

23 A.   **Theoretically, yes.**

24 Q.   And it can be even tougher being in a -- as a bedside

25 nurse in that progressive care unit, where you've got patients

TARYN DUIS - CROSS

1    that generally require more resources and more care than they

2    would on, say, the med-surg unit; right?

3    A.   **It's completely different.  It's completely different**

4    **nursing.  So it's -- Like, my patients in the PCU, they were**

5    **not allowed to get up, so there wasn't a whole lot of me having**

6    **to go in there and, you know, run here, you know, walk with**

7    **them here or walk with them there.  So it's just different.**

8    Q.   I understand.  But they might have five different

9    medications that you have to administer that you might not have

10   to do on the med-surg unit; right?

11   A.   **It really depend -- There's really, like, no comparison,**

12   **the way that they --**

13   Q.   All right.  So would you agree with me that the patients

14   on the progressive care unit are sicker and need more attention

15   than patients on the med-surg unit, for example?

16   A.   **Often, yes.**

17   Q.   And it's important in those units that have higher acuity

18   patients for the nurses to really work as a cohesive team,

19   isn't it?

20   A.   **Absolutely.**

21   Q.   And the reason for that is, you may have two or three

22   patients that have really high-level needs that need to be met

23   right away, and you can't be in three rooms at one time; right?

24   A.   **Right.**

25   Q.   So you might need help from one of your peers to go into a

TARYN DUIS - CROSS

1    patient room and do something that needs attention right away
2    while you're in another patient room doing something that needs
3    attention right away; right?
4    A.   **I mean, you could need that, but it's usually not, like,**
5    **an option.  Usually everybody is busy.  There's not usually,**
6    **like, people who are --**
7    Q.   You work as a team, though --
8    A.   **Yes.**
9    Q.   -- more so in the PC unit than you would, say, in the
10   obstetrics unit; right?
11   A.   **I've never worked in an obstetrics unit.  But as far as I**
12   **know, all nursing is team nursing.  It would be really hard to**
13   **nurse not on a team.**
14   Q.   It was important for the nurses to work as a cohesive team
15   in the PCU, though; correct?
16   A.   **Absolutely.**
17   Q.   Let me talk about your role as a charge nurse for a couple
18   minutes.
19        So I think your testimony was that you were a charge nurse
20   at the time in April; correct?
21   A.   **That's correct.**
22   Q.   And also in May?
23   A.   **Yes.**
24   Q.   You were always a charge nurse when you came in to work
25   your shift in April and May?

1    A.   **Like, 97 percent of the time.**

2    Q.   Okay.  And what that really -- I mean, it's not tricky.

3    It just means you're the nurse in charge on that unit for that

4    shift; right?

5    A.   **It's a little bit more than that.  It's quite a bit more**

6    **responsibilities, but yes.**

7    Q.   You're the team leader; right?

8    A.   **Yes.**

9    Q.   If the nurses aren't sure which way to go on something,

10   they come to you and ask; right?

11   A.   **Yes.**

12   Q.   They look up to you?

13   A.   **Yes.**

14   Q.   So you were the team leader for the team of nurses on the

15   shifts where you were the charge nurse; correct?

16   A.   **Yes.**

17   Q.   You talked a little bit about the nurses' station, and I

18   understand that -- Excuse me.  Too soon if that's for a cold.

19   I've been sweating like a maniac here.

20        And while you try to keep things a little quieter on the

21   night shift, there's still always nurses going in and out of

22   those doors; correct?

23   A.   **Like, of the patient rooms?**

24   Q.   No.  On the nurses' station.

25   A.   **I mean, if we need to, yes.  Sometimes we leave them**

TARYN DUIS - CROSS

1   cracked, but...

2   Q.   When you go to work, you don't sit in the nurses' station

3   your whole shift; right?

4   A.   **Well, of course not.**

5   Q.   Of course not.  So you go to the patient's room, do

6   whatever you need to do.  Would you come back to the nurses'

7   station to do the documentation on --

8   A.   **It depended.  Franciscan prefers that you chart at**

9   **bedside, so it just really depended on what you were doing and**

10  **what you had time -- Nursing isn't really something you can,**

11  **like, "This is a day-to-day thing, and this is how it always**

12  **works," because it's -- It's always different.**

13  Q.   Thank you for reminding me of that.  You reminded me of

14  another, sort of, important task that a nurse does that we as

15  lawyers are very aware of, but not maybe everybody understands.

