```
1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF INDIANA
2                          HAMMOND DIVISION

3    TARYN N. DUIS,                    )
                                       )
4          Plaintiff,                  )
                                       )
5          vs.                         )  Cause No.
                                       )  2:20-cv-00078-APR
6    FRANCISCAN ALLIANCE, INC.,        )
     a/k/a FRANCISCAN CROWN POINT      )
7                                      )
           Defendant.                  )
8    _____)

9
                       EXCERPT OF JURY TRIAL
10                   TESTIMONY OF NITA WIRKUS
        PLAINTIFF'S FINAL ARGUMENT AND REBUTTAL FINAL ARGUMENT
11                         MARCH 9, 2023
              BEFORE THE HONORABLE ANDREW P. RODOVICH
12                UNITED STATES MAGISTRATE JUDGE

13   APPEARANCES:

14   FOR THE PLAINTIFF:         RYAN P. SINK and RYAN C. FOX
                                Fox & Sink LLC
15                              6177 North College Avenue
                                Indianapolis, Indiana 46220
16                              317-254-8500
                                Email: rsink@foxsinklaw.com
17                                     rfox@foxsinklaw.com

18
     FOR THE DEFENDANT:         ROBERT A. ANDERSON
19                              Krieg DeVault LLP
                                8001 Broadway, Suite 400
20                              Merrillville, Indiana 46410
                                219-227-6100
21                              Email: randerson@kdlegal.com

22                              ELIZABETH M. ROBERSON
                                AMY J. ADOLAY
23                              Krieg DeVault LLP
                                12800 North Meridian Street, Suite 300
24                              Carmel, Indiana 46032
                                317-238-6342
25                              Email: eroberson@kdlegal.com
                                       aadolay@kdlegal.com
```

Angela Phipps, RMR, CRR, CSR
(219) 852-3616 - Angela_Phipps@innd.uscourts.gov

```
 1   ALSO PRESENT:            Plaintiff, Taryn N. Duis;
                              Sister Marilyn Oliver,
 2                            Franciscan Representative.

 3

 4   OFFICIAL REPORTER:       Angela Phipps, RMR, CRR
                              5400 Federal Plaza
 5                            Hammond, Indiana 46320
                              (219) 852-3616
 6                            angela_phipps@innd.uscourts.gov

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1          **THE COURT:**  Good morning, again.

 2      Bring the jury in, please.

 3      And then Nita -- is it Wirkus -- is your last witness?

 4          **MR. ANDERSON:**  Yes, Your Honor.

 5          **THE COURT:**  Please be seated.

 6      Good morning, ladies and gentlemen.

 7      We have one more defense witness, and we'll take our

 8  morning break, and then the attorneys will address you in their

 9  final arguments, and the case will be submitted to you at

10  lunchtime.

11      So call your next witness, please.

12          **MR. ANDERSON:**  Good morning, Your Honor.

13      Franciscan calls Nita Wirkus.

14      (The oath was duly administered.)

15          **THE WITNESS:**  Yes.

16          **COURTROOM DEPUTY:**  Thank you.  Please be seated.

17                          **NITA WIRKUS,**

18  **Defendant's witness, sworn, examined, and testified as follows:**

19                      <u>**DIRECT EXAMINATION**</u>

20  BY MR. ANDERSON:

21  Q.   Good morning.

22  A.   **Good morning.**

23  Q.   Could you please introduce yourself to the jury.

24  A.   **I am Nita Wirkus.  I am the director of human resources at**

25  **Franciscan Health Crown Point.**

NITA WIRKUS - DIRECT

1   Q.   And how long have you been in that position?

2   A.   **At Crown Point, I've been in the position since February,**

3   **2015, but I've been with Franciscan since 1985.**

4   Q.   And you said you were the director of human resources --

5   A.   **Yes.**

6   Q.   -- at Franciscan Crown Point?

7   A.   **Yes.**

8   Q.   What do you do there?  I mean, what are your roles?  What

9   are your job responsibilities in that position?

10  A.   **So my role is director of human resources.  It's a**

11  **strategic role with the hospital.  And I also do some**

12  **investigations when there's employee relation issues, update**

13  **policy and procedures, and I do make decisions regarding**

14  **terminations and suspensions.**

15  Q.   Are you sort of top boss for HR at Crown Point?

16  A.   **Yes.**

17  Q.   Who do you report to?

18  A.   **Dr. McCormick.**

19  Q.   And what is his role?

20  A.   **He's our president.**

21  Q.   So he's a president of the hospital?

22  A.   **Yes.**

23       **And I also report to the administrative director of human**

24  **resources, which is Corey Baute.**

25  Q.   And you said you've been with Franciscan since 1985?

NITA WIRKUS - DIRECT

1    A.    **Yes.**

2    Q.    So you started there as a teenager, apparently.

3          Have you been in HR the whole time?

4    A.    **In 1985, I started in word processing.  I was still in**

5    **college.  I was in nursing school.  I did change my mind.  When**

6    **I got into my clinicals, I decided I did not want to be a**

7    **bedside nurse.  So I switched my field to human resources, and**

8    **I started in human resources in 1989 as an HR assistant, and I**

9    **was still in college.**

10   Q.    And so have you just progressively worked your way up from

11   assistant to director?

12   A.    **Yes.  I have been in every level of human resources.**

13   Q.    What sort of college background do you have?

14   A.    **A bachelor's degree.**

15   Q.    From?

16   A.    **Governors State University.**

17   Q.    In what?

18   A.    **In business.**

19         **And I also have three certifications in human resources.**

20   **I have a PHR, which is Professional of Human Resources.  I have**

21   **a SHRM-CP, which is --**

22   Q.    Yeah, we heard that phrase yesterday.

23         What does SHRM stand for?

24   A.    **Society of Human Resource Management, Certified**

25   **Professional.**

1      **And then I also have a certification for Strategic HR**
2   **Business Partner.**
3   Q.   And how do you get those certifications?
4   A.   **You have to study and take a test.**
5   Q.   Okay.  And you have all three of those?  They're current
6   as of today?
7   A.   **They are all current, and I have to get 60 CEUs for each**
8   **certification every two years.**
9   Q.   What's a CEU?
10  A.   **Continuing education.**
11  Q.   And did you have all three of these certifications back in
12  2019?
13  A.   **I had two; the SHRM-CP and the PHR.  The Strategic HR**
14  **Business Partner I just received in 2021.**
15  Q.   I want to turn your attention, briefly -- and I don't want
16  to dwell on this too much because we've had a lot of testimony
17  in this case already -- but I want to turn your attention to
18  Franciscan's values, which, I think, are set forth in the
19  employee handbook, which you should have.
20      Do you have an exhibit book up there?
21  A.   **I do.**
22  Q.   Okay.  So if you open that up to tab 6.  This document is
23  already in evidence so I think we can display it to the whole
24  court.  We're putting it up on the screen, but it's the same
25  document that you have in tab 6 there.  I'm going to play my

1  hand with this, again, and see if I can make it so it's at
2  least somewhat readable.
3          Okay.  Can you tell the jury quickly what document is.
4          Oh, I'm sorry.  It's the wrong document.  Hold on.
5          Go to tab 8.  Do you see that?
6  A.   **Employee handbook.**
7  Q.   And what is behind tab 8?
8  A.   **Employee handbook.**
9  Q.   Okay.  And this is given to every employee when they
10 start?
11 A.   **Yes.**
12 Q.   It's online?
13 A.   **It's online.**
14 Q.   And employees can access it anytime they feel like it?
15 A.   **Yes.**
16 Q.   Could you turn to page 2 of that handbook.  It's got a
17 number at the bottom that we put on it that's Franciscan 209,
18 and it should look like what's on your screen in front of you
19 there.
20 A.   **Yes.**
21 Q.   Do you see that?
22 A.   **Yes.**
23 Q.   It looks like it doesn't print out quite the way it should
24 because it says "our healin ministry."
25          Healing ministry; right?

1   A.   **Yes.**

2   Q.   Okay.  Can you read for the jury -- And I just want to

3   highlight to them some of the things that are in these

4   documents that every employee gets.  Can you read that part --

5   that last paragraph down at the bottom that starts "faithful to

6   our mission."

7   A.   **"Faithful to our mission, we respect life and the dignity**

8   **of all persons.  Imitating Jesus, we minister with joy, love,**

9   **and compassion to all from conception to natural death.  Imbued**

10  **with the spirit of Christ and mindful of our Christian**

11  **stewardship, we provide the best possible care through**

12  **increased spiritual awareness, commitment, and dedication of**

13  **ourselves and all who work with us in extending our healing**

14  **ministry."**

15  Q.   Now, in your experience with Crown Point, is that just lip

16  service that some lawyers and HR people have put together, or

17  does Crown Point really try and live by that mission?

18  A.   **We absolutely try to live by that mission.  We have -- Our**

19  **values are in our handbook.  Our values are in every job**

20  **description.  Our values are listed on the performance**

21  **evaluations that employees receive annually.**

22  Q.   If you go to the next page, I think it should start with

23  "Franciscan values."  Do you see that?

24  A.   **Yes.**

25  Q.   And can you just sort of walk through what the Franciscan

1  values are.

2  A.   **We have five Franciscans values:  Respect for life,**

3  **fidelity to our mission, compassionate concern, joyful service,**

4  **and Christian stewardship.**

5  Q.   And those are all listed in the employee handbook?

6  A.   **Yes.**

7  Q.   And, again, same question.  Do you guys take these

8  seriously, or is this just something that we put in the

9  employee handbook and then never think about it again?

10  A.   **We take this very seriously.**

11  Q.   And how so?

12  A.   **We're a faith-based organization.  When employees are**

13  **hired, they understand and agree to the mission and values,**

14  **that they will abide by them.**

15  Q.   Now, that doesn't mean that you have to be Catholic to

16  work at the hospital, does it?

17  A.   **No.**

18  Q.   Do you have to even believe in God to work at the

19  hospital?

20  A.   **No.**

21  Q.   But you still have to abide by these principles; correct?

22  A.   **Yes.**

23  Q.   Turn to page 15 of that employee handbook.  And is this

24  something that you would have had a share in drafting or

25  reviewing occasionally to decide whether it should be updated?

1   A.   **Yes, drafting and reviewing.**

2   Q.   Okay.  So do you see page 15?  That starts with "employee

3   relations"?

4   A.   **Yes.**

5   Q.   Can you read that first sentence under "employee

6   relations."

7   A.   **"Continuing Christ's ministry in our Franciscan tradition**

8   **is of critical importance to our mission, as it is an essential**

9   **ministry of what we do, and it is within the social mission of**

10  **this church."**

11  Q.   All right.  And then down below, there's a sentence after

12  sort of the enumeration of, of the Franciscan values.  There's

13  a sentence that begins with "every person."  Can you read those

14  two sentences.

15  A.   **"Every person who works within Franciscan has the**

16  **responsibility to work together in a spirit of joyful service**

17  **to meet the health needs of the communities we serve.**

18  **Achieving a joyful workplace is the responsibility of all**

19  **Franciscan employees, including all those who supervise, as**

20  **well as those who receive supervision."**

21  Q.   A hospital can be a pretty tough place to work, can't it?

22  A.   **Yes.**

23  Q.   Is it always joyful?

24  A.   **No.**

25  Q.   And so how do you reconcile that with these statements?

NITA WIRKUS - DIRECT

1   A.   **I think every employee has a responsibility to their**

2   **employer to live by the rules of the -- of the hospital.  Part**

3   **of our rules are to abide by the Franciscan values and respect**

4   **the mission.**

5   Q.   Have you had days where you've come to work and maybe

6   haven't been quite as joyful as you would aspire to be?

7   A.   **Yes.**

8   Q.   And do you expect that that's possible for all employees?

9   A.   **Absolutely.**

10  Q.   And so how do you reconcile, you know, having a bad day,

11  say, with these two statements in the employee handbook?

12  A.   **I know there's times when employees, they're having a bad**

13  **day.  They share it with their manager that they're a little**

14  **off today, "I'm not feeling well today," "I did something, and**

15  **I'm sorry for it," "I'm not feeling well," "I'm stressed out,"**

16  **"I'm having personal issues at home."  That happens.**

17  Q.   Does somebody automatically get fired if they're not

18  acting joyful enough?

19  A.   **Absolutely not.**

20  Q.   Are these aspirational-type goals or values that

21  Franciscan tries to imbue?

22  A.   **I'm not sure I understand the question.**

23  Q.   Yeah.  It was a bad question.  Let me try another shot at

24  that.

25       So, you know, you just read these, saying that everybody

