### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| TARYN N. DUIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:20-cv-78 |
| | ) | |
| FRANCISCAN ALLIANCE INC., a/k/a | ) | |
| FRANCISCAN HEALTH CROWN | ) | |
| POINT, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the court on Motion for New Trial or Alternatively for Remittitur [DE 90] filed by the defendant, Franciscan Alliance Inc., on March 31, 2023. For the following reasons, the Motion for New Trial is **GRANTED**.

## I.     BACKGROUND

The plaintiff, Taryn Duis, was a charge nurse in the progressive care unit (PCU) at the Crown Point facility of the defendant, Franciscan Alliance, Inc. Duis was discharged on May 14, 2019 and claims that the discharge was motivated by her pregnancy and her plan to take a maternity leave following the birth of her child. Franciscan contends that the discharge was justified based on a profane comment Duis made in reference to a patient and her unprofessional attitude during the investigation into the allegations concerning her misconduct.

After a four-day trial, the jury returned a verdict in favor of Duis in the amount of $500,000 in compensatory damages and $5 million in punitive damages. Based on the evidence introduced at trial, the verdict was a miscarriage of justice and must be vacated.

## II.    THE WITNESSES

In order to make the factual background more understandable, the witnesses will be listed before their testimony is discussed. Besides Duis, the following individuals testified at trial:

**Nita Wirkus** was the director of human resources at Franciscan both when Duis was discharged and at the time of trial. Wirkus did not have the authority to discharge an employee unilaterally. After a department made the decision to terminate one of its employees, Wirkus would review the decision to ensure compliance with Franciscan policies. No discharge was final without her approval.

**Jessica Smosna** was a manager in human resources when Duis was discharged and remained in that position at the time of trial.

**Dawn Scott** was the director of nursing both when Duis was discharged and at the time of trial. Scott reported directly to the president of the hospital.

**Travis Thatcher-Curtis** was the director of critical care when Duis was discharged and reported directly to Scott. He currently is employed by Porter Memorial Hospital (PMH).

**Linda Steinhilber** was the manager of the Intensive Care Unit (ICU) and the PCU when Duis was discharged and reported directly to Thatcher-Curtis. At the time of trial, she was a floor nurse in the ICU at the Crown Point hospital.

**Dawn Smith** was a registered nurse in the PCU when the incidents leading up to Duis' discharge occurred. She was terminated by Franciscan on May 14, 2019.

**Heather Wyatt** is a registered nurse who currently works for Methodist Hospital. During the relevant time period, she was the house shift director at the hospital and was responsible for assigning float nurses to the units that needed assistance.

**Kimberly Buchanan** was a patient care assistant (PCA) in the PCU when the incident transpired. She was discharged on May 14, 2019.

**Jen Justice** is a registered nurse who worked as a float nurse in 2019. She was assigned to the PCU on a regular basis when Duis was the charge nurse. Justice no longer is employed by Franciscan.

**Carrie Renchen** is a registered nurse and was the director of obstetrics in 2019. One of her assignments in May 2019 was to work with a vendor to purchase new uniforms for the hospital personnel. Renchen still was employed by the hospital at the time of trial.

**Connie Snow** was the house supervisor in 2019, and her responsibilities included both staffing and responding to patient complaints. She was employed by Franciscan at the time of trial.

**Renee Salmi** is a registered nurse and the mother of Duis. She was employed by Franciscan in 2019, but she left the hospital in 2020.

### III.   THE EVIDENCE

#### A.   *The Hospital*

Franciscan operates hospitals and other medical facilities across Northwest Indiana. Duis was hired by Franciscan as a registered nurse at its Crown Point facility in July 2015. Her first assignment was as a floor nurse in intermediate care. Duis eventually was transferred to the PCU, her assignment at the time of her discharge.

