UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| TARYN N. DUIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CAUSE NO: 2:20-cv-0078-APR |
| | ) |
| FRANCISCAN ALLIANCE INC., a/k/a | ) |
| FRANCISCAN HEALTH CROWN | ) |
| POINT, | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFF'S MOTION TO VACATE AND/OR AMEND**
**THE ORDER DATED MAY 3, 2023**

Plaintiff, Taryn N. Duis ("Plaintiff" and/or "Duis"), pursuant to Fed. R. Civ. P. 59(e) and/or Fed. R. Civ. P. 60(b)(6), hereby Motions the Court to either vacate or amend its Order dated May 3, 2023, for the following reasons:

1. Because the Court's May 3rd, 2023, Order is an interlocutory Order, the Court has inherent power to reconsider, amend, and/or vacate its prior Order. Fed. R. Civ. P. 54(b); *Galvan v. Norbert*, 678 F.3d 581, 587 (7th Cir. 2012). The Court's May 3rd Order overturning the jury's verdict, ordering a new trial, and entering judgment as a matter of law on Plaintiff's claim for punitive damages, is fundamentally and legally flawed in three (3) primary respects.

2. First, the Court failed to offer Duis the option of a remittitur or a new trial. Duis conceded the $300,000.00 cap on compensatory and punitive damages and expected to be offered a remittitur in that range. Pursuant to *Haluschak v. Dodge City of Wauwatosa, Inc.*, 909 F.2d 254 (7th Cir. 1990), and its progeny:

> The court may vacate a jury verdict for excessiveness, however, only if it is 'monstrously excessive' or if there is 'no rational connection between the evidence on damages and the verdict.' **Even where a jury verdict meets this**

> **severe standard, we demand that the trial court present the plaintiff with the option of a reduction of damages or a new trial.** We require that plaintiffs receive this choice because the question of damages – primarily a question of fact – is one for the jury to decide. To allow the trial court to replace the jury's assessment of damages with its own would fundamentally undermine the parties' seventh amendment right to a jury trial.

*Id*. at 256-57 (emphasis added); *see also Spinnenweber v. Red River Supply, Inc*., 2:14-cv-101-JEM (N.D. Ind. June 24, 2019)("Viewing the trial record in the light most favorable to the verdict, there is no rational connection between the scant evidence presented and compensatory award of one million dollars. Accordingly, Plaintiff may choose remitter or a new trial."); *Burton v. American Cyanamid Co*., 07-cv-0303, 07-cv-0441, 10-cv-0075 (E.D. Wisconsin April 10, 2020)("When a jury verdict meets this standard, Seventh Circuit law requires that I present the plaintiff with the option of a reduction of damages or a new trial."); *Hardy v. City of Miluakee*, 88 F.Supp.3d 852, 884 (E.D. Wisc. 2015)("The punitive damages award, on the other hand, is excessive. Ultimately, the Court is obliged to offer Mr. Hardy the choice between a new trial and a reduced punitive damages award . . . .").

      3.      The Court failed to give Plaintiff such an option in this case, which at a minimum requires Amendment of the May 3rd Order. To the extent the Court relies upon *Dresser Industries, Inc. v. Waukesha Engine Division*, 965 F.2d 1442 (7th Cir. 1992), the Seventh Circuit skeptically questioned the idea that a high damages award, alone, could meet the standard of bypassing the mandate of offering a remittitur versus ordering a new trial, and ultimately left that issue undecided. *Id*. at 1448-49 ("Gradall's theory, however, is that passion and prejudice may be inferred from the size of the award, an unclear proposition . . . Older cases from this circuit, however, seem to reject that idea . . . We need not decide which rule to follow today, though."). Curiously, the Court also cited *Adams v. City of Chicago*, 798 F.3d 539, 542 (7th Cir. 2015), which reinstated a jury verdict totaling $3.7 million, found that the Judge abused his discretion

by not offering a new trial or remittitur, and held "[t]his is not the first time we have encountered the situation in which a trial judge failed to give a winning plaintiff the option of a new trial in lieu of a remittitur."  The Court also cited *Arroyo v. Volvo Group North America LLC*, 2022 WL 17960686 (N.D. Ill. Dec. 27, 2022), which is an Illinois case currently under appeal to the Seventh Circuit, Case No. 23-1165, thus offering no legal support for the May 3rd Order's failure to offer a remittitur.