16        Every time you go in that patient room and do something,

17  you have to document what you did or what you saw; right?

18  A.   **Yes.**

19  Q.   So you get on the computer, and you enter your notes, and

20  it's all electronic now; right?

21  A.   **Yes.**

22  Q.   So you enter your notes, hopefully in the right place, and

23  tell them what you did or tell them what the vitals were, and

24  you have to keep that up with each patient; right?

25  A.   **Yes.**

TARYN DUIS - CROSS

1   Q.   The nurses at the time at St. Anthony's had a device

2   called a Vocera phone; is that right?

3   A.   **Yes, that's correct.**

4   Q.   A Vocera phone was essentially like a cell phone, but one

5   that you could use in the hospital that the nurses and the

6   nurse's aides could communicate to each other with; right?

7   A.   **It's more like a walkie-talkie.**

8   Q.   Is it one of those --

9   A.   **Than a phone.**

10  Q.   -- like, when cellphones first came out, people would talk

11  into them like a speakerphone, and then it would sort of --

12  A.   **It is a speaker.**

13  Q.   -- the person would --

14  A.   **Yes.  It's all speakerphone.  It's not a handset or**

15  **headset.  It hangs here, and it projects anything that gets**

16  **said out.**

17  Q.   So when somebody calls you on the Vocera, if I happen to

18  be standing right next to you, I can hear both them and you;

19  right?

20  A.   **Yeah.  You should be able.  I mean, you should be able to**

21  **if you're standing right next to me, yes.**

22  Q.   And this should be obvious, but I've been good for asking

23  obvious questions.  When you say you worked from 7:00 p.m. to

24  7:30 a.m., so that's starting on 7:00 p.m. on day one and

25  finishing at 7:30 p.m. the next morning, day two; correct?

```
 1    A.    Mm-hmm.

 2    Q.    Sort of go overnight --

 3    A.    Yes.

 4    Q.    -- into the next day?

 5          I want to talk a little bit about the discipline policy,

 6    which is going to put me at risk here for showing you whether I

 7    can use this machine or not.  So bear with me.

 8          See, Amy took care of me.  It's already on.

 9          This is the Corrective Action Policy you testified about

10    on direct examination; right?

11    A.    Yes.

12    Q.    And it's got several pages to it; right?

13    A.    Yes.

14          MR. ANDERSON:  Boy, this is really hard to see.  Is

15    it possible to make it bigger?

16    Q.    Do you have it in front of you there?  Do you have it in

17    the book up there?

18          MR. ANDERSON:  Okay.  That's good.  That's fine.

19    Q.    Can you see it up there?

20    A.    Yes.

21    Q.    Can you read that paragraph that starts with "The

22    organization..."

23    A.    "The organization reserves the right to skip any of the

24    aforementioned steps and move directly to suspension and/or

25    termination.  The following list is not exhaustive, but the
```

1    following breaches of good conduct are considered sufficient

2    cause for immediate suspension pending investigation and/or

3    immediate termination."

4    Q.   And then we've got (A) through (G) on that page of things

5    that can lead to immediate termination?

6    A.   **Mm-hmm.**

7    Q.   And then it goes on to the next page, and we have (H)

8    through (AA) of some additional things that can lead to

9    immediate suspension; correct?

10   A.   **Yes.**

11   Q.   Okay.  I did just fine on the computer thing, but I

12   lost my place -- One second here.

13        You testified earlier that, Linda called you, Linda

14   Steinhilber, your manager, called you on May 9th to tell you

15   you were suspended; correct?

16   A.   **Yes, that's correct.**

17   Q.   Did she read to you at that time the witness statements

18   that she had taken?

19   A.   **No.**

20   Q.   Was there a second call on May the 9th or maybe even on

21   May the 10th where she called you and read to you the witness

22   statements?

23   A.   **The witness statements were never read to me.  But she did**

24   **call me a second -- on May 10th.**

25   Q.   Was that for suspension or for termination?

TARYN DUIS - CROSS

1    A.   **That was for suspension after I went to human resources.**

2    Q.   And on the May 10th call, she has Jess Smosna on the

3    phone with her?