```
 1   that works with Franciscan is responsible for a joyful
 2   workplace, and then you told me, well, there are days where
 3   you're just not that joyful.
 4   A.   Mm-hmm.
 5   Q.   How do you reconcile those two things?
 6   A.   Not sure I understand.
 7   Q.   Okay.  I'll withdraw the question.
 8   A.   Okay.
 9   Q.   You wouldn't fire somebody that's otherwise following
10   these rules and just has a bad day, would you?
11   A.   No.
12   Q.   Does Franciscan, though, routinely terminate people for
13   violations of its values in its mission?
14   A.   Yes.
15   Q.   And are you involved in those types of terminations?
16   A.   Yes.
17   Q.   Have you fired people for not following the Franciscan
18   values?
19   A.   Yes.
20   Q.   And you said the Franciscan values are incorporated into
21   the employee annual --
22   A.   Performance evaluations.
23   Q.   -- performance evaluations?
24   A.   Yes.
25   Q.   Why does Franciscan bother with a mission statement and
```

1   the statement of all these values?  Why is it important to
2   Franciscan?
3   A.   **Because the sisters, they started the Franciscan tradition**
4   **years and years ago, and they've opened these hospitals, and**
5   **the sisters live by their mission, and that's the expectation**
6   **of all employees, is to continue that "living in Christ"**
7   **ministry.**
8   Q.   You've been in some of these strategic meetings with
9   leadership?
10  A.   **Yes.**
11  Q.   And you've discussed these values and the mission?
12  A.   **Absolutely.**
13  Q.   Do the values and mission relate in any way to clinical
14  outcomes?  Do you think you provide better patient service with
15  people following the mission and the values?
16  A.   **Yes.**
17  Q.   Why so?
18  A.   **Because of the values that we have; joyful service,**
19  **compassionate concern, respect for life, fidelity to the**
20  **mission.**
21  Q.   Do you think that leads to better clinical outcomes?
22  A.   **Yes.**
23  Q.   Now I'm going to go to the policy that I had up earlier.
24  Sorry about that.
25  A.   **That's all right.**

1   Q.   Tell the jury what this is behind tab 6.  Could you just
2   tell the jury what this is.
3   A.   **This is a corrective action policy which explains the**
4   **steps in the corrective action process, and it also gives a**
5   **breakdown of some of the incidences that could happen which**
6   **could result in suspension or immediate termination.**
7   Q.   Okay.  And there's some dates up in the upper right-hand
8   corner that I've highlighted on the screen here.  Do you see
9   those?
10  A.   **Yes.**
11  Q.   What does that mean?
12  A.   **So the policy was last revised March 13th, 2019.  The**
13  **next review is 3/12/2022.**
14  Q.   And that's the next scheduled review?
15  A.   **That would be the next scheduled review.**
16  Q.   And so is this the policy that governed in May of 2019?
17  A.   **Yes.**
18  Q.   And then down there under that part, it says, "The policy
19  area is human resources;" right?
20  A.   **Yes.**
21  Q.   And that's where you live; right?
22  A.   **Yes.**
23  Q.   Okay.  Can you read that first paragraph for us?  I know
24  the jury can read, but I know this is also a little hard to
25  read on these screens.  So can you read that policy under

1    "corrective action policy."

2    A.    **"Franciscan Alliance is committed to providing**

3    **compassionate, quality healthcare to its patients.  As such, it**

4    **requires its co-workers to maintain high standards of**

5    **performance and behavior.  This policy describes the process**

6    **that will generally be taken when a co-worker's performance or**

7    **behavior does not meet organizational expectations."**

8    Q.    All right.  And then how about the paragraph under

9    "applicable to all co-workers"?

10   A.    **"Corrective action may be taken when a co-worker has**

11   **violated an organizational or departmental policy, procedure,**

12   **or when the co-worker's conduct or work performance does not**

13   **meet expectations.  The organization is committed to working**

14   **with co-workers to improve performance and will follow a**

15   **progressive corrective action process.  However, the**

16   **organization reserves the right to skip any or all steps in**

17   **progressive corrective action if deemed appropriate.**

18   **Additionally, some violations may result in immediate**

19   **termination without notice.  Law enforcement and/or licensing**

20   **or regulating agencies will be notified as required."**

21   Q.    What does that last sentence mean?

22   A.    **If we have employees that have stolen something, we could**

23   **press charges against them if we choose to do so.**

24   Q.    Okay.  We haven't had any of that in this case; right?

25   A.    **No.**

1   Q.   Okay.  I'm on the next page now of this.  It seems like

2   the print gets a little finer, so, if you would -- the top of

3   this page starts with "step 2."

4        Are these just the steps in the progression of

5   disciplinary steps?

6   A.   **Yes.**

7   Q.   Okay.  And then there's a part right under step 4 before

8   the paragraphs A, B, and C.  Can you read that for us.

9   A.   **"The organization reserves the right to skip any of the**

10  **aforementioned steps and move directly to suspension and/or**

11  **termination.  The following list is not exhaustive, but the**

12  **following breaches of good conduct are considered sufficient**

13  **cause for immediate suspension pending investigation and/or**

14  **immediate termination."**

15  Q.   And what does "not exhaustive" mean?

16  A.   **It's not a complete list.**

17  Q.   Okay.  And what is E on the list?

18  A.   **Sleeping during work shift.**

19  Q.   Okay.  So for sleeping during work shift, you can be fired

20  without any of these previous steps?

21  A.   **Yes.**

22  Q.   Can you turn the page and tell us what letter P says.

23  A.   **"Conduct that jeopardizes patient care."**

24  Q.   So that's also on the list of things that you can be

25  terminated for --

1    A.    **Yes.**

2    Q.    -- without any of these previous steps?

3    A.    **Yes.**

4    Q.    And there are other things that are just not enumerated in

5    this list; is that right?

6    A.    **Yes.**

7    Q.    Okay.  And then read the part at the bottom that says

8    "employment at will."

9    A.    **Employment at will.  It is understood that nothing in this**

10   **policy changes the fact that co-workers' employment is at**

11   **will."**

12   Q.    And as a person that's been in HR since the late '80s,

13   what does that mean to you?

14   A.    **We can dismiss employees at any time.**

15   Q.    For any reason?

16   A.    **For any reason.**

17   Q.    Notwithstanding what's in this policy?

18   A.    **Yes.**

19   Q.    What about for being pregnant; can you fire an employee

20   for being pregnant?

21   A.    **No.**

22   Q.    Why not?  It says "for any reason."

23   A.    **That's an FMLA law.**

24   Q.    Okay.

25   A.    **We outsource that to a vendor.**

NITA WIRKUS - DIRECT

1  Q.   Okay.  I want to talk just a little bit about -- not the

2  policy, but about standard operating procedure when it comes to

3  discipline of employees.

4       Tell us what the role of a manager is in the disciplinary

5  process, and, specifically, if you want to refer to Linda

6  Steinhilber in this case.  But, just generally, what's the role

7  of the manager in the disciplinary process?

8  A.   **Managers report issues to human resources.  They work with**

9  **the HR manager to discuss that.  If investigations need to take**

10 **place, managers participate in those investigations and**

11 **sometimes human resources.**

12 Q.   And in this case, Linda Steinhilber was the manager at

13 issue; right?

14 A.   **Yes.**

15 Q.   And you said she would have to report conduct to HR to

16 start that process?

17 A.   **They usually consult with human resources before the**

18 **process.**

19 Q.   If Linda had been in the nurses' station and had heard

20 Plaintiff Duis say, "I don't give an F if he wants his

21 medication.  He can wait," could she just have fired her right

22 on the spot right there?

23 A.   **No.**

24 Q.   "Just pick up your stuff and get out"?

25 A.   **No.**

1   Q.   Why not?

2   A.   **You have to consult with human resources.**

3   Q.   Okay.  And so what does human resources do then when it

4   gets a complaint like that?

5   A.   **Get the documentation, investigate the situation.  Human**

6   **resources reviews the documentation and then makes the decision**

7   **with the manager, director, and the VP of the department.**

8   Q.   And then is the manager then involved in discussions about

9   whether the employee should be terminated or should have some

10  lesser disciplinary --

11  A.   **Yes.**

12  Q.   Is it the manager's ultimate call, though, about what the

13  discipline should be?

14  A.   **Along with the director and VP of the department.**

15  Q.   And I just said "ultimate call."  But if there is a

16  difference of opinion on what the discipline should be, who's

17  got the ultimate authority to make that call?

18  A.   **Human resources.**

19  Q.   Would that be you?

20  A.   **Yes.**

21  Q.   Have you ever unilaterally made that decision before?

22  A.   **Yes.**

23  Q.   Is your preference to be collaborative with a manager?

24  A.   **No.**

25  Q.   You want the manager's input, though, I assume; right?

1   A.   **Yes.**

2   Q.   This seems awfully bureaucratic.  I mean, why not just

3   give the person that's on-site the ability to just terminate

4   employees for misconduct?

5   A.   **Because you have to -- you have to have documentation.**

6   **You have to review investigation notes before a decision is**

7   **made.**

8   Q.   Is part of your job to make sure that discipline is

9   consistent across the units?

10  A.   **Yes.**

11  Q.   Same question for you.  If you happen to be down there on

12  unit that day, and you heard a nurse say, "I don't give an F if

13  he wants his pain medication.  He can wait," would you have the

14  ability to look at the employee and say, "Get your stuff

15  together and get out"?

16  A.   **Yes.**

17  Q.   You could fire him on the spot right there?

18  A.   **Could suspend them pending investigation and consult with**

19  **their manager.**

20  Q.   All right.  So you would have the ability to suspend.

21       And then what would your next step be?

22  A.   **Speak with the manager.**

23  Q.   And why would that be?

24  A.   **Because the employee reports to that manager.**

25  Q.   All right.  I want to switch topics now a little bit on