Patients in need of the highest level of care at the hospital are placed in the ICU. The second level in the hierarchy is the PCU. A patient whose condition has improved may be transferred from the ICU to the PCU, or a patient can be assigned directly to the PCU from the emergency room. A charge nurse has the responsibility of running the unit during her shift. In

both units, nurses work 12-hour shifts, but the shifts overlap so the incoming nurses can be briefed on the needs of each patient.

At all relevant times, Duis worked the night shift in the PCU from 7:00pm to 7:30am. For a three-month period, Thatcher-Curtis was the manager who oversaw the ICU and the PCU. Before assuming his responsibilities over both units, Thatcher-Curtis was aware of problems within the PCU. Thatcher-Curtis referred to one of the problems as a "toxic atmosphere." Float nurses, registered nurses who were assigned to the PCU on an as needed basis, were reluctant to work on that floor. Duis was the charge nurse for the PCU both before and after Thatcher-Curtis became her supervisor and when he encountered these problems.

In March 2019, Thatcher-Curtis was replaced by Steinhilber when he became the director of nursing. Prior to being hired by Franciscan as a registered nurse, Steinhilber had worked for PMH. She had been discharged by PMH for her management style, but she did not disclose that to Thatcher-Curtis during her interview. Thatcher-Curtis was impressed with Steinhilber when she was hired, and he believed that she had the management skills necessary to correct the ongoing issues within the PCU.

### B.    The Nursing Staff

According to Wirkus, approximately 90% of the nurses at the Franciscan Crown Point Hospital are women, and 80% of those nurses are of childbearing age. In 2019, 80 women were granted maternity leaves. In fact, Duis had taken a maternity leave for the birth of her first child, and that leave was granted without incident. Besides the legal requirements, there was testimony that the hospital could not function if the nurses were not granted a maternity leave with automatic re-instatement.

Because some of the machines used in the hospital are potentially hazardous to a pregnant nurse, such as an x-ray machine, she is encouraged to report her pregnancy promptly so precautions can be taken. Patients who are not attached to potentially dangerous machines are assigned to a pregnant nurse, and Duis did not dispute this practice. In fact, Duis promptly disclosed her pregnancy in early 2019.

### C.    *The Anxiety Attack*

According to Duis, her problems with Steinhilber started after an April 11, 2019 incident. Duis was working as the charge nurse when another nurse, Smith, failed to follow a directive from Duis. After the confrontation, Duis suffered what she described as an anxiety attack. However, Duis claimed that the anxiety attack was the result of a stressful evening at work in general, not just the confrontation with Smith. Nevertheless, after being examined by a hospital doctor, Duis was sent home.

During this anxiety attack, Duis said that "she hates being a nurse and doesn't know if she is coming back after October." (Defendant's Exhibit A, pg. 2, 4). Because Duis' attitude was a factor Franciscan considered in deciding to discharge her, this negative comment was important to that decision. However, only the second portion of this statement was included on the termination form prepared by Steinhilber. (Plaintiff's Exhibit 1). Even though the second portion of the statement was taken out of context, it was used extensively by the plaintiff in questioning the witnesses and in final arguments to suggest Duis was looking froward to taking a maternity leave as a new mother. The defense never responded by placing the statement in context. Under all of the circumstances, the use of the statement was misleading and likely prejudicial.

After Duis' anxiety attack, Steinhilber scheduled a meeting with Thatcher-Curtis and Duis to discuss the incident. In spite of the fact that Smith's conduct was a factor in her anxiety attack, Duis downplayed the incident at this meeting. On cross-examination, Duis admitted that she and Smith were friends. According to Duis, her reluctance to implicate Smith caused Steinhilber to yell at her, to make critical comments about her pregnancy, and to question her ability to do her job. Duis testified that she was upset both by those comments and the fact that Thatcher-Curtis allegedly did not intercede on her behalf. Thatcher-Curtis denied these allegations and testified that he would have disciplined Steinhilber if she had made improper comments concerning a nurse's pregnancy.