4.	Notwithstanding the questionable legal grounds of ordering a new trial solely based on a high jury verdict, the May 3rd Order fails to recognize the myriad of reasonable explanations why a jury could render a large verdict in this case without necessarily being so inflamed by passion and prejudice that the underlying determination of liability needs overturned.  The jury instructions do not provide the statutory caps to the jury, nor do they provide any mathematical formulas to the jury.  Indeed, pursuant to 42 U.S.C. § 1981a(c)(2), "the court shall not inform the jury of the limitations described in subsection (b)(3)."  The amount of money needed to punish and deter future wrongdoing, especially of such a large entity like Defendant, is a subjective and discretionary notion not capable of precise mathematical calculation.  *Gracia v. Sigmatron Intl., Inc.*, 842 F.3d 1010, 1026 (7th Cir. 2016).  For example, assuming Defendant has an annual revenue of at least $1,000,000,000, then $5.5 million is only 0.55% of that amount.

Further, as noted by the Northern District of Indiana in *Finnegan v. Myers*, No. 3:08-cv-503 (N.D. Ind. Sept. 30, 2016), compensatory damages "are very difficult to quantify, leaving it to the jury to select a dollar amount that it believes will fairly compensate the plaintiff . . . Although a defendant may consider such evidence [garden variety] of a plaintiff's emotional distress 'meager,' a jury may properly view that same evidence in an entirely different light

based, for example, on its own observations of a witness's demeanor at trial . . . it is imperative that a jury's damage calculations are given deference because they are 'essentially an exercise in fact-finding." Duis did present evidence supporting compensatory and punitive damages, which is laid out in detail in her Response in Opposition to Defendant's Rule 59 post-trial motion. [See Docket # 99].

Neither counsel, nor the Court, briefed the jury on comparative jury verdicts. Per the Order *in limine*, the jury was never made aware of Duis' rate of pay, lost wages, and lost benefits. There is absolutely no evidence that the jury considered inadmissible evidence or inappropriate and inflammatory argument by counsel. There is no evidence that the jury violated their oaths. The Court itself conducted a very thorough *voir dire*, revealing no underlying bias that would prevent this jury from reaching a rational unanimous verdict. The jury was punctual, respectful, and demonstrated that they took their job seriously. The questions raised by the jury reflected that they were deliberating over the witness' testimony, the record, and the jury instructions. [Dkt. 76-79]. The jury took their time, deliberating over 5.5 hours. As the conscience of the community, juries should be free to valuate damages how they see fit, so long as within the parameters of the jury instructions, and juries are entitled to a presumption that they followed the Court's instructions. *United States v. L'Allier*, 838 F.2d 234, 242 (7th Cir. 1988). These are all perfectly rational explanations why a jury could reach a verdict in this case of $5.5 million, without jumping to the conclusion that the entire verdict, including liability, should be discarded. Parties, like Duis, expect to be given the option of a remittitur, not be penalized for succeeding on a large verdict. To the extent the Court claims it was not required to offer such an option to Duis because it overturned the verdict based on not only the damage award, but also

liability as being against the manifest weight of the evidence, this leads to the second legal error of the May 3rd Order.

5. The Court, in its May 3rd Order, held **"[t]he comment Duis attributed to Steinhilber, 'you care for your family more than your job,' could not have been believed by a fair-minded jury . . . [and] Duis testified that not once, but twice, Steinhilber made pregnancy comments which clearly violated federal law. It strains credibility to believe an experienced supervisor would make discriminatory remarks directly to the employee, in effect an admission of liability."** [Dkt # 105, p. 17, emphasis added]. As will be explained below, this is highly inappropriate because it afforded no deference to the jury's verdict and discarded extremely important evidence without indisputable proof of falsity. Defendant did not even move for a directed verdict on liability at the close of evidence, impliedly admitting that there were contested issues of material fact and severely undermining any contention that the verdict was against the *manifest* weight of the evidence. Nor did Defendant's post-trial Rule 59 motion even make the argument that the verdict was against the manifest weight of the evidence. The Court erred by applying the wrong standard of review in assessing the credibility of witnesses, substituting its credibility determinations in place of the jury without any deference, and taking evidence in favor of Duis off the scales. The Court's narrow role, when considering whether the verdict was against the manifest weight of the evidence, is only to see whether a "reasonable basis exists in the record to support the verdict." *Lewis v. McLean*, 941 F.3d 886, 893 (7th Cir. 2019). For each piece of disputed evidence wherein the May 3rd Order goes against Duis, the jury had a rational basis to find otherwise in favor of Duis.