4    A.   **I believe it was Jessica Smosna, yes.**

5    Q.   I think you testified in your direct testimony, but I want

6    to make sure I'm clear on it, that you really didn't have a lot

7    of contact with Linda Steinhilber prior to the incident on

8    April 11th and then the meeting that occurred on

9    April 14th -- was it, or April 19th?

10   A.   **April 19th.**

11   Q.   April 19th.  Prior to those two encounters with her, you

12   really hadn't had much contact with her at all; right?

13   A.   **No, not much.**

14   Q.   I think you said she came in at 8:00, and you were gone by

15   7:30 in the morning, so you wouldn't have seen each other even

16   coming and going; right?

17   A.   **Well, she stated to us her hours would be 8:00 to 4:00.**

18   **She was supposed to be responsible, obviously, for us for the**

19   **entire shift.  She was the floor manager for the shift.  But**

20   **she stated she would only be making herself available at those**

21   **times.**

22   Q.   Let me ask that question again because I'm not sure I got

23   an answer to it.

24        So I think you said you would be done by 7:30, right, and

25   she started at 8:00?

TARYN DUIS - CROSS

1   A.   **My shift ended at 7:30.  I was rarely done by 7:30.  But**
2   **Linda got there whenever she wanted to, so there wasn't a**
3   **specific time that she came in.**
4   Q.   Okay.  So I guess the point I'm trying to get to is, there
5   wasn't a lot of time in the mornings --
6   A.   **No.**
7   Q.   -- when the two of you would sit and have coffee together
8   or chitchat or any of that?
9   A.   **No.**
10  Q.   You didn't really see her in the mornings; right?
11  A.   **No.**
12  Q.   After a 12-and-a-half hour shift, I bet you were ready to
13  get out of there probably as soon as you could; right?
14  A.   **For the most part, I mean.**
15  Q.   Sure.  And then, you said, she worked until 4:00 or 5:00
16  or whatever time it was, but then you wouldn't come in until
17  7:00 that night; right?
18  A.   **Yes.**
19  Q.   So you wouldn't see her in the evening, either?
20  A.   **That's correct.**
21  Q.   And, you said, she worked at Porter previously.  You never
22  worked at Porter, right, so you didn't know her --
23  A.   **No.  I didn't work at Porter.**
24  Q.   And you didn't know her outside of the hospital in any
25  way, did you?

1    A.   **No.**

2    Q.   Okay.  I think you said in your direct testimony that

3    there were some requests by Linda Steinhilber to talk to you

4    and Dawn Smith together after that incident on the 14th of

5    April; correct?

6    A.   **It was April 11th, but yes.**

7    Q.   Am I getting my dates wrong?  I'm sorry.  April 11th.

8    You're right.  For some reason, I had it the day before tax

9    day.  I'll get that out of my head.

10        So April the 11th, you said that, after that, she wanted

11   to talk to you and Dawn together; correct?

12   A.   **Dawn and I both received a taped-up piece of paper --**

13   Q.   It's a "yes" or "no" answer.  Did she tell you she wanted

14   you to speak with her and Dawn together?

15   A.   **She did not verbally say it to me.  She wrote it in a**

16   **letter that was taped up in the nurses' station.**

17   Q.   And then your response to that was you felt

18   uncomfortable --

19   A.   **Absolutely.**

20   Q.   -- talking about Dawn with Dawn there; is that true?

21   A.   **Yes.**

22   Q.   Okay.

23   A.   **And about my own personal situation, yes.**

24   Q.   I got it.  The other thing that I wanted to ask you is,

25   you talked about pain medicine and how there's this long,

TARYN DUIS - CROSS

1    drawn-out process.  When a patient gets to the unit, sometimes
2    you have to call the doctor for orders, and then you have to
3    get it from a -- or you have to call the pharmacy, or the
4    pharmacy has to send it to the Pyxis machine?  It can take a
5    while; right?
6    A.   **Yes.**
7    Q.   And then I thought I heard you say you had cared for the
8    patient the day before and then were caring for the patient
9    again the next night --
10   A.   **Yes.**
11   Q.   -- when this supposedly came up; right?
12   A.   **No.  This came up -- The supposed complaint was from the**
13   **7th, which is why I was also baffled, because the patient**
14   **requested to have me back, and I took care of him two nights in**
15   **a row.  So there was nothing said the first night.**
16   Q.   It's also possible, though, to have what's called PRN
17   orders for pain medicine, isn't it?
18   A.   **All pain medicine is pretty much PRN, so yes.**
19   Q.   Which means the doctor orders the pain medicine, say --
20   Pick one.  Norco.
21   A.   **Mm-hmm.**
22   Q.   He's going to allow Norco every four hours as needed for
23   pain; right?
24   A.   **Yes.**
25   Q.   So that doesn't mean you have to give it every four hours;

TARYN DUIS - CROSS

1    it means if the patient asks for it and it's been four hours

2    since he got the last dose, you can give it again; right?