```
 1   you and talk about the hospital's FMLA experience.
 2        Was FMLA in place when you started working?
 3   A.   Yes.
 4   Q.   Have you taken FMLA leave before?
 5   A.   Yes.
 6   Q.   Do you have kids?
 7   A.   Two.
 8   Q.   Okay.  We've asked other witnesses this.  I'm going to ask
 9   you, too.
10        What percentage of the nurses at Crown Point would you say
11   are female?
12   A.   90 percent, 95 percent.
13   Q.   And of those female nurses, what percentage would you
14   estimate are in the child-bearing age?
15   A.   60 percent.
16   Q.   And you seem pretty confident of that.  Why is that?
17   A.   We have younger workforce, and, again, they're primarily
18   females.
19   Q.   And so is FMLA just a way of life at Crown Point?  I mean,
20   it's just something you have to deal with, isn't it?
21   A.   Yes.
22   Q.   Are you aware -- The whole time you've been at Crown
23   Point, are you aware of anybody that's been mistreated for
24   taking FMLA leave?
25   A.   No.
```

 1   Q.   And I don't mean just pregnancy.  I mean any FMLA leave.

 2   A.   **No.**

 3   Q.   Right?

 4        Because you can get FMLA leave, for example, if you have

 5   to take care of a sick relative or if you're sick yourself;

 6   right?

 7   A.   **Yes.**

 8   Q.   So I'm opening it up to everybody.

 9        Has anybody ever been mistreated for taking FMLA leave?

10   A.   **No.**

11   Q.   How about for just talking about taking FMLA leave?

12   A.   **No.**

13   Q.   How about for just being excited about taking FMLA leave?

14   A.   **No.**

15   Q.   And when I say "FMLA leave," you know that means maternity

16   leave; right?

17   A.   **Yes.**

18   Q.   Because maternity leave is, under the law, FMLA leave;

19   correct?

20   A.   **Correct.**

21   Q.   Would Franciscan tolerate it if you found out that a

22   manager was giving employees a hard time about taking FMLA

23   leave?

24   A.   **No.**

25   Q.   What would you do?

NITA WIRKUS - DIRECT

1    A.   **We'd have a conversation with that manager.**

2    Q.   Would you discipline the manager?

3    A.   **Yes.**

4    Q.   Have you ever had to do that?

5    A.   **No.**

6    Q.   Okay.  Let's turn our attention now to the Plaintiff,

7    Ms. Duis.

8         When did you first become aware that she was even a nurse

9    at Crown Point?

10   A.   **She was hired, I believe, in '15.**

11   Q.   Were you aware that she was hired?

12   A.   **I don't recall.**

13   Q.   Okay.  When were you aware that there was an issue with

14   her?  When did you become aware of that?

15   A.   **Of the time of the incident in May.**

16   Q.   So tell us about your involvement in the incident.

17   A.   **So we had an HR manager that brought the attention to me**

18   **that she and the manager were going to be suspending Ms. Duis**

19   **pending investigation.**

20   Q.   Who was the HR manager?

21   A.   **Jessica Smosna.**

22   Q.   Okay.  And how did she contact you?

23   A.   **She -- probably just in my office.  We had a human**

24   **resource department so ...**

25   Q.   Okay.  And what was your understanding of what had

1  happened?

2  A.   **My understanding of what had happened, that a comment was**

3  **made about making a patient wait for pain medicine.  That's all**

4  **I knew at the time.  She was just informing me that there would**

5  **be an investigation and she would be suspended pending the**

6  **investigation.**

7  Q.   So she wasn't seeking your permission to suspend the

8  employee; she had already done that?

9  A.   **Yes.**

10 Q.   And did you agree with that?

11 A.   **Yes.**

12 Q.   That was appropriate?

13 A.   **Yes.**

14 Q.   What was the next, either, thing that you learned or your

15 next involvement in the matter?

16 A.   **My next involvement was on May 10th.**

17      **I was at a funeral, and I had received a phone call, and I**

18 **had to step away from the funeral luncheon.  And I recall on**

19 **the phone was Ms. Duis; the manager, Linda; and Jessica Smosna;**

20 **and maybe Travis -- I don't recall if he was on the call -- and**

21 **having a conversation.  And she was just arguing the entire**

22 **suspension, not understanding why she was suspended and just**

23 **very angry.**

24 Q.   You had Ms. Duis on the phone --

25 A.   **Yes.**

1    Q.    -- with these others?

2    A.    **Yes.**

3    Q.    Okay.  And do you know where they were at in the process?

4    What were they doing?  Why were they calling you?

5    A.    **I believe they were still investigating the incident,**

6    **preparing -- getting statements ready.**

7    Q.    At that time, did anybody tell you that the Plaintiff was

8    pregnant?

9    A.    **No.**

10   Q.    Did anyone tell you that the Plaintiff was expressing some

11   happiness at being able to take a maternity leave --

12   A.    **No.**

13   Q.    -- FMLA leave?

14       Did anybody tell you that she was making accusations

15   against Linda Steinhilber about digging up dirt on her or

16   targeting her?

17   A.    **No.**

18   Q.    Okay.  And so how did that call conclude then?

19   A.    **She was suspended pending investigation, and we would get**

20   **back with her.**

21   Q.    Okay.  Why did they call you?

22   A.    **I don't recall.**

23   Q.    Okay.  You do recall the call, though?

24   A.    **Yes.**

25   Q.    How can you remember the call so well?

1   A.   **Well, being at a funeral for a family member and being**

2   **called out.**

3   Q.   Sticks in your mind?

4   A.   **Yes.**

5   Q.   Okay.  So what was your next involvement in the matter

6   then?

7   A.   **My next involvement was meeting with the manager, the**

8   **director, and our CNO to discuss next steps.**

9   Q.   So the manager is Linda Steinhilber?

10  A.   **Linda.  Travis and Dawn Scott, our CNO.**

11  Q.   Okay.  And is that a meeting, you said?

12  A.   **Yes.**

13  Q.   And what was that meeting about?

14  A.   **The meeting was about next steps.  We reviewed all the**

15  **investigation notes, and the decision was made to terminate.**

16  Q.   Okay.  Did Dawn Scott tell you that the Plaintiff had been

17  in her office with the Plaintiff's mother?

18  A.   **Yes.**

19  Q.   What do you remember about what was told to you about

20  that?

21  A.   **What I remember from Dawn, what was told about that was**

22  **that she just came into the office, unannounced, very**

23  **inappropriate in her behavior.**

24  Q.   Did anybody at this meeting say, oh, by the way, Plaintiff

25  is pregnant?

1   A.   **No.**

2   Q.   Did anybody tell you that Plaintiff was going to be

3   requesting FMLA leave?

4   A.   **No.**

5   Q.   To your knowledge, had Plaintiff requested FMLA leave at

6   that point?

7   A.   **No.**

8   Q.   Did anybody tell you that she was excited about FMLA

9   leave?

10  A.   **No.**

11  Q.   Was there any discussion whatsoever about either pregnancy

12  or FMLA leave in that meeting?

13  A.   **No.**

14  Q.   Would that have made a difference to you if --

15  A.   **No.**

16  Q.   Okay.  So the decision was made to terminate?

17  A.   **Yes.**

18  Q.   Who ultimately made that decision?

19  A.   **Human resources.**

20  Q.   That's you?

21  A.   **Yes.**

22  Q.   And why did you decide to skip those four steps that are

23  in the policy and go right to termination?

24  A.   **In reviewing the investigation notes, there was a delay in**

25  **patient care.  There was -- which we viewed as a form of**

NITA WIRKUS - DIRECT

1  **patient neglect.  There was inappropriate behavior, violated**

2  **the Franciscan values, and the attitude.  The attitude that she**

3  **displayed does not fit for a bedside nurse at our hospital.**

4  Q.   There were some of these other statements, as you recall

5  or may recall.  One of them was about a uniform fitting and

6  some conduct that she displayed at the uniform fitting.

7      Were you aware of that?

8  A.  **Yes.**

9  Q.   Did that factor into your assessment of her attitude?

10 A.  **Yes.  Again, another attitude situation with the fitting**

11 **and the attitude that she displayed when meeting with our CNO.**

12 Q.   And what do you mean by that?

13 A.  **Just the inappropriate attitude.**

14 Q.   Okay.  And so, based on your observation of the attitude

15 and the possible patient delay in medication, that was enough

16 for you to terminate?

17 A.  **Yes.**

18 Q.   Let's say there was no patient delay in the medication.

19 Would it still have been enough for you to terminate?

20 A.  **Yes.**

21 Q.   Did anyone at that meeting suggest that was too harsh,

22 that, "Maybe we should just give her a written warning"?

23 A.  **No.**

24 Q.   Would you have agreed with that if that had been proposed?

25 A.  **No.**

1    Q.    Let me ask you a different question.

2          If Dawn Scott had reported to you that she and her mother

3    came into Dawn Scott's office and she broke down and said, "You

4    know, I said it.  I shouldn't have said it.  It's not me.  I'm

5    not feeling really well.  I apologize.  I'm going to apologize

6    to my co-workers," would you have recommended termination?

7    A.    **No.**

8    Q.    Why not?

9    A.    **Because we give employees a chance.  I mean, people are**

10   **human beings.  We all make mistakes.  But own the mistake.  And**

11   **we have -- We have help to help employees.  We have an employee**

12   **assistance program.  If someone is struggling with something**

13   **personally or professionally, we have resources for that.**

14   Q.    Okay.  Let's talk a little bit about -- I know you

15   probably don't this in HR, but we're going to do it in this

16   courtroom a little later.  Let's talk about the standard of

17   evidence or standard of review.

18         How much evidence would you need of this statement in

19   order to terminate her for it?

20         Does that not make sense?  I can see on your face it

21   doesn't make sense.  Sorry.  I'll try again.

22         You had one statement from one nurse.  Did you know the

23   nurse that made the statement that said, "I don't give a fuck

24   if he wants his pain medication.  He can wait.  He should have

25   taken it before"?  Did you know the nurse that made that

1    statement?

2    A.   **No.**

3    Q.   All right.  Did you have any information about her

4    credibility?

5    A.   **No.**

6    Q.   Was that statement sufficient for you to say, "You know

7    what, it's been confirmed.  We're going to go ahead and

8    terminate her based on that"?

9    A.   **No.  There was some more statements that supported that.**

10   Q.   All right.  So that's the only statement, though, that

11   says she used that word or said it in that way?

12   A.   **Used that word?**

13   Q.   Yeah.

14   A.   **Correct.**

15       **But there was another statement where the employee**

16   **overheard something along those lines but didn't know exactly**

17   **what was said.**

18   Q.   Okay.  And was that sufficient for you to arrive at your

19   determination?

20   A.   **Yes.**

21   Q.   And was the determination of her attitude, was that

22   confirmed by what she told Dawn Scott or by her behavior in the

23   meeting with Dawn Scott?

24   A.   **Yes.**

25   Q.   And the uniform fitting?

1   A.   **Yes.**

2   Q.   You felt like you had sufficient information to make the

3   termination decision?

4   A.   **Yes.**

5   Q.   Was she terminated solely for using the F bomb in the

6   nurses' station?

7   A.   **No.**

8   Q.   Was she terminated solely for possibly being late on some

9   pain medication?

10  A.   **No.**

11  Q.   Did it factor into your analysis of whether she should be

12  terminated that she was a charge nurse?

13  A.   **Yes.**

14  Q.   Why is that?

15  A.   **When you're a charge nurse, you're responsible for leading**

16  **that shift.  You're the go-to person if anyone needs anything.**

17  **And with her attitude, it doesn't display a charge nurse.**

18  Q.   Had she not been the charge nurse, had she just been one

19  of the regular nurses on the unit, would you have still

20  terminated her for that attitude?

21  A.   **Yes.**

22  Q.   Is it fair to say that being the charge nurse just made it

23  worse?

24  A.   **Yes.**

25  Q.   Based on your understanding of the facts in the case, did

1    you believe that Nurse Duis should be a bedside nurse at

2    Franciscan Health Crown Point?

3    A.   **No.**

4    Q.   Now I want to talk about the termination meeting in

5    particular, but any of the meetings that you were involved in.

6         Did anyone at Crown Point think that the Plaintiff, Taryn

7    Duis, should be terminated because she was pregnant?

8    A.   **No.**

9    Q.   Did they think that she should be terminated because she

10   planned to take FMLA or maternity leave?

11        **MR. SINK:**  Objection; calls for speculation.

12        I assume you're talking about discussions?

13        **MR. ANDERSON:**  That you're involved in, yeah,

14   obviously.  I mean --

15        **MR. SINK:**  He asked what other people were thinking.

16        **THE COURT:**  Objection overruled as to the

17   discussions.

18   **BY MR. ANDERSON:**

19   Q.   So you heard the colloquy here.  I just want to know the

20   stuff that you were involved in.  Okay?

21   A.   **Mm-hmm.**

22   Q.   So going back to my questions, did -- was there any

23   mention or any factoring in, in any way, that she was pregnant?

24   A.   **No.**

25   Q.   Same question on -- that she was going to take FMLA leave

 1   or maternity leave?

 2   A.   **No.**

 3   Q.   Did it matter, one way or the other, whether she was going

 4   to come back after any maternity leave?

 5   A.   **No.**

 6   Q.   Was it any factor at all in your decision to terminate her

 7   that she was excited about having another baby?

 8   A.   **No.**

 9   Q.   Was it -- was there any factor involved in being excited

10   about going on leave?

11   A.   **No.**

12   Q.   Was there any discussion at all and was it a factor in any

13   way, even just slightly, any way, that she loved her family

14   more than she loved her job?

15   A.   **No.**

16   Q.   Do you love your family more than your job?

17   A.   **Yes.**

18   Q.   Did any of these things that I just talked about play any

19   role in the decision to terminate the Plaintiff?

20   A.   **No.**

21   Q.   If any of those things had come up -- if, for example,

22   Linda Steinhilber had said, "She's pregnant.  I've had with it

23   with pregnant nurses.  Let's get rid of her" -- what would your

24   reaction have been?

25   A.   **"No," and I would have had a different conversation with**

1    **that manager.**

2    Q.   What would that different conversation be?

3    A.   **That manager would not be with us.**

4    Q.   Okay.  And same thing.  "I'm tired of these nurses taking

5    FMLA.  I can't run my unit with all these nurses out all the

6    time.  Let's get rid of her.  She's going to take FMLA.  I know

7    she's not coming back.  Let's just can her now."

8         What would your response have been to that?

9    A.   **"No."**

10   Q.   Same thing?

11   A.   **Same thing.**

12   Q.   Have you ever heard anybody at Franciscan talk like that?

13   A.   **No.**

14            MR. ANDERSON:   Excuse me one second, Judge.

15   Q.   Were you aware that Nurse Duis had made some complaints

16   about Linda Steinhilber and Linda's targeting of her?

17   A.   **When she met with Dawn Scott, Dawn Scott shared that.**

18   Q.   And were her complaints to Dawn Scott or to anyone else

19   about Linda Steinhilber part of the reason for terminating her?

20   A.   **No.**

21   Q.   Did anybody raise that as part of the reason for

22   terminating her?

23   A.   **No.**

24   Q.   Now, just so we're clear, the attitude that she displayed

25   with Dawn Scott did come into play; right?

1   A.   **Yes.**

2   Q.   But the mere fact that she was complaining about her

3   manager was not grounds for her termination --

4   A.   **No.**

5   Q.   -- is that fair?

6   A.   **Yes.**

7           **MR. ANDERSON:**  I have nothing further.  Thank you.

8           **THE COURT:**  Any cross?

9           **MR. ANDERSON:**  Let me clean up my mess here.

10                      <u>**CROSS-EXAMINATION**</u>

11  **BY MR. SINK:**

12  Q.   Good morning.

13  A.   **Good morning.**

14  Q.   So let me get this straight.  You contend you were a

15  decision maker in the decision to terminate Ms. Duis?

16  A.   **I approve -- I approve terminations.**

17  Q.   I believe you just used the word, if there was an ultimate

18  decision maker, that would be you?

19  A.   **Yes.**

20  Q.   Okay.  Do you recall signing interrogatories in this case?

21  A.   **Yes.**

22          **MR. SINK:**  Permission to approach the witness?

23          **THE COURT:**  Go ahead, yes.

24  **BY MR. SINK:**

25  Q.   I'm going to hand you what's been marked as Plaintiff's