Because Steinhilber was the management person responsible for disciplining Smith for any misconduct, Steinhilber had the right to expect Duis to cooperate in the investigation. After all, the altercation caused Duis to become so upset that she could not complete her shift. The failure of Duis to cooperate with Steinhilber was a factor for the jury to consider in assessing her leadership abilities and her attitude as well as Steinhilber's motivation in conducting the subsequent investigation of Duis.

### D.  *The Profanity Incident*

On May 7, 2019, Duis started her normal shift in the PCU. Buchanan was working as a PCA, and Justice had been assigned to the unit as a float nurse. It is undisputed that Buchanan informed Duis that one of her patients had requested a pain medication. As a PCA, Buchanan was not permitted to dispense the medication.

Besides Duis, Justice and Buchanan were the only witnesses who testified to her response to the patient's request. According to Justice, Buchanan and Duis were in the nurse's station when Duis responded "I don't give a fuck if that patient wants pain meds. He can wait. He

should have taken it before." (Defendant's Exhibit A). Justice reported that comment to Wyatt, her immediate supervisor. At trial, Duis denied making the statement.

Buchanan denied Duis made the profane statement at trial. There was a dispute as to whether Duis' response was made to Buchanan in person or over a Vocera device. Vocera is a walkie-talkie type device which nurses use to communicate. Buchanan testified that she was in the patient's room, not the nurse's station, when she notified Duis of the request for pain medication. Buchanan admitted that she had to depress a button to communicate through Vocera and that without depressing the button she would not have been able to hear any response from Duis.

In determining whether Duis made the profane comment, the jury had to consider whether Buchanan was in a position to hear any response made by Duis. It also had to consider that Buchanan had been discharged by Franciscan and that Justice was the nurse who made the report which resulted in her discharge. Unlike Buchanan, the motivation of Justice was not subject to question.

At trial and in her response to the pending motion (DE 99, pg. 9), Duis has argued that no evidence was presented that she delayed getting the pain medication. That argument ignores the stated reasons for her discharge: the profane comment and her subsequent attitude. The patient may have received the pain medication in a timely fashion. However, Duis was not disciplined for neglecting the patient, so the timing of the medication was not at issue. Franciscan was entitled to find that the profane comment was made and that it was consistent with a negative or "toxic" attitude.

### E.      The Investigation

After Steinhilber was notified of the profanity incident, she began an investigation. Steinhilber testified that she interviewed everyone on that shift and took a statement from anyone who claimed to be present when Buchanan informed Duis of the patient's request. Justice was the only nurse who heard the profane statement. Christine Rogalski, a nurse from the float pool, stated that she heard Duis say the patient would have to wait for the medication but that she could not recall the exact words. (Defendant's Exhibit A, pg. 2).

Buchanan testified that she was approached by Steinhilber and was questioned about the incident. According to Buchanan, Steinhilber became aggressive when she declined to implicate Duis and pressed her for negative information about Duis. Steinhilber did not obtain a signed statement from Buchanan. At trial, Steinhilber could not recall talking to Buchanan during her investigation. The conflict in the testimony raised another credibility issue because Buchanan later was discharged for sleeping in the nurse's station.

According to Steinhilber, she did not have the authority to suspend Duis without the approval of human resources. Steinhilber completed her investigation without talking to Duis and obtained the approval from human resources to suspend her.

### F.      The Phone Call

On May 9, 2019, Steinhilber called Duis and told her that she had been suspended. Smosna was a party to the telephone conversation on behalf of human resources. Duis testified that she was not told the reasons for her suspension, but that contention was contradicted by both Steinhilber and Smosna and the report Steinhilber made following the call.

The Corrective Action Form prepared after the telephone call (Plaintiff's Ex. 1) supports the testimony of Steinhilber and Smosna. In the section titled "What happened? – Be Specific,"

Steinhilber entered "Taryn was contacted and given the opportunity to reply. Taryn stated she did not recall making the statement." That entry also contradicts Duis' trial testimony denying that she made the profane statement.