In *Latino v. Kaizer*, 58 F.3d 310 (7th Cir. 1995), the Seventh Circuit cautioned Judges not to act as a thirteenth juror, especially in cases like this one where we have basic disputed issues of fact on who said what:

> In cases involving simple issues but highly disputed facts (an apt description in this case), greater deference should be afforded the jury's verdict than in cases involving complex issues with facts not highly disputed . . . It is unlikely that even Chief Judge Barnes would have argued that a United States district judge has an absolute veto to set aside any civil jury verdict which that judge finds distasteful . . . 'he should not set the verdict aside as against the weight of the evidence merely because, if he had acted as trier of the fact, he would have reached a different result; and in that sense he does not act as a 13th juror in approving or disapproving the verdict. And since the credibility of witnesses is peculiarly for the jury, it is an invasion of the jury's province to grant a new trial merely because ethe evidence was sharply in conflict.'

*Id*. at 314-315.

In *Latino*, the Seventh Circuit made very clear that the Court should only make credibility determinations different than the jury, in the context to see if the verdict was against the manifest weight of the evidence, if the testimony at issue contradicts indisputable physical facts or laws, i.e. 100% objectively verifiable proof of falsity.  "The district judge can take away from the jury testimony that reasonable persons could not believe . . . However, that exception is a narrow one, and can be invoked only where the testimony contradicts indisputable physical facts or laws." *Id*. at 315.  Per *Latino*, the Judge's belief of what is common sense, what the jury should have believed was rational, more probable, or even the Judge's belief that a witness is lying under oath is still not sufficient to order a new trial, and to do so constitutes an abuse of discretion. *Id*. at 315-16.  The May 3rd Order explicitly and repeatedly violates the legal principles set forth in *Latino* by making credibility determinations contrary to the jury's verdict without indisputable objective proof showing that those credibility determinations by the jury were false.  [Order pp. 12, 17].

But *Latino* is not on an island. As further explained by the Seventh Circuit in *Whitehead v. Bond*, 680 F.3d 919 (7th Cir. 2012), the Court's power to weigh evidence as stated in *Mejia* is limited:

> *Mejia* stands for the proposition that the district court must properly exercise its discretion in weighing the evidence to determine if it's against the *manifest* weight of evidence. The district court, however, cannot grant a new trial just because it believes the jury got it wrong . . . '[S]ince the credibility of witnesses is peculiarly for the jury, it is an invasion of the jury's province to grant a new trial merely because the evidence was sharply in conflict.' *Id*. 'Even when evidence is contradictory, '[i]t's the jury's job – not the district court's job or the job of a panel of appellate judges – to figure out who's telling the truth.' *United States v. Hassebrock*, 663 F.3d 906, 920 (7th Cir. 2011)(quoting *Lowe v. Consol. Freightways of Del.*, 177 F.3d 640, 642-43 (7th Cir. 1999)("The fact that [the defendant] presented evidence that is inconsistent with the jury's verdict does not mean that the verdict should be reversed . . . The jury was there; it weighed the witnesses' credibility, considered the evidence, and reached a supportable conclusion . . . 'We will not supplant the jury's reasonable and factually supported verdict with our own judgment.' . . . .

*Id*.

Further, as explained in *Latino* and as stated in *Mejia v. Cook County, Ill*, 650 F.3d 631 (7th Cir. 2011), evidence should only be discounted if indisputably and verifiably false:

> In conducting its own assessment of the evidence presented, the district court cannot remove a piece of evidence from the calculus merely because the court belies it was not credible and then, with that piece excluded, grant a motion for a new trial because the verdict is now against the weight. *Latino v. Kaizer*, 58 F.3d 310, 315-17 (7th Cir. 1995). In weighing the facts, the district court is bound to the same evidence the jury considered, and can strike a piece of evidence from its weighing process only if 'reasonable persons could not believe' it because it 'contradicts indisputable physical facts or laws.'"

*Id*. at 633; *see also Venson v. Altamirano*, 827 F.Supp.2d 857 (N.D. Ill. 2011)("However, '[t]he district court's power to grant a new trial on weight grounds is not unlimited: a certain deference to the jury's conclusions is appropriate . . . In weighing the facts, the court is 'is bound to the same evidence the jury considered, and can strike a piece of evidence from its weighing

process only if reasonable persons could not believe it because it contradicts indisputable physical facts or laws.").