3    A.   **Yes.**

4    Q.   If the patient asks for it and it's only been two hours

5    since the last dose, you can't give it to him yet?  He's got --

6    A.   **No, I can't give it to him.  I can try to call the doctor**

7    **and get something else for him but --**

8    Q.   The whole point of it is, you don't want to overmedicate

9    patients; right?

10   A.   **Correct.**

11   Q.   So if a patient doesn't really need the pain medicine

12   four hours out, the patient can say, "Oh, I don't think I need

13   it"?

14   A.   **Yes, that's correct.**

15   Q.   Five hours, they might need it?

16   A.   **Mm-hmm.**

17   Q.   And you would be able to give it to them because it's been

18   more than four hours; correct?

19   A.   **Yes.  Yes.**

20   Q.   We talked a little bit about Travis Thatcher-Curtis.

21        Travis Thatcher-Curtis was the director of nursing

22   operations; right?

23   A.   **When I was still there at the time, he was the director of**

24   **critical care.**

25   Q.   He was Linda Steinhilber's boss?

TARYN DUIS - CROSS

```
1    A.   Yes.

2    Q.   And the person that you went to talk to with your mother,

3    Dawn Scott, she was the director of nursing; right?

4    A.   Vice president of nursing as far as --

5    Q.   Okay.  So she was Travis Thatcher-Curtis' boss?

6    A.   Yes.

7    Q.   Correct?

8    A.   Mm-hmm.

9    Q.   And when you went to speak with -- I think you said you

10   went to talk to Travis Thatcher-Curtis that day with your

11   mother but he wasn't there; right?

12   A.   That's correct.

13   Q.   You didn't have an appointment with him that day?  You

14   just showed up to speak with him?

15   A.   No.  I had messaged him and told him I would be there the

16   next day; and Travis always had a policy that, if we ever

17   needed him, we could stop by his office and talk to him.

18   Q.   Was that when he was the interim manager of the unit, or

19   was that --

20   A.   That was anytime.

21   Q.   -- after Linda Steinhilber showed up?

22   A.   That was anytime.

23   Q.   Anytime?

24   A.   Mm-hmm.

25   Q.   And what about Dawn Scott, the director of nursing; did
```

TARYN DUIS - CROSS

1   you have an appointment to see her?

2   A.   **No.  I didn't go --**

3   Q.   You didn't message her to let her know you were coming in

4   either; right?

5   A.   **No.  I didn't even know Dawn Scott.  I had never met her**

6   **or heard of her before.**

7   Q.   Okay.  Let's go to April the 14th, 2019.  If this was --

8   Was it April the 14th or April the 11th  on the panic

9   attack?

10  A.   **The 11th.**

11  Q.   All right.  April the 11th.

12  A.   **Mm-hmm.**

13  Q.   You really hadn't had, really, any exposure to

14  Linda Steinhilber prior to April the 11th; correct?

15  A.   **Any -- I mean, I had met her a couple times.**

16  Q.   Oh, if you're headed into her office and said hello?

17  A.   **No.  She came down and introduced herself and yelled at**

18  **the staff.**

19  Q.   Did she yell at you?

20  A.   **She yelled at everybody collectively.**

21  Q.   It's not your testimony, though, that the reason you had

22  the panic attack on April 11th was because of

23  Linda Steinhilber, was it?

24  A.   **No.  It was because it was very overwhelming on the floor.**

25  Q.   Being a bedside nurse on April the 11th caused you to

TARYN DUIS - CROSS

1  have a panic attack?

2  A.   **No.  I just think the culmination of everything that was**

3  **going on, because I've been a bedside nurse now since 2015 and**

4  **have never had a panic attack at work again.  So, no, I don't**

5  **believe it was the bedside nursing stress.  There wasn't -- I**

6  **mean, it was just a busy -- a busy day.**

7  Q.   It was a busy day on the unit, which is what caused you to

8  have a panic attack?