```
 1    Exhibit 16.

 2         (Document tendered to witness.)

 3              MR. SINK:  Just for the witness.

 4    BY MR. SINK:

 5    Q.   Can you identify what I just gave you?

 6    A.   Okay.

 7    Q.   Do these appear to be Defendant's responses to Plaintiff's

 8    first set of interrogatories?

 9    A.   Yes.

10    Q.   Okay.  And if you look on the next -- if you look at the

11    next-to-last page entitled "verification," is that your

12    signature?

13    A.   Yes.

14    Q.   And under "verification," does it indicate that Nita

15    Wirkus, under penalties of perjury, says that she's authorized

16    by Franciscan Alliance, Inc., to sign the foregoing responses?

17    A.   Yes.

18    Q.   And did you review those before you signed them?

19    A.   Yes.

20    Q.   And you're an honest and truthful person; right?

21    A.   Yes.

22    Q.   You would not lie on these; right?

23    A.   No.

24    Q.   And what's the date that you signed this?

25    A.   August 19.
```

1   Q.   Of 2020; right?

2   A.   **2020.**

3   Q.   So closer to the events in question; right?

4   A.   **(No response.)**

5   Q.   Right?

6   A.   **Yes.**

7           **MR. SINK:**  I would move to admit 16.

8           **MR. ANDERSON:**  We'll object to -- sorry.

9           **THE COURT:**  If you're looking for an inconsistent

10  statement, that's not admissible.  You have to confront her

11  with the statement.

12  **BY MR. SINK:**

13  Q.   All right.  Well, let's go to interrogatory 5.  And in

14  here, it asks a few questions.  And if you look under the

15  answer, the second sentence says, "The following individuals

16  made the decision to terminate Plaintiff's employment:  Linda

17  Steinhilber, Dawn Scott, and Travis Thatcher-Curtis."

18       Do you see that?

19  A.   **Yes.**

20  Q.   Is your name listed there?

21  A.   **No.**

22          **MR. SINK:**  I would now move to admit it as extrinsic

23  evidence of impeachment.

24          **THE COURT:**  She's acknowledged it, so it's not

25  admissible.

1    BY MR. SINK:

2    Q.    Okay.  So as of August of 2020, pursuant to these

3    interrogatory responses which you claim are truthful and

4    accurate, you answered here you were not a decision maker;

5    correct?

6    A.    **Correct.**

7    Q.    So what changed from August of 2020 until today to where

8    now, you are not only a decision maker, you're the ultimate

9    decision maker?

10   A.    **And maybe I misunderstood the question.**

11   Q.    Okay.

12   A.    **I don't make decisions on terminations.  I have to approve**

13   **or deny the decision that the leaders make.**

14   Q.    So you're not an ultimate decision maker?

15   A.    **No.**

16   Q.    -- in this case?

17         Okay.  Were you even a decision maker for Ms. Duis?

18   A.    **No.**

19   Q.    Who on May 14th was the ultimate decision maker behind

20   the decision to terminate Ms. Duis?

21   A.    **The director, the manager, and the CNO.**

22   Q.    And the director would have been who?

23   A.    **Travis.**

24   Q.    Okay.  And if he testified he was not the ultimate

25   decision maker, you would dispute that testimony?

1    A.    **No.  There's -- The manager, the director, and the VP,**
2    **which would have been the CNO, they discuss that, how they want**
3    **to move forward.  Then they consult with human resources.**
4    Q.    Can you identify one person in that May 14th meeting who
5    would be the ultimate decision maker on the decision to
6    terminate Ms. Duis as opposed to do a lower level of
7    discipline?
8    A.    **The CNO.**
9    Q.    And that would be who?
10   A.    **Dawn Scott.**
11   Q.    Okay.  And if she testified to this jury she was not the
12   ultimate decision maker, would you dispute that testimony?
13   A.    **I --**
14   Q.    Yes or no?
15   A.    **Managers, directors, and the VP, they consult with each**
16   **other and they consult with human resources.**
17   Q.    You would dispute her testimony then?
18   A.    **No.**
19   Q.    You would not dispute her testimony that she testified
20   that she was actually not the ultimate decision maker; is that
21   correct?
22   A.    **I guess I'm not understanding the question.**
23   Q.    Here, let me ask it another way.
24        Who on May 14th first uttered verbally, "Let's
25   terminate Ms. Duis," as opposed to saying a written warning or

NITA WIRKUS - CROSS

1    something lower than that?

2    A.    **The manager.**

3    Q.    Linda Steinhilber?

4    A.    **Yes.**

5    Q.    There we go.  Okay.

6          And everyone else during that meeting agreed with that?

7    A.    **Yes.**

8    Q.    Okay.  On May 14th, did Kim Buchanan's name come up?

9    A.    **I don't recall.**

10   Q.    Do you even know who she is?

11   A.    **Yes.**

12   Q.    Who is she?

13   A.    **She was a PCA.**

14   Q.    Did you ask about Kim Buchanan on May 14th?

15   A.    **No.**

16   Q.    You didn't take notes from May 14th, did you?

17   A.    **Not that I recall.**

18   Q.    Okay.  Did you ever interview Kim Buchanan?

19   A.    **No.**

20   Q.    In terms of the May 14th meeting, you relied on

21   Ms. Steinhilber to convey information from her investigation;

22   right?

23   A.    **I relied on all the investigation notes.**

24   Q.    Yeah.  You did not do your own independent investigation?

25   A.    **No.**

1  Q.   And you were not present on May 7th with Ms. Duis for

2  that shift; right?

3  A.   **No.**

4  Q.   And you were not present on May 10th with Dawn Scott and

5  Ms. Salmi?

6  A.   **No.**

7  Q.   And you made no independent efforts to verify the

8  credibility of Jen Justice?

9  A.   **No.**

10  Q.   Or Christine Regalski?

11  A.   **No.**

12  Q.   Or Carrie Renchen?

13  A.   **No.**

14  Q.   Or Heather Wyatt?

15  A.   **No.**

16  Q.   Have you ever even seen the termination paperwork in this

17  case?

18  A.   **Yes.**

19  Q.   Okay.  Did you help draft that termination paperwork?

20  A.   **No.**

21  Q.   Did you review the termination paperwork?

22  A.   **Yes.**

23  Q.   Would that have been before the phone call with Ms. Duis

24  on May 14th?

25  A.   **I don't recall.**

1   Q.   Do you recall, May 14th, if that termination paperwork

2   had already been drafted and you had reviewed it on that date?

3   A.   **Yes.**

4   Q.   Before the phone call to Ms. Duis?

5   A.   **Yes.**

6   Q.   And so the substance of what is in there was written by

7   Ms. Steinhilber?

8   A.   **I don't recall.**

9   Q.   On May 14th, were you aware that Dawn Scott had told

10  Ms. Steinhilber while Ms. Steinhilber was investigating

11  Ms. Duis -- were you awaree that Dawn Scott had gone up to

12  Ms. Steinhilber and told her that Ms. Duis had just been in her

13  office and she was on her way to HR to file a grievance against

14  Ms. Steinhilber?

15  A.   **I'm not aware of that.**

16  Q.   Would that have changed your view of what to do on

17  May 14th?

18  A.   **No.**

19  Q.   In your mind, that's appropriate to do?

20  A.   **What is appropriate to do?**

21  Q.   So Ms. Steinhilber was investigating Ms. Duis; correct?

22  A.   **Yes.**

23  Q.   Okay.  And Ms. Duis, according to Ms. Scott, was on her

24  way to HR to file a grievance against Ms. Steinhilber?

25  A.   **I'm not aware that she came to human resources to file a**

1    **grievance.**

2    Q.   You don't know?

3         So Ms. Duis testified, and if her mother testified that

4    they went to HR to meet with somebody, and nobody from HR would

5    meet with them, you would have no evidence to dispute that?

6    A.   **They did not come to human resources to meet with me.**

7    Q.   On May 10th, you were not there?

8    A.   **On May 10th, I was at a funeral.**

9    Q.   Okay.  You were not there at the office, so you don't know

10   whether she showed up in HR?

11   A.   **I do not know that.**

12   Q.   And you never investigated Ms. Steinhilber for targeting

13   Ms. Duis; correct?

14   A.   **No.**

15   Q.   You never investigated Ms. Steinhilber for any kind of

16   bullying or harassment against Ms. Duis; is that correct?

17   A.   **Correct.**

18   Q.   You never investigated Ms. Steinhilber for any allegations

19   of mocking Ms. Duis because of her pregnancy; is that correct?

20   A.   **Correct.**

21   Q.   You talked earlier about the vast number of pregnant women

22   who worked for Franciscan; do you recall that?

23   A.   **Yes.**

24   Q.   Now, with respect to Ms. Steinhilber, how many -- when she

25   was over the PCU, how many of her nurses were pregnant?

1    A.    **I don't know that number.**

2    Q.    If it was one, would you have any evidence or memory to

3    dispute that?

4    A.    **I don't recall who was pregnant during that time.**

5    Q.    And if that was -- Well ,you knew Ms. Duis was pregnant;

6    right?

7    A.    **Yes.**

8    Q.    Yeah, because it's in -- during the May 10th phone call,

9    you --

10   A.    **Yes.**

11   Q.    Yes, because it was talked about; right?

12   A.    **Yes.**

13   Q.    All right.  So you knew of at least one employee,

14   Ms. Duis, who was pregnant in the PCU while Ms. Steinhilber was

15   over it; right?

16   A.    **Yes.**

17   Q.    You were talking about statistics.

18         And Ms. Duis, that one pregnant employee, you're aware,

19   was terminated by Ms. Steinhilber, apparently; right?

20   A.    **Yes.**

21   Q.    Okay.  Are you aware of any other employee, while

22   Ms. Steinhilber was over the PCU, that had intended to take

23   FMLA or took FMLA?

24   A.    **I'm not aware.**

25   Q.    Okay.  Well, if a nurse who's eligible for FMLA and has

1   the birth of a child coming up, they would usually take FMLA;

2   correct?

3   A.   **Correct.**

4   Q.   That would be a qualifying condition?

5   A.   **Yes.**

6   Q.   And so the only one you're aware of under Ms. Steinhilber

7   would have been Ms. Duis?

8   A.   **Yes.**

9   Q.   Okay.  So all those other statistics, they're not really

10  relevant, are they?

11  A.   **Well, I know, in 2019, we had 80 employees go on maternity**

12  **leave.**

13  Q.   Yeah.  And out of those 80, who was under Ms. Steinhilber?

14  A.   **I don't know that.**

15  Q.   Yeah.

16       On May 14th, did you know that the patient at issue

17  actually received pain meds within 10 minutes of the call light

18  being issued?

19  A.   **I don't know that.**

20  Q.   You never asked that during the May 14th meeting?

21  A.   **Not that I recall.**

22  Q.   Did you know whether or not the patient had actually made

23  any kind of complaint about Ms. Duis?

24  A.   **Don't -- I don't know that.**

25  Q.   Did you know whether or not the comment at issue occurred

1    in person or whether it occurred over a Vocera device?

2    A.    **That was in person.**

3    Q.    How did you come to that belief?

4    A.    **That's -- I came to that belief from the investigation**

5    **notes.**

6    Q.    From the statement of Ms. Justice; is that correct?

7    A.    **Yes.**

8    Q.    So you were not aware that Kim Buchanan actually told

9    Ms. Steinhilber that that occurred over a Vocera?  You were not

10   aware of that?

11   A.    **Was not aware of that.**

12   Q.    And you were not aware that Kim Buchanan actually told

13   Ms. Steinhilber that statement never occurred?

14   A.    **Statement that I reviewed that Kim --**

15   Q.    Correct.

16   A.    **-- Buchanan did hear that -- something along those lines.**

17   **Didn't recall the specifics.**

18   Q.    Okay.  You were not aware that Ms. Buchanan told

19   Ms. Steinhilber that the statement at issue by Ms. Duis

20   actually never occurred?

21   A.    **Not aware of that.**

22   Q.    Thank you.

23         You testified earlier about Franciscan's values and joyful