Both Steinhilber and Smosna testified that Duis never mentioned her pregnancy or maternity leave during the telephone conversation. At trial, Duis never contradicted that claim. This was confirmed by a text Duis sent Thatcher-Curtis following the telephone call. (Plaintiff's Ex. 3). Duis complained to Thatcher-Curtis that she was being "bullied and harassed" by Steinhilber but made no mention of her pregnancy in the text.

### G.    The Reaction

Besides the text to Thatcher-Curtis, Duis and Salmi, her mother, went to the hospital to discuss the suspension with him. Thatcher-Curtis was not in his office, so Duis and Salmi elected to move up the chain of command and talk to Scott. Again, differing accounts of the meeting were given by the three participants.

Salmi acknowledged that Duis was crying and upset but denied that she behaved unprofessionally. However, she admitted that Scott had to tell Duis to "calm down" at least once. Salmi also testified that Duis told Scott that she was being bullied by Steinhilber and that Steinhilber had made derogatory comments about Duis' pregnancy when they had met with Thatcher-Curtis.

Scott testified that she was told that Duis was pregnant at the meeting but denied that either Duis or Salmi made any reference to improper comments by Steinhilber relating to the pregnancy. Scott indicated that she would have reported any discriminatory comments to human resources. Scott made notes after the meeting. (Plaintiff's Ex. 9).  Although Duis repeatedly

9

testified that she was not told why she had been suspended, Scott noted that Duis acknowledged the suspension related to a call light.

Scott also recorded Duis' accusation that she was being "targeted" by Steinhilber. Scott stated that the conversation "was very unproductive and filled with nasty remarks regarding [Steinhilber] and the unit." Scott described Duis' attitude as "toxic." This report was considered when the decision was made to discharge Duis.

It was argued at trial that Duis had the right to question her suspension and to give her side of the story. True, but that argument focused only on what Duis said and not how she said it. Her attitude was one of the reasons given for the discharge, and the memorandum Scott prepared after the meeting described an unprofessional attitude by Duis, an attitude consistent with a profane comment.

### H.    The Uniform Fitting

Another incident occurred on May 8, 2019, which reflected adversely on Duis' attitude. The hospital was in the process of ordering new uniforms for the staff, and a deadline was set for employees to arrange for a fitting. Renchen was in charge of working with the vendor and ordering the uniforms.

Without a doubt, a fitting was a meaningless gesture for a pregnant nurse. Any measurements taken early in the pregnancy would produce a uniform that might not fit even when it was delivered. Apparently, the hospital had not considered this problem, and Renchen did not have an answer for Duis when she raised her concern. Renchen reported her behavior as "argumentative," "loud," and "confrontational" and that it occurred in the presence of the vendor. (Defendant's Ex. F).

Two things are important about this incident. First, Renchen was the director of obstetrics, a separate department from the PCU. As such, she did not work with Steinhilber and Duis and had no reason to be biased before her encounter with Duis. Second, the confrontation occurred after the May 7 shift when the profane comment allegedly was made. It is reasonable to conclude that the attitude Duis displayed with Renchen was consistent with her response to the request for the pain medication a few hours earlier. There was no reason to question either the objectivity or the accuracy of Renchen's report.

Once again, the argument was made that Duis had the right to question the relevance of the fitting for a pregnant woman. That argument overlooked the unprofessional attitude displayed by Duis – an attitude which prompted a neutral observer to file a report with human resources.

### I.    The Termination

On May 14, 2019, the decision was made to terminate Duis. (Plaintiff's Ex. 1). Two boxes were checked on the termination form: Unsatisfactory Work Performance and Unsatisfactory Work Behavior. The termination form was prepared by Steinhilber.

The testimony was not clear on who participated in the meeting when the termination decision was made. It appears that the decision was made by Scott, Thatcher-Curtis, and Steinhilber. One aspect of the meeting was described with consistency – the decision to terminate Duis was unanimous. It was based on both the profane statement and Duis' attitude during the investigatin. The witnesses also agreed that Steinhilber made the initial recommendation.