   Finally, in *Galvan v. Norberg*, 678 F.3d 581 (7th Cir. 2012), the Seventh Circuit again reiterated that the Court must afford deference should be afforded to the jury's verdict, the Court may not take evidence off the scales unless indisputably false by physical facts or laws, and the Court's view of what is common sense is not enough to Order a new trial. *Id*. at 588-99. (explaining these limitations on the Court's power to reweigh the evidence and affirming that Judge Shadur's opinion on what the jury should have concluded based on his view of "common sense" was an abuse of discretion).

  6. Here, in violation of Duis' constitutional right to a trial by jury under the Seventh Amendment, the Court did precisely what the Seventh Circuit held a Court should <u>not</u> do in *Whitehead v. Bond*, 680 F.3d 919 (7th Cir. 2012), *Latino v. Kaizer*, 58 F.3d 310 (7th Cir. 1995), and *Galvan v. Norberg*, 678 F.3d 581 (7th Cir. 2012) - it afforded no deference to the jury's verdict, made its own credibility determinations based on its view of what a fair-minded jury should conclude, and substituted its own judgment for that of the jury simply because the Court believes the jury got it wrong, not because of indisputable proof of falsity. Further, to find that the verdict was against the manifest weight of the evidence, the Court discounted numerous pieces of evidence in favor of Duis, not because such evidence "contradicts indisputable physical facts or laws," but instead simply because the Court disagreed with the credibility determinations of the jury on who said what. [Dkt # 105, pp. 16-17]. This is not a situation wherein audio recordings or emails can objectively prove, with 100% accuracy, what was actually said. Rather, this case involved a standard he-said-she-said credibility dispute, which is within the province of

the jury, not the Court.  This is a fatal error that requires that the May 3rd Order be vacated.  By way of example and not limitation:

- The May 3rd Order ignores the fact that Kim Buchanon corroborated Duis and testified that Steinhilber made inappropriate pregnancy-based comments about Duis when it became clear that Buchanon would not tell Steinhilber that Duis uttered the statement in question regarding the call light.  [Dkt # 105, p. 8].   The May 3rd Order also appears to discredit all of Buchanon's testimony because she was terminated by Defendant due to a complaint by Jen Justice.  But Buchanon testified that she had already submitted her resignation prior to these incidences, and the jury was free to believe Buchanon over Jen Justice and Steinhilber.

- The May 3rd Order admits that it did not believe Duis *not* because of indisputable and objective proof undermining her testimony, but simply because **"[i]t defies logic and human experience to believe that Steinhilber made the statement attributed to her by Duis . . . [and] could not have been believed by a fair-minded jury, especially since it was refused by Smosna . . . It strains credibility to believe an experienced supervisor would make discriminatory remarks directly to the employee, in effect an admission of liability."**  [Dkt # 105, pp. 12, 17, emphasis added].  Yet Buchanon corroborated that Steinhilber was exactly the type of person to make these statements because Steinhilber made similar statements about Duis to her.  Further, a similar statement was written by Steinhilber in the termination form, and per *Galvan*, *Latino,* and *Whitehead*, the Court's personal opinions on what an experienced supervisor would likely say or not say is not enough to discredit the jury's credibility determinations in order to find that the manifest weight of evidence sits with Defendant. The Court needed indisputable proof of falsity that Steinhilber did not make those statements, and no such proof exists.

- To elaborate further on this corroboration completely discounted by the Court, Duis testified that during her April 19, 2019, meeting with Steinhilber and Thatcher-Curtis that Steinhilber mocked her referencing that she could not do her job because of her pregnancy.  Notably, Steinhilber could not recall the specifics of this meeting.  Buchanon corroborated such comments being made by Steinhilber when she testified that Steinhilber approached her and questioned Buchanon as to whether Duis was able to do the job due to her pregnancy, and whether Duis would return to work during maternity leave.  Notably, Buchanan testified that Steinhilber's demeanor when making said discriminatory comments was similar to what Duis testified to during her April 19, 2019, meeting with Steinhilber and Thatcher-Curtis.

- Furthermore, Steinhilber is not an "experienced supervisor."  The jury heard evidence that Steinhilber had been terminated by numerous prior employers, she had only been a nursing manager over the PCU for a few months before terminating Duis, and she did not even list her prior position at Porter on her

9

resume since she had been fired.  Steinhilber testified that she verbally informed Thatcher-Curtis about being terminated from Porter, yet Thatcher-Curtis denied that Steinhilber ever disclosed this during her interview.