9  A.   **I guess, yes.**

10 Q.   And let's talk about a hospitalist for a minute because I

11 think that might be another term that you and I may understand

12 what that means, but maybe the average person might not.

13      So a hospitalist, the reason they call them that is really

14 complicated, isn't it?  They call him that because he's at the

15 hospital?

16 A.   **Right.**

17 Q.   He or she is a critical care doctor that concentrates

18 mostly in the intensive care units and -- like your unit --

19 A.   **No.**

20 Q.   Progressive care; right?

21 A.   **No.  Hospitalists are GPs.  They're not specialized in any**

22 **sort of way.  They are definitely not for ICU or PCU.  That**

23 **would be an intensivist.  But the hospitalist will go and see**

24 **you if you have a splinter in your toe or if it's something**

25 **much more serious.  So, no, they're not.**

TARYN DUIS - CROSS

1   Q.   They show up at the codes?

2   A.   **They show up at the codes.  So did I.  And they show -- I**

3   **mean, they have to -- They are there to admit every single**

4   **patient that doesn't have a doctor.**

5   Q.   Do they enter orders for patients on the progressive care

6   unit?

7   A.   **Yes.  They would order them for anywhere.**

8   Q.   They enter orders for patients on the intensive care

9   unit, too?

10  A.   **Not very often.  Those are usually left to an intensivist.**

11  Q.   So the doctor -- the hospitalist happens to be there the

12  night that you're having the panic attack?

13  A.   **Mm-hmm.**

14  Q.   And evaluated you and decided, given the fact that you

15  were pregnant and it looked like you were having a panic

16  attack, it would be better for you to go home; correct?

17  A.   **Yes.  He was concerned about my pressure.**

18  Q.   And I take it you agreed with that assessment?

19  A.   **I did not want to leave.  But after everybody had worked**

20  **it out and assured me that it was probably the best thing to**

21  **do, then I decided that I would go ahead and go.**

22  Q.   And when you say everybody had worked it out, they found

23  coverage for you?

24  A.   **Yes, they did.  The hospitalist spoke with the ICU charge**

25  **nurse.  They also spoke with the shift director.  And they were**

1    able to rearrange things on the floor to get it worked out so

2    that my floor would not have to be short.  The hospitalist also

3    called down to the emergency room to let them know they could

4    not fill our last two beds.

5    Q.   Okay.  And I think what you said on your direct

6    examination, that one of the precipitating factors for this

7    was, it was just a really busy night on your shift; right?

8    A.   **Yes.**

9    Q.   I think you said you had a couple new patients come in

10   maybe at the same time?

11   A.   **Oh, yes.  Yes.  A bunch of patients at shift change, and**

12   **there was a code that had been called, like, right before shift**

13   **change.  So at that point, we weren't able to get -- like,**

14   **there wasn't technically a doctor available to hurry to us with**

15   **anything because they were involved in the code, so...**

16   Q.   Okay.  Let's talk a little bit about what a house

17   supervisor is.

18        Is a house supervisor a nurse, typically?

19   A.   **Typically, yes.  I don't know if they can be one without**

20   **being a nurse.**

21   Q.   And he or she is really in charge of all of the nurses and

22   the nursing function for that shift that he or she is the house

23   supervisor; right?

24   A.   **Not really.  They are kind of there to do staffing and go**

25   **get you supplies that are locked up.  They -- I have, in all of**

TARYN DUIS - CROSS

1    my years of nursing, never had a shift supervisor come and try

2    to, like, help with nursing.

3    Q.   Well, no.  I don't mean that.  I don't mean, like,

4    hands-on.  But they're sort of responsible for the nursing

5    function overnight.

6         So in your situation, where you had to leave and go home

7    for health reasons, was the house supervisor involved in moving

8    things around and getting coverage for your unit?

9    A.   **My unit kind of -- We worked extremely well together.  So**

10   **we kind of -- They figured it out for me while the doctor was**

11   **assessing me because they were so concerned.**

12   Q.   Do you know one way or the other whether the house

13   supervisor was involved in filling the gap that you left when

14   you had to go home?