24   service.  You recall that testimony?

25   A.    **Yes.**

NITA WIRKUS - CROSS

1    Q.    Okay.  If an employee is complaining of targeting by their

2    supervisor, they don't need to be joyful when they do it, do

3    they?

4    A.    **No.**

5    Q.    Yeah.

6          Whether or not they're nice or have a Disney smile, that

7    would not divest an employee of protection from retaliation;

8    correct?

9    A.    **Correct.**

10   Q.    Yeah.

11         And you talk about Franciscan values and how an employee

12   needs to be responsible to adhere to an employer's rules;

13   right?  And on that same token, you would agree that an

14   employer has to abide by federal law; right?

15   A.    **Yes.**

16   Q.    Employment laws; correct?

17   A.    **Yes.**

18   Q.    Yeah.

19         Are all of the management employees at Franciscan trained

20   on antidiscrimination?

21   A.    **Yes.**

22   Q.    Are they given the employee handbook that you looked at

23   earlier?

24   A.    **Yes.**

25   Q.    So they would know not to discriminate based on pregnancy?

1    A.   **Yes.**

2    Q.   And that would include Ms. Steinhilber?

3    A.   **Yes.**

4    Q.   And she would be counseled and advised so that she could

5    not fire an employee because of their pregnancy or FMLA?

6    A.   **Yes.**

7    Q.   And she could not mock an employee because of that?

8    A.   **Yes.**

9    Q.   Okay.  Would they also be advised that, if you do an

10   investigation, you should not have a conflict of interest?

11   A.   **I don't understand the question.**

12   Q.   Sure.

13        If a manager is going to investigate an employee, you

14   would agree they should not have a conflict of interest related

15   to that investigation?

16   A.   **Yes.**

17   Q.   Yeah.

18        So if a manager is going to investigate an employee for

19   misconduct, if that employee that they're investigating has

20   simultaneously accused that manager of targeting, that manager

21   should then recuse himself from that investigation; would you

22   agree?

23   A.   **Yes.**

24   Q.   Okay.  And also if that same manager was accused of

25   pregnancy discrimination, that manager should recuse himself

1   from investigating that employee; right?

2   A.   **Yes.**

3   Q.   That did not occur with Ms. Steinhilber?

4   A.   **No.**

5   Q.   You never recused Ms. Steinhilber; correct?

6   A.   **I was not involved in the investigation process.**

7   Q.   On May 14th, you never told Ms. Steinhilber that she

8   should be recused?

9   A.   **No.**

10  Q.   Yet you were aware, though, that at that time Ms. Duis had

11  made an allegation of targeting against Ms. Steinhilber?

12  A.   **I was aware after she met with Dawn Scott.**

13  Q.   Prior to the May 10th phone call, had you ever even met

14  Nurse Duis?

15  A.   **No.**

16  Q.   You had never observed her performance?

17  A.   **No.**

18  Q.   You had never disciplined Ms. Duis?

19  A.   **No.**

20  Q.   You had never investigated Ms. Duis?

21  A.   **No.**

22  Q.   You had never received any kind of patient complaint about

23  Ms. Duis?

24  A.   **No.**

25  Q.   And you've been in HR a long time; right?

1    A.    **Yes.**

2    Q.    1989, I believe?

3    A.    **Yes.**

4    Q.    So from her start of employment, 2015, until when

5    Ms. Steinhilber gets there, you're not aware of one single

6    performance problem of Ms. Duis?

7    A.    **No.**

8    Q.    You talked about Franciscan's values.

9          Did Franciscan, in particular Ms. Steinhilber, show those

10   same values to Ms. Duis?

11   A.    **Not aware.**

12   Q.    Did Ms. Steinhilber, in your opinion, show compassion to

13   Ms. Duis?

14   A.    **I'm not aware.**

15   Q.    Did Franciscan show dignity to Ms. Duis?

16   A.    **I'm not aware.**

17   Q.    You also indicated that employee evaluations incorporate

18   Franciscan values.  Do you recall saying that?

19   A.    **Yes.**

20   Q.    But you never reviewed the evaluations of Ms. Duis,

21   did you?

22   A.    **No.**

23   Q.    And so if there's testimony in this case that Ms. Duis had

24   perfectly fine evaluations prior to her termination, you would

25   have no evidence to dispute that?

1   A.   **No.**

2   Q.   And that would have, then, judged Ms. Duis for years on

3   whether she was complying with Franciscan values; right?

4   A.   **Yes.**

5   Q.   Did that seem odd to you that an employee for five years

6   would comply with Franciscan values, and then all of the sudden

7   under Ms. Steinhilber she's terminated without any progressive

8   discipline?

9   A.   **No.**

10  Q.   You indicated that employees should be afforded consistent

11  across-the-board treatment?

12  A.   **Yes.**

13  Q.   Okay.  Was Dawn Smith given better treatment than

14  Ms. Duis?

15  A.   **No.**

16  Q.   Dawn Smith was, in fact, given progressive discipline

17  prior to her termination?

18  A.   **Yes.**

19  Q.   Were you involved in that?

20  A.   **No.**

21  Q.   You were not a decision maker there, were you?

22  A.   **No.**

23  Q.   Were you even made aware of that?

24  A.   **Yes.**

25  Q.   After the fact?

1    A.   **After the fact of?**

2    Q.   The progressive discipline of Dawn Smith.

3         What was your role, if any, in that?

4    A.   **My HR manager was involved in that.  And I -- Again, I**

5    **have to approve terminations.**

6    Q.   So you don't know?

7    A.   **No.**

8    Q.   Okay.  And do you know who Melissa Roberts is?

9    A.   **I don't recall.**

10   Q.   If the record were to reflect that she was given a written

11   warning for a HIPAA violation, would you have any evidence to

12   dispute that?

13   A.   **I don't recall that.**

14   Q.   You looked earlier at the handbook regarding grounds to

15   bypass progressive discipline.

16        A HIPAA violation would be grounds to bypass progressive

17   discipline; right?

18   A.   **Yes.**

19   Q.   Yeah.

20        It's explicitly stated in there; correct?  Is that

21   correct?

22   A.   **It is.  I believe it depends on the level of HIPAA**

23   **violation.**

24   Q.   So if a nurse looked at their own medical records without

25   going through the proper process and committed HIPAA violation,

1   that could be immediate grounds for termination?

2   A.   **Yes.**

3   Q.   And you would have no evidence or memory to dispute

4   whether or not Melissa Roberts was given a written warning as

5   opposed to immediate termination for such violation?

6   A.   **I don't -- I don't recall that.**

7   Q.   Were you involved in any other discipline of Melissa

8   Roberts?

9   A.   **No.**

10  Q.   So if Ms. Steinhilber actually disciplined Ms. Roberts

11  after that HIPAA violation and, again, did not terminate

12  Ms. Roberts, you wouldn't know anything about that?

13  A.   **No.**

14  Q.   I believe, looking at the paperwork, another grounds for

15  immediate termination would be providing false statements or

16  false information; is that correct?

17  A.   **Yes.**

18  Q.   So if Jen Justice gave false information that was

19  contradicted by another witness in the case, that could be

20  immediate grounds for a termination?

21  A.   **I would have to look at the whole circumstance.  I don't**

22  **know.**

23  Q.   It could be; right?

24  A.   **Could be.**

25  Q.   Yeah.

NITA WIRKUS - CROSS

1          Would providing false information also include not

2   disclosing all of the relevant information?

3   A.   **Yes.**

4   Q.   Yeah.

5          That would be dishonest; right?

6   A.   **Yes.**

7   Q.   So if Ms. Steinhilber withheld relevant information from

8   you and others on May 14th, could that be grounds for

9   immediate termination?

10  A.   **Yeah.**

11  Q.   You never investigated Ms. Steinhilber for that, did you?

12  A.   **No.**

13  Q.   Have you ever disciplined Jen Justice?

14  A.   **Not that I recall.**

15  Q.   Have you ever investigated Jen Justice?

16  A.   **No.**

17  Q.   You testified earlier that at-will employees can be

18  terminated at any time for any reason; do you recall that

19  testimony?

20  A.   **Yes.**

21  Q.   Let's clarify.  Any lawful reason; correct?

22  A.   **Correct.**

23  Q.   Can't be a pregnancy?

24  A.   **No.**

25  Q.   Or FMLA?

1    A.    **No.**

2    Q.    Or any related medical condition for those; right?

3    A.    **No.**

4    Q.    You also testified earlier that you're not aware of any

5    miss treatment of an employee who has taken FMLA; is that

6    correct?

7    A.    **Correct.**

8    Q.    And since you've been in HR, are we talking thousands of

9    employees?

10   A.    **Well, if theirs was 80 employees that took FMLA for**

11   **maternity in 2019, we've had --**

12   Q.    Hundreds?

13   A.    **Hundreds.**

14   Q.    You have not talked to every single employee who took FMLA

15   since you've been in HR about whether or not they've been

16   mistreated, have you?

17   A.    **No.**

18   Q.    Okay.  On the May 10th phone call, did you identify

19   yourself on the phone?

20   A.    **I -- I don't recall.**

21   Q.    So if Ms. Duis would contend that she never knew you were

22   on the phone, you never identified yourself, you would have no

23   memory to dispute that?

24   A.    **I believe she knew I was on the call.**

25   Q.    How, if you didn't identify yourself?

1    A.    **I don't recall.**

2    Q.    What's that?

3    A.    **I don't recall.**

4    Q.    Okay.  Do you know if Linda identified you?

5    A.    **I don't recall.**

6    Q.    Do you know if -- who else was allegedly -- oh,

7    Ms. Smosna.

8    A.    **Ms. Smosna.**

9    Q.    Do you know if she identified you during that call?

10   A.    **I don't recall.**

11   Q.    Were you taking notes during that call?

12   A.    **No.**

13   Q.    Do you know if any of your colleagues were taking notes?

14   A.    **I do not know.  I was standing in a parking lot as I was**

15   **on the call.**

16   Q.    Do you recall what Ms. Duis said during that phone call,

17   the substance, specifically?

18   A.    **Not everything specifically.  I just know she was very**

19   **angry.**

20   Q.    Do you recall if Ms. Duis said anything during that phone

21   call about being excited to go on maternity leave?

22   A.    **Not that I recall.**

23   Q.    There's an exhibit book in front of you.  Can you turn to

24   Exhibit No. 1, which has already been admitted.

25         Okay.  Have you seen Exhibit 1 before?

1   A.   **Yes.**

2   Q.   When did you first see this document?

3   A.   **Back in 2019.**

4   Q.   So in here, there's -- I'm going to start here where it

5   says:  Taryn was contacted and given an opportunity to reply.

6        Do you know if that's referencing the phone call on

7   May 10th that you were on?

8   A.   **I don't recall, but I would not have -- I would not have**

9   **contacted Taryn.**

10  Q.   But you were on that call on May 10th; right?

11  A.   **I was on the call May 10th.**

12  Q.   Okay.  And was that the call where Ms. Duis was given the

13  opportunity to reply?

14  A.   **No.**

15  Q.   No?

16  A.   **No.**

17  Q.   So was there another call where Ms. Duis was given the

18  opportunity to reply?

19  A.   **I believe she was -- there was a prior call that she was**

20  **suspended pending investigation.**

21  Q.   Oh.  So there was a call -- a first call that occurred

22  before the one you were on?

23  A.   **Yes.**

24  Q.   And it's your contention that during that first call is

25  when Ms. Duis was given an opportunity and to reply?

1    A.    **I was not on that call, so I don't know.**

2    Q.    You don't know.

3          But on the second call that occurred on May 10th that you