Everyone involved in the decision was aware that Duis was pregnant because of the statements she made during the anxiety attack. In particular, they considered the statement that

Duis hated being a nurse and looked forward to her maternity leave. Again, the context of the statement demonstrated that she wanted to end her nursing duties, not that she was looking forward to having another child. The decisionmakers also agreed that Duis' negative comment about nursing was the only reference to her pregnancy that was discussed during the meeting.

Wirkus did not participate in the meeting, but no termination was final without her approval. After verifying that the procedures complied with Franciscan policies, Wirkus approved the termination decision.

### J.       The Termination Telephone Call

After the meeting, Steinhilber called Duis to inform her of the termination. Smosna also participated in the call. According to both Steinhilber and Smosna, Duis did not claim that she was being targeted for being pregnant or for planning to take a maternity leave. Like Scott and Thatcher-Curtis, Smosna testified that she would have investigated any allegations of discriminatory conduct.

Another aspect of the termination telephone call merits discussion. According to Duis, Steinhilber claimed that her family was more important to Duis than her job. Duis repeated this accusation when she was questioned about it on cross-examination. The defense asked each hospital witness whether their families were more important to them than their jobs. As expected, all of the witnesses acknowledged the obvious – their families took priority.

This case required the jury to make credibility determinations. Unlike some cases, there was no margin of error caused by the imperfections of human perception. The jury had the unpleasant task of deciding who was lying. It defies logic and human experience to believe that Steinhilber made the statement attributed to her by Duis. This statement should have weighed heavily in the jury's assessment of the conflicting testimony.

### K.     The Other Terminations

Smith and Buchanan were discharged while Steinhilber was investigating the profanity allegations against Duis. (Plaintiff's Ex. 10, Defendant's Ex. 8). Steinhilber signed both termination notices.

The Franciscan Corrective Action Policy generally provides for progressive discipline before an employee is subject to discharge. (Plaintiff's Ex. 6). However, the policy also lists a number of infractions which subject an employee to an immediate discharge, with the proviso that the list is not exclusive. It is undisputed that Duis was not given the benefit of progressive discipline.

Before her termination on May 14, 2019, Smith received several warnings for poor patient care and how she talked to patients. Steinhilber had received complaints from patients about Smith's performance, and she followed the Franciscan handbook progressive discipline policy with Smith. Duis cited Smith as an example of someone who had been given progressive discipline when she had not.

During the same May 7, 2019, shift which led to Duis' termination, Justice reported that Buchanan was sleeping in the nurse's station. Steinhilber signed the termination form on May 14, 2019, even though Buchanan had not been given the benefit of a progressive discipline. Buchanan testified that the termination coincided with her decision to leave the hospital.

### L.     The Damages

Duis testified that she was "heartbroken" by her suspension and discharge. She claimed that she could not sleep and had blood pressure problems which caused her to go to the emergency room on an unspecified number of occasions. Salmi, her mother, confirmed this

13

testimony. However, no evidence was introduced relating to the emergency room visits or the medical expenses, and Duis did not seek any counseling for her emotional problems.

Steinhilber, Smosna, and Thatcher-Curtis disputed Duis' testimony concerning any improper comments about her pregnancy, but the jury obviously believed Duis. The jury was entitled to find that being fired without cause and for an illegal reason increased the emotional distress of Duis.

Because lost wages are an equitable remedy, no evidence was introduced on that issue. The jury also was instructed that they should not consider lost wages when assessing the damages. However, Duis testified that her husband was on disability and that she was the primary source of income for her family. This was another factor the jury was entitled to consider in determining the emotional impact the discharge had on Duis.

A plaintiff is entitled to introduce evidence on the defendant's net worth in support of a punitive damage claim. Duis did not introduce any financial information on Franciscan, but the jury obviously was aware that it is a large corporation with many medical facilities in the area. The award of $5 million in punitive damages reflects a clear intent to punish a large corporation.