- With respect to the statement on the termination form - "Taryn stated she said she couldn't wait until October to be on maternity leave" - the May 3rd Order claims "[t]he defense never responded by placing the statement in context . . . [and] the use of the statement was misleading and likely prejudicial." [Dkt # 105, p. 5]. First, the Court is making arguments and post-trial objections on behalf of Defendant.  Second, counsel for Duis repeatedly asked why this statement was in the termination form, and Steinhilber's explanation was that whatever Duis stated during that call was included in the form.  But when pressed, Steinhilber admitted that not everything she said was in the termination form, *only if it was important* did it make it in the document.  Further, other managers of Defendant admitted that statement was improper to place in a termination form.

- The May 3rd Order claims that Dawn Smith caused Duis' anxiety attack and Duis somehow failed to cooperate in that investigation because she downplayed Smith's involvement.  [Order p. 6].  Dawn Smith did not even testify during trial.  The only evidence in the record, from witnesses with personal knowledge as to why Duis had a panic attack, were Duis and her alone.  Indeed, Duis testified that she told Steinhilber that "Dawn did not cause my panic attack, it didn't have anything to do with Dawn." [Dkt. No. 81, Trial Tr. Duis testimony p. 18 and p. 19, ll 3-5].  In response Steinhilber stated "Well I already told human resources that you would be calling, so that's what we're going to say." [Dkt. No. 81, Trial Tr. Duis testimony p. 19, ll. 6-7]. Duis' refusal to lie about Smith allegedly causing her anxiety attack during the April 19, 2019, meeting cannot be construed as a failure to cooperate, especially in light of Steinhilber's discriminatory comments.

- The May 3rd Order states "Duis has argued that no evidence was presented that she delayed getting the pain medication.  That argument ignores the stated reasons for her discharge: the profane comment and her subsequent attitude." [Order p. 7].  This is indisputably wrong.  The termination form explicitly states, "It was reported Taryn response was inappropriate **resulting in delay in patient care** and inappropriate and unsatisfactory work behavior . . . **Delay in patient care** . . . poor work performance as the charge nurse." [Dkt. No. 71, Trial Exhibit 1, emphasis added].

- The May 3rd Order states that the termination form, which stated that Duis "did not recall making the statement" was somehow inconsistent with Duis' trial testimony denying making the profane statement.  [Dkt # 105, p. 9].  But Duis has consistently, throughout this entire matter, always denied making the profane statement at issue.  Defendant's written summation of that phone call is not a prior inconsistent statement by Duis.

- The May 3rd Order takes issue with Duis' alleged toxic attitude at the May 10th meeting with Dawn Scott.  Not only was this disputed by Duis and Renee Salmi, but numerous management witnesses testified that an employee can naturally be upset and angry when reporting unlawful discrimination, and those reports are protected from retaliation even if not made with a "Disney smile."  Here, Duis testified that she informed Scott as to Steinhilber's discriminatory comments regarding her pregnancy.  [Dkt. No. 81, Trial Tr. Duis testimony pp. 34-36].  Duis' engagement in statutorily protected conduct was also corroborated by Renee Salmi when she testified Duis informed Scott as to Steinhilber's discriminatory comments.  [Dkt. No. 81, Trial Tr. Salmi pp. 8-9].

- The May 3rd Order, with respect to comparator Dawn Smith, is contradictory.  [Dkt # 105, p. 13].  The Order states "Smith received several warnings for poor patient care and how she talked to patients.  Steinhilber had received complaints from patients about Smith's performance, and she followed the Franciscan handbook progressive discipline policy with Smith[,]" yet the very next sentence states "Duis cited Smith as an example of someone who had been given progressive discipline when she had not."  [Dkt # 105, p. 13].  It is indisputable that Smith was given progressive discipline, unlike Duis.  To elaborate further on these comparators, none of which were pregnant, requested FMLA/maternity leave, or engaged in statutorily protected activity, the Court cannot dispute the following:

- **Dawn Smith:** In January of 2019 Dawn Smith received three (3) complaints against her alleging that she was lazy, not assisting her co-workers, not meeting patient care standards, and that patients she was taking care of were requesting another nurse.  [Dkt. No. 71, Trial Exhibit 10;  Bate Stamp #181)].  Thatcher-Curtis summarized those past complaints to Steinhilber on April 12, 2019.  [Dkt. No. 71, Trial Exhibit 10, Bate Stamp # 177-178 and 181)].  Thereafter, on April 17, 2019, Smith did not come to the room of a patient nor answer an alarm for 45-60 minutes.  [Dkt. No, 71, Trial Exhibit 10, Bate Stamp #177)].  On April 18, 2019, Smith yelled at a patient who reported that she was afraid of Smith and did not want her taking care of her again.   [Dkt. No, 71, Trial Exhibit 10, Bate Stamp #177)].  On April 19, 2019, four (4) rooms assigned to Smith were found to have not been attended to adequately by Smith with such complaints ranging from IV alarming air in line, IV bag dry, garbage overflowing, opened supplies on containers, and a soiled patient all while Smith was found to be on her cell phone in the nurses station.  [Dkt. No, 71, Trial Exhibit 10, Bate Stamp #177)].  In addition, on April 11, 12, 22, 23, and 26th of 20198 Smith had failed to return calls from her manager.  [Dkt. No, 71, Trial Exhibit 10, Bate Stamp #177)].  As a result of all these infractions Steinhilber did not immediately suspend or terminate Smith yet rather chose progressive discipline and issued her a final written warning.  [Dkt. No, 71, Trial Exhibit 10, Bate Stamp #177-178)].   Unlike, Duis, Smith was afforded a chance to correct her behavior and performance prior to any termination.

- **Melissa Roberts:** Steinhilber provided Roberts a written counseling after Roberts accessed personal medical information in violation of Defendant's policy. [Dkt. No, 71, Trial Exhibit 12, Bate Stamp #583-585)]. Subsequently, Steinhilber issued another written counseling to Roberts for incomplete restraint documentation on two patients, incorrect verbiage, on CABG consent, no order for restraints, and for not answering calls from the charge nurse on two occasions. [Dkt. No, 71, Trial Exhibit 12, Bate Stamp #586-588)].

- **Celeste Reed:** Celeste Reed another nurse under Steinhilber's supervision was provided progressive discipline when she was issued two written warnings. [Dkt. No, 71, Trial Exhibit 14, Bate Stamp #616-622)]. In the same month (July of 2019) Reed was issued a written warning for attendance and another written warning after Reed was insubordinate to Steinhilber on three (3) occasions. [Dkt. No. 7, Trial Exhibit 14, Bate Stamp 616-622]. Again, Steinhilber provided her progressive discipline unlike any progressive discipline ever received by Duis.

- The May 3rd Order held that $500,000 in compensatory damages was against the manifest weight of the evidence because "no medical records or bills were introduced to support that contention, and she did not seek any professional help for her anxiety." [Dkt 105, p. 17]. But that is not the legal standard. Duis had no legal requirement to present medical records or expert testimony in support of compensatory damages. *Deloughery v. City of Chicago*, 422 F.3d 611, 619-620 (7th Cir. 2005); *Tullis v. Townley Engineering & Man. Co., Inc.*, 243 F.3d 1058, 1068 (7th Cir. 2001); *Merriweather v. Family Dollar Stores of Indiana, Inc.*, 103 F.3d 576, 580 (7th Cir. 1996). Further, as shown in *Vega v. Chicago Park District*, 954 F.3d 996 (7th Cir. 2020), garden variety compensatory damages without medical records and expert testimony can reach the statutory maximum. The May 3rd Order completely ignores these legal principles and discounts the following evidence from both Duis and Renee Salmi:

    - Duis, as the sole provider of her family, cried and cried, she was devastated and heartbroken;
    - Duis started having panic attacks, losing weight, could not eat, and was terrified as this was her first nursing job;
    - Duis was especially anxious as to how someone would hire a nurse six months pregnant;
    - Duis was having a lot of anxiety, could not eat, could not sleep, and her blood pressure was through the roof that culminated in her being hospitalized four times in July;
    - Salmi verified that Duis was upset and extremely depressed; and
    - Salmi verified that Duis had blood pressure problems, it was hard for her to function, and Duis stated many times that if it was not for her baby and her son, she did not want to live.