15   A.   **They just moved somebody from my floor into that position.**

16   Q.   I don't think that answers my question.

17        My question is:  Do you know one way or the other whether

18   the house supervisor was involved in helping fill the gap that

19   you left when you had to go home?

20   A.   **There wasn't a gap, so no.  I mean, they stopped**

21   **admissions from coming to our floor so they wouldn't be**

22   **overstaffed, so there wasn't --**

23   Q.   And you don't know one way or the other whether the house

24   supervisor was involved in that decision, do you?

25   A.   **Involved -- Dr. Zorub called the emergency room and let**

TARYN DUIS - CROSS

1    them know.  The doctor called, the hospitalist called, and let

2    the emergency room know what was going on.

3    Q.   You're not answering my question, are you?

4         Do you know one way or the other whether the house

5    supervisor was involved in making arrangements so that you

6    could go home without leaving your team shorthanded?

7    A.   She -- I mean, I --

8              THE COURT:  The question can be answered "yes" or

9    "no," ma'am.

10   A.   Okay.  So no.  No.  As far as I know.

11   BY MR. ANDERSON:

12   Q.   You really don't know whether she was or not; correct?

13   A.   No.

14   Q.   Do you know who Connie Snow is?

15   A.   Yes, I do.

16   Q.   Connie Snow happened to be the house supervisor that

17   evening; right?

18   A.   I am -- I believe so, but I'm not a hundred percent

19   certain.

20   Q.   Okay.  You testified that this wasn't your first child;

21   you had another child previously; correct?

22   A.   That's correct.

23   Q.   A little boy?

24   A.   Yes.

25   Q.   And you were working at Franciscan Health Crown Point at

1    that time, too; right?

2    A.   **Yes, I was.**

3    Q.   And you took maternity leave; right?

4    A.   **Yes, I did.**

5    Q.   And I bet you were excited to take it that time, too?

6    A.   **Well, of course I was.**

7    Q.   And you came back after maternity leave and continued

8    right where you left off; right?

9    A.   **Yes.**

10   Q.   I think you said in your deposition in this case that most

11   of the nurses that you knew had taken maternity leave at

12   Crown Point; is that true?

13   A.   **Yes.   Several nurses did.**

14   Q.   Hmm?

15   A.   **Yes.   Several nurses did.**

16   Q.   You would agree with me that most of the nurses on the

17   unit that you worked with were female; correct?

18   A.   **Yes.**

19   Q.   And most of those female nurses with whom you worked were

20   of childbearing age; correct?

21   A.   **Yes.**

22   Q.   In fact, you said, I think, quote, almost every single

23   employee that you knew at Franciscan took maternity leave,

24   closed quote; right?

25   A.   **Yes.**

TARYN DUIS - CROSS

1    Q.   Dawn Smith's name has come up a little bit, and it will

2    come up again, I think, in this case.  She's a friend of yours,

3    isn't she?

4    A.   **Yes.**

5    Q.   You guys are Facebook friends?

6    A.   **I don't -- I don't have a Facebook, so...**

7    Q.   Really?

8    A.   **Oh.  Unless -- You know, I did create one to do thing --**

9    **but I've never used it, so -- but I'm friend--**

10   Q.   Dawn Smith is a Facebook friend, isn't she?

11   A.   **I really don't know.  I've never logged in to --**

12   Q.   I have my computer here.  Do you want me to pull it up?

13   A.   **You can.  I've never posted anything on Facebook.  I have**

14   **on Instagram but -- but I'm not a social media-er.  So I never**

15   **had a Facebook at the time.  I just made it a couple**

16   **months ago.**

17   Q.   Now you're really challenging me because now I'm going to

18   go from the ELMO to a PC.  So bear with me.  All right?

19   A.   **I don't even know how to log in to Facebook, so...**

20   Q.   Well, somebody does.  And this won't take long.  I don't

21   want to belabor the point here.  No pun intended.

22        Let's see.  I need to go to HDMI.

23             **THE COURT:**  It's not in evidence.  It's just going to

24   come up for the witness and the attorneys until it's admitted

25   into evidence.