4    were on, that was not when she was given an opportunity and to

5    reply?

6    A.    **I don't recall that.**

7    Q.    So in here, let me get specific.  I'm going to circle a

8    sentence here.  This document states:  Taryn stated she said

9    she couldn't wait until October to be on maternity leave.

10         Do you see that?

11   A.    **Yes.**

12   Q.    On the call you were on on May 10th, did Ms. Duis say

13   that?

14   A.    **I don't recall.**

15   Q.    Is that an appropriate statement to put in a termination

16   form for an employee?

17   A.    **I think all statements are appropriate.**

18   Q.    All statements are appropriate?

19   A.    **Well, any statement that's made should be included.**

20   Q.    Any statement Ms. Duis made when she was given an

21   opportunity to reply should be included in this?

22   A.    **You asked me if that statement was appropriate.**

23   Q.    Yeah, to be put in a termination form.

24   A.    **I didn't write this termination form.**

25   Q.    So is it appropriate to put in there if you would have

NITA WIRKUS - CROSS

1   written it?

2   A.   **(No response.)**

3   Q.   You don't know?

4   A.   **I --**

5   Q.   It's not your contention that everything Ms. Duis said on

6   May 10th shows up on this document, is it?

7   A.   **No.  Ms. Duis' termination was not based on her pregnancy.**

8   Q.   That's not my question.  My question is whether or not you

9   contend that everything Ms. Duis said on May 10th, when you

10  were on that call -- everything she said is not cited in this

11  document; is that correct?

12  A.   **I was not taking notes for everything that was said.**

13  Q.   You can't --

14  A.   **I don't recall.**

15  Q.   You don't know one way or the other?

16  A.   **I don't recall.**

17  Q.   You also cited Ms. Duis' attitude at the May 10th meeting;

18  do you recall that testimony?

19  A.   **Yes.**

20  Q.   You were not there on May 10th; right?

21  A.   **No.**

22  Q.   And, furthermore, if you look at Exhibit 1, the

23  termination paperwork, what's the date under the statement of

24  facts?

25  A.   **May 8th.**

1    Q.   May 10th is not even identified, is it?

2    A.   **No.**

3    Q.   Is it your contention that Travis Thatcher-Curtis was in

4    the May 14th meeting?

5    A.   **Yes.**

6    Q.   In person?

7    A.   **I don't recall.**

8    Q.   Okay.  If he testified in this case he was not there on

9    May 14th, would you dispute that testimony?

10   A.   **I don't recall.**

11   Q.   So you would not dispute his testimony?

12   A.   **No.**

13   Q.   You can't even remember actually who was in the meeting;

14   right?  Is that correct?

15   A.   **Manager, director, and the CNO.**

16   Q.   But you can't remember --

17   A.   **I don't remember who is -- if they were in a meeting or if**

18   **it was via phone.**

19   Q.   You can't remember if Travis was there in person or over

20   the phone --

21   A.   **I don't recall.**

22   Q.   -- or at all?

23        You mentioned the attitude of Ms. Duis.

24        If Ms. Smosna testified yesterday that Ms. Duis was

25   terminated for patient neglect and she did not mention any

1   attitude of Ms. Duis, would you dispute that testimony?

2   A.   **No.**

3   Q.   Would that be odd if -- Ms. Smosna would be underneath

4   you; right?

5   A.   **Yes.**

6   Q.   Should you guys be consistent on why an employee is

7   terminated?

8   A.   **Yes.**

9   Q.   You testified earlier that Ms. Duis, had she apologized,

10  things might have turned out differently; do you recall that?

11  A.   **Yes.**

12  Q.   Should an employee be required to apologize if they

13  dispute the underlying allegation?

14  A.   **An employee should be required to accept responsibility**

15  **for their actions and behaviors.**

16  Q.   Okay.  And if she disputes the actions and behaviors at

17  issue, it's your contention she should still apologize for it?

18  A.   **No.**

19  Q.   Okay.  You also mentioned the statement of Christine

20  Regalski; do you recall that?

21  A.   **Yes.**

22  Q.   That statement is actually inconsistent with that of

23  Ms. Justice, right?

24  A.   **I don't have the statement in front of me.**

25  Q.   Ms. Justice indicated there was cursing.  Ms. Regalski

 1   indicated she couldn't hear whether or not there was cursing;

 2   is that right?

 3   A.   **Yes.**

 4   Q.   And you never investigated -- you never took any action to

 5   kind of reconcile any of those inconsistencies; right?

 6   A.   **No.  She was not discharged because of profanity.**

 7           **MR. SINK:**  Okay.  No more.

 8           **THE COURT:**  Any redirect?

 9           **MR. ANDERSON:**  Thank you.

10                        <u>**REDIRECT EXAMINATION**</u>

11   **BY MR. ANDERSON:**

12   Q.   The buck stops with you in HR, doesn't it?

13   A.   **Yes.**

14   Q.   You have to approve all terminations; is that what you

15   said?

16   A.   **Yes.**

17   Q.   Did you approve the termination of Plaintiff here?

18   A.   **Yes.**

19   Q.   Regarding the actual meeting among the other people, is

20   that more of a collaborative process in your experience?

21   A.   **Yes.**

22   Q.   And I know I asked you this, but because of the cross, I'm

23   going to ask you again.

24       Did Linda Steinhilber have the authority to terminate the

25   Plaintiff?

1   A.   **Yes.**

2   Q.   Well, did she have the sole authority to terminate the

3   Plaintiff?

4   A.   **No.**

5   Q.   When you said "yes" to my question, what did you mean by

6   that?

7   A.   **Managers terminate employees.  They cannot do that without**

8   **approval from their director, the VP, and human resources.**

9   Q.   If Linda Steinhilber was hell-bent on getting Duis

10  terminated and the rest of the people in the meeting didn't

11  think that was appropriate, would Linda Steinhilber be able to

12  overrule them?

13  A.   **No.**

14  Q.   Were you aware that Duis had made some allegations of

15  targeting against Linda Steinhilber?

16  A.   **Yes.**

17  Q.   What was your understanding of the substance of those

18  allegations?

19  A.   **My understanding was when, she met with Dawn Scott,  Dawn**

20  **told her, "If you want to file a grievance, you need to go to**

21  **human resources."**

22  Q.   What was your understanding, though, of the allegation

23  about targeting?  What was that based on, if you know?

24  A.   **I don't know.**

25  Q.   This call on May 10th, when you were standing out in the

1    parking lot at the funeral luncheon, do you know if you were on

2    the call for the entirety of the call?

3    A.   **I do not know that.**

4    Q.   So there could have been parts of the call before they got

5    you on and parts after they let you go?

6    A.   **Yes.  Yes.**

7    Q.   Were they aware that you were at a funeral when they

8    called you?

9    A.   **I don't know if I announced that.**

10   Q.   They were aware you were out of the office, though; right?

11   A.   **Jessica was aware that I was out of the office.**

12   Q.   Let's talk about the conflict of interest.

13        Do you believe that an employee just alleging that a

14   manager who's doing an investigation into the employee is

15   targeting the employee necessarily requires you to then pull

16   that manager off the investigation?

17   A.   **No.**

18   Q.   There was a reference to compassion for Ms. Duis; do you

19   remember that?

20   A.   **Yes.**

21   Q.   Compassion, though, even under the Franciscan values,

22   doesn't mean tolerance of bad behavior, does it?

23   A.   **No.**

24        **MR. ANDERSON:**  Thank you.  I have nothing further.

25        **THE COURT:**  Any redirect?

1          **MR. SINK:**  Very quickly, Your Honor.

2          **THE COURT:**  -- or recross.

3                    <u>**RECROSS-EXAMINATION**</u>

4    **BY MR. SINK:**

5    Q.   You were not a decision maker in the decision to terminate

6    Ms. Duis; right?

7    A.   **Define decision making.**

8         **I approve terminations or deny terminations.**

9    Q.   You approve, but you were not a decision maker?

10   A.   **No.**

11         **MR. SINK:**  No more.

12         **MR. ANDERSON:**  Nothing further, Your Honor.

13         **THE COURT:**  Okay.  Thank you, ma'am.  You may step

14   down.

15        (Witness excused.)

16         **THE COURT:**  Any additional evidence for the Defense?

17         **MR. ANDERSON:**  No.

18         **THE COURT:**  Defense rests?

19         **MR. ANDERSON:**  Defense rests.

20         **THE COURT:**  Any rebuttal?

21         **MR. FOX:**  No, Your Honor.

22         **THE COURT:**  Okay.  Ladies and gentlemen, you have

23   heard all of the evidence in the case.  We will take a short

24   break.  After the break, the attorneys will address you in

25   their final arguments.  Please do not discuss the case or form

1    any opinions at this time, and we will start at 25 of.

2         (Jury out at 10:14 a.m.)

3              THE COURT:  Before we adjourn, any motions from

4    either side?

5              MS. ROBERSON:  Yes, Your Honor.  We would file for

6    motion for judgment as a matter of law under Federal Rule of

7    Civil Procedure 50 as it relates to punitive damages.

8              THE COURT:  Show that motion as denied.

9         Anything else before we take our break?

10        (No response.)

11        All right.  We'll start at 25 of.

12             MS. ROBERSON:  Do you want us to object to the jury

13   instructions now?

14             THE COURT:  Why don't we do that after the arguments,

15   so when the jury goes out.

16        (Recess taken at 10:15 a.m.)

17        (Proceedings resumed in open court at 10:35 a.m.:)

18             THE COURT:  Bring the jury in, please.

19        Mr. Fox, you're going to do the finals for the Plaintiff?

20             MR. FOX:  I am, Your Honor.

21             THE COURT:  Mr. Anderson, you're going to

22   be speaking?

23             MS. ADOLAY:  I will.

24             THE COURT:  Oh, okay.  Ms. Adolay.

25             MR. ANDERSON:  Judge, on the record, too.  I

1    understand there was a comment in chambers about these two

2    being the brains of the operation.  I would just like to say on

3    the record that I wholeheartedly concur.

4         **THE COURT:**  Oh, okay.

5         I'll roll over on them.  They didn't disagree with me,

6    so...

7         **MR. ANDERSON:**  I appreciate that information.

8         (Jury in at 10:40 a.m.)

9         **THE COURT:**  Please be seated.

10        Ladies and gentlemen, as I indicated to you, the attorneys

11   now will address you in their final arguments.  I have said

12   previously what the attorneys say is not evidence.  The

13   evidence has come from the exhibits and the witnesses.  But

14   since they presented the case to you, I would suggest you give

15   them your careful attention as they explain what they believe

16   they have proven throughout the course of the trial.

17        Because the Plaintiff has the burden of proof, the

18   Plaintiff will speak first, the Defendant will speak second,

19   and then the Plaintiff will have time to speak briefly in

20   rebuttal.

21        Mr. Fox, I believe you are doing finals for the Plaintiff?

22        **MR. FOX:**  Yes, Your Honor.

23        **THE COURT:**  If you're ready to proceed.

24

25

CLOSINGS - PLAINTIFF

**CLOSING ARGUMENTS**

**BY MR. FOX**

Congratulations.  We finally made it to closing.  So I want to thank each of you for serving your country as a juror today.  It's been a long three-and-a-half days, I think, for everybody.  But I truly appreciate your attention and being here, because I think it's a great honor to do that.