Both compensatory and punitive damages were discussed by Duis' attorney in his final argument. However, he did not request a specific amount as compensation or provide any guidance for the jury in how to assess a reasonable amount for either element of damages. This may have contributed to a verdict which was not supported by the evidence.

## IV.   <u>DISCUSSION</u>

Franciscan did not request a directed verdict on the claim for compensatory damages at the close of all the evidence, but it made the request on the claim for punitive damages. Therefore, Franciscan is not entitled to a judgment notwithstanding the verdict on the

compensatory damages claim but may seek a JNOV on the award of punitive damages. **Fed. R. Civ. P. 50(b).** Two different standards must be applied in evaluating the jury verdict, but each standard yields the same result.

Although a jury verdict is entitled to great deference, it is subject to review by the trial court. The Seventh Circuit discussed the appropriate standard of review in ***Haluschak v. Dodge City of Wauwatosa***, 909 F.2d 254 (7th Cir. 1990):

> The decision to set aside a jury verdict lies within the sound discretion of the trial judge. The court may vacate a jury verdict for excessiveness, however, only if it is "monstrously excessive" or if there is "no rational connection between the evidence on damages and the verdict."

909 F.2d at 256.

*See also* ***Lust v. Sealy, Inc.***, 383 F.3d 580, 589 (7th Cir. 2004); ***Spinnenweber v. Laducer***, 2019 WL 2591017, at *4 (N.D. Ind. June 24, 2019) (where the court granted a motion for a new trial when there was "no rational connection between the scant evidence presented and compensatory award of one million dollars.").

In deciding a Rule 50(a) or (b) motion, the court must view the evidence in the light most favorable to the plaintiff. However, the court may consider the weight of the evidence and the credibility of the witnesses in ruling on a motion for a new trial.

> The district court heard the same testimony as the jury; it observed the witnesses' demeanor just as the jury did. In deciding whether to order a new trial, it was entitled to weigh the evidence for itself.

***Thomas v. Stalter***, 20 F.3d 298, 304 (7th Cir. 1994).

*See also* ***Mejia v. Cook County, Ill.***, 650 F.3d 631, 633 (7th Cir. 2011) ("In…a motion for new trial, the district court has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial.") (citing ***Byrd v. Blue Ridge Rural Elec. Coop., Inc.***, 356 U.S. 525, 540 (1958) ("The trial

15

judge in the federal system has powers…to comment on the weight of the evidence and credibility of witnesses….")); ***Fegan v. Reid***, 2010 WL 3324889, at *1 (N.D. Ill. Aug. 19, 2010).

The fact that the verdict was "monstrously excessive" also affects the evaluation of the jury's decision on liability. In ***Dresser Industries, Inc. v. The Gradall Company***, 965 F2d 1442 (7th Cir. 1992), the court stated that "[u]nquestionably, a new trial, and not a remittitur, is required when an award is the result of passion and prejudice, because the prejudice may have infected the verdict itself." *Id.* at 1448. *See also* ***Adams v. City of Chicago***, 798 F.3d 539, 543 (7th Cir. 2015); ***Arroyo v. Volvo Group North America LLC***, 2022 WL 17960686, at *4 (N.D. Ill. Dec. 27, 2022) (where the court found the "jury's $2.6 million compensatory verdict was a product of passion and prejudice, it had no discretion to offer Plaintiff remittitur.").

The verdict for compensatory damages was contrary to the clear weight of the evidence, both on the issue of liability and the amount of damages. When Thatcher-Curtis was the manager for the PCU, he identified several problems with Duis while she served as the charge nurse. The primary one was the "toxic" attitude of the nursing staff. When he became the director of critical care, Thatcher-Curtis instructed Steinhilber to correct those problems. Then five incidents involving Duis occurred in a one-month period: the anxiety attack coupled with Duis' derogatory remarks about being a nurse; her reluctance to blame Smith when Steinhilber attempted to investigate the reasons for the anxiety attack; the profane response to a patient's request for pain medication; the tirade against Renchen concerning the new uniforms; and the confrontational meeting with Scott after her suspension.