For each piece of disputed evidence identified above, the jury had a rational basis to find in favor of Duis. The May 3rd Order violates the following three (3) basic legal principles articulated in *Latino*, *Whitehead*, and *Galvan*: (1) deference should be given to the jury's verdict and credibility determinations, especially with he-said-she-said disputes – none was given here; (2) the Court cannot discount evidence, for purposes of seeing if the verdict was against the manifest/overwhelming weight of the evidence, unless the jury's determinations are indisputably false with 100% objective proof – the Court discounted numerous pieces of critical evidence without indisputable proof of falsity; and (3) the Court cannot substitute its own judgment for that of the jury based on what it subjectively believes to be common sense, fair minded, logical, human, rational, more probable, or even the Judge's belief that a witness is lying under oath and committing perjury – the May 3rd Order did exactly this, rather than simply asking whether the jury had a rational basis to come to its conclusion, which it did. Even Judge Simon's Order on summary judgment in this case recognized that a *jury* was needed to resolve factual disputes, not the Court:

> Duis has pointed to evidence that, if credited by a *jury*, is evidence of a discriminatory intent. This comes in the form of statements made by her manager as things started to unravel for her on the job . . . if the *jury* believes Duis and therefore disbelieves Steinhilber, this is strong evidence of discriminatory intent . . . Any arguments about the ridiculousness of an HR manager making such a comment have to be left to a *jury* . . . There are clearly two accounts of what is going on here, and the *jury* is going to have to work out who it believes . . . 'the issue of whether the employer discriminated against the plaintiff is to be determined by the *jury* – not the court.'

[Dkt. 42, pp. 12-16, emphasis added].

7.    Even hypothetically ignoring these three (3) legal principles, permitting the Court to draw all credibility determinations against Duis/the jury's verdict, and even taking all of the disputed evidence off the scales, then the *manifest* weight of the evidence still does not sit with

Defendant. Judge Hamilton, now on the Seventh Circuit, described this standard as "a substantial burden [and] . . . [t]he issue is whether the evidence was so lopsided that the verdict was contrary to the manifest weight of the evidence." *Walberry v. Trustees of Indiana University*, 1:04-cv-0848 (S.D. Ind. July 20, 2006). In *Latino*, the Seventh Circuit described this standard as "where the verdict, on the record, cries out to be overturned or shocks our conscience." *Latino v. Kaizer*, 58 F.3d 310, 315 (7th Cir. 1995). The record, therefore, must be overwhelmingly lopsided in favor of Defendant. Defendant does not even believe the evidence is overwhelmingly in their favor, as Defendant did not even move for a directed verdict on liability, nor did Defendant argue post-trial that the verdict was against the manifest weight of the evidence. For example, the following facts are undisputed, even if the Court construes every piece of evidence against Duis/the jury's verdict and takes such evidence off the scales:

- Duis was pregnant at the time of termination.
- Duis was never progressively or formally disciplined, or placed on any sort of performance improvement plan, prior to her suspension and termination. In fact, the first time Duis was ever made aware of any alleged performance problems, she had already been suspended.
- Duis received satisfactory evaluations throughout her employment, even as a Charge Nurse.
- The alleged incidences that occurred preceding Duis' termination did not result in any discipline of Duis at the time, and management never even confronted Duis about those alleged incidences.
- Defendant did not obtain signed witness statements against Duis on these alleged prior incidences until after Duis had suffered a panic attack on April 9th for fear of suffering a miscarriage and after Duis had complained to Scott about Steinhilber.
- Defendant did not investigate Duis' claims against Linda Steinhilber.
- Instead, Dawn Scott informed Steinhilber that Duis was in her office, complained about her, and was going to HR to file a grievance against her.
- Thereafter, Defendant permitted Steinhilber to continue to conduct her investigation into Duis, even though Defendant admitted that Steinhilber had a conflict of interest.
- Steinhilber conducted the entire investigation, interviewed the witnesses, including Kim Buchanon, but did not relay the testimony of Buchanon, nor did she request a written statement from Buchanon. Instead, she ignored it.
- Management and HR outside of Steinhilber did nothing to vet the accuracy and reliability of Steinhilber's investigation into Duis.