TARYN DUIS - CROSS

```
 1              MR. ANDERSON:  Okay.
 2   Q.   All right.  Well, I'm going to use this to refresh your
 3   memory, then.
 4        So can you see this on your screen?
 5   A.   Yes.
 6   Q.   Okay.  And can you search for Dawn Smith.  Do you see her
 7   there?
 8   A.   Yes.  It says add friend.  So I'm guessing that means I'm
 9   not friends with her if I have to add it.
10   Q.   I think that's for me to add you as my friend, which I
11   don't think you're probably going to want me to do.
12   A.   I have no idea.  I've never -- I don't use Facebook, so I
13   don't know.
14   Q.   All right.  But you're friends with her?
15   A.   Okay.
16   Q.   Well, I'm asking you.  I think you've already answered it;
17   right?  You're friends with Dawn Smith?
18   A.   Yes, I'm friends with Dawn Smith.
19   Q.   Okay.  And Dawn was terminated from Crown Point as well;
20   right?
21   A.   Yes, she was.
22   Q.   On the same day that you were even --
23   A.   That's correct.
24   Q.   And you're friends with Kim Buchanan too; correct?
25   A.   Yes, I am.
```

TARYN DUIS - CROSS

1   Q.   She was also terminated from Franciscan?

2   A.   **Yes.**

3   Q.   Same day as you; right?

4   A.   **Yes.**

5   Q.   When you left or were terminated from Franciscan, you

6   actually found work fairly quickly with Fresenious; correct?

7   A.   **It took me --**

8         **MR. FOX:**  Objection, Your Honor.

9         **THE COURT:**  What's the objection?

10        **MR. FOX:**  Can I come to the side?

11        **THE COURT:**  Approach the bench, please.

12   (Bench conference had as follows:)

13        **THE COURT:**  Are you going into lost wages or just the

14   emotional anxiety issue?

15        **MR. ANDERSON:**  It's just to the fact that she did not

16   serve as a bedside nurse at Fresenius, that she took a job that

17   was less stressful.  I'm not going to go into how much she was

18   paid.  I'm just going to ask her if that was a bedside nursing

19   job or not.  And there's one more after that, where I think it

20   was a pediatric home care nurse.  I'm not going to get into

21   much.  I'm just going to ask her if that was a bedside

22   nursing job.

23        **THE COURT:**  Without getting into lost wages.

24        **MR. ANDERSON:**  No.

25        **MR. FOX:**  My only thought is that then I'm going to

 1   ask her about every job she's had since that could that leak

 2   into wages as well?  Are we going down that road now?

 3            MR. ANDERSON:  I'm not going to open the door to

 4   wages.  I'm just going to ask her if she took a job that was

 5   not a bedside nursing job after she left Franciscan.

 6            THE COURT:  You talked about that she said she had

 7   anxiety because she was worried about getting a job, so I think

 8   we can follow it up.  So as long as you're staying away from

 9   the wages --

10            MR. ANDERSON:  I am.

11            THE COURT:  -- I'll allow it.

12       (Bench conference concluded.)

13   BY MR. ANDERSON:

14   Q.   You started a job at Fresenius sometime in June of 2019;

15   correct?

16   A.   **I was interviewed in June.  I started July '15.**

17   Q.   Okay.  And that job was -- was assisting patients with

18   dialysis in an outpatient setting; is that right?

19   A.   **I was an acute dialysis nurse.  So I was supposed to**

20   **travel to hospitals to do, like, bedside dialysis.**

21   Q.   Did you do bedside dialysis?

22   A.   **Before I went on maternity leave, no, I did not.**

23   Q.   It was more --

24   A.   **It was when I got back from -- well, not maternity leave,**

25   **but after I had my --**

TARYN DUIS - CROSS

1  Q.   Which was a considerably different job than being a
2  bedside nurse in the PCU, wasn't it?
3  A.   **Oh, yeah.  It's much different.**
4  Q.   And I'm not going to go into every job.  But then you also
5  took a job as a pediatric home health nurse; correct?
6  A.   **Yes.**
7  Q.   And are you still doing that?
8  A.   **No.**
9  Q.   That job also was not anything close to being a bedside
10 nurse at the progressive care unit; correct?
11 A.   **Correct.**
12 Q.   And just so I have your testimony clear from direct, it's
13 your testimony to the jury in this case under oath that someone
14 in human resources at Franciscan told you that Franciscan was
15 terminating you because you were taking maternity leave related
16 to your pregnancy?
17 A.   **Yes, because I was taking FMLA.**
18 Q.   Is that the same thing as maternity leave?
19 A.   **I mean, it's what's covered.  Family and Medical Leave Act**
20 **covers pregnancy, so it's -- it's --**
21 Q.   Okay.  And so let me rephrase it.
22      So it's your sworn testimony to this jury that either
23 Jessica Smosna or Nita Wirkus or both told you that Franciscan
24 was terminating you because you were planning to take FMLA; is
25 that true?