I had an opening scheduled to give you guys today.  And after what happened this morning, I've changed it, because throughout this proceeding, we keep hearing from Franciscan that there was collaboration and they always collaborate on things.

And I have to agree there was collaboration here.  They collaborated on how best to protect Franciscan Alliance.  They collaborated in attempt to hide who the true decision maker in this matter was.  And try as they may, they could not hide the fact that it was, in fact, Linda Steinhilber.

How do we know that?  We know that because Linda Steinhilber was able to do whatever she wanted.  She was able to run her investigation into Nurse Duis however she wanted.  She was able to choose the witnesses she chose to talk to however she wanted.  She was able to pick which statements the witnesses gave however they wanted.

They will call it a collaboration, but I would call it turning their back on a fellow employee.  I would call it

1    discrimination, because the common theme throughout this that

2    keeps appearing again and again is the fact that Ms. Duis was

3    pregnant and it is the fact that she was excited to go on

4    maternity leave and she was excited to go on FMLA leave.

5        And when she felt she was mistreated, she first turned to

6    Mr. Curtis, and she sent him a text.  Mr. Curtis didn't

7    respond.

8        My client was upset.  She had just been suspended for

9    something she did not do.  She didn't understand that after

10   three-and-a-half years suddenly, with a perfect performance

11   record, good evaluations, no discipline, no patient complaints,

12   in the space of one shift, she was suddenly suspended.

13       So what did she do when Travis wasn't available?  She went

14   to Dawn, Dawn Scott, one level up.  And was she upset?  She

15   was.  Did she use profanity?  No.  Did she curse?  No.  Did she

16   get up and get in their face?  No.  She sat there and told Dawn

17   what happened, including the fact that her supervisor, Linda

18   Steinhilber, was mocking her, was mocking her due to her

19   pregnancy.

20       So what does Franciscan do?  This is what they do.  Dawn

21   Scott turns that around.  She retaliates against her.

22       My client engaged in protected activity.  When you tell

23   somebody that you're being discriminated against -- And as

24   you've heard them say again and again, you're supposed to

25   investigate.  But you know what Dawn Scott did?  She tipped off

1    Linda Steinhilber.  She told Linda that my client was going

2    to HR.

3        HR was well aware that my client had complained that she

4    was targeted.  Jennifer Smosna even testified that she looked

5    at Dawn Scott's notes that said my client was being targeted.

6        But then to top it off, they actually used her complaint

7    with Dawn Scott as some reason to, after the fact, terminate

8    her, because it's not in the termination form.

9        We've all seen the termination form.  We've seen it again

10   and again.  But you know what is in that termination form and

11   what is the common thread?  It's the maternity leave.  It's the

12   being excited about maternity leave.

13       You know, the first incident we all start with is

14   April 11th, and we talk about this April 11th conflict.

15   You know what happened on April 11th?  Our client had a panic

16   attack.  She had had a miscarriage.  And you know what

17   happened?  Connie -- Connie talked with us yesterday.  And you

18   know what Connie said?  She said she went up and Connie said --

19       (Pause in proceedings.)

20       **MR. FOX:**  This is what happens when you go off

21   script.

22       That's what Connie said.  It was on April 11th.

23       Connie didn't do anything about this with regards to

24   writing up a statement of fact at that time, because it really

25   wasn't that important.  But a month later, suddenly, it was,

1  and suddenly it became a witness statement in order to

2  terminate my client, to try to justify that termination.  And

3  you know what's in there?  Once again, doesn't want to come

4  back after October.  You know what happens after October?  My

5  client would have given birth and a chance to take FMLA leave

6  and return to work.

7      They talked about this conflict with Dawn Smith.  After

8  that, the next day, Linda Steinhilber calls my client.  And my

9  client is clear that there is no conflict with Dawn Smith.

10 There has been no testimony that anyone has come up here and

11 actually witnessed a conflict with Dawn Smith and my client.

12 That should have been the end of it.  But, no.

13     April 19th rolls around.  And, suddenly, on

14 April 19th, my client is dragged into a meeting with Mr.

15 Curtis and Ms. Steinhilber.  And during that meeting, again, my

16 client says there was no conflict with Dawn Smith.

17     Now, we know Dawn Smith worked with Linda at Porter, and

18 we know Linda was terminated by Porter and three of the last

19 seven employers she's had and that she wasn't completely

20 truthful in that information when she was hired.

21     But more importantly, why are they having this meeting

22 with her?  There is no purpose to it.  But you know what does

23 happen during that meeting?  She mocks her.  She mocks Taryn.

24 She was pregnant.  She had a panic attack.  She was wondering

25 if she can't do her job now because she was pregnant, and that

1    upset Taryn.  It upset her greatly.

2         We've heard a lot of testimony about people that have

3    worked with Taryn.  We've heard from Lynette Dunham.  We've

4    heard from Anna Basham.  We've heard from Kim Buchanan.  They

5    all worked with her regularly on the night shift.  They weren't

6    a float nurse like Jen Justice.  They worked with her all the

7    time, and they liked working with her.  They liked Taryn.  They

8    liked Taryn to be a charge nurse, a charge nurse that has

9    leadership, a charge nurse that is supposed to be the utmost

10   patient care, and that's what Taryn did for Franciscan.

11        May 7th comes around.  But even before May 7th, or

12   around May 7th, right after May 7th comes around, and it's

13   a fairly normal shift.  But the next morning my client gets a

14   phone call from Linda Steinhilber, and she's terminated.  And

15   at that point, it's just for failure to provide medication in a

16   timely manner.

17        And that -- Right after that shift, Linda Steinhilber goes

18   and talks to Kim Buchanan, who is a witness in this matter and

19   who came in here and spoke to you.  And Kim made it clear to

20   Linda that my client -- there was no delay in pain medication.

21        What's interesting about this case is we never heard from

22   the patient.  We've never heard the patient was in any trouble.

23   They can't tell you how long the pain medication was delayed.

24   All you can be told is that there wasn't from Taryn, there

25   wasn't from Kim.

CLOSINGS - PLAINTIFF

1    And so she's upset.  She gets suspended, and she thinks

2    there's no reason.  And, of course, she texts Travis for help.

3    Travis isn't there, and she goes to Dawn.

4    Meanwhile, Steinhilber is going behind her back.  Lynette

5    Dunham talked about it.  She said that every interaction that

6    she had with Linda Steinhilber almost involved something about

7    Taryn Duis, about trying to get some information on Taryn Duis,

8    oh, isn't Taryn Duis doing a poor job.

9    And Kim Buchanan spoke and said when she was approached

10   after this May 7th incident that she, once again, brought up

11   pregnancy with regards to Taryn and whether she could handle

12   her job because she was pregnant.  And when Kim did not give

13   her the information that she wanted, she simply ignored what

14   Kim said because -- guess what -- she was in charge of the

15   investigation, and nobody at Franciscan was going to stop her.

16   We heard from Jessica Smosna.  We heard from Travis

17   Curtis.  We heard today from Nita Wirkus.  She had broad

18   authority.

19   You know how much authority Linda Steinhilber had?  She

20   had so much authority that she had never been overruled while

21   she was a nursing manager on the PCU, never.  Whatever she said

22   went, period.  No one could contradict that.

23   She meets with Dawn.  Her mom talked about it.  She's

24   upset.  She believes she's being discriminated against.  The

25   meeting lasted 15 minutes.  15 minutes.  Dawn and her hadn't

1 had any interaction before that.  But you heard Dawn Scott get

2 up on that stand and say that she was so toxic and that she

3 should never be a bedside nurse based upon that 15-minute

4 conversation.  You know what that 15-minute conversation was

5 about?  It was about engaging in statutorily protected conduct

6 at the minimum, at the bare minimum.

7      They should have done some investigation.  They should

8 have at least -- someone should have questioned that didn't

9 have a conflict of interest.  Someone should have questioned

10 whether Linda Steinhilber was targeting my client.  But they

11 didn't do it because they let Linda Steinhilber do whatever she

12 wanted.

13      So why was she terminated?  What's their big reason?

14 What's their reason why after these great years of service and

15 the testimony that she was a good nurse?  What's their reason?

16 Their reason is pretty clear.  Their reason is that she failed

17 to give pain medication and that she used vulgarity, horrible

18 vulgarity, I will say.

19      She denies it.  And only one witness, one witness, can say

20 she said it, Jen Justice.  That is it.  We provided a witness

21 that told Linda Steinhilber she didn't say it.  Linda

22 Steinhilber didn't want to hear that.

23      Linda Steinhilber wanted our client gone, and it was

24 directly related to her pregnancy.  It was directly related to

25 her not being able to do her job, and she was going on FMLA.

CLOSINGS - PLAINTIFF

1    She didn't like it, and the evidence is through and through.

2         No delay in patient medication, so that's out of the

3    picture.

4         Profanity, which we have disputed -- and you know what

5    we've heard?  We've heard profanity -- although Jessica Smosna

6    said that if profanity is used you're going to be disciplined.

7         They may have to change their policies.  But profanity is

8    pretty widespread.  Nursing is a difficult job.  People curse

9    at work, but that doesn't mean you're terminated.  Linda

10   Steinhilber admits she cursed.  Linda Steinhilber admits she's

11   used the f-word at work.  It's not a terminable offense.

12        You know what, absent all of the comments, absent

13   everything else, you look at their reasons for termination, and

14   you can tell that they're phony.  And one of the reasons you

15   tell something is phony is when they try to add it on, when

16   they try to add something.

17        So what Linda did is she went around and she tried to get

18   people to say bad things so she could add on to the reasons for

19   termination.  And you can look at the witness statements and

20   see that, you know.  We could look at them.

21        Here's Jen's only one.  The only one that could testify

22   that Karen replied, "I don't give a fuck if that patient wants

23   a pain med.  He can wait.  He should have taken it before."

24        No evidence of patient neglect.  I think you heard that

25   word by Franciscan during this testimony, patient "neglect."

1    There was no patient neglected.  There was no patient that ran

2    out of pain medication.

3        We've already seen this one.  Connie Snow, excited about

4    wanting to come back after October, that hates being a nurse.

5    She was having a panic attack at the time, and they knew it.

6        I don't know really where to start with this one.  You