Duis never denied making the comment that she hated being a nurse. Although she denied making the profane response to the request for pain medication at trial, she told Steinhilber she did not recall making the comment. Duis also told Scott that her suspension

related to a call light incident. Her denials at trial were inconsistent with the other evidence, including the contemporaneous reports made by Steinhilber and Scott.

The jury also had to deal with other credibility issues. Duis attempted to portray Steinhilber as the villainess hell-bent on revenge because of her pregnancy. The comment Duis attributed to Steinhilber, "you care for your family more than your job," could not have been believed by a fair-minded jury, especially since it was refuted by Smosna. It also should have weighed heavily on any other credibility determinations, including Duis' attack on Steinhilber.

The composition of the nursing staff also makes the verdict problematic. The undisputed testimony was that pregnant nurses were a common occurrence at the hospital. With 90% of the nursing staff female, a pregnancy was not an unexpected event, and maternity leaves were granted as a matter of course. Besides the employee handbook (Plaintiff's Ex. 8), the federal laws which prohibit all types of discrimination in the workplace are common knowledge to most employees. Duis testified that not once, but twice, Steinhilber made pregnancy comments which clearly violated federal law. It strains credibility to believe an experienced supervisor would make discriminatory remarks directly to the employee, in effect an admission of liability. Additionally, those comments allegedly were made in the presence of two supervisors, Thatcher-Curtis and Smosna, who testified they would have disciplined Steinhilber if they had witnessed such behavior. Like the family comment previously discussed, this testimony raised serious credibility issues.

The amount of compensatory damages awarded also was against the clear weight of the evidence. Duis testified that her emotional distress led to high blood pressure which required medical attention. However, no medical records or bills were introduced to support that contention, and she did not seek any professional help for her anxiety. With the issue of lost

wages removed from the jury, the verdict of $500,000 was not supported by any special damages and not based on a fair assessment of the evidence. *See **Danius v. Dunlap***, 330 F.3d 919, 929 (7th Cir. 2003).

Duis had an even greater burden when seeking an award of punitive damages. In ***Kolstad v. American Dental Ass'n***, 527 U.S. 526, 119 S. Ct. 2118 (1999), the Supreme Court discussed both the required mental state for an award of punitive damages and the added proof required to justify an award against a corporate employer. Under the Civil Rights Act of 1991, 42 U.S.C. § 1981a(b)(1), punitive damages may be awarded if the plaintiff has demonstrated "egregious" conduct. A plaintiff is not required to show actual malice, but punitive damages are appropriate when an employer violates federal law either intentionally or with "reckless indifference." ***Kolstad***, 527 U.S. at 535, 119 S. Ct. at 2126.

Title *VII* does not permit an award of punitive damages against a corporation based on the traditional principles of *respondeat superior*.

> Recognizing Title VII as an effort to promote prevention as well as remediation, and observing the very principles underlying the Restatements' strict limits on vicarious liability for punitive damages, we agree that, in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's "good-faith efforts to comply with Title VII."

***Kolstad***, 527 U.S. at 545, 119 S. Ct. at 2129.

*See also **Pickett v. Sheridan Health Care Center***, 610 F.3d 434, 446 (7th Cir. 2010). Duis was required to show misconduct by Franciscan, and just not individual employees, to justify an award of punitive damages.

Evidence supporting an award of punitive damages also was lacking. Although Duis testified at trial that she repeatedly complained of improper comments by Steinhilber, that testimony was contradicted by both the exhibits and the testimony of the other participants to the

alleged conversations. Steinhilber denied making any discriminatory comments, and this testimony was supported both by Thatcher-Curtis and by Smosna. Duis' testimony that she informed Scott of the discriminatory comments was contradicted by Scott, the memorandum Scott prepared after the meeting, and Duis' text message to Thatcher-Curtis immediately following the meeting.