- Steinhilber made the recommendation and ultimate decision to terminate Duis. However, Steinhilber and all of Defendant's witnesses, except for Nita Wirkus, claimed it was a "collaborative" decision and none could recall who ultimately made the decision.
- The termination paperwork explicitly stated, "Taryn stated she said she couldn't wait until October to be on maternity leave." Management admitted this was improper. Further, Defendant attempted to explain this away by stating it was merely documenting Duis' statements, yet Defendant admitted that not all of her statements made it into that termination form, *only if it was important*.
- Nita Wirkus attempted to testify, in contradiction of her sworn interrogatories, that she was the ultimate decision-maker. When confronted with her prior testimony, she admitted she was wrong and claimed that Steinhilber was the ultimate decision-maker.
- Profanity at work was commonplace. Even Steinhilber admitted to using profanity.
- The undisputed record (contrary the Court's May 3rd Order) shows that Dawn Scott and other similarly situated comparators <u>did</u> receive progressive discipline for comparable, if not much worse, behavior as cited above.
- The May 3rd Order states "[t]he composition of the nursing staff makes the verdict problematic." But that is not the legal standard to Order a new trial. Further, in terms of statistics, the undisputed record also established that while Steinhilber was over the PCU, only one nurse (Duis) was pregnant and requested FMLA, and that one employee was terminated.
- Multiple witnesses also verified that Steinhilber's disciplinary decisions have never been overruled by Defendant's HR or upper management.

As shown here, the evidence is not overwhelmingly lopsided in favor of Defendant, even if credibility determinations are made against Duis and even if the disputed evidence is taken off the scales.

8.  Third, the Court again violated the standard of review when granting judgment as a matter of law to Defendant on punitive damages. Defendant did not even seek judgment as a matter of law in its Rule 59 post-trial motion. When deciding judgment as a matter of law, there is absolutely no ability by the Judge to re-weigh the evidence or make credibility determinations in place of the jury. *Gower v. Vercler*, 377 F.3d 661, 666 (7th Cir. 2004). Under Fed. R. Civ. P. 50(b) the Court "must construe the facts strictly in favor of the party that prevailed at trial." *Schandelmeier-Bartels v. Chic. Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011). Based on this

standard and construing the facts in a light most favorable to Duis' verdict, the Court cannot find good faith efforts to enter judgment as a matter of law on punitives because, *inter alia*:

- Travis Thatcher-Curtis ignored Duis' texts for help.
- Dawn Scott failed to investigate Duis' complaints of discrimination and harassment, and instead warned Steinhilber that Duis was in her office and was going to HR to file a grievance against her.
- HR then refused to meet with Duis and her mother, thereby preventing Duis from formally filing a grievance of pregnancy discrimination and harassment against Duis.
- Not only did Steinhilber make inappropriate statements showing bias against Duis because of her pregnancy to both Kim Buchanon and Duis, but Jessica Smosna also uttered such inappropriate statements.
- Management and HR completely ignored Duis' concerns, yet permitted Steinhilber to control the entire investigation and make the ultimate decision to terminate Duis, without taking any efforts to test the reliability of her investigation results.
- Then management and HR played the familiar game of hide-the-decision-maker, resulting in purported lack of memory combined with outright impeachment of Ms. Wirkus.
- On top of all of this, non-pregnant comparators, such as Dawn Scott, Melissa Roberts, and Celeste Reed, received progressive discipline for similar (if not much worse) behavior.

The May 3rd Order ignored all of these facts, which must be accepted as true if the Court is applying a Rule 50(b) analysis. Further, the presence of an anti-discrimination policy, alone, does not insulate an employer from liability for punitive damages. *See EEOC v. Mgmt. Hosp. of Racine, Inc.,* 666 F.3d 422, 438 (7th Cir. 2012) (noting that the existence of anti-discrimination policies "is not sufficient in and of itself to insulate an employer from a punitive damages award. Otherwise, employers would have an incentive to adopt formal policies in order to escape liability for punitive damages, but they would have no incentive to enforce those policies.").

9. Accordingly, the Court's Order dated May 3, 2023, should be vacated and/or at the minimum amended to offer Duis an option of remittitur. Notably, either option resurrects Plaintiff's other post-trial motions and requires the new trial date to be vacated.

                Respectfully Submitted,

                */s/ Ryan C. Fox (w/perm)*
                Ryan C. Fox

                */s/ Ryan P. Sink*
                Ryan P. Sink

                Attorneys for Plaintiff

                Fox & Sink, LLC
                6177 North College Avenue
                Indianapolis, Indiana 46220
                rsink@foxsinklaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing document was served this 19th day of May, 2023, by the Court's electronic filing system to the following counsel of record:

Amy J. Adolay: aadolay@kdlegal.com
Elizabeth M. Roberson: eroberson@kdlegal.com
Robert A. Anderson: randerson@kdlegal.com

                */s/ Ryan C. Fox (w/perm)*
                Ryan C. Fox

                */s/ Ryan P. Sink*
                Ryan P. Sink

                Attorneys for Plaintiff