1    A.    **Yes.**

2    Q.    And it's your sworn testimony under oath in this court

3    that Linda Steinhilber told you with someone from HR on the

4    phone with her that Franciscan was firing you because you were

5    being excited about taking maternity leave and for valuing your

6    children's life over your job; is that your testimony?

7    A.    **Yes.  That's correct as well.**

8          MR. ANDERSON:  Thank you.  I have no further

9    questions.

10         THE COURT:  Any redirect?

11                    <u>**REDIRECT EXAMINATION**</u>

12   BY MR. FOX:

13   Q.    At the time you were suspended, did anyone from Franciscan

14   ever tell you the names of any alleged witnesses for the

15   May 7th incident?

16   A.    **No.**

17   Q.    Do you still need a doctor's order to have a PRN ordered?

18   A.    **Absolutely, yes.**

19         MR. FOX:  Nothing further, Your Honor.

20         MR. ANDERSON:  May I just have one follow-up, Judge?

21         THE COURT:  Go ahead.

22                    <u>**RECROSS EXAMINATION**</u>

23   BY MR. ANDERSON:

24   Q.    Well, it's famous lawyer's last words.  Just one more

25   question, three questions in.

TARYN DUIS - RECROSS

1    You need a doctor's order for PRN; but once you get it,

2    it's good for a while; right?

3    A.   **Yes.**

4    Q.   So you don't have to go back to the doctor every time the

5    patient says, "Well, it's been five hours.  I think I'll have

6    that other pain pill now"?  Once you have the order, it's good

7    for what, a couple days probably; right?

8    A.   **It depends on how long the doctor sets it for.**

9    Q.   Until they terminate it; right?

10   A.   **The doctor could set it, "This order is good for**

11   **two days," "This order is" --**

12   Q.   Oh, I see.  Okay.  Fine.  So --

13   A.   **It's up to discretion of the doctor.**

14   Q.   Let's say I'm in the hospital, and I'm a big baby.  So he

15   or she could put in an order that says give him a Norco every

16   hour hours as he needs it, and this order is good for the next

17   three days; right?

18   A.   **Yes, they could.**

19   Q.   Or they could come in and discontinue it and say he's

20   being a baby, just give him Tylenol; correct?

21   A.   **They could.**

22   Q.   But once you have that PRN order in, then you can give the

23   medication as long as you're doing it in accordance with the

24   order; correct?

25   A.   **Not necessarily.  If the patient has another order that**

1   **supersedes that order, then, no, you cannot --**

2   Q.   Well, obviously.  That's a different fact; right?  But

3   once the --

4   A.   **Well, no, because the patient that came up had an NPO**

5   **order, which means nothing by mouth, and that's top priority,**

6   **number one, of --**

7   Q.   You're talking about the actual patient in question that

8   night?

9   A.   **Yes.**

10  Q.   And you remember that specifically --

11  A.   **Absolutely.**

12  Q.   -- this many years ago without looking at the chart?

13  A.   **Yes, absolutely.**

14          **MR. ANDERSON:**  All right.  Thank you.

15          **THE COURT:**  Anything else?

16          **MR. FOX:**  Nothing else, Your Honor.

17          **THE COURT:**  Thank you, ma'am.  You may step down.

18          **THE WITNESS:**  Thank you.  Do I leave this here, the

19  book?

20          **THE COURT:**  Why don't you leave that there.

21          **THE WITNESS:**  Thank you.

22      (Conclusion of excerpt.)

23

24

25

1
**CERTIFICATE OF REPORTER**

2

3          I, Angela Phipps, RMR, CRR, certify that the

4    foregoing is a true, complete, and accurate excerpt of the

5    record of proceedings in the above-entitled matter before

6    Magistrate Judge Andrew P. Rodovich, on March 6, 2023.

7

8    Date:  March 11, 2023

9          S/Angela Phipps, RMR, CRR

10         Official Court Reporter
           For the U.S. District Court

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25