7    guys can make up your own mind about that.  Carrie Renchen.

8    She was going for a fitting.  "You've got to pay for your

9    scrubs if they don't fit."  She's pregnant.  We disputed that

10   as well.  Carrie couldn't really get into specifics about what

11   happened, and I'm not really sure where this came from, but

12   it's adding on, the same way they added on with Dawn.

13       So how else do we show that it might be related?  How else

14   do we show that it was unfair?  Well, we look at the decision

15   maker, and the decision maker, we know, is Linda because they

16   all relied on what she was saying.  They let her do whatever

17   she was saying.  And when people complained about her, they

18   didn't do anything about it and, let alone, investigate her.

19       So then we look at how Linda has treated others, others

20   that reported directly to Taryn.

21       So Dawn.  Dawn was not immediately terminated.  Dawn was

22   only given a final written warning.

23       I had Linda read this for a -- I had Linda read this for a

24   reason, and the reason is that anyone going through this can

25   see there was a lot of violations, a whole lot more violations

1    than what Taryn Duis was even accused of, even accused of.  But

2    the only difference between all these individuals, whether it

3    be Melissa Roberts, whether it be Dawn Smith, they were not

4    pregnant.  They were not seeking FMLA leave.  They did not

5    complain of discrimination.  That is the difference.  That is

6    evidence.

7        I'm not going to put that corrective action on the screen

8    again.  I think you guys know what that is.

9        But, for example, Melissa Roberts.  Melissa Roberts, HIPAA

10   violation, PHA.  That could be grounds for immediate

11   termination under the corrective action plan.  What did she get

12   from Linda?  She got a written counseling, the very first step,

13   very first step any sort of discipline.  This was also a week

14   after Taryn was fired.

15       And this is, again, Ms. Roberts.  And look at this.  You

16   want to talk about patient care issues.  Our patient care issue

17   was, allegedly, there was a delay in pain medication that never

18   happened.  But look at Melissa Roberts.  Look at all those

19   things that she was accused of doing and that Linda typed up

20   and Linda was responsible for.  What did she get?  Written

21   counsel (indicating).

22       Now, we have Celeste Reed, also, not pregnant, didn't take

23   FMLA, didn't complain of discrimination, wasn't expecting to

24   take FMLA.  She had some attendance issues.  And then just a

25   couple months after Taryn was fired, how many times was she

1    insubordinate?  You heard Linda Steinhilber say it.  Three

2    times.  You know what she got?  A written warning.  It doesn't

3    make sense.

4         If you were to believe what Franciscan Alliance is saying,

5    then when in the space of something that happened within

6    literally 10, 12 minutes my client was terminated on the night

7    shift, that suddenly she became such a horrible nurse in the

8    space of a week that she deserved termination, that is not the

9    case here.

10        Look at what each of the witnesses said.  Look at what

11   each of the decision makers said.  Throughout this proceeding,

12   they have continued to use the term "collaboration."

13   Mr. Curtis, Ms. Smosna, Ms. Scott, and then this morning

14   Ms. Wirkus.  They have continued to pass the responsibility and

15   not admit until today that the real decision maker is

16   Ms. Steinhilber.

17        I am not saying that every person that works at Franciscan

18   Alliance discriminates or that Franciscan Alliance across the

19   board discriminates against this person or that person.  But

20   when you allow one manager to just do whatever she wants, and

21   she has an agenda, and it is related by their own statements,

22   her own writing -- because you know what she said?  You know

23   what she told us?  And I don't think she meant to say it, but

24   she said it.  If it's important, she writes it down.

25        She wrote this down.  This is the termination form.  Even

 1   looking at the termination form, you know that my client didn't

 2   deserve to be terminated.

 3       I'll save the remainder of my time for rebuttal.  Thank

 4   you for your time.

 5       (WHEREUPON, proceedings were had and reported, but not

 6        made a part of this record.)

 7       (The following proceedings were had in open court, jury

 8        present.)

 9           **THE COURT:**  Mr. Fox, are you going to speak in

10   rebuttal?

11           **MR. FOX:**  I am, Your Honor.

12           **THE COURT:**  If you're ready, then.  Thank you.

13                   **REBUTTAL ARGUMENT**

14                     **BY MR. FOX**

15       I just want to have a few more minutes of your time.

16       The April 19th meeting.  According to the testimony that

17   you heard, Ms. Steinhilber cannot recall the meeting at all

18   with Travis and Nurse Duis.  And Mr. Curtis, he testified that

19   he could not recall everything that happened at that meeting,

20   and he was clear about that.

21       It's also clear that Linda did not interview all the

22   witnesses that night.  And the most important one that she did

23   interview and that she left out was Kim Buchanan.

24       And what Kim Buchanan told you was that not only had she

25   tried to persuade Kim Buchanan to tell Linda that there was a

1  problem and delay in pain medication, but she also -- when she

2  didn't get the answer she wanted, she then got up into Kim's

3  face.

4      And Kim was sitting right over there, and she looked right

5  at you and kind of showed the way that Linda was acting towards

6  her.  And she said that Taryn couldn't do her job due to her

7  pregnancy or complaining about her job due to her pregnancy.

8  Kim Buchanan testified to that, the same way that Nurse Duis

9  testified, that that occurred in the April 19th meeting, in a

10 mocking manner.

11     She also asked Kim about whether or not someone was

12 complaining about not coming back to work after the birth of

13 the child.  And Kim made it clear throughout that that wasn't

14 occurring but Linda kept pushing.

15     And without a doubt, even on the incident forms, it lists

16 KB as a witness that night.  So you would think if there was a

17 problem with patient neglect, if you thought somebody was

18 concerned about the patient, someone would have talked to her.

19 But Linda ignored it because she was in charge of the

20 investigation, and no one checked, which is interesting because

21 they keep saying that -- this delay in pain medication they

22 keep bringing up, but still I don't hear anyone -- anyone

23 testifying about the patient, about checking with the patient.

24 Taryn worked with the patient again.  There's been nothing

25 about that.  There's been no evidence of patient neglect.

 1    There's been no evidence that the patient did not receive the

 2    medication, and they keep bringing it up.

 3        Even Jen Justice was so upset when she heard that alleged

 4    comment, you would think -- with Jen Justice, you would think

 5    she would have gone to check on the patient.  Nobody checked on

 6    the patient because there wasn't any delay in pain medication.

 7        They also talk about Jennifer Smosna being on the form and

 8    the termination form.  And you've seen the termination form.

 9    And they claim that Taryn Duis said, "I don't recall that

10    statement."  But when pushed, Jennifer Smosna, she said, "I

11    can't remember everything that was said in that statement."

12        You also heard about Dawn Scott and that Dawn Scott was so

13    upset about Nurse Duis' behavior during the meeting and that

14    she had failed to take accountability for her actions.  Well,

15    that doesn't make any sense.  And you know why?  Because Dawn

16    Scott barely even knew why she was suspended.  What was she

17    supposed to take account for?

18        If you don't do something and you're an employee like

19    Taryn Duis was -- Taryn Duis didn't do anything so she didn't

20    take account for it.  She was upset.  She was upset that she

21    was being discriminated against.

22        The HR team at Franciscan Alliance, they all knew that

23    Taryn was complaining about Linda.  And we've heard that they

24    all have degrees and they all have years of experience.  But

25    the first step in being an HR representative, whether you agree

 1   with it or not, if an employee comes to you and complains of

 2   discrimination, all you got to do is investigate.

 3       But they did something completely different.  They tipped

 4   off the person that was accused of discrimination.  They failed

 5   to take prompt and corrective action, and then they just didn't

 6   investigate at all, nothing.

 7       And, instead, you keep hearing about this collaboration,

 8   collaboration; we all collaborated.

 9       But we've heard from Curtis.  We've heard from Dawn Scott.

10   We've heard from Jennifer Smosna.  And, today, finally,

11   finally, on cross, we heard who the decision maker was.  We

12   heard it straight from the Defendant.  It was Linda

13   Steinhilber.

14       One does not need to take accountability for something

15   that they did not do.

16       And then we talk about Renchen, the scrub individual.  And

17   when pushed about how inappropriate Nurse Duis' behavior was,

18   she couldn't give one example, not one, nothing.  You would

19   think she would remember it, especially the day she wrote the

20   statement, about how disruptive she was or how awful she was at

21   that fitting, but nothing, no specifics.  Seems to be a

22   pattern, don't you think?

23       You know what, you know, I think HR should have done?

24   They should have, as soon as someone claimed that she was being

25   discriminated against like when Nurse Duis went to Dawn Scott,

REBUTTAL ARGUMENT - PLAINTIFF

1   they should at least, even the bare, bare minimum, removed

2   Steinhilber from being the lead investigator, taken her off the

3   investigation, handed it over to HR.  I think their

4   HR department has more than one employee.

5        Then they talk about Dawn Smith:  Well, we fired Dawn

6   Smith.

7        They did.  But you know what Dawn Smith got?  And it's in

8   your exhibits, and you can look at it as many times as you

9   want.  But you know what she got?  She got a heck of a lot of

10  progressive discipline, and Nurse Duis got zip.

11       Emotional damages.  You heard Taryn talk.  You definitely

12  heard her mom talk.  It affected her emotionally.

13       The most important thing here with regard to Franciscan

14  Alliance, Franciscan Alliance HR team, they didn't protect

15  Nurse Duis.  They did protect Linda Steinhilber.

16       We ask you to deliver a verdict.  We ask you to deliver a

17  verdict for Nurse Duis.

18       Thank you.

19            **THE COURT:**  Thank you, Counsel.

20       (WHEREUPON, proceedings were had and reported, but not

21        made a part of this record.)

22

23

24

25

1                    CERTIFICATE OF REPORTER

2            I, Angela Phipps, RMR, CRR, CSR, certify that the

3    foregoing is a true, complete, and accurate excerpt of the

4    record of proceedings in the above-entitled matter before the

5    Honorable Andrew P. Rodovich, Magistrate Judge, on March 9,

6    2023.

7

8    Date:  April 10, 2023       S/Angela Phipps, RMR, CRR
                                  Official Court Reporter
9                                for the U.S. District Court

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25