The jury was instructed that the greater weight of the evidence is not determined solely by the number of witnesses. (Court's Instruction 10). In this case, Duis provided the only evidence in support of punitive damages, but her testimony was undermined through evidence of impeachment and contradiction. The evidence supporting an award of punitive damages was questionable, at best.

Duis also failed to meet her burden of showing improper conduct by Franciscan, even if one or more employees engaged in illegal conduct. The undisputed evidence demonstrated that Franciscan recognized its obligations under federal law and established procedures to enforce the antidiscrimination laws. (*See* Employee Handbook, Plaintiff's Ex. 8). No evidence was presented that Franciscan enacted these policies as a pretext or repeatedly failed to follow its own policies in other employment cases. In fact, Wirkus testified without contradiction that no termination was final until she reviewed the file to determine that the department managers had complied with Franciscan Policies. Both factually and legally, the award of punitive damages was improper.

In addition to a lack of evidence to support an award of punitive damages, even Duis has conceded that the verdict of $5 million was a "staggering amount." (Motion to Award Liquidated Damages [DE 85], at ¶ 4). Query: is there a material distinction between a "staggering amount"

19

and "monstrously excessive"? The amount awarded for punitive damages had no rational basis, especially considering the fact that it lacked evidentiary support for corporate liability.

Under all of the circumstances, the verdict in favor of Duis was against the clear weight of the evidence. The fact that the damages award was "monstrously excessive," or in a "staggering amount," suggests that the verdict was based on passion and prejudice. As such, the verdict cannot stand.

The reference to "jury duty" suggests a form of conscription. In reality, it is a privilege to be part of the American justice system. A jury verdict is entitled to great deference, and rightly so. Lay people are asked to apply their good judgment to problems attorneys and judges could not solve. However, our system of justice is not perfect, and juries, like judges, can make mistakes. When that happens, a judge has both the authority and the responsibility to correct that mistake. That power must be exercised sparingly, but when an injustice has occurred, it must be corrected. In this case, the size of the verdict focuses greater attention on the power of the judge to vacate that verdict, especially if viewed from the plaintiff's standpoint. However, it also emphasizes the concurrent responsibility of the judge to correct an injustice, and the apparent wealth of the defendant is irrelevant. The verdict in this case was contrary to the evidence and manifestly unfair, so it must be set aside.

Besides the strict requirements for vacating a jury verdict contained in the Federal Rules of Civil Procedure, the Seventh Circuit added one more in *Haluschak*: "As has been often noted 'when two juries have reached substantially the same result, the possibility of a miscarriage of justice is very slight.'" *Haluschak*, 909 F.2d at 257. As a result, "[t]he the practice of the courts seems to follow a Supreme Court dictum that 'courts rarely grant a new trial after two verdicts upon the facts in favor of the same party.'" **11 Wright & Miller**, § 2803 (quoting *Louisville &*

20

*N.R. Co. v. Woodson*, 134 U.S. 614 (1890)). In other words, the collective judgment of two juries takes priority over the opinion of the court.

Because a new trial has been granted, it is not necessary to discuss the remaining issues raised by Franciscan. It should be noted, however, that the parties agree that the maximum amount Duis would have been able to recover for compensatory and punitive damages under 42 U.S.C. § 1981a(b)(3)(D) was $300,000. *Vega v. Chicago Park District*, 954 F.3d 996, 1002 (7th Cir. 2020).

## V.    <u>CONCLUSION</u>

Based on the foregoing reasons, the defendant's Motion for New Trial [DE 90] is **GRANTED**. Franciscan is entitled to a judgment notwithstanding the verdict on the claim for punitive damages and a new trial on the claim for compensatory damages.

ENTERED this 3rd day of May, 2023.

<u>/s/ Andrew P. Rodovich</u>
United States Magistrate Judge